## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

———————————————————————

SHERYL WULTZ, et al.

                    Plaintiffs,

                                                    Civil File No. 1:08-cv-01460 (RCL)

        v

THE ISLAMIC REPUBLIC OF IRAN,

et al.,

                    Defendants.

———————————————————————

## DEFENDANT BANK OF CHINA LIMITED'S
## MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Defendant Bank of China Limited ("BOC") hereby moves this Court for an order

granting BOC's motion to dismiss the First Amended Complaint as it applies to BOC.

This motion is made pursuant to Fed. R. Civ. P. 12(b)(1), Fed. R. Civ. P. 12(b)(2), and

Fed. R. Civ. P. 12(b)(6).  The grounds for this motion are set forth in the accompanying

memorandum of points and authorities.

This motion is based on the memorandum of points and authorities and the supporting

declarations of Walter P. Loughlin, Peter Gad Naschitz, Wang Lijun and Charles W. Freeman

III that are served and filed herewith.

A proposed order is attached.

Respectfully submitted,


Dated: March 5, 2009


By: /s/ Walter P. Loughlin _____          By: /s/ Mitchell R. Berger __
    Walter P. Loughlin                        Mitchell R. Berger (D.C. Bar No. 385467)
K&L Gates LLP                               Patton Boggs LLP
599 Lexington Avenue                        2550 M Street, N.W.
New York, New York 10022-6030               Washington, D.C. 20037
Telephone: (212) 536-3900                   Telephone: (202) 457-5601
Facsimile: (212) 536-3901


Co-counsel for Defendant Bank of China Limited

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

_____

SHERYL WULTZ, et al.

                Plaintiffs,

      v.

THE ISLAMIC REPUBLIC OF IRAN,

et al.,

                Defendants.

_____

Civil File No. 1:08-cv-01460 (RCL)

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT BANK OF CHINA LIMITED'S
## MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

K&L GATES LLP

Walter P. Loughlin
599 Lexington Avenue
New York, New York 10022-6030
Telephone: (212) 536-3900

PATTON BOGGS LLP

Mitchell R. Berger
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-5601

Co-counsel for Defendant Bank of China Limited

**Table of Contents**

Page

INTRODUCTION ................................................................................................. 1

I.    PLAINTIFFS LACK STANDING BECAUSE THEIR INJURIES ARE NOT
      "FAIRLY TRACEABLE" TO BOC'S CONDUCT............................................ 4

II.   THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE FAC
      PRESENTS NONJUSTICIABLE ISSUES .................................................... 5

III.  THE FAC AGAINST BOC MUST BE DISMISSED FOR LACK OF PERSONAL
      JURISDICTION ...................................................................................... 12

      A.    BOC Lacks the Requisite Contacts With the District of Columbia........... 12

      B.    BOC Has No Minimum Contacts Under D.C.'s Long-Arm Statute.......... 13

      C.    The "National Contacts" Test Does Not Establish Personal
            Jurisdiction Over BOC.................................................................... 13

      D.    Any Exercise of Personal Jurisdiction Over BOC Here Would Violate
            Due Process................................................................................... 15

IV.   THE FAC FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE
      GRANTED AS TO THE BANK OF CHINA ................................................ 18

      A.    Plaintiffs Have Not Stated a Claim Against BOC Under the Anti-
            Terrorism Act................................................................................. 19

      B.    The Plaintiffs' Implausible Chain of Incorporation:  Several Links
            Too Far.......................................................................................... 20

      C.    The FAC Fails to State a Claim With Respect to the Essential State of
            Mind Elements of the Anti-Terrorism Act Cause of Action.................... 23

V.    THE FAC'S ALLEGATION THAT BOC AIDED AND ABETTED A VIOLATION
      OF THE ANTI-TERRORISM ACT SHOULD BE DISMISSED ...................... 28

VI.   THE ISRAELI CAUSES OF ACTION ALLEGED IN THE FAC FAIL TO STATE
      A CLAIM UPON WHICH RELIEF CAN BE GRANTED ............................. 29

      A.    The First Cause of Action, for Negligence, Fails to State a Claim............ 31

            1.    Duty of Care:  The Bank of China Has No Duty of Care,
                  Under the Law of Israel, to the Plaintiffs..................................... 32

            2.    Applying These Legal Standards to Banks..................................... 35

3.   Causation:  The Bank of China Did Not Proximately Cause the Plaintiffs' Alleged Damages ........................................................36

B.   The Breach of Statutory Duty Cause of Action Fails to State a Valid Legal Claim .......................................................................................38

1.   The FAC Fails to Meet the Requirements of § 13 of the Penal Law ...................................................................................................39

2.   The Emergency Defense Regulations and Penal Law Provisions Protect Governmental, Not Private, Interests .............39

3.   The FAC Fails to Satisfy the Double Actionability and Double Criminality Requirements Under Israeli Law ...............................40

4.   The Specific Criminal Laws Cited in Count Five Do Not Apply to BOC .....................................................................................41

a)   Section 4 of the Prevention of Terrorism Ordinance .................................................................41

b)   Sections 145-148 of the Penal Law .......................42

c)   Section 85 of the Emergency Defense Regulations ..........................................................42

C.   The Sixth Cause of Action, Alleging Vicarious Liability, Fails to State a Claim ......................................................................................43

CONCLUSION................................................................................................ 45

## Table of Authorities

### U.S. CASES

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*,
No. 98 Civ. 7766 (PAC), 2008 WL 2787981 (S.D.N.Y. July 17, 2008) ..........................26

*Allen v. Wright*,
468 U.S. 737 (1984)................................................................................................. 4

*Ange v. Bush*,
752 F. Supp. 509 (D.D.C. 1990) ........................................................................ 9, 10

*Bailey v. J&B Trucking Servs.*,
No. 08-644 (RMC), 2008 U.S. Dist. LEXIS 97447  (D.D.C. Dec. 2, 2008) ............. 30, 32

*Baker v. Carr*,
369 U.S. 186 (1962)...................................................................................... 6, 8, 9,10

*Bancoult v. McNamara*,
445 F.3d 427 (D.C. Cir. 2006) ............................................................................. 9

*Beer v. Islamic Republic of Iran*,
574 F. Supp. 2d 1 (D.D.C. 2008) .........................................................................30

*Bell Atl. Corp. v. Twombly*,
127 S. Ct. 1955 (2007).................................................................................... 18,19

*Biton v. Palestinian Interim Self-Gov't Auth.*,
310 F. Supp. 2d 172 (D.D.C. 2004) .............................................................. 11,14,15

*Boim v. Holy Land Found. for Relief and Dev.* ("BOIM III"),
549 F.3d 685 (7th Cir. 2008) .................................................. 19, 23, 29, 30, 36

*Brady Campaign to Prevent Gun Violence v. Ashcraft*,
239 F. Supp.2d 68 (D.D.C. 2004) ......................................................................... 4

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)........................................................................................ 17

*Burnett v. Al Baraka Inv. & Dev. Corp.* ("Burnett I"),
274 F.Supp. 2d 86 (D.D.C. 2003) ................................................................. 14, 30

*Burnett v. Al Baraka Inv. & Dev. Corp.* ("Burnett II"),
292 F. Supp. 2d 9 (D.D.C. 2003). ....................................................................... 14

*Carnegie Mellon Univ. v. Cohill*,
   484 U.S. 343 (1988) ................................................................. 29

*Coleman v. Miller*,
   307 U.S. 433 (1939) ................................................................. 10

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*,
   331 F.3d 918 (D.C. Cir. 2003) ................................................... 10

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ................................................................... 9

*Doe I v. State of Israel*,
   400 F. Supp. 2d 86 (D.D.C. 2005) ............................................. 12

*Elmaliach v. Bank of China Ltd.*,
   No. 102026/09 (Sup. Ct. N.Y. Cty. filed Feb. 12, 2009) ............... 15

*Estate of Klieman v. Palestinian Auth.*,
   424 F. Supp. 2d 153 (D.D.C. 2006) ........................................... 11

*Estate of Klieman v. Palestinian Auth.*,
   467 F. Supp. 2d 107 (D.D.C. 2006) ........................................... 14

*First Chi. Int'l v. United Exch. Co.*,
   836 F.2d 1375 (D.C. Cir. 1988) ................................................. 12

*Formica v. Cascade Candle Co.*,
   125 F. Supp. 2d 552 (D.D.C. 2001) ........................................... 17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................... 4

*FW/PBS, Inc. v. Dallas*,
   493 U.S. 215 (1990) ................................................................... 4

*\*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
   422 F. Supp. 2d 96 (D.D.C. 2006) ............................. 11, 12, 14, 15, 16, 17

*Gonzalez-Vera v. Kissinger*,
   449 F.3d 1260 (D.C. Cir. 2006) ................................................... 9

*Greenberg v. Bush*,
   150 F. Supp. 2d 447 (E.D.N.Y. 2001) .......................................... 5

*Gurary v. Winehouse,*
  270 F. Supp. 2d 425 (S.D.N.Y. 2003)............................................................26

*Haig v. Agee,*
  453 U.S. 280 (1981)............................................................................... 9

*Halberstam v. Welch,*
  705 F.2d 472 (D.C. Cir. 1983)................................................................. 44

*Harbury v. Hayden,*
  522 F.3d 413 (D.C. Cir. 2008).................................................................. 9

*Hundley v. District of Columbia,*
  494 F.3d 1097 (D.C. Cir. 2007)............................................................... 36

*In re Colombian Coffee Co., Inc.,*
  75 B.R. 177 (S.D. Fla. 1987) ................................................................. 31

*In re Terrorist Attacks on Sept. 11, 2001,*
  No. 03 MDL 1570 (GBD)(FM), 2007 WL 2907278 (S.D.N.Y. Oct. 5, 2007)........... 18, 30

*\*In re Terrorist Attacks on September 11, 2001,*
  349 F. Supp. 2d 765 (S.D.N.Y. 2005)........................................................ 24

*\*Int'l Shoe Co. v. Wash., Office of Unemployment Comp. & Placement,*
  326 U.S. 310 (1945)........................................................................... 17

*Jaroslawicz v. Safety Kleen Corp.,*
  151 F.R.D. 324 (N.D. Ill. 1993).............................................................26

*Khulumani v. Barclay Nat'l Bank Ltd.,*
  504 F.3d 254 (2d Cir. 2007)................................................................. 44

*Kirschenbaum v. Islamic Republic of Iran,*
  572 F. Supp. 2d 200 (D.D.C. 2008) ...........................................................30

*Klinghoffer v. S.N.C. Achille Lauro,*
  937 F.2d 44 (2d Cir. 1991)................................................................... 11

*Knox v. Palestine Liberation Org.,*
  306 F. Supp. 2d 424 (S.D.N.Y. 2004)......................................................... 11

*Kolari v. New York-Presbyterian Hosp.,*
  455 F.3d 118 (2d Cir. 2006).................................................................. 29

*Kowal v. MCI Commc'ns Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994)............................................................ 18

*Lowry v. Reagan*,
  676 F. Supp. 333 (D.D.C. 1987) ......................................................... 8

*Mahorner v. Bush*,
  224 F. Supp. 2d 48  (D.D.C. 2002) ..................................................... 6

*Mastafa v. Australian Wheat Bd. Ltd.*,
  No. 07 Civ. 7955(GEL), 2008 WL 4378443 (S.D.N.Y. Sept 25, 2008) ......................... 24

*Mountain States Legal Found. v. Bush*,
  306 F.3d 1132 (D.C. Cir. 2002) ........................................................ 18

*Nat'l Cmty. Reinvestment Coal. v. Nat'l Credit Union Admin.*,
  290 F. Supp. 2d 124 (D.D.C. 2003).....................................................2

*Nix v. Hoke*,
  62 F. Supp. 2d 110 (D.D.C. 1999)......................................................13

*Park v. Hyatt Corp.*,
  436 F. Supp. 2d 60 (D.D.C. 2006)...................................................... 28

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
  244 F. Supp. 2d 289 (S.D.N.Y. 2003)................................................... 26

*Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*,
  119 F.3d 935 (11th Cir. 1997) ......................................................... 30

*Rimkus v. Islamic Republic of Iran*,
  575 F. Supp. 2d 181 (D.D.C. 2008)..................................................... 30

*Schneider v. Kissinger*,
  412 F.3d 190 (D.C. Cir. 2005).......................................................... 9

*Second Amendment Found. v. United States Conference of Mayors*,
  274 F.3d 521 (D.C. Cir. 2001).......................................................... 12

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976)..................................................................... 4

*Stutts v. De Dietrich Group*,
  No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006)...............23, 24, 30

*United Mine Workers v. Gibbs,*
   383 U.S. 715 (1966) ............................................................................................... 29

*United States v. Curtiss-Wright Exp. Corp.,*
   299 U.S. 304 (1936) ................................................................................................. 9

*Ungar v. Islamic Republic of Iran,*
   211 F. Supp. 2d 91 (D.D.C. 2002) ........................................................................ 44

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
   454 U.S. 464 (1982) .................................................................................................. 4

*Wald v. Costco Wholesale Corp.,*
   No. 03 Civ. 6308 (JSR), 2005 WL 425864 (S.D.N.Y. Feb. 22, 2005) ............................26

*World Wide Minerals, Ltd. v. Republic of Kazakhstan,*
   296 F.3d 1154 (D.C. Cir 2002) .............................................................................. 25

*W.S. Kirkpatrick Co. v. Envtl. Tectonics Corp., Int'l,*
   493 U.S. 400 (1990) .................................................................................................8

*Zivojinovich v. Barner,*
   525 F.3d 1059 (11th Cir. 2008) ..............................................................................32

## ISRAELI CASES

*Ayalon Insurance Company Ltd. v. Executor of Oppalger Estate*
   [2004] IsrSC 59(2) 349. ......................................................................................... 35

*Barclays Discount Bank  v. Frost Kostman*
   [1993] IsrSC 47(5) 31 ............................................................................................ 35

*Rav Bariach Ltd. v. Havshush Vehicle Accessory Trading House Ltd.*
   [2001] IsrSC 55(5) ................................................................................................ 43

*State of Israel v. Levy*
   [1994] IsrSC 48(3) ................................................................................................. 34

*Vaknin v. Beit Shemesh Local Council*
   [1982] IsrSC 37(1). ................................................................................. 33, 34, 36, 37

## STATUTES

*18 U.S.C. § 2331.............................................................................................. 6, 20, 22

*18 U.S.C. § 2332.............................................................................................. 20, 23

18 U.S.C. § 2333......................................................................... 2, 3, 6, 15, 20, 22

18 U.S.C. § 2339A........................................................................................ 20, 22, 23

18 U.S.C. § 2339B.................................................................................................. 22

18 U.S.C. § 2339C.................................................................................................. 22

28 U.S.C. § 1391(f)(4)...........................................................................................16

D.C. Code § 13-422 (2001)...................................................................................12

D.C. Code § 13-423 (2001)................................................................................... 13

Fed. R. Civ. P. 8................................................................................................... 18

Fed. R. Civ. P. 12(b)(6)........................................................................................ 18

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

———————————————————

SHERYL WULTZ, et al.

