UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------- X
                :

SHERYL WULTZ, individually, as      :
personal representative of the Estate of  :
Daniel Wultz, and as the natural     :
guardian of plaintiff Abraham Leonard :
Wultz, YEKUTIEL WULTZ,        :
individually, as personal representative  :
of the Estate of Daniel Wultz, and as the :
natural guardian of plaintiff Abraham  :    **OPINION AND ORDER**
Leonard Wultz, AMANDA WULTZ, and :
ABRAHAM LEONARD WULTZ, minor, :    11 Civ. 1266 (SAS)
by his next friends and guardians     :
Sheryl Wultz and Yekutiel Wultz,    :
                :
         Plaintiffs,   :
                :
    - against -        :
                :
BANK OF CHINA LIMITED,     :
                :
         Defendant. :
------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: 8/3/11

SHIRA A. SCHEINDLIN, U.S.D.J.:

# I.   INTRODUCTION

      This suit arises out of the death of Daniel Wultz, and the injuries of

Yekutiel Wultz, suffered in a 2006 suicide bombing in Tel Aviv, Israel.  Four

members of the Wultz family bring this suit against Bank of China ("BOC"),

alleging acts of international terrorism and aiding and abetting international

terrorism under the Antiterrorism Act ("ATA"),[1] as well as negligence, breach of statutory duty, and vicarious liability under Israeli law.  BOC moves the Court to apply New York, rather than Israeli, law to plaintiffs' non-federal claims.  For the reasons discussed below, defendant's motion is denied.

## II.    BACKGROUND

On April 17, 2006, the Palestinian Islamic Jihad ("PIJ") carried out a suicide bombing in Tel Aviv, Israel,[2] severely injuring sixteen-year-old Daniel Wultz and his father, Yekutiel Wultz, both Florida residents.[3]  Daniel Wultz died of his injuries on May 14, 2006.[4]  The attack killed ten others and injured many more.[5]

The PIJ, a radical terrorist organization founded in the Gaza Strip in the early 1980s,[6] seeks "the creation of an Islamic state in the territory of Israel, the West Bank and the Gaza Strip, and the destruction of the state of Israel and the

---

[1]    *See* 18 U.S.C. § 2333.

[2]    *See* First Amended Complaint ("FAC") ¶¶ 1-2.

[3]    *See id.* ¶ 3.

[4]    *See id.*

[5]    *See id.* ¶ 85.

[6]    *See id.* ¶ 26.

murder or expulsion of its Jewish residents."[7]  Since its founding, the PIJ has

committed thousands of terrorist acts, killing numerous American and Israeli

citizens.[8]  Consequently, the PIJ had been designated by the United States

Government as a Foreign Terrorist Organization and a Specially Designated Global

Terrorist,[9] and is therefore subject to stringent economic sanctions.[10]

The American-imposed sanctions regime seeks to "prevent PIJ from

conducting banking activities and thereby limit its ability to plan, prepare and [ ]

carry out terrorist attacks."[11]  According to plaintiffs, however, BOC has not

complied with those regulations.[12]  Between 2003 and the 2006 attack, BOC

facilitated dozens of wire transfers, totaling millions of U.S. dollars, for the PIJ.[13]

Most of the transactions were initiated at a BOC branch in Guangzhou, China, in

the name of "S.Z.R[.] Alshurafa," from an account owned by a PIJ leader named

---

[7]     *Id.* ¶ 27.

[8]     *See id.* ¶¶ 28-30.

[9]     *See id.* ¶ 31.

[10]     *See id.* ¶ 63.

[11]     *Id.* ¶ 64.

[12]     *See id.* ¶ 68.

[13]     *See id.* ¶ 69.

Said al-Shurafa.[14]  Other transfers were made by way of BOC branches in the United States to another of Shurafa's accounts.[15]  Plaintiffs allege that these transfers were instrumental in helping the PIJ to plan and execute terrorist attacks.[16]

In April 2005, Israeli security officers informed Chinese security and bank officials of exactly why the PIJ transfers were being made and of the impact the transfers had on the PIJ's terrorist activities.[17]  Later that month, Chinese officials alerted the BOC leadership that Israeli officials had requested that BOC halt the transfers.[18]  Plaintiffs aver that BOC ignored these warnings and demands.[19]  Plaintiffs therefore allege that "[a]t all times, BOC had actual knowledge that the PIJ transfers were being made by the PIJ for the purpose of carrying out terrorist attacks."[20]  Further, plaintiffs contend that regardless of the warning from Israeli officials, BOC "knew or should have known that the PIJ

---

[14]     *Id.*

[15]     *See id.*

[16]     *See id.* ¶ 74.