               Plaintiffs,

     v.

THE ISLAMIC REPUBLIC OF IRAN,

et al.,

               Defendants.

Civil File No. 1:08-cv-01460 (RCL)

———————————————————

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT BANK OF CHINA LIMITED'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

### INTRODUCTION

The First Amended Complaint ("FAC") alleges that "a suicide bombing carried out by the Palestine Islamic Jihad ("PIJ") terrorist organization on April 17, 2006, in Tel Aviv, Israel" injured Plaintiff Yekutiel Wultz and his son, Daniel Wultz, and led to Daniel Wultz's death. (FAC ¶¶ 1, 3). Plaintiffs seek to hold the Bank of China Limited ("BOC") liable for damages arising from this terrorist violence. While one feels deep sympathy for the Wultz family and outrage at the barbarism of this terrorist atrocity, the effort to hold BOC legally responsible for this suicide bombing is factually irrational and legally defective.

Through a combination of reckless speculation and the recitation of statutory boilerplate, the FAC alleges that BOC, the fifth largest commercial bank in the world,[1] is liable for the

---

[1]    *See* http://financialranks.com. Bank of China is not alleged to have any connection with the April 17, 2006 bombing in Tel Aviv other than its provision of routine banking services, *i.e.*, wire transfer facilities, to a single bank customer at a single branch in Guangzhou, China. (FAC ¶ 69).

1

damages suffered by the Wultz family solely on the basis of BOC's provision of routine wire transfer facilities to and from the accounts of a single bank customer at one of the approximately 10,000 BOC branches in China,[2] a customer (identified in the FAC as Said al-Shurafa) who is not, and was not previously, designated as a terrorist by a U.S. or other government organization.[3]

The specific claims against BOC are based on the Israeli tort causes of action of negligence (Count Four), breach of statutory duty (Count Five), and vicarious liability (Count Six). The FAC also alleges that BOC's provision of wire transfer facilities in connection with the al-Shurafa accounts constituted and aided and abetted "acts of international terrorism," in violation of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333 (Counts Two and Three), a primarily criminal statute which provides, at section 2333(a), a civil remedy -- including treble damages and attorneys' fees -- for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism." (FAC ¶¶ 113, 122).

There are multiple legal deficiencies in the FAC which require its dismissal.

---

[2]     Bank of China Limited, 2007 Summary Annual Report iv (2007) at 75.

[3]     Plaintiffs described Mr. al-Shurafa in their initial Complaint as "a senior operative and agent of the PIJ" (Compl. ¶ 69), the terrorist organization alleged to be responsible for the April 17, 2006 suicide bombing. The FAC has now elevated his status and modified his terrorist identity so that now he is alleged to be "a senior officer and agent *both* of the PIJ and of the Hamas terrorist organization." (FAC ¶ 69) (emphasis added). Regardless of the evolving nature of these allegations, this individual's name does not appear on the Office of Foreign Asset Control ("OFAC") list of designated terrorists. OFAC, which is part of the U.S. Department of Treasury, maintains a list of restricted parties in a document called the Specially Designated Nationals SDN List available at the OFAC website. www.ustreas.gov/offices/enforcement/ofac/sdn; *see* 31 C.F.R. Ch. V, Appendix A. In the absence of a match between a bank customer's name and the SDN list, or other authority, such as a court order, a bank is not free to block transfers to or from a customer's account and a correspondent bank. *See generally* OFAC Regulations for the Financial Community available on the OFAC website; 31 C.F.R. Ch. V; *see also Nat'l Cmty. Reinvestment Coal. v. Nat'l Credit Union Admin.*, 290 F. Supp. 2d 124, 131 (D.D.C. 2003) (upon examining motions to dismiss, courts may consider matters of public record and matters of which courts can take judicial notice in addition to considering the facts alleged in the complaint).

*First*, Plaintiffs do not have Article III standing to sue BOC because their injuries are not "fairly traceable" to the wire transfers. BOC has no connection with the terrorists who planned and carried out the April 17, 2006 suicide bombing in Tel Aviv. Nor does the FAC allege any such connection. BOC has no connection with the numerous Iranian and Syrian named defendants. Nor does the FAC allege any such connection. Because the FAC does not plausibly allege that the single suicide bombing on April 17, 2006 would not have occurred without the wire transfers executed by a single BOC branch, Plaintiffs do not have standing.

*Second*, the Court lacks subject matter jurisdiction over the allegations that BOC violated the Anti-Terrorism Act, 18 U.S.C. § 2333, or Israeli law by financing terrorism at the behest of the PRC government. These allegations involve political questions implicating issues of foreign relations which are not judicially cognizable.

*Third*, the Plaintiffs have commenced this action in a jurisdiction that has no connection with BOC's alleged conduct or the Plaintiffs' injuries, and where BOC has no minimum contacts. Accordingly, there is no lawful basis for the exercise of personal jurisdiction over BOC in this case. Indeed, as shown below, the conduct of counsel for the Plaintiffs with respect to the issue of jurisdiction in connection with both this and a simultaneously-filed second action against BOC, involving nearly identical claims and allegations, has been characterized by abusive maneuvering and forum-shopping.

*Fourth*, all of the counts in the FAC in which BOC is alleged to have violated Israeli or U.S. law are legally insufficient in that they fail to state a claim upon which relief can be granted.

**I.**

## PLAINTIFFS LACK STANDING BECAUSE THEIR INJURIES ARE NOT "FAIRLY TRACEABLE" TO BOC'S CONDUCT

Plaintiffs do not have standing to sue BOC based on its provision of routine wire transfer facilities to a single bank customer. The Constitution limits a federal court's power to resolving "cases" and "controversies." U.S. Const. Art. III, § 2; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). The doctrine of "standing" is one of the "most important" components of the "case or controversy" requirement. *Allen v. Wright*, 468 U.S. 737, 750 (1984). Because standing is a jurisdictional prerequisite, the FAC must allege facts establishing Plaintiffs' standing. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

To establish standing, the FAC must allege that (1) Plaintiffs "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) *the injury is fairly traceable to the challenged action of the defendant*; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (emphasis added); *Allen*, 468 U.S. at 751 ("personal injury fairly traceable to the defendant's allegedly unlawful conduct" must be alleged). The "fairly traceable" requirement tests whether "the line of causation between [defendant's allegedly] illegal conduct and [plaintiffs'] injury [is] too attenuated." *Allen*, 468 U.S. at 752. There is no standing where it is "purely speculative" that the injury can be fairly traced to "the challenged action of the defendant," as opposed to "the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *Brady Campaign to Prevent Gun Violence v. Ashcraft*, 239 F. Supp.2d 68, 77 (D.D.C. 2004) ("the attenuation of the causal link between the injury and the

4

defendants' challenged conduct is central to a determination concerning the traceability/redressibility requirement").

Standing cannot be established here because Plaintiffs' alleged injuries are too causally attenuated from the wire transfers allegedly executed by the Guangzhou branch of BOC. There are innumerable third parties without whose "independent action" Plaintiffs would not have been injured -- starting with the individual PIJ members who allegedly planned and carried out the April 17, 2006 suicide bombing. *See Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001) (dismissing for lack of standing a claim that American foreign policy resulted in terrorist attacks in Israel because "[i]t would be difficult to imagine a clearer example of a third party's actions breaking the causal chain").

There can be no genuine claim that PIJ lacked the means to finance and carry out the April 17, 2006 bombing without the wire transfers from Guangzhou. Nor does the FAC even so allege. The FAC's implausible conclusory assertions that the wire transfers "enable[d]" PIJ to carry out the attacks, (*e.g.*, FAC ¶ 72) are plainly insufficient. Rather, "Plaintiffs must satisfy the burden of alleging *facts* from which it could be reasonably inferred that, absent Defendants' unlawful acts, there is a substantial probability that Plaintiffs would not have been [attacked] by a third party." *Greenberg*, 150 F. Supp. 2d at 455 (emphasis added). Because the FAC fails to satisfy this burden, the Plaintiffs' injuries cannot be "fairly traced" to BOC. Consequently, the Plaintiffs lack Article III standing to bring this action against BOC.

## II.

### THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE FAC PRESENTS NONJUSTICIABLE ISSUES

In the unlikely event the Court determines that the Plaintiffs have standing to sue BOC, the FAC must nonetheless be dismissed on the ground that the Court lacks subject matter

jurisdiction because Plaintiffs raise nonjusticiable issues related to the conduct of foreign affairs which are constitutionally committed to the political branches of government and which are not suitable for judicial resolution. *Baker v. Carr*, 369 U.S. 186 (1962); *see Mahorner v. Bush*, 224 F. Supp. 2d 48, 49, 52-53 (D.D.C. 2002) (the "political question doctrine" deprives federal courts of subject matter jurisdiction).

The FAC's theory of BOC's liability presents political questions which make it impossible for the Court to avoid entanglement in issues involving the internal and external political policies of China, Israel, and the United States.  The FAC acknowledges Plaintiffs' burden to plead and prove that BOC engaged in "'acts of international terrorism' as defined in 18 U.S.C. §§ 2331 and 2333." (FAC ¶ 113).  However, Plaintiffs' core allegations of "international terrorism" all implicate alleged actions by the government of the People's Republic of China ("PRC") in the conduct of its foreign policy, and the alleged "approval of the PRC" of BOC's allegedly unlawful actions in China.  (FAC ¶¶ 77, 112).  This Court, therefore, cannot adjudicate the essential element of "international terrorism" without passing judgment on the alleged actions of the government of the PRC.

Specifically, the FAC alleges that BOC illegally financed terrorist activity because the Chinese government directed BOC's actions "so as to facilitate the PIJ's use of terrorism to intimidate the Israeli government and public" (FAC ¶ 112(f)), and the Chinese government required BOC to "support and advance the policies and goals of the Party and the Central Government" (FAC ¶ 112(c)), "including the Party's and Central Government's policies and goals vis-à-vis the PIJ and Hamas and their terrorist activities." (FAC ¶ 112(e)).  Further, the FAC alleges the following issues which "lie[] beyond judicial cognizance," *Baker*, 369 U.S. at 211:

- "The PRC considers itself a potential rival and competitor of the United States." (FAC ¶ 112(a)).

- The PRC seeks to "undermine [the position] of the United States . . ." and "undermine [Israel,] an ally of the United States."  (FAC ¶ 112(a)-(b)).

- "The PRC is an authoritarian state whose citizens and enterprises are expected and required to support and advance the policies and goals of the Party and the Central Government."  (FAC ¶ 112(c)).

- "BOC acted to advance the Party's and Central Government's policies and goals, including the Party's and Central Government's policies and goals vis-à-vis the PIJ and Hamas and their terrorist activities."  (FAC ¶ 112(e)).

- "In April 2005, officials of the counterterrorism division of the Office of the Prime Minister of the State of Israel (collectively hereafter: "Israeli officials") met with officials of the PRC's Ministry of Public Security and the PRC's central bank (collectively hereinafter: "PRC officials") . . . ."  (FAC ¶ 77).

- "[T]he PRC officials notified the BOC of the Israeli officials' statements that the PIJ Transfers were being made by the PIJ for the purpose of carrying out terrorist attacks and that the PIJ Transfers enhanced the PIJ's ability to plan, prepare for and carry out such attacks.  At the same time (i.e. in April 2005) the PRC officials also notified BOC of the Israeli officials' demand the BOC halt the PIJ Transfers, but the BOC (with the approval of the PRC) ignored this demand and continued to carry out further PIJ Transfers . . . ."  (*Id.*).

Accordingly, the FAC alleges pervasive issues that are barred from judicial consideration by the political question doctrine.  As these allegations demonstrate, the central theory of

Plaintiffs' Anti-Terrorism Act claim is that BOC was required to, and did, act in a manner consistent with the alleged political and policy goals of the government of the PRC.[4] As the accompanying Declaration of Professor Charles W. Freeman III demonstrates, these allegations are contrary to the facts with respect to foreign relations between and among the PRC, Israel and the United States, as well as with respect to the nature of the PRC government in relation to banking institutions. Moreover, as Professor Freeman concludes, litigation of and judicial determinations on these issues would represent an encroachment by the courts on the political branches with respect to important and sensitive foreign policy issues.

These are precisely the dangers that the political question doctrine seeks to avoid. Justice Brennan's opinion in *Baker v. Carr*, 369 U.S. at 217, identifies the "classic catalogue of conditions to which the political question doctrine applies," *Lowry v. Reagan*, 676 F. Supp. 333, 339 (D.D.C. 1987):

> [p]rominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Application of the *Baker v. Carr* criteria to the matters which lie at the heart of the FAC's theory of liability against BOC leads to the conclusion that the FAC presents nonjusticiable political questions. The first issue under the *Baker v. Carr* formulation of the doctrine is whether

---

[4]      As noted below, these allegations also threaten to plunge the Court into determinations about the legality of an alleged "official act of a foreign sovereign" barred by the Act of State doctrine. *W.S. Kirkpatrick Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990).

the allegations in the FAC involve issues which are constitutionally committed to a coordinate political department. The Supreme Court has long held that the Article 11 executive power is "plenary" over foreign affairs. *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936); *see Dames & Moore v. Regan*, 453 U.S. 654 (1981) (the conduct of foreign affairs is within the executive's broad constitutional authority). While the reference in those decisions to "plenary" executive power may be overbroad in relation to the constitutional powers of Congress, there can be no question that the power to conduct foreign affairs is constitutionally committed to the political branches. *See, e.g., Ange v. Bush*, 752 F. Supp. 509, 512 (D.D.C. 1990) ("[T]he Constitution appears to grant the executive and legislative branches certain powers which either directly or indirectly affect the conduct of foreign affairs.") (Lamberth, J.).

The political question doctrine has particular force in foreign relations. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."). The D.C. Circuit has repeatedly affirmed that foreign relations are "quintessential sources of political questions." *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006); *see, e.g., Harbury v. Hayden*, 522 F.3d 413 (D.C. Cir. 2008); *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260 (D.C. Cir. 2006); *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005).

The Plaintiffs' attempt to litigate the political policies and goals of the Chinese government with respect to other foreign powers, including the United States and Israel, its relationship to Chinese citizens and corporations in connection with its policies, the alleged communications between Israeli and Chinese counterterrorism officials, and the Chinese government's alleged disregard of Israeli government concerns about terrorism invite judicial

9

encroachment on matters assigned by the Constitution exclusively to the political branches of government.