[17]     *See id.* ¶¶ 74, 77.

[18]     *See id.* ¶ 77.

[19]     *See id.*

[20]     *Id.*

transfers were being made for illegal purposes because BOC had and has statutory duties,"[21] specifically to follow rules promulgated by the United States' Financial Action Task Force.[22]

The Wultz family originally filed suit in the U.S. District Court for the District of Columbia, against the Islamic Republic of Iran and several of its leaders, the Syrian Arabic Republic and several of its leaders, as well as BOC.[23] That court denied BOC's motion to dismiss,[24] but on reconsideration, acknowledged that it lacked personal jurisdiction over the Bank, severed the claims against BOC from the others, and transferred the case here.[25]  In April, I denied BOC's request to reconsider its motion to dismiss, but ordered briefing on choice of law.[26]

## III.   APPLICABLE LAW

### A.   Waiver

---

[21]    *Id.* ¶ 80.

[22]    *See id.*

[23]    *See generally* FAC.

[24]    *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010).

[25]    *See Wultz v. Islamic Republic of Iran*, 762 F. Supp. 2d 18, 20 (D.D.C. 2011).

[26]    *See* Transcript of 4/04/11 Conference ("4/04/11 Tr."), at 7, 36.

When a party assumes in its briefs that a particular jurisdiction's law applies, it gives "'implied consent [. . .] sufficient to establish choice of law,'"[27] at least unless "strong countervailing public policy" suggests otherwise.[28]  Courts, though, do not generally hold the choice-of-law determination to have been waived until a late stage in litigation, such as at the point of making of summary judgment motions.[29]  Furthermore, in contrast to appellate courts, district courts are not

---

[27]     *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000) (quoting *Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) ("[I]mplied consent to use a forum's law is sufficient to establish choice of law. . . .").  *Accord International Bus. Mach. Corp. v. Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 423 (2d Cir. 2002); *Bluestein & Sander v. Chicago Ins. Co.*, 276 F.3d 119, 121-22 (2d Cir. 2002); *Larsen v. A.C. Carpenter, Inc.*, 620 F. Supp. 1084, 1103 (E.D.N.Y. 1985), *aff'd*, 800 F.2d 1128 (2d Cir. 1986).

[28]     *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984).

[29]     *See Santalucia*, 232 F.3d 293 (finding waiver when adjudicating fee dispute after the settlement of an underlying suit); *Tehran-Berkeley Civil & Envtl. Eng'rs*, 888 F.2d 239 (finding waiver on appeal for the second time); *International Bus. Mach. Corp.*, 303 F.3d 419 (finding waiver during appeal from summary judgment); *Bluestein & Sander*, 276 F.3d 119 (finding waiver during appeal from summary judgment); *Larsen*, 620 F. Supp. 1084 (finding waiver in bench trial opinion).  The same principle is found in the cases cited by plaintiffs.  *See, e.g.*, *CSX Transp., Inc. v. Commercial Union Ins. Co.*, 82 F.3d 478 (D.C. Cir. 1996) (finding waiver during appeal from summary judgment); *Muslin v. Frelinghuysen Livestock Managers, Inc.*, 777 F.2d 1230, 1231 n.1 (7th Cir. 1985) (finding waiver at a "late point in this litigation"); *Farm Credit Bank of Texas v. Fireman's Fund Ins. Co.*, 822 F. Supp. 1251, 1258 (W.D. La. 1993), *aff'd*, 50 F.3d 1033 (5th Cir. 1995) (finding waiver on summary judgment).

required to consider arguments on a strict timetable.[30]  Rather, "in most cases trial judges can provide parties with an adequate opportunity to respond to particular arguments by ordering additional briefing or an extra round of oral argument."[31]