The second "dominant" consideration related to the political question doctrine is whether there are "satisfactory criteria for a judicial determination" of the issues challenged as nonjusticiable. *Baker*, 369 U.S. at 210 (quoting *Coleman v. Miller*, 307 U.S. 433, 454-55 (1939)). As this Court has characterized this consideration, the question is whether "the judicial branch . . . is . . . equipped [or] empowered to intrude into the realm of foreign affairs where the Constitution grants operational powers only to the two political branches." *Ange*, 752 F. Supp. at 513. The political question doctrine applies when a case presents issues "of a kind for which the Judiciary has neither the aptitude, facilities nor responsibility and which ha[ve] long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Id.*

This case involves just such issues. It is difficult to discern "the satisfactory criteria for judicial determination" that the Court could utilize to rule on the FAC's PRC-centric theory of "international terrorism." What discovery will take place to develop evidence in support of, and in opposition to, the FAC's contentions about the Chinese government's policies with respect to Israel, the United States, terrorism, and counterterrorism? Do Plaintiffs expect the Court to require Chinese and Israeli government officials to produce documents in response to discovery requests, and to submit to depositions, on the subject of governmental policies and goals with respect to terrorism, including an exploration of the inner councils of these governments? If the Chinese, Israeli, or United States government fails to cooperate in providing such evidence, will the Court compel discovery and impose sanctions? *See, e.g., Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 928, 932, 935 (D.C. Cir. 2003) (rejecting FOIA request for information concerning the government's investigation of the September 11 attacks; "the

investigation and prevention of terrorism" is a "quintessential executive power"; "the role of the executive [is] to acquire and exercise the expertise of protecting national security"; "the judiciary is in an extremely poor position to second-guess the executive's judgment in this area of national security").

To be sure, there are cases decided in this Circuit and by other courts involving claims under the Anti-Terrorism Act where the invocation of the political question doctrine has been rejected and the issues in the case have been found to be justiciable. *See, e.g.*, *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 422 F. Supp. 2d 96 (D.D.C. 2006); *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153 (D.D.C. 2006); *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991); *Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424 (S.D.N.Y. 2004). These cases, however, are distinguishable from the allegations in the present case in that they arose from circumstances the courts regarded as involving only a political "backdrop," *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 184 (D.D.C. 2004), or the "politically charged context" of the Middle East conflict, *Klinghoffer*, 937 F.2d at 49, but did not require the adjudication of fundamentally political and nonjusticiable issues.

The present case, by contrast, clearly presents "intractable political questions." *Knox*, 306 F. Supp. 2d at 448-49. The determinative test of whether a case is justiciable is not how it is characterized, but the specific contentions put into dispute by the FAC's allegations. As shown above, the issues on which Plaintiffs rely to establish alleged violations of U.S. and Israeli law are profoundly political questions about the policies, goals, and internal government and intergovernmental communications about the issues of terrorism and counterterrorism. "The political question doctrine . . . is based upon respect for the pronouncements of coordinate branches of government that are better equipped and properly intended to consider issues of a

distinctly political nature." *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 111 (D.D.C. 2005).

Litigation of such issues is barred by the political question doctrine. *Id.* at 111-12.

    The Court should dismiss the FAC on the ground that it requires the adjudication of

nonjusticiable issues.

**III.**

**THE FAC AGAINST BOC MUST BE DISMISSED
FOR LACK OF PERSONAL JURISDICTION**

    The FAC alleges that BOC "is a corporation organized under the laws of the [PRC] and

headquartered [there]," has branches in New York and California, and that this Court has

jurisdiction over the defendants pursuant to "28 U.S.C. §§ 1330-1332, 1367, 1605A and U.S.C.

§§ 2333-2334." (FAC ¶¶ 24, 4).  However, the FAC does not specify how Plaintiffs intend to

meet their burden of establishing personal jurisdiction under the Anti-Terrorism Act or

otherwise. *See Gilmore*, 422 F. Supp. 2d at 99 ("To avoid dismissal of an [Anti-Terrorism Act]

action for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), 'a

plaintiff must make a *prima facie* showing of pertinent jurisdictional facts.'") (citation to internal

quotes omitted); *see also Second Amendment Found. v. United States Conference of Mayors*, 274

F.3d 521, 524 (D.C. Cir. 2001); *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1377-79

(D.C. Cir. 1988)

    **A.**    **BOC Lacks the Requisite Contacts With the District of Columbia**

    Under D.C. Code § 13-422 (2001), a court in the District of Columbia may exercise

general jurisdiction "as to any claim for relief" over a party outside the District of Columbia if

the party is "domiciled in, organized under the laws of, or maintaining his or its principal place

of business in, the District of Columbia."  The FAC does not allege that BOC meets any of these

statutory criteria.  Nor could it.  BOC is organized under the law of the PRC with its principal

12

place of business in China and – within the United States – has branches only in New York and California.  (FAC ¶ 24).

**B.      BOC Has No Minimum Contacts Under D.C.'s Long-Arm Statute**

Under D.C. Code § 13-423 (2001), a court may exercise personal jurisdiction over a nonresident party as to claims "arising from" conduct relating to the District.  However, none of the categories of conduct specified in the D.C. long-arm statute is at issue in this case.  The FAC alleges conduct related to a BOC customer's account in Guangzhou, China.  As the accompanying Declaration of Wang Lijun, BOC's General Manager of Overseas Business attests, BOC has no office or operations in the District of Columbia.[5]

**C.      The "National Contacts" Test Does Not Establish Personal Jurisdiction Over BOC**

In light of the FAC's failure to allege any contacts between BOC and the District of Columbia, Plaintiffs may contend that BOC's contacts with the United States as a whole determine the issue of personal jurisdiction because the Anti-Terrorism Act allows for nationwide service of process, or because of Rule 4(k)(2) of the Federal Rules of Civil Procedure.

Plaintiffs cannot rely on a "national contacts" approach to jurisdiction over BOC for several reasons.  As demonstrated below, the Anti-Terrorism Act fails to state a legally cognizable claim against BOC.  In the absence of this federal claim, which is subject to dismissal, the service of process provisions of that statute become inapplicable.  *See, e.g., Nix v. Hoke*, 62 F. Supp. 2d 110, 115 (D.D.C. 1999) (plaintiff cannot invoke RICO to establish personal

---

[5]      BOC has only three branches in the United States:  one in Los Angeles, California at 444 South Flower Street, Los Angeles, California 90071, one in Chinatown, New York at 42 East Broadway, New York, New York 10002, and one in midtown Manhattan at 410 Madison Avenue, New York, New York 10007.  *See* www.boc.cn/en/static/index.html (linkBOCNetwork).

jurisdiction over a defendant where complaint fails to state a RICO claim on which relief can be granted). None of the other claims in the FAC, which consist of statutory causes of action under the law of Israel, could even arguably involve a "contacts with the United States as a whole" test.

There are decisions in this District, with respect to defendants such as the Palestine Authority and defendants alleged to be associated with al Qaeda, where personal jurisdiction over nonresident defendants has been found on the basis of "national contacts." *See, e.g., Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107 (D.D.C. 2006); *Biton*, 310 F. Supp. 2d at 172; *Burnett I*, 274 F. Supp. 86 (D.D.C. 2003); *see Gilmore v. Palestinian Interim Self-Government Auth.*, 422 F. Supp. 2d 96 (D.D.C. 2006) (applying this approach); *Burnett v. Al Baraka Investment and Development Corporation* ("*Burnett II*"), 292 F. Supp. 2d 9 (D.D.C. 2003). However, these decisions generally involve international terrorist organizations or other primary participants in terrorist violence. *See, e.g., Gilmore*, 422 F. Supp. 2d at 98 (defendants alleged to be "responsible for planning and carrying out the shooting"); *Biton*, 310 F. Supp. 2d at 174 (defendants alleged to be involved "in the bombing of a school bus"). An expansive approach to personal jurisdiction was justified in those cases to foster the policy of providing redress to plaintiffs injured by international terrorist organizations which had ***no traditional ties to or presence in the United States***. In stark contrast, BOC is the fifth largest commercial bank in the world. Clearly, it is not a shadowy international terrorist organization and—more importantly—BOC is subject to the general jurisdiction of the courts of New York and California, where its U.S. branches are located, and where Plaintiffs' counsel has brought actions against BOC alleging nearly identical claims as those alleged in the FAC.

The expansive theory of personal jurisdiction reflected in the decisions cited above was also justified, in part, by reference to Federal Rule of Civil Procedure 4(k)(2), under which

service of a summons establishes personal jurisdiction over a defendant if the "defendant . . . is not subject to the jurisdiction of the courts of general jurisdiction of any state." *See, e.g., Gilmore*, 422 F. Supp. 2d at 103; *Biton*, 310 F. Supp. 2d at 177.  Because BOC is subject to the general jurisdiction of the courts of New York and California, the states where it has U.S. branches, Rule 4(k)(2) does not apply.

Indeed, Plaintiffs have cited the address of BOC's branch in Los Angeles in the caption of this case.   Moreover, BOC is currently defending an action alleging nearly identical claims brought by the same Plaintiffs' counsel and filed at the same time as the present case, initially in California state court in August 2008 -- in which the Los Angeles branch of BOC was cited as the basis of personal jurisdiction -- and then later re-filed in New York State court, on February 12, 2009, after Plaintiffs voluntarily dismissed the California action.  The midtown New York branch of BOC is cited in the caption of the re-filed case, along with BOC's New York Chinatown branch, as the alleged basis of personal jurisdiction in that case.  *See Elmaliach v. Bank of China Ltd.*, No. 102026/09 (Sup. Ct. N.Y. Cty. filed Feb. 12, 2009).

### D.   Any Exercise of Personal Jurisdiction Over BOC Here Would Violate Due Process

Personal jurisdiction, no matter how broadly construed, may not be exercised with respect to a defendant unless doing so is consistent with due process.  As Judge Friedman stated in *Estate of Klieman*, 467 F. Supp. 2d 107: "[I]n cases brought pursuant to 18 U.S.C. § 2333 [the Anti-Terrorism Act], *a plaintiff must demonstrate that the defendant has sufficient minimum contacts to satisfy a traditional due process analysis*." *Id.* at 113, n. 3 (quoting *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 95 (D.R.I. 2001)) (emphasis added). Even when minimum contacts with the forum exist in an Anti-Terrorism Act case, "a court [still] must assure itself that the maintenance of the suit does not offend traditional notions of fair play

and substantial justice." *Gilmore*, 422 F. Supp. 2d at 104 (internal quotations omitted) (quoting *Int'l Shoe Co. v. Wash.*, *Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)).

In other words, even if the FAC alleged a prima facie showing of personal jurisdiction, instead of ignoring the issue entirely, it would still have to meet the constitutional requirement that "the single most important consideration is whether a defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Gilmore*, 422 F. Supp. 2d at 104 (internal quotations omitted) (citing *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59 (D.D.C. 2003)). The Plaintiffs cannot satisfy that "single most important consideration" here. Indeed, the FAC does not even attempt to do so.

The subject matter of this case lacks any connection with the District of Columbia. The FAC arises from a suicide bombing in Israel. (FAC ¶ 1). Plaintiffs are Florida residents alleging primarily Israeli causes of action. (FAC ¶¶ 3, 5-7). BOC is a Chinese corporation with headquarters in China, and offices in the U.S. outside of this District. (FAC ¶ 24). Plaintiffs' claims against BOC are alleged to be based on wire transfers made to and from the accounts of a single BOC customer at a single BOC branch in China. (FAC ¶ 69). The Plaintiffs simply "do not provide any evidence whatsoever to show that haling the . . . Defendant[ ] [BOC] into this Court would 'not offend the Constitution.'" *Gilmore*, 422 F. Supp. 2d at 104.[6]

---

[6]      Plaintiffs and their counsel may have chosen this forum because of their focus on the defendants who are foreign state and foreign government officials – 14 of the 15 named defendants in this case – and the venue provision specifying that for a civil action "brought against a foreign state or political sub-division thereof," this District is the appropriate venue. *See* 28 U.S.C. § 1391(f)(4) (the venue provision cited in the First Amended Complaint). (FAC ¶ 4). However, the FAC does not make any showing, much less a *prima facie* showing, that any of BOC's alleged acts in China have any connection with the foreign state defendants who may be sued in this District, none of whom have even been served by

There are several factors relevant to a determination of whether an exercise of personal jurisdiction would "offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457 (1940)). As noted, first and "most important" is the adequacy of Plaintiffs' showing that BOC's alleged "conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court []here." *Gilmore*, 422 F. Supp. 2d at 104 (internal quotations and citations omitted). Since the FAC is utterly devoid of any allegation that BOC or its alleged conduct in China has ***any*** contact with this District, this criterion argues in favor of dismissal on due process grounds. Second, courts may consider the forum's interest in adjudicating the dispute and the burden on the defendant. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). A jurisdiction's interest in a dispute is "considerably diminished" when, as in this case, the plaintiffs are not citizens of the forum. *Formica v. Cascade Candle Co.*, 125 F. Supp. 2d 552, 556 (D.D.C. 2001) ("Where the plaintiff is not a resident of the forum, the forum state's 'legitimate interests in the dispute have considerably diminished.'") (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 114 (1987)). The lack of ***any*** connection between the subject matter of the action and the District of Columbia casts doubt on whether this jurisdiction has any discernible interest in the adjudication of this matter, which arises from an incident which occurred in Israel, is brought by residents of Florida, against a Chinese bank not present in this District, based on conduct that allegedly occurred in China, injuries alleged to be sustained in Israel, giving rise primarily to causes of action under the law of Israel.

In sum, this Court should conclude that Plaintiffs have failed to meet the burden of making a *prima facie* showing of personal jurisdiction.

---

Plaintiffs as of the date of the filing of this motion – more than 6 months after this lawsuit was commenced.

## IV.

## THE FAC FAILS TO STATE A
## CLAIM UPON WHICH RELIEF CAN BE
## GRANTED AS TO THE BANK OF CHINA

In the event the claims against BOC survive the jurisdictional challenges set forth above, the FAC nonetheless must be dismissed because it fails to state a claim upon which relief can be granted against BOC. Fed. R. Civ. P. 12(b)(6).

There are four claims against BOC in the FAC:  that BOC (1) violated the Anti-Terrorism Act (Counts Two and Three); (2) violated the statutory cause of action of negligence as defined by the *Civil Wrongs Ordinance* ("CWO") of Israel (Count Four); (3) violated the Israeli statutory cause of action of breach of statutory duty as defined by the *CWO* (Count Five); and (4) is vicariously liable for the terrorist violence of PIJ, as that cause of action is defined by the *CWO* with respect to the Plaintiffs' damages (Count Six).

The Supreme Court has set the pleading standard under Fed. R. Civ. P. 8 at a level the FAC cannot meet.  In *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court stated that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965 (internal citation omitted).  A pleading must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Plaintiffs are required to plead sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Id.* at 1974; *see In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570(GBD)(FM), 2007 WL 2907278, at *3 (S.D.N.Y. Oct. 5, 2007) (dismissing ATA claim against defendant bank where plaintiff failed to allege facts sufficient to "make [her] claim plausible"); *see also Mountain States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994).