### B.  Conflict of Laws

When exercising supplemental jurisdiction over state law claims, federal courts follow the choice of law rules of the forum state to determine the controlling substantive law.[32]  In New York, "'the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws.'"[33]  "In the absence of substantive difference . . . a New York court will dispense with choice of law analysis; and if New York law is

---

[30]     *See Booking v. General Star Mgmt. Co.*, 254 F.3d 414, 418 (2d Cir. 2001) ("The courts of appeals generally do not consider arguments raised for the first time in reply briefs because, *inter alia*, such is the dictate of Rule 28(a) of the Federal Rules of Appellate Procedure . . . . These considerations, however, do not apply with full force in a district court.  Rule 28 of the Federal Rules of Appellate Procedure, for example, has no analogue in the Federal Rules of Civil Procedure . . .").

[31]     *Id.*

[32]     *See Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).

[33]     *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir. 1998)).

among the relevant choices, New York courts are free to apply it."[34]

### C.    Choice of Law

To resolve conflicts in tort cases, New York applies an "interest analysis" to identify the jurisdiction that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that "'relate to the purpose of the particular law in conflict.'"[35]

> Under the interest-analysis test, torts are divided into two types, those involving the appropriate standards of conduct, rules of the road, for example and those that relate to allocating losses that result from admittedly tortious conduct . . . such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit.[36]

"Conduct-regulating rules have the prophylactic effect of governing conduct to prevent injuries from occurring."[37]  When such rules are at issue, the

---

[34]    *International Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

[35]    *GlobalNet Financial.com*, 449 F.3d at 384 (quoting *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197 (1985)).  *Accord Finance One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 337 (2d Cir. 2005) (citation omitted) (explaining that the interest analysis is a "flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation").

[36]    *GlobalNet Financial.com*, 449 F.3d at 384 (quotation marks and citations omitted).

[37]    *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 522 (1994).

law of the place of the tort — commonly known as *lex loci delicti* — "will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."[38]  "For claims sounding in negligence, courts generally apply the law of the state where the injury is suffered, rather than the state where the negligent conduct occurred."[39]  This test — looking to the location of the "last event necessary" to make a party liable — "however is not dispositive. . . . Rather, courts must still conduct an interest analysis."[40]  Cases arising out of acts of terror present a strong case for departing from the last-event necessary test.[41]  The same is true of cases involving international business dealings.[42]

---

[38]     *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993).

[39]     *HSA Residential Mortg. Servs. of Texas v. Casuccio*, 350 F. Supp. 2d 352, 364 (E.D.N.Y. 2003) (citing *Schultz*, 65 N.Y.2d at 195).

[40]     *Id.*

[41]     *Cf. In re Sept. 11th Litig.*, 494 F. Supp. 2d 232, 239 (S.D.N.Y. 2007) (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 13 (2d Cir. 1996)) ("For claims arising out of a 'disaster befalling a plane aloft,' however, 'the place of the crash is often random or, as here, fixed by a warped mind,' and thus legitimate reasons to deviate from the *lex loci delicti* rule may exist.").  To be sure, a case arising out of an act of terror involving an airplane presents an especially strong case for a departure from last-event necessary, given that the place of the crash may be random.  In contrast, a terrorist bombing such as the one at issue in the instant litigation may be "fixed by a warped mind," but it was nevertheless specifically chosen and was not in any way random.

[42]     *See LaSala v. TSB Bank, PLC*, 514 F. Supp. 2d 447, 465-66 (S.D.N.Y. 2007) ("A situation such as this, where the alleged misconduct occurred in one jurisdiction, but because of the international nature of a company's business

Nevertheless, "in tort cases involving personal injury and property damage, the doctrine of *lex loci delicti* governs except in 'extraordinary circumstances.'"[43]   In the end, "[i]f the choice of law analysis leads to the application of foreign law, a court may refuse to apply that law only if its application would be violative of fundamental notions of justice or prevailing concepts of good morals."[44]

Other courts have outlined several considerations that are useful in an interest analysis.  Generally speaking, a jurisdiction has an interest in "protecting the reasonable expectations of the parties who relied on" that jurisdiction's law in orienting their conduct.[45]  More specifically, when a U.S. citizen falls victim to a terrorist attack, "the United States has a 'unique interest' in having its domestic law apply."[46]  In fact, the United States has a "profound and compelling interest in

dealings the harm caused by that misconduct was felt in another country, presents precisely the sort of circumstance where a blind adherence to the rule that the last place determines the locus of the tort and therefore the jurisdiction with the greatest interest would result in the jurisdiction which does not possess the greatest interest being deemed so for choice[-]of[-]law purposes.").