18

The FAC in this case does not even approach this standard. Plaintiffs' allegations rarely move beyond "a formulaic recitation of the elements of a cause of action." *Twombly*, 127 S. Ct. at 1965. Even then, they offer nothing more than speculative and conclusory argumentation, particularly as to the essential elements of knowledge and intent.

**A.   Plaintiffs Have Not Stated a Claim Against BOC Under the Anti-Terrorism Act**

In Count Two, Plaintiffs allege that BOC violated Section 2333(a) of the ATA, which provides as follows:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

(*See* FAC ¶¶ 106-15).

The FAC alleges a theory of liability under the Anti-Terrorism Act that is based on what Judge Posner's recent opinion for an *en banc* Seventh Circuit described as a "chain of incorporations theory," in that it seeks to connect an elaborate set of dots along a serpentine path from section 2333(a) to section 2331(1) to section 2339A to section 2332. *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685 (7th Cir. 2008) (*en banc*) ("*BOIM III*").

The difficulty for the Plaintiffs is that their effort to shoehorn their ATA claim into the "chain of incorporations" theory – the only legal theory available to them – is on a collision course with multiple requirements they cannot meet, including that their allegations are so implausible that they fail to satisfy the *Twombly* pleading standard. Moreover, it falls short of plausibly alleging the essential "requirements relating to . . . state of mind . . . [which] must be satisfied." *BOIM III*, 549 F.3d at 692.

19

The chain of incorporations theory of Anti-Terrorism Act liability begins with section 2333(a), which provides a civil remedy for U.S. nationals injured by reason of an act of "international terrorism."  The next link is the section 2331(1) statutory definition of "international terrorism" as constituting "activities that . . . involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States," that "appear to be intended . . . to intimidate or coerce a civilian population" or "affect the conduct of a government by . . . assassination," and that "transcend national boundaries in terms of the means by which they are accomplished" or "the persons they appear intended to intimidate or coerce."  18 U.S.C. § 2331(1).

Because the section 2333(1) definitional link in the chain includes not only violent acts but also "acts dangerous to human life that are a violation of the criminal laws of the United States," the next link picks up 18 U.S.C. § 2339A(a), which states that "[w]hoever provides material support or resources . . . , knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [18 U.S.C. § 2332]" shall be guilty of a federal crime.  The final link in the chain, therefore, is section 2332, which criminalizes the killing, conspiracy to kill, or the infliction of bodily injury on, any American citizen outside the United States.

**B.    The Plaintiffs' Implausible Chain of Incorporation:  Several Links Too Far**

Plaintiffs' claim that BOC violated the Anti-Terrorism Act represents their unsuccessful effort to construct the links in the chain of incorporations theory set out in *BOIM III*.  However, the end result of the FAC's labrynthine route through the various provisions of the Anti-Terrorism Act is a theory so utterly implausible – indeed irrational – that it falls far short of the *Twombly* standard.

The Plaintiffs' claim, which is set out at ¶¶ 107-115 of the FAC, has as its first link the allegation that the "PIJ uses terrorism . . . to coerce, intimidate and influence government

decision-makers and the public in Israel and the United States to accept the PIJ's demands."
(FAC ¶ 117). The second link is the allegation that the government of China ("PRC") has as a
policy an effort to "undermine [the position] of the United States," and that the PRC seeks to
implement this policy by "facilitat[ing] the ongoing campaign of terrorism against Israel
conducted by terrorist groups such as the PIJ and Hamas . . . in order to influence the policy of
the Israeli government and intimidate the civilian population in Israel and thereby to strengthen
the PRC's own position and undermine an ally of the United States." (FAC ¶¶ 112(a)-(b)). At
this point, all that the FAC has accomplished is the construction of an allegation, which is
inherently implausible and contradicted by the Freeman Declaration, that the government of the
PRC supports the PIJ's use of terrorism because of the PRC's purported foreign policy
opposition to the United States and Israel. None of these allegations has anything to do with
BOC.

In order to tie BOC to the allegation that the PRC supports the PIJ's use of terrorism, the
FAC alleges that because the "PRC is an authoritarian state," BOC – along with all "citizens and
enterprises" in China – is "required to support and advance the policies and goals of the Party
and the Central Government." (FAC ¶ 112(c)). Without this link, the chain is broken. To drive
this fanciful point home, the FAC alleges its final link: that BOC "carried out" the wire transfers
because it "acted to advance the Party's and Central Government's policies and goals, including
the Party's and Central Government's policies and goals vis-à-vis the PIJ and Hamas and their
terrorist activities," as it was required to do by its government. (FAC ¶¶ 112(e)-(f)).

The remainder of Count Two's allegations consists entirely of a conclusory recitation of
statutory boilerplate, including that BOC's provision of wire transfer facilities to its customer:

- was "intended . . . to intimidate and coerce a civilian population, and to influence
  the policy of a government by intimidation and coercion." (FAC ¶ 112(g)).

21

- "constituted a violation of the criminal laws of the United States including . . . 18 U.S.C. §§ 2339A, 2339B and 2339C, which prohibit the provision of material support . . . to terrorist organizations." (FAC ¶ 108).

- "w[as] dangerous to human life, since the PIJ is a violent terrorist organization" committed to the murder of Israeli and American civilians. (FAC ¶ 109).

- constituted "acts of international terrorism" and "aiding and abetting the PIJ's 'acts of international terrorism,' within the meaning of 18 U.S.C. §§ 2331 and '2333." (FAC ¶¶ 113, 122).

These allegations demonstrate the extraordinary lengths to which the Plaintiffs have been forced to go in their effort to transform BOC's routine provision of banking facilities into "acts of international terrorism." BOC is, of course, a commercial bank with no foreign policy of its own. Yet the FAC alleges that BOC seeks to "intimidate and coerce" the Israeli and American governments and civilian populations by supporting Palestinian terrorists bent on murdering "innocent Israeli and American civilians." (FAC ¶¶ 109, 112(g)). In doing so, the FAC crosses the line from implausibility to the realm of absurdity.

While such scurrilous accusations show the unrestrained advocacy of the Plaintiffs and their counsel, fortunately the law imposes limits on such excesses. The very reason the Supreme Court insisted that a complaint must allege sufficiently "plausible," and not merely "conceivable," facts is to prevent the wild and reckless speculation illustrated by the FAC in this case. If this sort of pleading is countenanced, there are few defendants – no matter how remote they are from terrorist violence – who will be able to avoid the cost, burden and reputational damage of defending against an accusation of having engaged in "acts of international terrorism," regardless of the inherent implausibility of such allegations in the context of a bank's provision of routine services to a single customer.[7]

---

[7]     These allegations are not made more plausible by the declaration of Gordon Chang submitted with the FAC. While this declaration purports to be an expert opinion, it consists of a repetition of allegations in the FAC and the conclusory assertion that such allegations are "well founded" because, in

C.     **The FAC Fails to State a Claim With Respect to the Essential State of Mind Elements of the Anti-Terrorism Act Cause of Action**

As Judge Posner's *en banc* opinion in *BOIM III* makes clear, there can be no liability for alleged terrorist financing under section 2333, as a matter of law, unless the defendant knows it is providing financial services to someone involved in terrorism and does so intending to assist terrorism. *BOIM III*, 549 F.3d at 691 ("a donor to terrorism, to be liable under section 2333, must have known that the money would be used in preparation for or in carrying out the killing or attempted killing of, conspiring to kill, or inflicting bodily injury on, an American citizen abroad"); *see id.* at 692 ("since section 2333 provides for an automatic trebling of damages it would require proof of intentional misconduct"); *see also* 18 U.S.C. § 2339A(a) ("Whoever provides material support or resources . . . , *knowing* or *intending* that they are to be used in preparation for, or in carrying out, a violation of [18 U.S.C. § 2332] shall be fined . . . , imprisoned . . . , or both.") (emphasis added).

Even before *BOIM III*, other courts dismissed claims similar to Count Two in this case due to legally insufficient allegations of the necessary state of mind.  For instance, in *Stutts v. De Dietrich Group*, No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006), plaintiffs sued certain banks, alleging that they issued letters of credit to support the sale of supplies and services to the Government of Iraq. *Id.* at *1.  Iraq, plaintiffs alleged, used those supplies and services to develop chemical weapons that allegedly injured them. *Id.*

As in the present case, the complaint's allegations of knowledge in *Stutts* simply tracked the elements of the cause of action, alleging that (1) the banks "were aware of their role as part of the unlawful and/or tortious activity that gave rise to the injuries of Plaintiffs," (2) the banks

---

Mr. Chang's opinion, all banks act in the manner the FAC alleges BOC acted.  Mr. Chang's declaration is an echo chamber for the Plaintiffs, not an expert opinion.  By contrast, BOC has submitted the declaration of Charles Freeman III in response to Mr. Chang's curious submission.

"knowingly and substantially participated in the unlawful and/or tortuous conduct" of the suppliers of the chemical precursors "in that the Bank Defendants knew of the nature of the goods and services sold and to whom the goods and services were being provided," and (3) the banks "knew, or reasonably should have known that, as a result of services they provided, Hussein's regime and its use of chemical weapons endangered all who opposed Saddam Hussein." *Id.* at *6, 12 (internal quotations omitted). The *Stutts* Court granted the banks' motion to dismiss, holding that the complaint's "wide-sweeping" allegations were insufficient to state a claim. *Id.* at *6, 19.

Similarly, the *Terrorist Attacks* case demonstrates that mere repetition of the allegation that a bank knew or should have known certain facts is insufficient. In that case, survivors and representatives of victims of the September 11, 2001 terrorist attacks brought claims under the Anti-Terrorism Act against various defendants, including Saudi American Bank ("SAB"). *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 831-34 (S.D.N.Y. 2005).[8] The complaint alleged that SAB acted as the correspondent bank for banks that allegedly provided financial support to al-Qaeda. *Id.* at 833-34. In dismissing plaintiffs' ATA claim, the court held that plaintiffs failed to sufficiently allege that SAB knew that its banking services were being used by terrorists. *Id.* at 834 ("[T]here can be no bank liability for injuries caused by money routinely passing through the bank."); *see Mastafa v. Australian Wheat Bd. Ltd.*, No. 07 Civ. 7955(GEL), 2008 WL 4378443, at *4-5, (S.D.N.Y. Sept 25, 2008) (dismissing claim based on allegation that a bank "'knowingly provided knowing practical assistance' to the Hussein regime," finding that the allegation of knowledge was "nothing more than a 'formulaic

---

[8]      Certain other rulings in that litigation were certified as final, appealed to the Second Circuit, and affirmed. 538 F.3d 71 (2d Cir. 2008).

recitation' of the requirement, and . . . not sufficient to make the claim 'plausible'" under *Twombly*) (internal citations omitted).

Like the complaints dismissed in *Stutts* and *Terrorist Attacks*, the allegations in this case that BOC knew that its provision of wire transfer facilities had any connection with a Palestinian terrorist organization is simply a continuation of the FAC's speculative and conclusory allegations unsupported by facts. In their entirety, the FAC's allegations of BOC's knowledge are contained in paragraphs 77-81, where it is alleged that BOC had "actual knowledge" that it was supporting terrorism because in April 2005, one year before the suicide bombing in April 2006, Israeli counterterrorism officials met with their PRC counterparts and the PRC's Central Bank. The FAC alleges that the "Israeli officials demanded that the PRC officials take action to prevent" the transfers but that "BOC (with the approval of the PRC) ignored this demand and continued to carry out further" wire transfers. (FAC ¶ 77).[9]

As a threshold matter, this contention of "actual knowledge" puts in issue factual contentions about the validity of official acts of the government of the PRC. The Act of State doctrine, however, precludes the adjudication of a case "when the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its boundaries." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir 2002) (internal quotations omitted) (citing *W.S. Kirkpatrick Co.*, 493 U.S. at 405). This doctrine bars judicial resolution of the allegation that

---

[9]        In assessing the plausibility of this allegation of "actual knowledge," it is relevant that one of the participants to the alleged communication has publicly denied it occurred. Shortly after the filing of the complaints in this and the parallel case brought against BOC by the same plaintiffs' counsel, the People's Bank of China, which is China's Central Bank, denied that the 2005 meeting with Israeli counterterrorism had taken place and stated that the allegation "doesn't conform with the facts." *See Israeli Victims of Terror File Suit Against Bank of China*, Wall Street Journal, Aug. 23, 2008, at p. A5. (A copy of this article is annexed to the Declaration of Walter P. Loughlin as Exhibit 1.)

BOC engaged in the wire transfers at issue – the very conduct alleged to constitute "acts of international terrorism" – "with the approval of the PRC."[10]  Yet this is the only allegation of BOC's "actual knowledge" that its provision of wire transfer facilities had any possible connection with a terrorist organization.  Moreover, even if the Court could consider this allegation, despite the Act of State Doctrine, such consideration would be counter to the political question doctrine, as discussed above at pp. 5-12.

Finally, even if this allegation was not barred from judicial consideration by either or both the Act of State and political question doctrines, it would still be found wanting.  Missing from the allegations are any facts that were actually presented to BOC, or to the Chinese government or banking officials, about the specific customer, his accounts, or his purported relationship with PIJ.  Presumably, such factual allegations do not appear in the FAC because there is no good faith basis to allege them.[11]

The FAC also seeks to allege that BOC possessed the requisite knowledge of its customer's alleged connection to PIJ through argumentative inferences (1) that BOC should have known this either from the activity in the accounts, which is alleged to reveal "indicia of transactions made for illegal purposes" that "all professional bankers" would have recognized,

---

[10]     BOC may invoke the Act of State doctrine even though it is a private party.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 344 (S.D.N.Y. 2003) ("While ordinarily invoked by sovereign defendants, the [Act of State] doctrine may be invoked by private defendants in cases that call into question the legality of acts of a foreign government.").

[11]     This possibility gains force from the pattern of improper tactics in litigation which has led Plaintiff's counsel, Robert J. Tolchin, and his firm, Jaroslawicz & Jaros LLP, to be repeatedly criticized by federal courts in which they have appeared.  *See, e.g., Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, No. 98 Civ. 7766(PAC), 2008 WL 2787981, at *10-16 (S.D.N.Y. July 17, 2008) (fees related to defense of patent infringement claim imposed on Tolchin's firm for bringing a baseless claim); *Wald v. Costco Wholesale Corp.*, No. 03 Civ. 6308JSR, 2005 WL 425864, at *4-5 (S.D.N.Y. Feb. 22, 2005) (Tolchin criticized for "blatant contempt [of] the Court's orders"); *Gurary v. Winehouse*, 270 F. Supp. 2d 425 (S.D.N.Y. 2003) (sanction imposed on Tolchin's firm for filing frivolous action); *Jaroslawicz v. Safety Kleen Corp.*, 151 F.R.D. 324, 330 (N.D. Ill. 1993) (Tolchin firm criticized for appearance of "manufactured litigation").