[43]     *Campbell v. Goodyear Tire & Rubber Co.*, No. 83 Civ. 6282, 1985 WL 1514, at *1 (S.D.N.Y. June 3, 1985) (quoting *Cousins v. Instrument Flyers, Inc.*, 44 N.Y.2d 698, 699 (1978)).

[44]     *Curley*, 153 F.3d at 12 (citing *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1031 (2d Cir. 1996)).

[45]     *Hamilton v. Accu-Tek*, 47 F. Supp. 2d 330, 337 (E.D.N.Y. 1999).

[46]     *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 210 (D.D.C. 2008).

combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks," especially when the network's financial underpinnings rely upon U.S. financial institutions.[47]  Of course, when it comes to terrorism, a jurisdiction's interest in having its law applied is heightened when its citizens comprise the majority of those injured and when its property bears the brunt of the damage.[48]  A locale's interest is also heightened when its citizens were specifically targeted by terrorists.[49]

Congress has articulated the United States' strong interest in

---

[47]    *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 443-44 (E.D.N.Y. 2008).

[48]    *See, e.g.*, *In re Sept. 11th Litig.*, 494 F. Supp. 2d at 240 ("Several thousand New Yorkers were killed, and billions of dollars of New York property was destroyed.  New York, rather than the several domiciles of the passengers on board Flights 11 and 175, or of the defendants who were sued in connection with their involvement in those flights, has the greatest interest in applying its conduct-regulating law."); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 376, 390-91 (S.D.N.Y. 2002) ("[N]ot only is Austria the locus of the tort, but it is clear that Austria has the far greater interest in this litigation — many if not most of the 155 victims were Austrian, the safety of Austria's transportation systems is implicated, and the defendants committed much of the alleged wrongful conduct within Austria's borders.").

[49]    *See Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842-43 (D.C. Cir. 2009) ("But [the victim] was not an American national; nor has the plaintiff suggested that the defendants knew Oveissi had an American grandchild or that the United States or its nationals were in any other way the object of the attack.").

compensating American victims of terrorism.[50]  In passing the ATA,

> "Congress has explicitly granted private parties the right to pursue common [law] tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations . . . . [P]rivate tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism vindicate the national and international public interest."[51]

Additionally, when a bank's conduct is challenged, that bank's corporate domicile, or at least the location where its allegedly tortious acts took place, also has a keen interest in applying its laws.[52]  Finally, courts have considered the fact that injuries are often felt in a place different from where the attack was executed and have

---

[50]    *See Weiss v. National Westminster Bank, PLC*, 242 F.R.D. 33, 50 (E.D.N.Y. 2007).

[51]    *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 715 F. Supp. 2d 253, 268 (D.R.I. 2010) (quoting *Weiss*, 242 F.R.D. at 50).

[52]    *See Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1075 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71 (2d Cir. 1993) ("[P]laintiffs challenge the integrity of the [defendants', including the Bank of Israel's,] conduct. That conduct took place in Israel. Whether or not defendants' conduct was tortious will be measured by the law of Israel.  It is that law upon which the parties, plaintiffs and defendants alike, relied in respect of defendants' conduct; and the interest of Israel in applying its law to admonish or prevent similar conduct in the future assumes a critical and, in my opinion, controlling importance in choice of law analysis."); *LaSala,* 514 F. Supp. 2d at 465-66 ("Switzerland's interest in regulating the conduct of banks within its borders, particularly where the bank is a leading financial services provider in the country, is great. The reputability of the country's banking system is intimately connected to the effectiveness of the country's regulation of its banks.").

accounted for the interests of that particular location.[53]

## IV.   DISCUSSION

### A.   BOC Has Not Waived Its Right to Argue for the Application of New York Law

Plaintiffs argue that because BOC did not dispute the application of

Israeli law in its motion to dismiss, BOC has waived its right to argue for the

application of New York law.  This contention misstates BOC's position in its

brief.  BOC wrote:

> The FAC does not explain why the Plaintiffs chose to allege statutory causes of action under Israeli law, rather than bringing this case under the law of the domicile (Florida) or the law of this District, where they chose to file the action.  However, this choice is of no moment because the law of Israel, which is conceptually similar to U.S. common law standards of duty, forseeability[,] and causation, forecloses all of Plaintiffs' Israeli law claims.[54]

Thus, while BOC noted that plaintiffs' choice of law was curious, it elected to

argue that the claims should be dismissed under any jurisdiction's law.

Subsequently, the D.C. District Court recognized that at least one of plaintiffs'

---

[53]    *See Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131, 145 (D.D.C. 2005), *aff'd*, 266 F. App'x 1 (D.C. Cir. 2008) ("Though the actual abduction took place in Turkey, the plaintiffs also seek recovery for injuries suffered by the family members of Wyatt and Wilson, including emotional distress and damages for consortium and solatium as a result of their kidnaping, injuries which the plaintiffs suffered while in the United States.").

[54]    Defendant's Memorandum of Points and Authorities in Support of Defendant Bank of China Limited's Motion to Dismiss the FAC, at 30.

13

claims was a "unique" cause of action[55] and then transferred the case to this Court,

triggering the application of New York choice of law rules and making the

application of New York substantive law possible.  Now, with the understanding

that there may be a conflict of laws, and because new choice of law rules apply,

BOC has chosen to assert its choice of law position.  Furthermore, this litigation is

in its infancy.  BOC raised the issue in April 2011 at one of the first conferences

before this Court.[56]  Accordingly, plaintiffs' request that the Court not even

consider BOC's motion is denied.

### B.    A Substantive Conflict Exists Between New York and Israeli Law

With respect to each of plaintiffs' non-federal claims, there exists a

substantive conflict of laws.  While neither party formally disputes the conflict's

existence,[57] I present a brief summary of the differences before proceeding.

### 1.    Negligence

The basic elements of negligence are the same under New York and

_____

[55]    *See Wultz*, 755 F. Supp. 2d at 80 ("Although plaintiffs caption their claim under [Israel's Civil Wrongs Ordinance ("CWO")] § 12 as one for 'vicarious liability,' liability of a defendant under § 12 is unique. . . .").

[56]    *See generally* 4/04/11 Tr.

[57]    BOC contends that plaintiffs cannot recover under any set of laws, but for the purposes of this motion, assumes the existence of an "arguable conflict." *See* Memorandum in Support of Bank of China's Motion Concerning the Choice of Law Governing Plaintiffs' Non-Federal Claims ("Def. Mem."), at 3-7.

Israeli law.[58]  New York, however, does not impose upon banks a duty to shield

non-customers from intentional torts committed by customers,[59] while there is at

least an argument that Israel does.[60]  BOC will almost certainly contest the

existence of such a duty under Israeli law.[61]

---

[58]     *See Licci v. American Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 409 (S.D.N.Y. 2010) ("[N]o actual conflict exists between the applicable substantive law of negligence in New York and Israel.").

[59]     *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 830 (S.D.N.Y. 2005), *on reconsideration in part*, 392 F. Supp. 2d 539 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008) ("Banks do not owe non-customers a duty to protect them from the intentional torts of their customers.").  *See also Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003) ("Plaintiffs offer no support, and we have found none, for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service."); *Century Bus. Credit Corp. v. North Fork Bank*, 668 N.Y.S.2d 18, 19 (1st Dep't 1998) ("[T]o hold that banks owe a duty to their depositors' creditors to monitor the depositors' financial activities so as to assure the creditors' collection of the depositors' debts would be to unreasonably expand banks' orbit of duty.").