(FAC ¶¶ 78-79), or (2) that BOC knew or should have known that the wire transfer facilities were being made for illegal purposes because of the "know [your] customer[]," anti-money laundering, and due diligence duties imposed by U.S. banking laws and regulations and similar international norms. (FAC ¶¶ 80-81).

Even if one assumes that U.S. banking laws and regulations apply fully to BOC, "a corporation organized under the laws of the [PRC] and headquartered [there]" (FAC ¶ 24) – a fact we do not concede – these allegations amount to nothing more than factually unsupported arguments of constructive knowledge. The FAC alleges no facts about what action BOC took or failed to take which might have led to the revelation that its customer was allegedly part of a terrorist organization and that his use of wire transfer facilities was part of PIJ's financial support.[12]

Moreover, all of these allegations, whether viewed collectively or in isolation, amount to arguments about what a reasonable banker in BOC's position should have known. But *BOIM III* makes clear that the knowledge requirement is subjective, not objective. As Judge Posner states:

> So it would not be enough to impose liability . . . for violating section 2333 . . . , that the average person or a reasonable person would realize that the organization he was supporting was a terrorist organization, if the actual defendant did not realize it.

---

[12]     It is also noteworthy that at the same time BOC is defending against two actions alleging it provided financial support to Hamas and PIJ, press reports in Israel have described the recent transfer by the State of Israel of NIS 100 million (an Israeli shekel is currently worth approximately $1.27) to the Palestinian Authority in Gaza under circumstances in which Palestinian officials "admitted there is no guarantee that some of the money did not find its way to Hamas." *See Cash sent to Gaza banks*, *Ha'aretz*, Dec. 12, 2008, a copy of which is annexed to the Declaration of Walter P. Loughlin as Exhibit 2. Ironic may be too restrained a term to describe a circumstance in which BOC is accused of unlawfully providing financial support to Hamas and PIJ while the government of Israel is simultaneously transferring huge amounts of money to Palestinian authorities with a probability that some of these funds will "find its way to Hamas."

549 F.3d at 693. Even if it were not so clear that the state of mind requirement is subjective, the FAC fails to allege facts making it plausible that the routine wire transfers at issue here would have alerted any reasonable bank of a possible connection to PIJ – where nothing about the wire transfers is alleged to suggest such a connection and the customer's name is not on an OFAC list.

In sum, Count Two fails to allege a legally sufficient violation of the Anti-Terrorism Act. Its effort to construct the chain of incorporations theory of liability cannot meet the *Twombly* plausibility standard. Its allegations of the requisite knowledge and intent fall short, as well. As a consequence, Count Two must be dismissed.

## V.

### THE FAC'S ALLEGATION THAT BOC
### AIDED AND ABETTED A VIOLATION
### OF THE ANTI-TERRORISM ACT
### SHOULD BE DISMISSED

Count Three of the FAC alleges that the conduct of BOC "constituted aiding and abetting" of the PIJ's acts of terrorism in violation of the same provisions of the Anti-Terrorism Act cited in Count Two. There are two fatal flaws to this aiding and abetting claim. First, it is duplicative of the claim in Count Two. *See, e.g., Park v. Hyatt Corp.*, 436 F. Supp. 2d 60, 66 (D.D.C. 2006). Second, it is wrong as a matter of law.

In *BOIM III*, the Seventh Circuit reversed *BOIM I*, 291 F.3d 1000 (7th Cir. 2002), to the extent that its prior decision recognized a claim for aiding and abetting as part of the civil remedy of section 2333(a). *BOIM III* holds that, in the absence of Congress authorizing secondary liability under section 2333(a), the combination of statutory silence and the precedential force of *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), "means there is none," *i.e.*, there is no aiding and abetting liability under the Anti-Terrorism Act. 549 F.3d at 689. Judge Posner went on to say this was not only correct as a

matter of law, it was also good policy because: "To read secondary liability into section 2333(a), moreover, would enlarge the federal court's extraterritorial jurisdiction." *Id.* at 689-90. Accordingly, the Seventh Circuit analyzed the defendants' liability under the "material support" for terrorism framework which is addressed in the preceding section of this memorandum. This Court should do likewise, dismiss the FAC's aiding and abetting claim, and as a matter of law, analyze the FAC's Anti-Terrorism Act claim solely on the basis of whether it is a legally sufficient pleading of primary liability under the Anti-Terrorism Act.[13]

## VI.

### THE ISRAELI CAUSES OF ACTION ALLEGED IN THE FAC FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The FAC alleges three causes of action under the law of Israel: negligence, breach of statutory duty, and vicarious liability, none of which states a claim upon which relief can be granted.

The FAC does not explain why Plaintiffs chose to allege statutory causes of action under Israeli law, rather than bringing this case under the law of their domicile (Florida) or the law of

---

[13]    If the Court agrees that the FAC's Anti-Terrorism Act claim fails to state a claim upon which relief can be granted, the Court should decline to exercise supplemental jurisdiction over the Israeli causes of action. Federal district courts have supplemental jurisdiction over non-federal claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case of controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, this is "a doctrine of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (discussing pendent jurisdiction). A district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Supreme Court has stated "that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining [non-federal] claims. *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *accord Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). Because there is no reason to conclude that this is anything other than the "usual case," the Court should decline to exercise supplemental jurisdiction over the statutory causes of action under the law of Israel if it agrees that the Anti-Terrorism Act claim is subject to dismissal.

this District, where they chose to file this action.[14]  However, this choice is of no moment

because the law of Israel, which is conceptually similar to U.S. common law standards of duty,

forseeability and causation, forecloses all of Plaintiffs' Israeli law claims.  Indeed, the outcome

would be no different if the Court applied the law of Plaintiffs' domicile or the law of this

District.  As explained below, the law of Israel on issues of duty, forseeability and causation are

in harmony with what Judge Posner in *BOIM III* called the "ordinary tort requirements" of U.S.

law.  549 F.3d at 692; *see Bailey v. J&B Trucking Servs.*, No. 08-644 (RMC), 2008 U.S. Dist.

LEXIS 97447, at *12 (D.D.C. Dec. 2, 2008) (negligence claim involves these elements).

A common thread of both Israeli and U.S. law is that – as Judge Robertson explained in

another Anti-Terrorism Act case – a bank cannot be "liable for injuries done with money that

passes through its hands in the form of deposits, withdrawals, check clearing services, or any

other routine banking service." *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F.Supp. 2d 86, 109

(D.D.C. 2003) ("The act of providing material support to terrorists, or 'funneling' money

through banks for terrorists is unlawful and actionable, but . . . Al Rajhi [Bank] is alleged only to

be the funnel.").  This rule is widely accepted.  *See, e.g., Terrorist Attacks*, 2007 WL 2907278, at

*3 (dismissing negligence claim on this basis); *Stutts*, 2006 U.S. Dist. LEXIS 47638, at *61-68

(same).[15]

---

[14]      *See, e.g., Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 196 (D.D.C. 2008) (Lamberth, C.J.) (applying District of Columbia choice of law rules); *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1, 10 (D.D.C. 2008) (Lamberth, C.J.) (same); *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 210 (D.D.C. 2008) (Lamberth, C.J.) (same).

[15]      Even under the law of Florida – Plaintiffs' domicile – a bank cannot be liable for performing routine banking transactions. *See, e.g., Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997) (affirming the Southern District of Florida's dismissal of Panama's RICO claims against the "First American" banking defendants where the complaint "merely describes routine banking transactions that do not support an inference that the First American defendants possessed the requisite intent.  Although Panama identifies numerous wire transfers to and from BCCI's First American account, these transactions do not provide us with a sufficient basis to infer that the First American

The law in Israel is substantially the same, as explained in the accompanying expert Declaration of Peter Gad Naschitz (the "Naschitz Decl."), Senior Founding Partner of the Tel Aviv law firm of Naschitz, Brandes & Co. and former Chairman of the Tort Committee of the Israel Bar. (Naschitz Decl. ¶ 1). Because Plaintiffs have chosen to allege statutory causes of action under Israeli law, and there are no material differences between the fundamental tort concepts of duty, forseeability, and causation in the tort law of Israel, Florida, and relevant federal standards, the legal sufficiency of the FAC's Israeli causes of action are analyzed under the law of Israel – where the causes of action were statutorily created.

## A.     The First Cause of Action, for Negligence, Fails to State a Claim

The negligence cause of action is governed by Sections 35 and 36 of the CWO,[16] which the Supreme Court of Israel, whose rulings are "binding on all courts" in Israel, has defined as having the following essential elements:

---

defendants knew, or had any reason to suspect, that Manuel Noriega was the source and ultimate beneficiary of the funds transferred."); *see also In re Colombian Coffee Co., Inc.*, 75 B.R. 177, 179 (S.D. Fla. 1987) ("Wire transfers are voluminous. The defendant bank receives over 100 a day. Larger banks receive thousands. They involve billions of dollars. They constitute an integral part of today's worldwide banking system . . . . The wire transfer notice frequently does not identify the originating party . . . . They are frequently automated and never seen by a human eye. If a bank must at its peril examine the source of the wired funds, determine its solvency and verify the consideration it received before the bank honors the transfer, the wire transfer system would utterly collapse.") (quotations and citations omitted).

[16]     Sections 35 and 36 of the CWO state as follows:

> 35.     Where a person does some act which in the circumstances a reasonable prudent person would not do, or fails to do some act which in the circumstances such a person would do, or fails to use such skill or take such care in the exercise of any occupation as a reasonable prudent person qualified to exercise such occupation would in the circumstances use or take, then such act or failure constitutes carelessness and a person's carelessness as aforesaid in relation to another person to whom he owes a duty in the circumstances not to act as he did constitutes negligence. Any person who causes damage to any person by his negligence commits a civil wrong.

> 36.     For the purpose of section 35, every person owes a duty to all persons whom, and to the owner of any property which, a reasonable

(i)      a duty of care on the part of the defendant toward the injured party;
(ii)     a breach of such duty of care by the defendant, by act or omission
(referred to also as a person's "carelessness" in Section 35); and
(iii)    a causal connection between the breach of the duty of care and the damage
incurred, such damage being of the type that is likely to be caused by the breach
of duty in the usual course of events.

(Naschitz Decl. ¶¶ 4-5).

As demonstrated below, the FAC fails to satisfy these essential requirements because

BOC, as a matter of law, has no duty of care to third parties such as Plaintiffs; without such a

duty, there can be no breach giving rise to tort liability; and there is no causal relationship

between BOC and the alleged injuries, as a matter of law, under the circumstances alleged in the

FAC.

**1.      Duty of Care:  The Bank of China Has No Duty of Care, Under the Law of Israel, to the Plaintiffs**

The Supreme Court of Israel has held that whether a defendant owes a duty of care to a

plaintiff is determined primarily by application of the test of foreseeability, which is comprised

of two components:  (1) the notional duty of care – a general duty of care as between classes of

alleged tortfeasors and injured parties, and (2) a duty of care in fact – the duty of care between a

specific defendant and a specific injured party or parties under the circumstances alleged in a

---

person ought in the circumstances to have contemplated as likely in the
usual course of things to be affected by an act, or failure to do an act,
envisaged by that section.

(Naschitz Decl. ¶ 3).  This definition is comparable to negligence under U.S. law.  *See, e.g., Bailey*, 2008
U.S. Dist. LEXIS 97447, at *12 (negligence cause of action consists of (1) a defendant's duty of care to a
plaintiff; (2) defendant's breach of that duty; and (3) a plaintiff's damage caused by that breach);
*Zivojinovich v. Barner*, 525 F.3d 1059, 1067 (11th Cir. 2008) (listing elements of a negligence claim
under Florida law).

particular case. CA 145/80 *Vaknin v. Beit Shemesh Local Council* [1982] IsrSC 37(1) 113, 122-23, 125-26.[17] (Naschitz Decl. ¶ 6).

The Supreme Court of Israel explained the difference between the notional and specific aspect of the duty of care:

> In the context of the notional duty of care, the question is an abstract one.  It deals with entire categories of tortfeasors (manufacturers, employers, drivers, teachers), and of injured parties (consumers, pedestrians, pupils), of damage (physical, pecuniary) and of actions (act, omission).  The examination is disconnected from the concrete facts of the specific event." (*Vaknin*, IsrSC 37(1) at 125).

> The law recognizes the existence of a notional duty of care in relationships between the plaintiff and the tortfeasor.  That is a necessary, though not sufficient, condition of the existence of liability in the tort of negligence.  There still arises the additional question – whether there is a concrete duty of care between the specific tortfeasor and the specific injured party, under the particular circumstances of the case, for the specific damage caused.  (*Id.*).

(Naschitz Decl. ¶ 6).

Applying Israel's foreseeability concept to the duty of care involves an additional distinction between technical foreseeability – that which can actually be foreseen – and normative foreseeability – that which a person ought to foresee. (Naschitz Decl. ¶ 7). The Supreme Court of Israel has explained: "the starting point, in principle, is that where damage can be technically foreseen, there is a notional duty of care, unless there are considerations of legal policy that negate the duty." *Vaknin*, IsrSC 37(1) at 123.  However, normative foreseeability "is never derived automatically from technical foreseeability" because the law does not impose a duty of care unless the following three requirements are met: "first, foreseeability; second, 'neighborhood' or 'proximity'; and, third, a judicial conclusion that is

---

[17]     Certified translations of the majority of the Israeli cases cited herein are attached as exhibits to the Affidavit of Walter P. Loughlin.  According to the Naschitz Declaration, *Vaknin* contains "[t]he leading statements of the law . . . ." (Naschitz Decl. n.3).

fair, just and reasonable that a normative duty of care be imposed by force of law." CA 915/91 *State of Israel v. Levy* [1994] IsrSC 48(3) 45, 65.  (Naschitz Decl. ¶ 7).

If the parties are too remote from one another – and therefore not "neighbors" with respect to the tort of negligence – there is no duty of care.  (Naschitz Decl. ¶ 7).  Without a duty of care, there can be no liability in tort.  The result is the same even in cases where the harm is technically foreseeable.  *Levy*, IsrSC 48(3) at 60-61 (holding, per Justice Shamgar, that the Commissioner of Insurance and the State were not responsible to individual insurance policy holders for damages alleged to have been caused by an insolvent insurance company licensed by the Commissioner).[18]

The considerations of judicial policy that operate to negate normative foreseeability have been described by the Supreme Court of Israel as essential to striking the proper balance between "the need to ensure freedom of operation on the one hand, and the need to protect property and person on the other." *Vaknin*, IsrSC 37(1) at 123.  (Naschitz Decl. ¶ 8).  The normative factors cited in Israeli case law as relevant to negating the duty of care include:  (1) whether the relevant activities or interests of the parties are remote or proximate; (2) whether the asserted tort liability is based on passive omission or active conduct; (3) whether a defendant or a third party caused the alleged harm; and (4) whether the alleged damages are economic.  *Levy*, IsrSC 48(3) at 65-67.  (Naschitz Decl. ¶ 8).