[60]     *See* Affidavit of Robert J. Tolchin, Submitted in *Elmaliach v. Bank of China*, Ex. A to Declaration of Mitchell R. Berger ("Berger Decl."), ¶ 20 (quoting C.A. 906801 *Ayalon Insurance Co. Ltd. v. The Executor of the Estate of Haya Ofelger*, 59(2) P.D. 349) ("[T]he trend in Israeli law insofar as pertains to the duty of care imposed on the banks is an expansive trend . . . and in certain cases, the Court has recognized the tortious liability of a bank based on the tort of negligence, also to third parties who are not the bank's customers . . . . According to these standards, the bank is subject to the duty of foreseeing that its negligence would cause damage to a third party, even if said third party is not its customer, and the bank is required to take a reasonable level of care in order to prevent this.").

[61]     In the parallel state action brought by Israeli victims of the same attack, the New York Supreme Court recently held that "the specific allegations

## 2.        Breach of Statutory Duty and Vicarious Liability

A choice of law analysis is required when a party relies upon "a number of provisions of [foreign] substantive law that are potentially decisive and that have no New York law equivalent."[62]  Here, plaintiffs' breach of statutory duty claim, itself a provision of the Israeli CWO, is premised upon the violation of at least three Israeli Acts.[63]  Similarly, as the Court pointed out earlier in this litigation, the claim labeled vicarious liability

> should be distinguished from ordinary joint and several liability as well as from vicarious liability of an employer or principal for the actions of his employee or agent, which are dealt with elsewhere in the CWO. . . . Although plaintiffs caption their claim under § 12 as one for "vicarious liability," liability of a defendant under § 12 is unique: "there is no prerequisite that the other person, which actually inflicted the loss, be

_____

regarding BOC's actual knowledge of Shurafa's terrorist activities sufficiently distinguishes the Complaints herein from the pleading in *Licci* and takes it outside the usual rule that '[b]anks do not owe non-customers a duty to protect them from intentional torts committed by their customers.'"  *Elmaliach v. Bank of China, Ltd.*, No. 102026/09 (quoting *Licci*, 704 F. Supp. at 410).  Plaintiffs use this passage to argue that there is no longer a substantive conflict-of-laws.  While *Elmaliach* certainly bolsters plaintiffs' case, I cannot conclude, on the basis of one decision by the lowest state court, that relevant Israeli and New York laws are in harmony.

[62]        *Finance One Pub. Co. Ltd.*, 414 F.3d at 332.

[63]        *See* FAC ¶¶ 141-152.  *See also Wultz*, 755 F. Supp. 2d at 79 ("The elements of Israel's [breach of statutory duty tort] are clear.  They include the violation of duty imposed by an Israeli enactment, including Israeli penal laws, not any other nation['s] penal laws.").

16

personally liable for the commission of a tort."[64]

As such, both the breach of statutory duty and vicarious liability claims rely

exclusively on unique foreign laws and therefore trigger a choice-of-law inquiry.

### C.     *Lex Loci Delicti* Compels the Court to Apply Israeli Law

Before I can turn to an interest analysis, I must determine whether

conduct-regulating, as opposed to loss-allocating, rules are at issue.  Negligence

and breach of statutory duty are unmistakably claims that implicate the appropriate

standard of conduct and are thus conduct-regulating rules.  The third cause of

action, arising under section 12 of the Israeli CWO and labeled "vicarious

liability," is a closer question.  At first blush, it sounds like a classic loss-allocation

rule.  However, because that Act holds liable "a person who participates in, assists,

advises or solicits an act or omission, committed or about to be committed by

another person, or who orders, or authorizes such an act or omission,"[65] this Act

also regulates conduct.  Plaintiffs' contention that, notwithstanding the misleading

caption, the claim is most akin to one for aiding and abetting is accurate.[66]  I

---

[64]     *Wultz*, 755 F. Supp. 2d at 80 (quoting ISRAEL GALID, LIABILITY FOR DAMAGE CAUSED BY OTHERS UNDER ISRAELI LAW, IN UNIFICATION OF TORT LAW: LIABILITY FOR DAMAGE CAUSED BY OTHERS 139, 142–43 (J. Spier ed., 2003)).

[65]     FAC ¶ 155.