---

[18]      Israeli law relies on English law with respect to this point.  (Naschitz Decl. n.5).  Relevant English case law provides that normative and technical foreseeability are separate and distinct elements. *Id.* (citing the following British cases: *Donoghue v. Stevenson* (1932) All E.R. Rep. 1; *McCloughlin v. O'Brian* (1982) 2 All. E.R. 298; *Caparo Indus. v. Dickman* (1990) 1 All E.R. 568).

2.    **Applying These Legal Standards to Banks**

The Supreme Court of Israel has applied the factors set forth above in a number of cases involving banks and financial institutions. (Naschitz Decl. ¶ 9). For instance, the Court has held that the public and economic status of banks may put them in a position where, depending of the circumstances, they may be held to have a duty of care to third parties arising out of the bank's relationship with its customer, especially where the third party is relying on the proper conduct of a bank's operations or the third party's financial interests may be directly affected by the bank's conduct. S. Ct. 1740/91 *Barclays Discount Bank  v. Frost Kostman* [1993] IsrSC 47(5) 31; CA 8068/01 *Ayalon Insurance Company Ltd. v. Executor of Oppalger Estate* [2004] IsrSC 59(2) 349.

However, the Supreme Court of Israel has emphasized that extending a bank's duty of care to persons who are neither bank customers nor property holders relying on the bank to safeguard such property must only be done – if it is done at all – with caution and only after a careful review of the circumstances of a particular case. One example of a duty of care being extended in this way is *Ayalon*, where an account administrator's behavior was so unusual and exceptionally suspicious that the court held that the danger to the account beneficiary's property created a duty on the part of the bank to take affirmative action. *Ayalon*, IsrSC 59(2) at 373. (Naschitz Decl. ¶ 9).

According to the Naschitz Declaration, there is *no* legal precedent in the law of Israel to the effect that a bank has a notional duty of care with respect to what a third party does with money that it receives from that bank – the precise circumstances presented by the FAC in this case; *no* legal precedent in the law of Israel imposing a notional duty of care upon a bank such that it would be liable in negligence for the conduct of third parties who receive money from a

customer of that bank; and *no* legal precedent in the law of Israel that would support the imposition of a notional duty of care on a bank to third parties or the public at large to prevent illegal activity by bank customers using the routine services available to bank customers. (Naschitz Decl. ¶ 10).

The foregoing principles demonstrate that the Bank of China is not subject to a duty of care to the Plaintiffs and therefore, under the applicable legal standards, the Bank of China cannot be liable for a breach of any such duty of care to the Plaintiffs, because the existence of a duty of care is a necessary prerequisite for the Plaintiffs to maintain the negligence cause of action.

### 3.     Causation: The Bank of China Did Not Proximately Cause the Plaintiffs' Alleged Damages

In addition to the threshold requirement of duty of care, the law of Israel also requires that a causal link exist between alleged tortious conduct and alleged damages before tort liability can be imposed. *Vaknin*, IsrSC 37(1) at 138.  (Naschitz Decl. ¶¶ 5, 11).  As the Naschitz Declaration states, an alleged tortfeasor's conduct must be a "but for" cause without which the event or events giving rise to the alleged damages would not have occurred.  (*Id.* at ¶ 11).[19] Because the injuries or deaths resulting from terrorist violence do not occur in the natural and ordinary course of a party's use of banking services, the allegations in the FAC to the effect that the Bank of China caused the alleged injuries by providing banking services to a customer cannot satisfy the "but for" test of factual causation under the tort law principles of the law of Israel.  (*Id.*).

---

[19]     Causation is a fundamental principle of the law of torts.  "It is 'black letter' law that tort liability requires proof of causation.'"  *BOIM III*, 549 F.3d at 695; *see Hundley v. District of Columbia*, 494 F.3d 1097, 1104 (D.C. Cir. 2007) ("D.C. follows the black-letter tort law principle that an intervening force breaks the chain of proximate causation when that intervening force is sufficiently unforeseeable as to constitute a superseding cause.").

In addition to the FAC's failure to satisfy the "but for" causation requirement necessary to establish a negligence claim, it also fails to satisfy the requirement, set forth in Section 64(2) of the CWO, that the alleged tortfeasor be the *decisive* cause of the alleged harm. (Naschitz Decl. ¶ 12). The factors which are relevant to a determination of whether a person's conduct is the decisive cause of tort damages are (1) foreseeability, (2) scope of risk, and (3) common sense. *Vaknin*, IsrSC 37(1) at 146 (collecting authorities). (*Id.*)

The application of these factors to the FAC's allegations demonstrates that the negligence cause of action is legally deficient because, in the absence of a direct connection between BOC and the harm caused by the terrorist violence – which is not and cannot be alleged – or an allegation that BOC had actual knowledge of the use of an account for illegal or terrorist purposes – which is not alleged except in the most sweeping and factually unsupported way – it is "farfetched," using the term from the Naschitz Declaration, to view "a bank's rendition of banking services as the proximate cause of damage in terms of the law of negligence." (Naschitz Decl. ¶ 12).[20]

Drawing on the "common sense" that the tort law of Israel requires for this analysis, the Naschitz Declaration states that, unless the banking services can be causally linked to the specific terrorist attacks that are the subject of the FAC, under the law of Israel it is the terrorists who committed the decisive wrongdoing and bear legal responsibility for the alleged damages which resulted, not the Bank of China. (*Id.*)

---

[20]     This principle is consistent with the cases in which U.S. courts have rejected claims of bank liability for damages allegedly suffered by third parties in circumstances such as those presented by this case. *See* pp. 23-25, *supra*.

**B.   The Breach of Statutory Duty Cause of Action Fails to State a Valid Legal Claim**

The FAC next alleges the statutory cause of action of breach of statutory duty under Section 63 of the CWO, which provides, in pertinent part, that there can be tort liability for: "[T]he failure by any person to perform a duty imposed upon him by any enactment other than this Ordinance [which] was intended to be for the benefit or protection of any other person, whereby such other person suffers damage of a kind or nature contemplated by such enactment . . . ." The enactments of Israeli law which the FAC alleges were designed for the protection and benefit of the Plaintiffs, apply to BOC, and were breached by BOC in a manner that caused Plaintiffs' damages are three Israeli criminal law statutes:[21]

- Section 4 of the Prevention of Terrorism Ordinance, 5708-1948.

- Sections 145 and 148 of Israel's Penal Law, 5737-1977.

- Section 85 of the Defense Emergency Regulations of 1945.

The FAC acknowledges that "BOC's conduct did not take place in Israel," but alleges that the Israeli criminal law statutes cited above apply to BOC's conduct in China because of the general proposition that "Israel has extraterritorial criminal jurisdiction over crimes against the security of the State of Israel and over crimes against the lives and persons of Israeli citizens as such, pursuant to § 13 of Israel's *Penal Law, 5737-1977.*" (FAC ¶ 147).

The FAC is legally insufficient with respect to the breach of statutory duty cause of action on the following grounds: (1) the criminal statutes cited in the FAC as predicate statutory duties do not apply to BOC's alleged conduct, (2) these statutes are directed at the protection of

---

[21]     This was not Plaintiffs' original theory of liability. The initial pleading alleged BOC's breach of statutory duty based on alleged breach of duties imposed by U.S. federal laws and regulations. Because even Plaintiffs' expert on the law of Israel advised counsel that this cause of action could only be based on a violation of Israeli law, and that their initial pleading was erroneous, Plaintiffs' counsel confessed error and filed the FAC to substitute the Israeli criminal law predicates for the U.S. statutes and regulations. (*See* Exhibit 3 to the Declaration of Walter P. Loughlin). The amendment has not cured the error in the allegation of this cause of action.

governmental interests and create no private right of action for money damages in tort, and (3) the FAC fails to meet the Israeli law requirements necessary for the extra-territorial application of the tort and criminal law of Israel. (Naschitz Decl. ¶¶ 21-24).

### 1. The FAC Fails to Meet the Requirements of § 13 of the Penal Law

The linchpin of the FAC's theory of extending the criminal law of Israel to BOC is Section 13 of Israel's Penal Law which "has extraterritorial criminal jurisdiction over crimes . . . against the lives and persons of *Israeli citizens as such* . . . ." (emphasis supplied). (FAC ¶ 147). Although the FAC refers to the critical phrase "Israeli citizens as such," it either fails to appreciate or ignores the legal impact of the phrase on the validity of Count Five. Section 13 requires that conduct outside Israel be based on anti-Israel animus, or an "Israel-specific malicious intent," in order for the law of Israel to reach extra-territorial conduct. (Naschitz Decl. ¶ 20):

> [I]f a defendant is accused of violence against *Israelis as such outside of Israel*, a determination whether the penal laws apply . . . by force of §13 of the Penal Law will turn on . . . the defendant's motives and objectives as to whether they were directed against Israelis as such . . . . *If the Defendant is not accused of such violence, motivation and objectives, the defendant will not be subject to the extension of Israeli penal law under §13 . . . .*

(*Id.*) (emphasis supplied). The FAC does not, and cannot, allege that BOC provided routine banking services to a customer in China based on "Israeli-specific malicious intent," or any prejudice or animus toward the citizens of Israel. (*Id.*) Consequently, the criminal laws cited in the FAC do not, as a matter of Israeli law, apply extra-territorially to BOC's conduct in China.

### 2. The Emergency Defense Regulations and Penal Law Provisions Protect Governmental, Not Private, Interests

As the FAC acknowledges, the breach of statutory duty cause of action requires that the enactments cited as predicates be "for the specific benefit and protection of . . . plaintiffs." (FAC ¶ 148). However, this requirement cannot be satisfied with respect to two of the alleged predicate crimes because both Penal Law Sections 145-148 and Section 85 of the Emergency Defense Regulations protect solely state and governmental interests and confer no legal rights on

private persons in relation to the civil law of torts under the CWO. (Naschitz Decl. ¶¶ 28-29).
This is clear from the enumeration of the interests protected in Section 84 of the Emergency
Defense Regulations, which refer solely to state interests such as the Government of Israel, its
Constitution, and government ministers and property. (*Id.* ¶ 28).[22] This distinction was made
explicit by the Supreme Court of Israel in *Vaknin* where Justice Barak explained that some
statutes "were not intended to protect the interests of the individual. These include those statutes
aimed at protecting the interests of the State, of the government, and of the collective fabric of
life, and the lifestyle of the nation." (*Id.* ¶ 29).

Because the Emergency Defense Regulations and Penal Law provisions cited in the FAC
protect governmental interests, they are not, as a matter of law, intended for the "specific benefit
and protection of . . . the plaintiffs" or other individuals for purposes of civil claims for money
damages in tort.

### 3.    The FAC Fails to Satisfy the Double Actionability and Double Criminality Requirements Under Israeli Law

In order for the FAC's theory of liability for breach of statutory duty to be valid, it must
allege that BOC's tortious and criminal conduct, under Israeli law, would be similarly unlawful
in China. For instance, Sections 14(a)-(b)(1) of the Penal Law provide that "Israeli penal law
shall apply to foreign offences against . . . an Israeli national or resident . . . [w]here the offence
is committed [in] . . . another state . . . *only if it is an offence also under the law of that state.*"
(Naschitz Decl. ¶ 23) (emphasis supplied). This is an important issue of principle so as to avoid
criminalizing under Israeli law extra-territorial conduct which is lawful in the country where the
conduct occurred.

There is, however, no allegation in the FAC that the predicate Israeli offenses cited in
Count Two also constitute criminal offenses under Chinese law. This failure is fatal to the
breach of statutory duty theory of liability. As the Naschitz Declaration states: "The Plaintiffs

---

[22]    "[T]he provisions of the Penal Law, §§145-148, fall within the same category." (Naschitz Decl. ¶ 28).

have not alleged the content of Chinese law or provided an opinion to prove it. Therefore . . . the FAC does not disclose a cause of action for breach of statutory duty under Israeli law on that ground as well." (*Id.* ¶ 24).

This same analysis also applies to an alleged tort committed outside Israel. "[A]n Israeli court hearing a tort claim in which the alleged tort was committed abroad [would apply] the rule of double actionability, [under which] the plaintiff must show that the conduct complained of is a tort both according to the law of the forum as well as the law of the place of the commission of the tort." (*Id.* ¶ 21). The FAC is silent on the issue of the law of torts in China. Because it fails to satisfy this essential requirement of Israeli law for the extra-territorial application of tort and criminal law, Count Two must be dismissed.

4.   **The Specific Criminal Laws Cited in Count Five Do Not Apply to BOC**

a)   Section 4 of the Prevention of Terrorism Ordinance

Section 4 of the Terrorism Ordinance prohibits a variety of different forms of conduct supportive of terrorism – including publishing or possessing terrorist propaganda and providing a meeting place for a terrorist organization – none of which has anything to do with the FAC's allegations. Although the FAC does not specify, the only provisions of Section 4 which could arguably apply are Sections 4(d) and 4(f) which prohibit a defendant from "giv[ing] money . . . for the benefit of a terrorist organisation," and prohibit "put[ting] an article at the disposal" of someone for purposes of assisting a terrorist organization's act. (*See* Naschitz Decl. ¶ 16 (quoting Section 4)).

However, BOC is not alleged to have donated or contributed to Hamas or PIJ; nor does the FAC allege that BOC put an article or other tangible item at the disposal of a terrorist organization. Instead, the FAC alleges solely that BOC provided routine wire transfer facilities to a bank customer. As the Naschitz Declaration concludes: "it seems to follow quite clearly that none of the allegations in the FAC disclose[] the elements of any of [the] offenses" set forth in section 4 of the Terrorism Ordinance. (*Id.*)

41

b)     Sections 145-148 of the Penal Law

There is no aspect of Sections 145-148 of the Penal Law which even arguably applies to BOC or its alleged conduct.  These provisions apply to "unlawful associations and assemblies" and those who support them.  (Naschitz Decl. ¶ 17).  For instance, section 146 imposes criminal liability for advocating or encouraging unlawful associations or assemblies; section 148 prohibits the payment or solicitation of membership fees or contributions for or on account of unlawful associations.  (*Id.*)  The FAC's allegation that BOC violated these provisions of the Penal Law suggests that it has arbitrarily and irresponsibly cited to any provision of the Israeli criminal law having anything to do with support for terrorist organizations regardless of whether the text of the Israeli statute bears any relation to BOC's alleged conduct in the FAC.

c)     Section 85 of the Emergency Defense Regulations

The FAC does not specify which provision of the Emergency Defense Regulations it regards as relevant.  Section 85(c) imposes criminal liability on "any person who . . . does any work or performs any service for an unlawful association, unless he proves that he *bona fide* believed that the work or service was not for an unlawful association."  (Naschitz Decl. ¶ 18).  Clearly, this section does not apply.