[66]     *See* Plaintiffs' Memorandum in Opposition to Bank of China's Motion Concerning the Choice of Law Governing Plaintiffs' Non-Federal Claims,

therefore conclude that all three of plaintiffs' claims invoke conduct-regulating

laws.[67]

Because conduct-regulating rules are at stake, I will begin my analysis

with the place of the tort. The last event necessary to make BOC liable took place

---

at 5-7. Aiding and abetting claims appear most often in the context of breach of fiduciary duty, so courts conducting a choice of law analysis with respect to such claims frequently apply the internal affairs doctrine, which is inapposite here. *See In re Hydrogen, L.L.C.*, 431 B.R. 337, 350 (Bankr. S.D.N.Y. 2010) (collecting cases). Courts that have not applied the internal affairs doctrine have not offered a clear answer as to whether aiding and abetting is conduct-regulating. *See Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y. 1998), *aff'd*, 163 F.3d 151 (2d Cir. 1998) (holding that New York had the greatest interest in applying its law without explicitly deciding whether aiding-and-abetting was conduct-regulating); *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 41 (Bankr. S.D.N.Y. 2007), *aff'd in part sub nom. Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration*, No. 05 Civ. 9050, 2008 WL 1959542 (S.D.N.Y. May 5, 2008) (treating aiding-and-abetting breach of fiduciary duty "like the other tort claims," but not explicitly determining whether it is conduct-regulating). *Cf. Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 669 (S.D.N.Y. 1996) ("[U]nder the choice of law principles of both New Jersey and New York, New Jersey's *conduct-regulating* tort law should govern the Customers' [aiding and abetting claim against a bank.]") (emphasis added).

[67] Alternately, if the Court were to compare the elements of common-law aiding and abetting with CWO § 12, it could still find the existence of at least an arguable conflict. Compare *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 287-88 (2d Cir. 2007), *aff'd sub nom. American Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008) (requiring that an aiding-and-abetting defendant "substantially assist the principal violation"), *with Wultz*, 755 F. Supp. 2d at 80 ("Indeed, mere negligent provision of assistance to a wrongdoer has been sufficient [to] establish such liability [under CWO § 12]."). *See also King v. George Schonberg & Co.*, 650 N.Y.S.2d 107, 108 (1st Dep't 1996) ("[T]he silence of the [defendant] did not amount to the substantial assistance that is a required element of aider or abettor liability [under New York law].").

18

in Israel.  While the bank's acts likely occurred in China and New York, BOC

would not be before this Court had the PIJ not committed a terrorist attack in Tel

Aviv.  Thus, because this case arises out of personal injury, I place significant

emphasis on the *lex loci delicti*, which is Israel.

   In undertaking an interest analysis, many factors point toward the

application of American, specifically New York, law.  *First*, BOC has relied upon

the laws of China and New York in conducting its affairs; it has never sought to do

any business in Israel.[68]  Indeed, according to the Amended Complaint, the

allegedly tortious wire transfers likely passed through BOC's American branches.[69]

Not only does the United States have a general interest in protecting the bank's

reasonable expectations of the laws to which it would be subjected, it also has a

specific interest in applying its laws to regulate banks and other financial

institutions operating within its borders.  *Second*, the United States has an interest

in thwarting terrorist attacks against American citizens and allies and blocking

---

   [68]  *See, e.g.*, About Us, Bank of China, http://www.boc.cn/en/aboutboc/.
*See also* FAC ¶ 24 ("[BOC] is a corporation organized under the laws of the
People's Republic of China ("PRC") and headquartered in the PRC.  Defendant
BOC has branches in California and New York, does extensive business
throughout the United States and holds significant assets in the United States.");
Def. Mem. at 15 (stating that BOC "has no branch, and does not business" in
Israel).  Indeed, this fact is undisputed.

   [69]  *See* FAC ¶ 69.

those who help finance terrorist organizations.  As the country's financial hub, New York has a particularly strong interest in ensuring that financial institutions operating here do not facilitate terrorist activity.  *Third*, and similarly, the United States has a profound interest in applying American law when Americans, like the Wultzes, are the victims of terrorism.[70]  *Fourth*, much of the Wultz family's harms, including those experienced by Daniel Wultz before his death, as well as the loss of pecuniary support, loss of income, loss of consortium, emotional distress, and loss of society, companionship and solatium, were felt most acutely in the United States.[71]

Conversely, other factors point toward the application of Israeli law. *First*, because the attack took place in Tel Aviv, Israel also has an interest in combating domestic terrorism and ensuring that terrorists operating within its borders do not have easy access to financial resources.  *Second*, many, if not most, of the attack's victims were Israeli citizens and the property damage occurred on

---

[70]     This factor, however, points just as strongly toward the application of Florida law, where the plaintiffs are domiciled.