The FAC does not allege that BOC worked for an unlawful association; nor does it allege that BOC performed any service for an unlawful association within the meaning of Section 85(c).  In order for "[a] service to be considered as a service 'performed for' an unlawful association," and be violative of this provision, the "performance of a service directly for the unlawful association" would be required, such as a contract for services.  (*Id.*)  As the Naschitz Declaration concludes on this point:  "the allegations in the FAC are not to the effect that the Bank had a contract of services with the PIJ, but rather the banking services were given to an individual account holder, who is alleged" to be an agent of the unlawful associations.  (*Id.*).  As

42

such, the FAC states no claim under Section 85(c).  (*Id.*)[23]

### C.  The Sixth Cause of Action, Alleging Vicarious Liability, Fails to State a Claim

The FAC next alleges that BOC is vicariously liable in tort for the Plaintiffs' alleged

damages.  This cause of action alleges a violation of Section 12 of the CWO, which provides:

> For the purpose of this Ordinance, any person who joins or aids in,
> authorises, counsels, commands, procures or ratifies any act done
> or to be done, or any omission made or to be made, by any other
> person shall be liable for such act or omission.

(Naschitz Decl. ¶ 17).  Even before reference to Israeli law, the Plaintiffs' claim is refuted by the

very text of Section 12.  The FAC does not, and cannot, genuinely allege that BOC "join[ed] or

aid[ed] in, authorise[d], counsel[ed], command[ed], procure[d] or ratifie[d]" the terrorist violence

detailed in the FAC.

Moreover, to be a legally valid allegation of a violation of Section 12, the FAC also must

allege that the defendant "ha[s] a subjective intent to commit the same act as the principal

wrongdoer . . . .  [I]t is not sufficient that a party may have merely assisted a person, who then

committed or procured others to commit a violent tortious act . . . ." (Naschitz Decl. ¶ 30).  As

the Supreme Court of Israel stated in CA 1636/98 *Rav Bariach Ltd. v. Havshush Vehicle*

*Accessory Trading House Ltd.* [2001] IsrSC 55(5) 337, 349,  holding that Section 12 of the CWO

is consistent with the common law rule on joint tortfeasors:

> Where one person instigates another to commit a tort they are joint
> tortfeasors; so are persons whose respective shares in the
> commission of a tort are done in furtherance of a common design.
> 'All persons in trespass who aid or counsel, direct, or join, are joint
> trespassers.'  But mere similarity of design on the part of

---

[23]     To the extent that BOC is regarded, in connection with wire transfers, to have "in its possession . .
. funds related to . . . an unlawful association," Section 85(f) contains language which has at least a
theoretical connection to the allegations in Count Two.  (*Id.* ¶ 19).

independent actors, causing independent damage, is not enough;
*there must be concerted action towards a common end*. A person
who only facilitated (as opposed to procured) a tort would not be
liable as a joint tortfeasor. (Naschitz Decl. ¶ 30) (emphasis
added).[24]

However, the FAC's vicarious liability claim merely tracks the general language of the

concept of vicarious liability. There is no allegation that BOC shared any subjective intent

similar to that of the persons or organizations responsible for the violent terrorist acts described

in the FAC. Indeed, the FAC is devoid of any factually supported allegation that even

approaches what a legally valid claim of vicarious liability under Section 12 requires.

As the Naschitz Declaration concludes in this regard, "it does not state a cause of action

under Section 12 for the Plaintiffs to allege that the Defendant Bank of China facilitated the

activity of terrorist organizations by the very rendition of banking services to a terrorist operant."

(*Id.*). Instead, the FAC, in order to allege the cause of action of vicarious liability, would have to

allege that the Bank of China "joined the conspiracy to carry out the terrorist bombings,

knowingly and in concert with the terrorist organization, thereby inflicting the alleged harm."

(*Id.*). Because it has not, and cannot, make such allegations, the statutory cause of action of

vicarious liability under Section 12 must be dismissed.[25]

---

[24]     Justice Englard paragraphs 18 and 22 of the judgment.

[25]     The Israeli statutory cause of action of vicarious liability is similar to the concept of aiding and
abetting under U.S. law, a valid pleading of which would require a showing that the Bank of China
"knows that [the principal's] conduct constitutes a breach of duty and gives substantial assistance or
encouragement" toward the accomplishment of the principal's objectives. *Khulumani v. Barclay Nat'l
Bank Ltd.*, 504 F.3d 254, 287-89 (2d Cir. 2007) (citing Restatement (Second) of Torts § 876(b));
*Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983) (aiding-abetting includes evidence, *inter alia*,
that the defendant knowingly and substantially assisted the principal violation"); *Ungar v. Islamic
Republic of Iran*, 211 F. Supp. 2d 91, 99 (D.D.C. 2002) (same principle). As shown, *supra*, on pages 23-
28, the FAC's allegations of BOC's actual and/or constructive knowledge of any connection between
terrorist violence and its routine provision of wire transfer facilities is insufficient.

**CONCLUSION**

For the foregoing reasons, BOC respectfully submits that the FAC should be dismissed as to BOC in its entirety.

Respectfully submitted,

Dated: March 5, 2009

By: /s/ Walter P. Loughlin                    By: /s/ Mitchell R. Berger
    Walter P. Loughlin                            Mitchell R. Berger (D.C. Bar No. 385467)
K&L Gates LLP                                 Patton Boggs LLP
599 Lexington Avenue                          2550 M Street, N.W.
New York, New York 10022-6030                 Washington, D.C. 20037
Telephone: (212) 536-3900                     Telephone: (202) 457-5601
Facsimile: (212) 536-3901

Co-counsel for Defendant Bank of China Limited

45

# STATUTORY APPENDIX

18 U.S.C. § 2331

18 U.S.C. § 2332

18 U.S.C. § 2333

18 U.S.C. § 2339A

18 U.S.C. § 2339B

18 U.S.C. § 2339C

D.C. Code § 13-422 (2001)

D.C. Code § 13-423 (2001)

Westlaw.

C

**Effective: October 26, 2001**

United States Code Annotated Currentness
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 113B. Terrorism (Refs & Annos)
        → **§ 2331. Definitions**

As used in this chapter--

  **(1)** the term "international terrorism" means activities that--

   **(A)** involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

   **(B)** appear to be intended--

     **(i)** to intimidate or coerce a civilian population;

     **(ii)** to influence the policy of a government by intimidation or coercion; or

     **(iii)** to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

   **(C)** occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;

  **(2)** the term "national of the United States" has the meaning given such term in section 101(a)(22) of the Immigration and Nationality Act;

  **(3)** the term "person" means any individual or entity capable of holding a legal or beneficial interest in property;

  **(4)** the term "act of war" means any act occurring in the course of--

   **(A)** declared war;

   **(B)** armed conflict, whether or not war has been declared, between two or more nations; or

   **(C)** armed conflict between military forces of any origin; and

  **(5)** the term "domestic terrorism" means activities that--

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**(A)** involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;

**(B)** appear to be intended--

    **(i)** to intimidate or coerce a civilian population;

    **(ii)** to influence the policy of a government by intimidation or coercion; or

    **(iii)** to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

**(C)** occur primarily within the territorial jurisdiction of the United States.

CREDIT(S)

(Added Pub.L. 102-572, Title X, § 1003(a)(3), Oct. 29, 1992, 106 Stat. 4521, and amended Pub.L. 107-56, Title VIII, § 802(a), Oct. 26, 2001, 115 Stat. 376.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

C

**Effective: April 24, 1996**

United States Code Annotated Currentness
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
     Part I. Crimes (Refs & Annos)
       Chapter 113B. Terrorism (Refs & Annos)
      ➡ § 2332. Criminal penalties

**(a) Homicide.**--Whoever kills a national of the United States, while such national is outside the United States, shall--

    **(1)** if the killing is murder (as defined in section 1111(a)), be fined under this title, punished by death or imprisonment for any term of years or for life, or both;

    **(2)** if the killing is a voluntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than ten years, or both; and

    **(3)** if the killing is an involuntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than three years, or both.

**(b) Attempt or conspiracy with respect to homicide.**--Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall--

    **(1)** in the case of an attempt to commit a killing that is a murder as defined in this chapter, be fined under this title or imprisoned not more than 20 years, or both; and

    **(2)** in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.

**(c) Other conduct.**--Whoever outside the United States engages in physical violence--

    **(1)** with intent to cause serious bodily injury to a national of the United States; or

    **(2)** with the result that serious bodily injury is caused to a national of the United States;

shall be fined under this title or imprisoned not more than ten years, or both.

**(d) Limitation on prosecution.**--No prosecution for any offense described in this section shall be undertaken by the United States except on written certification of the Attorney General or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population.

CREDIT(S)

(Added Pub.L. 99-399, Title XII, § 1202(a), Aug. 27, 1986, 100 Stat. 896, § 2331, and amended Pub.L. 102-572, Title X, § 1003(a)(1), Oct. 29, 1992, 106 Stat. 4521; renumbered § 2332 and amended Pub.L. 102-572, Title X, § 1003(a)(2), Oct. 29, 1992, 106 Stat. 4521; Pub.L. 103-322, Title VI, § 60022, Sept. 13, 1994, 108 Stat. 1980; Pub.L. 104-132, Title VII, § 705(a)(6), Apr. 24, 1996, 110 Stat. 1295.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**C**

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part 1. Crimes (Refs & Annos)
         Chapter 113B. Terrorism (Refs & Annos)
           → § 2333. Civil remedies

**(a) Action and jurisdiction.**--Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

**(b) Estoppel under United States law.**--A final judgment or decree rendered in favor of the United States in any criminal proceeding under section 1116, 1201, 1203, or 2332 of this title or section 46314, 46502, 46505, or 46506 of title 49 shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

**(c) Estoppel under foreign law.**--A final judgment or decree rendered in favor of any foreign state in any criminal proceeding shall, to the extent that such judgment or decree may be accorded full faith and credit under the law of the United States, estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

CREDIT(S)

(Added Pub.L. 102-572, Title X, § 1003(a)(4), Oct. 29, 1992, 106 Stat. 4522, and amended Pub.L. 103-429, § 2(1), Oct. 31, 1994, 108 Stat. 4377.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

18 U.S.C.A. § 2339A                                                                                      Page 1

► 

**Effective: March 9, 2006**

United States Code Annotated Currentness
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part I. Crimes (Refs & Annos)
         Chapter 113B. Terrorism (Refs & Annos)
      → **§ 2339A. Providing material support to terrorists**

**(a) Offense.**--Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, or 2340A of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

**(b) Definitions.**--As used in this section--

   **(1)** the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

   **(2)** the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

   **(3)** the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

CREDIT(S)

(Added Pub.L. 103-322, Title XII, § 120005(a), Sept. 13, 1994, 108 Stat. 2022, and amended Pub.L. 104-132, Title III, § 323, Apr. 24, 1996, 110 Stat. 1255; Pub.L. 104-294, Title VI, §§ 601(b)(2), (s)(2), (3), 604(b)(5), Oct. 11, 1996, 110 Stat. 3498, 3502, 3506; Pub.L. 107-56, Title VIII, §§ 805(a), 810(c), 811(f), Oct. 26, 2001, 115 Stat. 377, 380, 381; Pub.L. 107-197, Title III, § 301(c), June 25, 2002, 116 Stat. 728; Pub.L. 107-273, Div. B, Title IV, § 4002(a)(7), (c)(1), (e)(11), Nov. 2, 2002, 116 Stat. 1807, 1808, 1811; Pub.L. 108-458, Title VI, § 6603(a)(2), (b), Dec. 17, 2004, 118 Stat. 3762; Pub.L. 109-177, Title I, § 110(b)(3)(B), Mar. 9, 2006, 120 Stat. 208.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw

► 

**Effective: December 17, 2004**

United States Code Annotated Currentness
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      📖 Part 1. Crimes (Refs & Annos)
         📖 Chapter 113B. Terrorism (Refs & Annos)
         ➡ **§ 2339B. Providing material support or resources to designated foreign terrorist organizations**

**(a) Prohibited activities.--**

   **(1) Unlawful conduct.**--Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d) (2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

   **(2) Financial institutions.**--Except as authorized by the Secretary, any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, shall--

      **(A)** retain possession of, or maintain control over, such funds; and

      **(B)** report to the Secretary the existence of such funds in accordance with regulations issued by the Secretary.

**(b) Civil penalty.**--Any financial institution that knowingly fails to comply with subsection (a)(2) shall be subject to a civil penalty in an amount that is the greater of--

      **(A)** $50,000 per violation; or

      **(B)** twice the amount of which the financial institution was required under subsection (a)(2) to retain possession or control.

**(c) Injunction.**--Whenever it appears to the Secretary or the Attorney General that any person is engaged in, or is about to engage in, any act that constitutes, or would constitute, a violation of this section, the Attorney General may initiate civil action in a district court of the United States to enjoin such violation.

**(d) Extraterritorial jurisdiction.--**

   **(1) In general.**--There is jurisdiction over an offense under subsection (a) if--

      **(A)** an offender is a national of the United States (as defined in section 101(a)(22) of the Immigration and Na-

tionality Act (8 U.S.C. 1101(a)(22))) or an alien lawfully admitted for permanent residence in the United States (as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)));

(B) an offender is a stateless person whose habitual residence is in the United States;

(C) after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;

(D) the offense occurs in whole or in part within the United States;

(E) the offense occurs in or affects interstate or foreign commerce; or

(F) an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

(2) **Extraterritorial jurisdiction.**--There is extraterritorial Federal jurisdiction over an offense under this section.

(e) **Investigations.--**

(1) **In general.**--The Attorney General shall conduct any investigation of a possible violation of this section, or of any license, order, or regulation issued pursuant to this section.

(2) **Coordination with the Department of the Treasury.**--The Attorney General shall work in coordination with the Secretary in investigations relating to--

(A) the compliance or noncompliance by a financial institution with the requirements of subsection (a)(2); and

(B) civil penalty proceedings authorized under subsection (b).

(3) **Referral.**--Any evidence of a criminal violation of this section arising in the course of an investigation by the Secretary or any other Federal agency shall be referred immediately to the Attorney General for further investigation. The Attorney General shall timely notify the Secretary of any action taken on referrals from the Secretary, and may refer investigations to the Secretary for remedial licensing or civil penalty action.

(f) **Classified information in civil proceedings brought by the United States.--**

(1) **Discovery of classified information by defendants.--**

(A) **Request by United States.**--In any civil proceeding under this section, upon request made ex parte and in writing by the United States, a court, upon a sufficient showing, may authorize the United States to--

(i) redact specified items of classified information from documents to be introduced into evidence or made available to the defendant through discovery under the Federal Rules of Civil Procedure;

(ii) substitute a summary of the information for such classified documents; or

(iii) substitute a statement admitting relevant facts that the classified information would tend to prove.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**(B) Order granting request.**--If the court enters an order granting a request under this paragraph, the entire text of the documents to which the request relates shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

**(C) Denial of request.**--If the court enters an order denying a request of the United States under this paragraph, the United States may take an immediate, interlocutory appeal in accordance with paragraph (5). For purposes of such an appeal, the entire text of the documents to which the request relates, together with any transcripts of arguments made ex parte to the court in connection therewith, shall be maintained under seal and delivered to the appellate court.