[71]     *See* FAC ¶¶ 137, 149.  This factor also favors the application of Florida law at least as much as it favors the application of New York law.

Israeli soil.[72]  In fact, Israel and its citizens were specifically targeted by the PIJ.[73]

*Third*, as plaintiffs have vigorously argued, the *American* interest in seeing

American victims of terrorism compensated may actually point toward the

application of Israeli law, given that BOC contends, and plaintiffs have admitted

several times, that under New York law, there may be no recovery.[74]  This

contention is somewhat blunted, however, by plaintiffs' July 13 Letter to the Court,

in which they argue that in the recent New York Supreme Court decision, "the

*Elmaliach* court held that if BOC had actual knowledge it will be liable in

negligence under New York law."[75]

        In evaluating the competing interests, meaningful considerations favor

---

[72]    *See Elmalich*, No. 102026/09 (outlining action by families of Israeli victims).

[73]    BOC contends that Americans were also targeted, supporting that proposition with citations to parts of the FAC which essentially allege that China, via BOC and the PIJ, targeted Israel to "undermine an ally of the United States." *See* Def. Mem. at 20 (quoting FAC ¶ 112).  This contention is wholly conclusory without any factual support.

[74]    *See* Transcript of 3/08/11 Hearing in *Elmaliach*, Ex. D. to Burger Decl., at 21:21-22.

[75]    07/13/11 Letter to the Court, 2.  However, plaintiffs' assertions aside, the question of whether plaintiffs will be able to recover under a particular set of laws remains unsettled.  In addition, whether the bank had actual knowledge is a hotly contested issue.

all of the choices — New York, Florida, and Israel.[76]  On the one hand, the impact on the regulation of financial institutions operating in the United States strongly favors the selection of New York law.  On the other hand, Israel's interest in combating terrorism and protecting its citizens and territory cuts strongly in favor of applying that nation's law.  In the end, because the interest analysis does not conclusively point in favor of only one choice, I defer to the weight of the particular precedent that suggests that when conduct-regulating rules are at issue, and when the suit arises out of personal injury, the locus of the tort controls.  I therefore choose to apply the law of Israel.

Application of foreign law here is not "violative of fundamental notions of justice or prevailing concepts of good morals."[77]  While BOC has not intentionally done business in Israel, to the extent that BOC's expectations matter, banks must expect in the modern global economy that their clients will transact business in one location that has an impact in another.  The application of Israeli law does not unfairly deprive plaintiffs of the opportunity to recover damages.  Nor does it significantly burden the defendant, which has already commissioned its own Israeli law experts.  It is true that today's decision necessitates an additional

---

[76]    In fact, as the defendant's corporate domicile, China too has an interest in having its law applied.

[77]    *Curley*, 153 F.3d at 12 (citation omitted).

round of briefing to define the contours of applicable Israeli law. Nonetheless, "[t]he public policy interests of the State of New York, although not insignificant, do not rise to [the necessary] level" for the Court to eschew the application of Israeli law.[78]

## V.    CONCLUSION

For the foregoing reasons, defendant's motion to apply New York law is denied. The parties are instructed to brief the Construction of Foreign Law Motion. Plaintiffs, as moving party, should submit their brief within twenty-eight (28) days of this Order. BOC's response is due twenty-one (21) days later and plaintiffs' reply will be due fourteen (14) days after that.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 3, 2011

---

[78]     *Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, No. 98 Civ. 7664, 1999 WL 673347, at *5 (S.D.N.Y. Aug. 30, 1999).

23

**- Appearances -**

**For Plaintiffs:**

Robert J. Tolchin, Esq.
111 Livingston Street, Suite 1928
Brooklyn, NY 11201
(718) 855-3627

**For Defendant:**

Mitchell R. Berger, Esq.
Patton Boggs LLP
2500 M Street, N.W.
Washington, D.C.  20037
(202) 457-5601

Walter P. Loughlin, Esq.
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022
(212) 536-3900