**(2) Introduction of classified information; precautions by court.**--

**(A) Exhibits.**--To prevent unnecessary or inadvertent disclosure of classified information in a civil proceeding brought by the United States under this section, the United States may petition the court ex parte to admit, in lieu of classified writings, recordings, or photographs, one or more of the following:

(i) Copies of items from which classified information has been redacted.

(ii) Stipulations admitting relevant facts that specific classified information would tend to prove.

(iii) A declassified summary of the specific classified information.

**(B) Determination by court.**--The court shall grant a request under this paragraph if the court finds that the redacted item, stipulation, or summary is sufficient to allow the defendant to prepare a defense.

**(3) Taking of trial testimony.**--

**(A) Objection.**--During the examination of a witness in any civil proceeding brought by the United States under this subsection, the United States may object to any question or line of inquiry that may require the witness to disclose classified information not previously found to be admissible.

**(B) Action by court.**--In determining whether a response is admissible, the court shall take precautions to guard against the compromise of any classified information, including--

(i) permitting the United States to provide the court, ex parte, with a proffer of the witness's response to the question or line of inquiry; and

(ii) requiring the defendant to provide the court with a proffer of the nature of the information that the defendant seeks to elicit.

**(C) Obligation of defendant.**--In any civil proceeding under this section, it shall be the defendant's obligation to establish the relevance and materiality of any classified information sought to be introduced.

**(4) Appeal.**--If the court enters an order denying a request of the United States under this subsection, the United States may take an immediate interlocutory appeal in accordance with paragraph (5).

**(5) Interlocutory appeal.**--

(A) **Subject of appeal.**--An interlocutory appeal by the United States shall lie to a court of appeals from a decision or order of a district court--

(i) authorizing the disclosure of classified information;

(ii) imposing sanctions for nondisclosure of classified information; or

(iii) refusing a protective order sought by the United States to prevent the disclosure of classified information.

(B) **Expedited consideration.**--

(i) **In general.**--An appeal taken pursuant to this paragraph, either before or during trial, shall be expedited by the court of appeals.

(ii) **Appeals prior to trial.**--If an appeal is of an order made prior to trial, an appeal shall be taken not later than 10 days after the decision or order appealed from, and the trial shall not commence until the appeal is resolved.

(iii) **Appeals during trial.**--If an appeal is taken during trial, the trial court shall adjourn the trial until the appeal is resolved, and the court of appeals--

(I) shall hear argument on such appeal not later than 4 days after the adjournment of the trial;

(II) may dispense with written briefs other than the supporting materials previously submitted to the trial court;

(III) shall render its decision not later than 4 days after argument on appeal; and

(IV) may dispense with the issuance of a written opinion in rendering its decision.

(C) **Effect of ruling.**--An interlocutory appeal and decision shall not affect the right of the defendant, in a subsequent appeal from a final judgment, to claim as error reversal by the trial court on remand of a ruling appealed from during trial.

**(6) Construction.**--Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States to protect against the disclosure of classified information, including the invocation of the military and State secrets privilege.

**(g) Definitions.**--As used in this section--

(1) the term "classified information" has the meaning given that term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.);

(2) the term "financial institution" has the same meaning as in section 5312(a)(2) of title 31, United States Code;

(3) the term "funds" includes coin or currency of the United States or any other country, traveler's checks, personal checks, bank checks, money orders, stocks, bonds, debentures, drafts, letters of credit, any other negotiable

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

instrument, and any electronic representation of any of the foregoing;

(4) the term "material support or resources" has the same meaning given that term in section 2339A (including the definitions of "training" and "expert advice or assistance" in that section);

(5) the term "Secretary" means the Secretary of the Treasury; and

(6) the term "terrorist organization" means an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act.

(h) **Provision of personnel.**--No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

(i) **Rule of construction.**--Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States.

(j) **Exception.**--No person may be prosecuted under this section in connection with the term "personnel", "training", or "expert advice or assistance" if the provision of that material support or resources to a foreign terrorist organization was approved by the Secretary of State with the concurrence of the Attorney General. The Secretary of State may not approve the provision of any material support that may be used to carry out terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act).

CREDIT(S)

(Added Pub.L. 104-132, Title III, § 303(a), Apr. 24, 1996, 110 Stat. 1250, and amended Pub.L. 107-56, Title VIII, § 810(d), Oct. 26, 2001, 115 Stat. 380; Pub.L. 108-458, Title VI, § 6603(c) to (f), Dec. 17, 2004, 118 Stat. 3762, 3763.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw

**Effective: March 9, 2006**

United States Code Annotated Currentness
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 113B. Terrorism (Refs & Annos)
            → § 2339C. Prohibitions against the financing of terrorism

**(a) Offenses.--**

**(1) In general.**--Whoever, in a circumstance described in subsection (b), by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out--

    **(A)** an act which constitutes an offense within the scope of a treaty specified in subsection (e)(7), as implemented by the United States, or

    **(B)** any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act,

shall be punished as prescribed in subsection (d)(1).

**(2) Attempts and conspiracies.**--Whoever attempts or conspires to commit an offense under paragraph (1) shall be punished as prescribed in subsection (d)(1).

**(3) Relationship to predicate act.**--For an act to constitute an offense set forth in this subsection, it shall not be necessary that the funds were actually used to carry out a predicate act.

**(b) Jurisdiction.**--There is jurisdiction over the offenses in subsection (a) in the following circumstances--

    **(1)** the offense takes place in the United States and--

    **(A)** a perpetrator was a national of another state or a stateless person;

    **(B)** on board a vessel flying the flag of another state or an aircraft which is registered under the laws of another state at the time the offense is committed;

    **(C)** on board an aircraft which is operated by the government of another state;

    **(D)** a perpetrator is found outside the United States;

(E) was directed toward or resulted in the carrying out of a predicate act against--

(i) a national of another state; or

(ii) another state or a government facility of such state, including its embassy or other diplomatic or consular premises of that state;

(F) was directed toward or resulted in the carrying out of a predicate act committed in an attempt to compel another state or international organization to do or abstain from doing any act; or

(G) was directed toward or resulted in the carrying out of a predicate act--

(i) outside the United States; or

(ii) within the United States, and either the offense or the predicate act was conducted in, or the results thereof affected, interstate or foreign commerce;

(2) the offense takes place outside the United States and--

(A) a perpetrator is a national of the United States or is a stateless person whose habitual residence is in the United States;

(B) a perpetrator is found in the United States; or

(C) was directed toward or resulted in the carrying out of a predicate act against--

(i) any property that is owned, leased, or used by the United States or by any department or agency of the United States, including an embassy or other diplomatic or consular premises of the United States;

(ii) any person or property within the United States;

(iii) any national of the United States or the property of such national; or

(iv) any property of any legal entity organized under the laws of the United States, including any of its States, districts, commonwealths, territories, or possessions;

(3) the offense is committed on board a vessel flying the flag of the United States or an aircraft which is registered under the laws of the United States at the time the offense is committed;

(4) the offense is committed on board an aircraft which is operated by the United States; or

(5) the offense was directed toward or resulted in the carrying out of a predicate act committed in an attempt to compel the United States to do or abstain from doing any act.

(c) **Concealment.**--Whoever--

(1)(A) is in the United States; or

**(B)** is outside the United States and is a national of the United States or a legal entity organized under the laws of the United States (including any of its States, districts, commonwealths, territories, or possessions); and

**(2)** knowingly conceals or disguises the nature, location, source, ownership, or control of any material support or resources, or any funds or proceeds of such funds--

**(A)** knowing or intending that the support or resources are to be provided, or knowing that the support or resources were provided, in violation of <u>section 2339B</u> of this title; or

**(B)** knowing or intending that any such funds are to be provided or collected, or knowing that the funds were provided or collected, in violation of subsection (a),

shall be punished as prescribed in subsection (d)(2).

**(d) Penalties.--**

**(1) Subsection (a)**--Whoever violates subsection (a) shall be fined under this title, imprisoned for not more than 20 years, or both.

**(2) Subsection (c)**--Whoever violates subsection (c) shall be fined under this title, imprisoned for not more than 10 years, or both.

**(e) Definitions.**--In this section--

**(1)** the term "funds" means assets of every kind, whether tangible or intangible, movable or immovable, however acquired, and legal documents or instruments in any form, including electronic or digital, evidencing title to, or interest in, such assets, including coin, currency, bank credits, travelers checks, bank checks, money orders, shares, securities, bonds, drafts, and letters of credit;

**(2)** the term "government facility" means any permanent or temporary facility or conveyance that is used or occupied by representatives of a state, members of a government, the legislature, or the judiciary, or by officials or employees of a state or any other public authority or entity or by employees or officials of an intergovernmental organization in connection with their official duties;

**(3)** the term "proceeds" means any funds derived from or obtained, directly or indirectly, through the commission of an offense set forth in subsection (a);

**(4)** the term "provides" includes giving, donating, and transmitting;

**(5)** the term "collects" includes raising and receiving;

**(6)** the term "predicate act" means any act referred to in subparagraph (A) or (B) of subsection (a)(1);

**(7)** the term "treaty" means--

**(A)** the Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague on December 16, 1970;

(B) the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, done at Montreal on September 23, 1971;

(C) the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, adopted by the General Assembly of the United Nations on December 14, 1973;

(D) the International Convention against the Taking of Hostages, adopted by the General Assembly of the United Nations on December 17, 1979;

(E) the Convention on the Physical Protection of Nuclear Material, adopted at Vienna on March 3, 1980;

(F) the Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, supplementary to the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, done at Montreal on February 24, 1988;

(G) the Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation, done at Rome on March 10, 1988;

(H) the Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms located on the Continental Shelf, done at Rome on March 10, 1988; or

(I) the International Convention for the Suppression of Terrorist Bombings, adopted by the General Assembly of the United Nations on December 15, 1997;

(8) the term "intergovernmental organization" includes international organizations;

(9) the term "international organization" has the same meaning as in section 1116(b)(5) of this title;

(10) the term "armed conflict" does not include internal disturbances and tensions, such as riots, isolated and sporadic acts of violence, and other acts of a similar nature;

(11) the term "serious bodily injury" has the same meaning as in section 1365(g)(3) of this title;

(12) the term "national of the United States" has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

(13) the term "material support or resources" has the same meaning given that term in section 2339B(g)(4) of this title; and

(14) the term "state" has the same meaning as that term has under international law, and includes all political subdivisions thereof.

(f) Civil penalty.--In addition to any other criminal, civil, or administrative liability or penalty, any legal entity located within the United States or organized under the laws of the United States, including any of the laws of its States, districts, commonwealths, territories, or possessions, shall be liable to the United States for the sum of at least $10,000, if a person responsible for the management or control of that legal entity has, in that capacity, committed an offense set forth in subsection (a).

CREDIT(S)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(Added Pub.L. 107-197, Title II, § 202(a), June 25, 2002, 116 Stat. 724, and amended Pub.L. 107-273, Div. B, Title IV, § 4006, Nov. 2, 2002, 116 Stat. 1813; Pub.L. 108-458, Title VI, § 6604, Dec. 17, 2004, 118 Stat. 3764; Pub.L. 109-177, Title IV, § 408, Mar. 9, 2006, 120 Stat. 245.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**C** Formerly cited as DC ST 1981 § 13-422

District of Columbia Official Code 2001 Edition <u>Currentness</u>
    Division II. Judiciary and Judicial Procedure
        Title 13. Procedure Generally. <u>(Refs & Annos)</u>
            <u>Chapter 4</u>. Civil Jurisdiction and Service Outside the District of Columbia. <u>(Refs & Annos)</u>
            <u>Subchapter II</u>. Bases of Personal Jurisdiction Over Persons Outside the District of Columbia. <u>(Refs & Annos)</u>
                ➡ **§ 13-422. Personal jurisdiction based upon enduring relationship.**

A District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief.

CREDIT(S)

(July 29, 1970, 84 Stat. 549, Pub. L. 91-358, title I, § 132(a).)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

DC ST § 13-423

**C** Formerly cited as DC ST 1981 § 13-423

District of Columbia Official Code 2001 Edition Currentness
    Division II. Judiciary and Judicial Procedure
        Title 13. Procedure Generally. (Refs & Annos)
            Chapter 4. Civil Jurisdiction and Service Outside the District of Columbia. (Refs & Annos)
                Subchapter II. Bases of Personal Jurisdiction Over Persons Outside the District of Columbia. (Refs & Annos)
                    → **§ 13-423. Personal jurisdiction based upon conduct.**

(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's --

  (1) transacting any business in the District of Columbia;

  (2) contracting to supply services in the District of Columbia;

  (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

  (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;

  (5) having an interest in, using, or possessing real property in the District of Columbia;

  (6) contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia at the time of contracting, unless the parties otherwise provide in writing; or

  (7) marital or parent and child relationship in the District of Columbia if:

    (A) the plaintiff resides in the District of Columbia at the time the suit is filed;

    (B) such person is personally served with process; and

    (C) in the case of a claim arising from a marital relationship:

      (i) the District of Columbia was the matrimonial domicile of the parties immediately prior to their separation, or

      (ii) the cause of action to pay spousal support arose under the laws of the District of Columbia or under an agreement executed by the parties in the District of Columbia; or

    (D) in the case of a claim affecting the parent and child relationship:

(i) the child was conceived in the District of Columbia and such person is the parent or alleged parent of the child;

(ii) the child resides in the District of Columbia as a result of the acts, directives, or approval of such person; or

(iii) such person has resided with the child in the District of Columbia.

(E) Notwithstanding the provisions of subparagraphs (A) through (D), the court may exercise personal jurisdiction if there is any basis consistent with the United States Constitution for the exercise of personal jurisdiction.

(b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

CREDIT(S)

(July 29, 1970, 84 Stat. 549, Pub. L. 91-358, title I, § 132(a); Mar. 10, 1983, D.C. Law 4-200, § 4, 30 DCR 125.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## CERTIFICATE OF SERVICE

I, Sarah P. Kenney, hereby certify that on March 5, 2009, I caused (i) Defendant Bank of China Limited's Motion to Dismiss the First Amended Complaint, (ii) Memorandum of Points and Authorities in Support of Defendant Bank of China Limited's Motion to Dismiss the First Amended Complaint, (iii) Declaration of Walter P. Loughlin with exhibits 1-12, (iv) Declaration of Peter Gad Naschitz with exhibit A, (v) Declaration of Charles W. Freeman III, (vi) Declaration of Wang Lijun and (vii) Proposed Order to be served by first class mail, postage prepaid, addressed as follows:

> Robert J. Tolchin, Esq.
> Jaroslawicz & Jaros, LLC
> 225 Broadway, 24th Floor
> New York, New York 10007
> *Attorney for Plaintiffs*

Dated:   New York, New York
         March 5, 2009

Sarah P. Kenney