# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SHERYL WULTZ, et al.

    Plaintiffs,

    v.              Civ. No. 11-01266 (SAS)

THE ISLAMIC REPUBLIC OF IRAN, et al.

    Defendant.

## REPLY DECLARATION OF  DR. BOAZ SHNOOR

I, Dr. Boaz Shnoor of Jerusalem, Israel, declare pursuant to 28 U.S.C. § 1746 as follows:

## INTRODUCTION

1.  I have been asked by counsel for the Plaintiffs in the above-captioned matter to prepare and submit this Reply Declaration for the purpose of responding to certain assertions made in the Further Declaration of Peter Gad Naschitz, executed on November 11, 2011, which was submitted by defendant Bank of China ("BOC") in this action.

## OPINION

### A.  This Reply Declaration Addresses Substantive Israeli Law Only

2.  In his Further Declaration, Mr. Naschitz presents his opinions regarding two distinct issues: (a) the substance of Israeli tort law; and (b) whether the constructive knowledge allegations of the First Amended Complaint ("FAC") state a claim under that law.

3.  This declaration will address the first issue – i.e. Israeli tort law – only. Since (as I have been informed by plaintiffs' counsel) there is no motion pending regarding the sufficiency of the allegations of the FAC there is no reason for me to address that issue – particularly as discovery may result in new facts being revealed and the complaint ultimately being amended.

4.      Indeed, even if Mr. Naschitz's conclusions as to whether the constructive knowledge allegations of the FAC state a claim were correct (and in my opinion they are not) those conclusions will be mooted if, as a result of discovery, the plaintiffs can show new facts, i.e. facts in addition to those already alleged in the FAC.

### B.      In *Ben Shimon v. Barda* the Israeli Supreme Court *Imposed* Liability

5.      Mr. Naschitz's Further Declaration relies heavily on the decision of the Israeli Supreme Court in C.A. 576/81 *Ben Shimon v. Barda*, 38(3) P.D. 1 (1984) which, according to Mr. Naschitz, <u>dismissed</u> the claim against the defendants. Naschitz Further Decl. at ¶ 7.

6.      In fact, however – precisely contrary to Mr. Naschitz's claim – in *Ben Shimon* the Supreme Court unanimously <u>reversed</u> the decision of the lower court dismissing the action against the defendants, and found the defendants <u>liable</u>. *Id.* at 11 ("[W]e grant the appeal, vacate the judgment of the lower court and hold that Barda was negligent vis-à-vis the appellant and liable to him, and that the State of Israel is vicariously liable for his actions.").

7.      Furthermore, the facts and holding in *Ben Shimon* strongly support the instant plaintiffs' negligence claims against BOC. There, two teenagers ripped boards and barbed wire off of a window to enter a pre-army training club, then pried the door to the weapons room out of its moorings, and once in the weapons room broke a lock holding rifles in place and stole rifles and ammunition. Several days later, in the course of playing a "war game," they shot the plaintiff in the head using the stolen weapons. The Supreme Court found the club operator and the State of Israel liable in negligence to the plaintiff for not adequately securing the rifles, despite the fact that the injuries to the plaintiff were the result of the intervening criminal conduct of third parties (i.e. the teenagers) who had to forcefully break through three barriers (the window, the door and the rifle lock) in order to reach and steal the weapons, and shot the plaintiff only days later.

8. Indeed, unsurprisingly, Prof. Porat cited *Ben Shimon* as supporting authority in his declaration in this action. *See* Declaration of Professor Ariel Porat, May 18, 2009, at ¶ 61.

### C. There Is No Basis to Distinguish "Terrorist" Crimes from Other Crimes

9. Mr. Naschitz asserts in his Further Declaration (*see e.g.* ¶¶ 4, 11) that BOC would not be liable in negligence under Israeli law in this case even if it could have foreseen that the accounts at issue were being used for "general" illegal activity; rather, BOC would have had to been able to foresee that the accounts were being used specifically for terrorist crimes.

10. But Mr. Naschitz cites no authority in support of this assertion, and to the best of my knowledge no such authority exists. On the contrary, the Supreme Court has made clear that it is sufficient if the defendant could have foreseen that his conduct will enable some sort criminal conduct by a third party; there is no requirement that the defendant be able to foresee the specific type of crime ultimately committed or the specific type of harms ultimately caused.

11. For example, in *Ben Shimon v. Barda* (discussed above), the defendants were held liable despite the fact that the harm to the plaintiff was caused by two different and unrelated crimes that took place days apart: the theft of the rifles and the later shooting of the plaintiff. The Supreme Court's decision makes clear that because the theft of the rifles was foreseeable, the defendants did not need to foresee the subsequent specific criminal use to which the rifles were put. As the Court explained, "the liability of the tortfeasor does not depend on his foreseeing the specifics of the harm as they occurred, and their severity. The relevant foreseeability is not exact prognostication of all the details of the matter but rather seeing its general lines only. That is the case regarding the event that constitutes the negligence; all the more so in respect to its results." *Id*. at 8 (citations and quotation marks omitted).

12.     The same rule is reflected in the Supreme Court's decision in C.A. 3510/99 *Valas (Wallace) v. Egged*, 45(5) P.D. 826. There, the Court found that the Egged bus company could be held liable to a plaintiff who was beaten by thugs while waiting at an Egged bus terminal. The decision makes clear that Egged's liability did not turn on its ability to foresee the specific type of crime committed against the plaintiff; rather it was sufficient that Egged could have foreseen that passengers at the terminal might be victimized in one way or another by criminals. An English translation of the decision in *Valas*, published by the Supreme Court, is attached hereto.[1]

13.     In sum, there is no basis for Mr. Naschitz's claim that BOC will be liable in negligence only if the plaintiffs can prove that it could have foreseen that the accounts at issue were being used for crimes related to terrorism, rather than crimes of another type. As the cases above make clear, it is sufficient for plaintiffs to show that BOC could have seen that the activity in the accounts reflected indicia of some type of illegal conduct.

### D.     The Cases Cited by Mr. Naschitz Are Inapposite

14.     Mr. Naschitz cites a number of cases in his Further Declaration, none of which are relevant here. *Maccabi v. Dubek* dealt with an attempt to import a Master Settlement Agreement into Israel, and the court ruled that, due to the specific language of the relevant law, such recognition should be done by the legislator. This decision did not even deal with negligence. *Carmel Hospital v. Malul* dealt with the theory of proportional liability (which is not recognized anywhere else in the world). The Supreme Court, by a majority of 5:4, accepted it only in a very narrow set of cases while also recognizing the Loss of Chance theory in medical malpractice cases. Again, this case had nothing to do with negligence.

---

[1] The document is available at http://elyon1.court.gov.il/files_eng/99/100/035/p03/99035100.p03.pdf.

15.     Likewise, the negligence cases cited by Mr. Naschitz are of no relevance here: In *Kitan v. Weiss*, the Supreme Court found no liability because the employee's use of a company-supplied gun to murder his attorney was entirely unforeseeable. Notably, in *Ben Shimon v. Barda*, the Court expressly stated that it would have imposed liability in *Kitan* if the employer had had any indication that the employee might use the gun to attack anyone – whether his lawyer or a different victim. The *Valas* court also distinguished *Kitan*. *Id.* at 7. Similarly, *Levy v. State of Israel*, *Eshbal v. Azrieli* and *Yaar Zeev v. HaSneh* are all irrelevant here, because foreseeability was found lacking.[2] And *Freimont v. Doe* is inapposite because the court found that action by the defendant would not have prevented the harm.

16.     In sum, none of the cases cited by Mr. Naschitz are apposite to this case, much less undermine plaintiffs' claims in this action.

**E.     *Tziring* and *Bank Mizrahi* Cannot Be Distinguished on the Facts**

17.     In my prior declaration I cited and quoted the recent decisions in *Tziring v. Mishkan* and *Bank Mizrahi v. Cohen* as additional authority in support of the plaintiffs. Mr. Naschitz seeks to distinguish those cases by focusing on their facts.

18.     That effort should be rejected because as a reading of the relevant passages makes clear, the *Tziring* and *Bank Mizrahi* were addressing the general rules of liability of banks toward third parties, and did not limit their remarks to the specific facts of the case.

**F.     Banks' Liability in Israel - De Lege Lata and De Lege Ferenda**

---

[2] Indeed, in 9212/09 *Tzion Insurance v. State of Israel* 56(2) P.D. 906 (2002) the court held the State liable for harm that was caused in an arson, in circumstances similar to *Yaar Zeev*, since the State, as a landowner that threw flammable waste into an adjacent yard, could have foreseen that having flammable materials in close proximity to a building will result in fire, even if it could not necessarily have foreseen an arson.

19.    Mr. Naschitz asserts in his Futher Declaration that his opinion "is based on the law as embodied in statute and binding precedent" while Prof. Porat's opinion and my own are "an attempt to predict or speculate as to what the law might become based on certain liability expanding trends." *Id*. at ¶ 12. This characterization is completely groundless. The declaration submitted by Prof. Porat, and my previous and current declarations, are based entirely on the applicable statutes and existing Supreme Court precedents, and reflect those authoritative sources of law as they exist today, as should be clear to any objective reader.

20.    Indeed, one need look no further than *Tziring* and *Bank Mizrahi* for persuasive evidence that the current state of Israeli case law regarding the duties of banks to third parties is as presented by Prof. Porat and myself.

21.    It is of course undisputed that the Israeli courts have never dealt with the specific fact-pattern presented by this case. Thus, no one can cite to a single "on-point" case that will answer all questions and settle all disputes.

22.    Rather, the proper course of analysis – which both Prof. Porat and I have followed – is to apply the clear principles of the existing case law to the facts of this case. Doing so leads clearly to the conclusion that BOC should be held liable if it is shown to have had constructive knowledge that the accounts in question were being used for illegal purposes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

December 12, 2011

Dr. Boaz Shnoor

CA 3510/99

**Reuven Wallace**

v

**1. *'EGGED'* Israel Transport Cooperation Society**
**2. Fassel Samuel**

The Supreme Court sitting as the Court of Civil Appeals
[6 August 2001]
*Before President A. Barak and Justices* J. *Türkel, E. Rivlin*

Appeal on the judgment of the Jerusalem District Court (Justice D. Cheshin)
dated 13 April 1999 in CC 1294/97.

**Facts:** On August 30, 1995, while the appellant was waiting for a bus at an
*Egged* bus station, the respondent no. 2 and his friends beat up the appellant.
Passersby came to the appellant's aid but he suffered serious injuries and
required hospitalization. Respondent no. 2 was convicted in the Magistrates
Court in Jerusalem of an offense according to section 380 of the Penal Law
5737-1977. The appellant filed a lawsuit against *Egged* and respondent no. 2 for
damages, claiming against *Egged* negligence and breach of a statutory duty. The
Magistrates Court summarily dismissed the appellant's lawsuit for failure to
show a claim. The appellant is appealing this decision.

**Held:** It was not appropriate to summarily dismiss the appellant's lawsuit
without weighing the factual and legal claims and the question of liability in
torts for the failure to take precautionary measures to prevent a criminal act that
was committed by a third party. In the Court's view the fact that the occurrence
of an attack was spontaneous and unprovoked does not instantly remove it from
the realm of tort liability. At this stage in the proceedings, and before the
necessary determinations have been made, it was not appropriate to determine
that the incident at the Central Bus Station was unforeseeable, and it would not
be appropriate to say that as a question of legal policy, the respondent is exempt
from undertaking any precautionary measures in order to prevent such criminal
activity. Rather, the lower court needs to examine the specific circumstances of
the case. The Court also determined that it was not appropriate for the District
Court at this stage in the proceedings to make the determination that even if
there was negligent conduct on *Egged*'s part, in failure to place a security
person, there was no causal connection between the negligent conduct and the
harm to the appellant. Therefore the appeal was granted, the decision of the
lower court was overturned and the case was returned to the District Court to be
determined on the merits.

**Legislation cited:**
Penal Law, 5737-1977, s. 380
Torts Ordinance [New Version] s. 35.

**Regulations cited:**
Civil Procedure Regulations, 5744-1984 – regulation 100(1).

**Israeli Supreme Court cases cited:**
[1]   CA 343/74 *Grubner v. City of Haifa* IsrSC 30(1) 141.
[2]   CA 76/86 *Feinstein v. H.S. Hotels Ltd.* IsrSC 43(3) 124.
[3]   CA 755/76 *'Mishmar' Guarding and Security Services Ltd.* IsrSC 33(2) 656.
[4]   CA 350/77 *Kitan v. Weiss* IsrSC 33(2) 785.
[5]   CA 796/80 *Ohana v. Avraham* IsrSC 37(4) 337.
[6]   CA 5355/97 *State of Israel v. Madah* (unreported).
[7]   CA 576/81 *Ben Shimon v. Bardah* IsrSC 38(3) 1.
[8]   CA 500/82 *Etzioni v. Ezkar* IsrSC 40(2) 733.
[9]   CA 126/85 *R.GM Mart v. State of Israel* IsrSC 44(4) 272.
[10]  CA 8/79 *Goldschmidt v. Arad* IsrSC 35(3) 399.
[11]  CA 145/80 *Vaknin v. Bet Shemesh Local Council* IsrSC 37(1) 113.
[12]  CA 371/90 *Subachi v. Israel Train* IsrSC 47(3) 345.
[13]  CA 915/91 *State of Israel v. Levi* IsrSC 48(3) 45.
[14]  CA 704/71 *Agabrya v. Hameiri* IsrSC 26(1) 743.

**American cases cited:**
[15]  *Brogan Cadillac, Etc. v. Central Jersey Bk.* 443 A. 2d 1108 (1981).
[16]  *Bradley Center, Inc. v. Wessner* 296 S.E. 2d 693 (1982).
[17]  *Tarasoff v. Regents of University of California* 17 Cal. 3d 425 (1976).
[18]  *Kline v. 1500 Massachusetts Avenue Apartment Corp.* 439 F. 2d 477 (1970).
[19]  *Goldberg v. Housing Auth. of Newark* 186 A. 2d 291 (1962).
[20]  *Viands v. Safeway Stores* 107 A. 2d 118 (1954).
[21]  *Cornpropst v. Sloan* 528 S.W. 2d 188 (1975).
[22]  *Carey v. New Yorker of Worcester, Inc.* 245 N.E. 2d 420 (1969).
[23]  *Atamian v. Supermarkets General Corp.* 369 A. 2d 38 (1976).
[24]  *Isaacs v. Huntington Memorial Hosp.* 695 P. 2d 653 (1985).
[25]  *Sharpe v. Peter Pan Bus Lines, Inc.* 519 N.E. 2d 1341 (1988).
[26]  *Quigley v. Wilson Line of Massachusetts* 154 N.E. 2d 77 (1958).
[27]  *Feld v. Merriam* 485 A. 2d 742 (1984).
[28]  *Burgess v. Chicopee Savings Bank* 145 N.E. 2d 688 (1957).

**Israeli books cited:**

[29]   Y. Sussman, Civil Processes (7th Edition, S. Levin ed., 1995)

[29]   Y. Sussman, Civil Processes (7th Edition, S. Levin ed., 1995)

[30]   I. Englard *The Philosophy of Tort Law* (1993).

[31]   A. Barak, 'Liability for the Actions of Others', in G. Tedeschi ed., *The Law of Torts  –  the General Doctrine of Torts*, 2nd ed., 1977, 435.

**Israeli articles cited:**

[32]   I. Gilead, 'On the Elements of the Tort of Negligence in Israeli Tort Law', *Iyunei Mishpat* 14 *(*1989) 319.

[33]   I. Englard, 'The Contribution of Case Law to Developments in Tort Law – Its Self Image and Reality', *Iyunei Mishpat 11* (1986-1987) 67.

**Foreign books cited:**

[34]   W.L. Prosser, W.P. Keeton On the Law of Torts (St. Paul, 5th ed., 1984).

**Foreign articles cited:**

[35]   W.M. Sanders 'Between Bystander and Insurer: Locating the Duty of the Georgia Landowner to Safeguard Against Third-party Criminal Attacks on the Premises' 15 *Ga. St. U.L. Rev.* (1999) 1099.

[36]   M.J. Bazyler 'The Duty to Provide Adequate Protection: Landowners' Liability for Failure to Protect Patrons from Criminal Attack' 21 *Ariz. L. Rev.* (1979) 727.

[37]   W.J. Flanagan 'Negligent Security: Is *Peter Pan* A Merchant's Nightmare? *Sharpe v. Peter Pan Bus Lines, Inc.*' 24 *N. Eng. L. Rev.* (1990) 1193.

[38]   R. Cooter, A. Porat 'Does Risk to Oneself Increase the Care Owed to Others? Law and Economics in Conflict' 29 *The Journal of Legal Studies* (2000) 19.

**Other:**

[39]   Restatement 2d, *Torts.*

For the appellant – Moshe Inbar.

For the respondent 1 – A. Novik.

For the respondent 2 – Ron Weinstock

**JUDGMENT**

**Justice E. Rivlin**

1.   The appellant Reuven Wallace, objects to the decision of the District Court in Jerusalem (Justice D. Cheshin), which summarily dismissed his complaint against the respondent, '*EGGED*' Israel Transport Cooperation Society (hereinafter: '*Egged*') for failure to state a claim.

In coming to decide on *Egged*'s petition to summarily dismiss the complaint filed against it by the appellant the District Court, as is required,  presumed that all the factual claims made in the complaint had been adequately proven.  A similar presumption will, thus, stand at the basis of this judgment.

*The Facts*

2.   On August 30, 1995, in the early morning hours, the appellant, a g-d-fearing man set foot for *Egged*'s central bus station in Jerusalem on his way to his place of work as the supervisor for observance of Jewish dietary laws at the slaughterhouse 'Marbek' in Ashkelon.  While he was waiting for his bus, the respondent no. 2 and his friends began to gang up on him.  They threw his hat down, kicked him in the stomach and threw him to the ground.  Passersby who were in the area came to the assistance of the appellant, and the respondent no. 2 and his friends ran away.

The appellant was severely injured in his hand and in his shoulder and required hospitalization at the hospital where his hand was operated on.

Respondent no. 2 was tried in a criminal trial in the Magistrates Court in Jerusalem and convicted of an offense according to section 380 of the Penal Law 5737-1977 which deals with an assault which causes real injury.

The appellant filed a complaint against *Egged* and respondent no. 2 for damages, and this – according to the appellant – for *Egged*'s negligent conduct and for its breach of a statutory duty.

*The District Court's decision*

3.   The District Court accepted *Egged*'s petition and ordered the summary dismissal of the complaint against it, for two reasons: first, due to an absence of a concrete duty of care under the circumstances; second, due to the absence of a causal connection attributed to the omission attributed to *Egged* and the appellant's injury.

The learned judge presumed that there is a conceptual duty of care imposed on *Egged* toward those who come to the Central Bus Station. This duty, so it determined, is based on the role of *Egged* as a national carrier which possesses property within which lively public activity takes place, and that therefore contains the potential for violence.  In such a situation, the learned judge determined, there exists both a 'technical' foreseeability (meaning, awareness of the risk) and 'normative' foreseeability, as the social interests as to the public peace and public order impose a duty on those who manage property of this type to take care of reining in the potential violence and ensuring to a reasonable degree the safety of the visitors.  However, so determined the District

Justice E. Rivlin

Court, under the circumstances a concrete duty of care toward the appellant did not arise for *Egged*.  In mentioning the judgment of the President (then Justice) Shamgar in CA 343/74 *Grubner v. City of Haifa* [1] the learned judge determined that reasonable action was required of *Egged* to safeguard the visitors to the station – but not action that would ensure absolute protection.  In this case – the Court ruled – the attack that the respondent no. 2 and his accomplices attacked the appellant was not foreseeable, as it came about without any provocation by the victim.

This and more was determined by the lower court: even if *Egged* was negligent in its conduct as it did not place security personnel, there was no causal connection between its negligent conduct and the injury.  Even if a security person was in the area, so presumed the Court, he would not have had the opportunity to assist the appellant, and it is very doubtful whether his very presence would have been sufficient to deter the attackers in advance.  It is a fact, so noted the learned judge, that the presence of passersby in the area did not deter the attacker.

As for the claim of the appellant as to *Egged*'s duty to filter the entry of thugs to the station and to monitor the conduct of the crowd of visitors, the District Court found that such a demand would obligate *Egged* with actions which would amount to policing actions and would infringe on basic human rights, such as freedom of movement, the principle of equality and human dignity.

In the security instructions put out by the Israeli Police, which constitute part of the license to manage the business of the station, the learned judge also did not find support for the appellant's stance as to the question of the existence of a concrete duty of care and on the question of the existence of a causal connection.

The lower court also dismissed the claim that *Egged* breached a statutory duty, for the reason that the statutory provisions on which the appellant wished to base his claim did not appear in the complaint.  As to this last matter there is not an appeal before us.

*The objections in the appeal*

4.    In the appeal the appellant turned to the instructions of the Israel Police which, as stated, constitute part of the terms of the license that was granted to *Egged*.  By power of these instructions *Egged* has the duty to appoint someone to be responsible for security who will fulfil tasks related to prevention of hostile acts and guarding the business and conducting sweeps – all as per the security procedures.  From these instructions the appellant wishes to infer the existence of a duty imposed upon *Egged* to take the necessary steps to maintain the security of the visitors to the bus station.

The appellant is of the view that it is not possible to distinguish between different types of violence, and that *Egged* can and should have foreseen the violent incident the subject of the appeal, meaning unprovoked attack.  According to the appellant, *Egged*, as a service provider to the public, is responsible for the safety of the public invited by it to the station.

5.    As to the causal connection the appellant distinguishes between

the consequence of the presence of just any passersby at the station and the significance of placing armed security people at the place. Only the latter – so holds the appellant – may, with their presence and appearance, create a deterrence to acts of violence. Indeed, the appellant agrees, it is not possible to provide absolute security to the riding public, but the duty of *Egged*, according to the appellant's approach, is to place proper security.

The appellant disagrees with the determination of the lower court, according to which the security of the station infringes on the freedom of movement and the principle of equality. Placing security people and maintaining checks on the entrance of visitors, is, according the appellant's approach, an accepted practice in public places, and it constitutes a proper balance between the right of the individual to freedom of movement and the right of the individual to bodily wholeness.

The appeal, it is my view, is to be granted.

*Summary dismissal*

6.     The civil procedure provisions require the court to take extra care before deciding to summarily dismiss a lawsuit. Regulation 100(1) of the Civil Procedure Regulations 5734-1984 authorizes the court to order dismissal of a lawsuit which does not show a claim. The court will make use of its authority according to this regulation only when it is '. . . clear and beyond any doubt, that on the basis of the facts claimed the plaintiff cannot be successful in obtaining the remedy he seeks. . .' (Y. Sussman, *Civil Processes* [29], at p. 384). The Court, in coming to dismiss the lawsuit for lack of a claim, will therefore take extra care, and a remote possibility that the plaintiff will succeed in obtaining the remedy sought by him is sufficient for the court to avoid summarily dismissing the claim (CA 76/86 *Feinstein v. H.S. Hotels Ltd.* [2]) With these before us – we will examine the question of the existence – in theory– of the claim at the basis of the lawsuit here.

*The tort of negligence and the duty to protect from a criminal act*

7.     The question which requires an answer here – although a theoretical one only – is not easy. It is a question of liability that arises in torts for the failure of the defendant to take precautionary measures to prevent a criminal act that was committed by a third party against the plaintiff. Professor I. Englard already explained the 'borderline nature' of this question in tort law.

> '...the specific question to what extent a person is liable for his failure to prevent the commission of a crime by another touches upon the frontiers of tort liability. The answer to this borderline category of cases, though formulated in terms of traditional concepts, often induces courts to take an open stand on the foundations of modern tort law' (I. Englard, *The Philosophy of Tort Law* [30], at p. 175).

The matter was discussed in the case law of this court, primarily in the limited context of entrusting a weapon in the hands of a person who used it later to commit a crime. In those cases a difficulty arose in

establishing the existence of the causal connection between breaching the duty and the injury. Thus, for example, in the case of CA 755/76 *'Mishmar' Guarding and Security Services Ltd.* [3] at p. 672 Justice Asher determined that:

> 'There is negligent conduct in providing a weapon to a person against instructions, but there cannot be foreseeability of murder unless there was concrete knowledge of such a risk, and it matters not according to which of the three tests established in the case law it was learned. . .'

In CA 350/77 *Kitan v. Weiss* [4] the question was asked whether a corporation is liable in torts for the fact that an employee who worked for it as a guard took a handgun that he obtained through his work and murdered his attorney. The President (then Justice) Shamgar determined that the deficiencies in the managing of the corporation – and they are lack of continuous and efficient supervision of the handgun, and the failure to take any steps consequent to the disappearance of the handgun for some time, about a week prior to the murder – constitute a breach of the duty of care imposed on the corporation by authority of section 35 of the Torts Ordinance [New Version]. As to the question of the legal causal connection between the negligent conduct of the corporation and the act of murder, President Shamgar determined, at pp. 801-802:

> '. . . A criminal act committed by another which constitutes an intervening third party, will not be considered as the determining cause of the injury which frees the first negligent entity of liability in torts, if foreseeability of the malicious act is required of the first negligent party as one of the possible outcomes of the act or omission which constitute the fault of the first negligent entity.'

However, in that same case it was decided that legal causation did not exist, as the corporation was not required to foresee that a person who was authorized by the police as fit to carry a weapon, who never was involved in a crime and who served as a guard for many years, would be capable of murdering his attorney over a dispute of which the corporation knew nothing.

In a similar vein Justice Bejski noted in CA 796/80 *Ohana v. Avraham* [5] that a wilful act of a second tortfeasor does not in all cases break the causal connection of the first person at fault. However, in the circumstances of that case Justice Bejski determined that:

> 'The act of the respondent in throwing a grenade into a club crowded with people is so unusual in its character and so appalling in its implementation and consequences, that it certainly cannot be explained by common sense: and in terms of foreseeability and predictability, it appears that only if one of the two were to be argued and proven, would it be possible to attribute a duty of foreseeability: either that the armed forces knew that in the heart of the respondent thoughts of murder and revenge is nesting, or that there was

a reasonable suspicion or any suspicion or possibility of knowing, that the respondent suffers from mental illness, to the point where he does not have control of his actions or will.' **(Ibid**, at 345)

And recently, it was said by Justice Or, in CA 5355/97 *State of Israel v. Madah* [6] that:

'As long as the police did not have such information, according to which a special danger exists of the use of weapons by Udah in a dispute with others, it does not seem reasonable to prevent a police officer in the Israel police from possessing a weapon, only for the reason that there is a theoretical possibility that he would make inappropriate use of it. Indeed, it can be said, that Udah's superiors had no basis to suspect or foresee that Udah would use the sub-machine gun to resolve a dispute with his neighbours or that he would make other inappropriate use of it. In these circumstances, and act of murder or intentional killing by Udah was not within the range of reasonable foreseeability for Udah's superiors in the police.'

On the other hand, in another case, it was determined that a person who holds guns and bullets in a youth center needs to foresee that youth that come to the center will seek to take a weapon and make prohibited use of it. Therefore – so it was decided – that person was required to undertake reasonable precautionary measures in order to prevent this. The negligent conduct of the appellant in that case was expressed in the failure to properly close the window, in installing a door that is easy to break into and lack of supervision and guarding. It was further decided, that the foreseeable intervention of a third party in between the act of negligent conduct and the injury, is not sufficient to break the causal connection. (CA 576/81 *Ben Shimon v. Bardah* [7]).

The question whether a person must take precautionary measures with property in his control, and which is directed at preventing damage from the actions of criminals, was dealt with as to landlord-tenant relations in CA 500/82 *Etzioni v. Ezkar* [8]. The Court did not see a difference in principle between the case in which a tenant was injured due to the unsafe physical condition of the property and the case where property damage or bodily harm was caused to the tenant when he was in the property that was in the control of the landlord, as a result of criminal behavior of a third party, as long as the behavior was foreseeable, and it was possible to undertake measures to prevent it. As to this matter the Court, President (then Justice) Barak, said that:

'. . . It is not new that the tortfeasor should foresee the criminal conduct of a third party. Such a duty has been recognized in the past both as to negligent conduct, and as to reckless conduct and as to malicious conduct of a third party. Indeed, more than once, Tort law imposes a duty on the tortfeasor to foresee intentional and criminal behavior of a third party – conduct which causes damage. . .' **(Ibid** [8], at pp. 740-741).

In this context it is worth mentioning CA 126/85 *R.G.M Mart v. State of Israel* [9], where the duty of the police to compensate a factory that was connected to police dispatch with an alarm system, for negligent conduct that brought about the completion of a break-in to the factory, was discussed and decided.

8.      The issue of tort liability for failure to undertake precautionary measures to prevent criminal acts by a third party has also been discussed in case law in the United States. The fundamental approach which is reflected in the case law there is that the commission of a criminal act by a third party is not, as a rule, within reasonable foreseeability, and therefore a person is not liable in torts for the omission of not protecting another person from the criminal act of a third party. This is so, unless special circumstances exist. As to the rule and the exception to it the American court explained in one of the cases in determining:

> 'It would be unjust to require one to anticipate that a crime
> will be committed unless there has been a warning or unless
> a previous criminal act occurred in the same premises'
> (*Brogan Cadillac, Etc. v. Central Jersey Bk.* (1981) [15], at
> p. 1110).

As arises from these words, the rule as to lack of liability has exceptions. Thus, the American court recognized the duty of the defendant to undertake precautionary measures against criminal acts committed by a third party due to the nature of the relationship between the plaintiff and the defendant or the defendant and that same third party, for the fact that the defendant with his conduct increased the risk of the commission of a criminal act, or for the control and supervision of the defendant over the one committing the crime or the location of its commission. In the framework of the first exception the court recognized various types of relationships as giving rise to a duty to undertake measures to prevent crime, including relationships between hotel owner and guest; school and students; landlord and his tenants; a business invitor and a business guest; employer and employee. (See W.L. Prosser, W.P. Keeton *On the Law of Torts* [34], *at pp. 201-202*).

The primary tests which served the courts there when they came to decide the question whether the criminal act that was committed against the plaintiff by a third party was within the reasonable foreseeability of the defendant is twofold:  **the first** is the test of knowledge of the approaching crime; and **the second** is the test of knowledge of similar incidents that occurred in the past. In several cases a broader test was established, which examines the totality of the circumstances of the situation.

In one of the cases the liability in torts of a private psychiatric hospital for a murder committed by a patient was examined. The Supreme Court of Georgia determined that it was the hospital's duty to act with reasonable caution in supervising the patient who was hospitalized at the hospital. Once the duty was breached, and as a result the patient murdered his wife, the hospital was liable in torts for the death of the woman, since the hospital knew of the possibility that the patient would cause physical harm to his wife, if he had the possibility of

doing so. (*Bradley Center, Inc. v. Wessner* (1982) [16]; *Tarasoff v. Regents of University of California* (1976) [17]; See also England *supra* [30], at pp. 176-180).

Another issue that was dealt with in American case law relates to the duty of care that a landowner owes to his tenants, to undertake precautionary measures against thefts and attacks which take place on his property (see a broad discussion in W.M. Sanders 'Between Bystander and Insurer: Locating the Duty of the Georgia Landowner to Safeguard Against Third-party Criminal Attacks on the Premises' [35]).

In the case of *Kline v. 1500 Massachusetts Avenue Apartment Corp.* (1970) [18] the federal court determined that the risk that one of the tenants in the defendant's apartment buildings would fall victim to assault and robbery committed by a third party was foreseeable by the respondent, in particular in light of similar criminal acts that occurred previously.  It was further determined there, that the prevention or reduction of the risk – which was shared by all the tenants – was almost exclusively in the hands of the defendant as the one with control of the area.  The court there was resolved in its view as to the division of responsibility between the public policing entities and the owners of the property:

> 'Not only as between landlord and tenant is the landlord best equipped to guard against the predictable risk of intruders, but even as between landlord and the police power of government, the landlord is in the best position to take the necessary protective measures. Municipal police cannot patrol the entryways and the hallways, the garages and the basements of private multiple unit apartment dwellings. They are neither equipped, manned, nor empowered to do so... We note that in the fight against crime the police are not expected to do it all; every segment of society has obligations to aid in law enforcement and to minimize the opportunities for crime' (at p. 484).

Compare *Goldberg v. Housing Auth. of Newark* (1962) [19].

Similar considerations were weighed as to the duty of a business owner to its customers to provide them with protection while in the business (M.J. Bazyler 'The Duty to Provide Adequate Protection: Landowners' Liability for Failure to Protect Patrons from Criminal Attack' [36])  In this context the following considerations were weighed: whether the business foresaw or should have foreseen the possibility of the impending occurrence of the criminal incident; whether similar incidents occurred in the past and whether the business in terms of its nature or its location creates convenient conditions for committing criminal acts.  (See *Viands v. Safeway Stores* (1954) [20]; *Cornpropst v. Sloan* (1975) [21]; *Carey v. New Yorker of Worcester, Inc.* (1969) [22]; *Atamian v. Supermarkets General Corp.* (1976) [23]).  As stated, in several cases the courts in the United States made the test for determining the foreseeability of the criminal incident more flexible and determined that a decision in this matter is to be determined by way of examination of the totality of circumstances in each and every case.

Justice E. Rivlin

(*Isaacs v. Huntington Memorial Hosp.* (1985) [24]).

It is also worth quoting section 344 of the Restatement 2d, *Torts* [39] in this context.

> 'A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>
> (a) discover that such acts are being done or are likely to be done, or
>
> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it'.

10.   The question of liability in torts of a public carrier who holds property that is filled with people to a visitor who is injured bodily by a criminal act committed against him by a third party was discussed in the Massachusetts Supreme Court in a matter similar to ours in the case of *Sharpe v. Peter Pan Bus Lines, Inc*. (1988) [25].  In that case a sixteen year old girl was attacked while waiting innocently for a bus at a crowded station when two of her friends were sitting next to her – without any provocation on her part and without warning – and was stabbed to death in her back by a stranger – a person with a history of mental illnesses.  The attacker was convicted of second degree murder.  A civil suit was filed against the company that operates the bus lines and against the station where the attack occurred due to their negligent conduct in failure to undertake measures to ensure the safety of the passengers.  It was proven in the trial, that even though the station was in an area in which much criminal activity takes place, the defendants had no knowledge of the impending offense, nor of similar incidents that occurred in the station in the past.  Police patrols took place in the station on the hour by the local police, which was located close to the bus station.

Despite this it was determined that the defendants were negligent in not providing adequate protection to visitors to the station and this negligent conduct was the reason for the death of the girl.  The Court was of the view that the defendants are to be found liable in torts because they did not employ a uniformed security person despite the widespread crime in the vicinity of the station.  The presence of such a security guard – so it was determined – even if it would not have prevented the tragic outcome from the moment the attack was in process – it was reasonable to presume that it would have deterred the attacker **in advance**.

The Court relied there, *inter alia*, on the case in the matter of *Quigley v. Wilson Line of Massachusetts* (1958) [26], where it was decided that a public carrier owes its passengers a duty of care at a particularly high degree, and is to foresee acts of violence by other passengers, or by strangers, and prevent them.

In the *Sharpe* case [25] liability was imposed on the carrier as a

business owner invitor for a spontaneous illogical criminal act against the invitee, without the defendant being aware of the possibility of the approaching occurrence of the criminal act, and was not aware of similar occurrences that took place in that place in the past (for a discussion of the *Sharpe* case [25] and its significance see W.J. Flanagan 'Negligent Security: Is *Peter Pan* A Merchant's Nightmare? *Sharpe v. Peter Pan Bus Lines, Inc.*' [37]).

The general rule: when we come to examine the question of the imposition of liability in torts for the failure of the defendant to protect from a criminal act committed by a third party against the plaintiff, we turn to examining the question of the existence of each of the elements of the tort of negligence. At the center of the examination is the question of the foreseeability of the criminal incident – its nature and scope. This question may come up both at the stage of checking for the duty and at the stage of checking for the existence of the legal causal connection between the breach of the duty and the harmful outcome.

Survey of the case law of the courts, in this country and in the United States reveals a tendency to impose tort liability in those cases where there was a special relationship among those involved in the incident (plaintiff-defendant or defendant-third party), and in those cases where the criminal act was within the bounds of a foreseeable risk that was created by the behavior of the defendant. (See England *supra* [30] at p. 176).

*From there to here*

11. The lower court determined, as stated, that the defendant in this appeal owed a conceptual duty of care toward those coming to the station. The foundation of this duty – so it determined – 'stems from the role of *Egged* as a public carrier which holds lands within which vibrant public activity takes place'. (As to the responsibility of a landowner to visitors on his lands see also CA 8/79 *Goldschmidt v. Arad* [10]; CA 145/80 *Vaknin v. Bet Shemesh Local Council* [11] (hereinafter: 'the *Vaknin* case')).

However, as is known, a conceptual duty of care is not sufficient. Once it is determined that a conceptual duty of care exists as to a certain type of tortfeasor toward a certain type of injured parties, it is to be examined whether there is also a concrete duty of care, meaning '. . . whether there is a concrete duty of care between the specific tortfeasor and the specific injured party, in the special circumstances of the case for the specific damage that occurred.' (The *Vaknin* case [11] at p. 125).

This duty – so it was determined in the District Court – did not exist in the circumstances here, as an attack unprovoked by the victim was not foreseeable. This conclusion had no place at this stage of the determination of the lawsuit. It is not to be said that the complaint – on its face – does not reveal a chance to obtain the remedy sought. As we have seen the court is not deterred, in the appropriate cases, from imposing liability for an omission rooted in the failure to take reasonable precautionary measures against intentional criminal activity committed by third parties. The station is held by *Egged* and could serve as a

widespread and fruitful area for criminal activity.  (As to open public places as a comfortable area for criminal activity see also *Feld v. Merriam* (1984) [27]).

And indeed in his decision the learned judge in the lower court determined that:

> 'As is the way of crowded places they are likely to become **a convenient area for a range of criminal activities**, which constitute a weighty element in creating the potential for the occurrence of acts of violence'. (Emphasis mine-E.R.).

In the episode before us a criminal incident in fact took place.  Indeed, the attack occurred without any provocation on the part of the appellant, however, this is, more often than once, the way of criminal activity, which is done toward an innocent and law-abiding citizen who in his actions did not contribute a thing to the occurrence of the criminal incident.  This is the way of thugs.  Even a criminal act which is, on its own, sudden and quick, may come within the range of reasonable foreseeability of the business defendant who holds the lands on which the act occurred – and this, for the repetition of similar incidents in the past, for the suspicious behavior of the criminal prior to committing the act, and even – based on a broader approach – for the location of the commission being in an area that is prone to criminal activity, and also in light of the totality of the circumstances of the incident.

13.  Criminal acts may occur – and indeed occur – in almost every place and time, and therefore in a certain sense they are always 'foreseeable' in the technical sense.  The American court explained this in one of the cases:

> 'Everyone can foresee the commission of crime virtually anywhere and at any time. If foreseeability itself gave rise to a duty to provide 'police' protection for others, every residential curtilage, every shop, every store, every manufacturing plant would have to be patrolled by the private arms of the owner' (*Goldberg* [19], at p. 293).

However, the duty of care also includes, in addition to the requirement of 'technical' foreseeability, a requirement for 'normative' foreseeability.  One is therefore to 'sift' and choose from a range of risks that exist in daily life those unreasonable risks which should be foreseen, and for which liability is imposed.  This 'sifting' is done during the course of the examination of the concrete duty of care (and to be more precise – its normative aspect).  President Barak explained this in the *Vaknin* case [11] at pp. 126-127.

> 'Daily life is full of risks, which at times materialize and cause damage, without the creators of the risks bearing liability in torts.  The reason for this is, that those risks are natural and regular to acceptable human activity, and for them it was determined as a matter of legal policy that a concrete duty of care does not materialize.  The risks are reasonable, and proper societal life takes their existence into

account. . .  the unreasonable risk, for which the concrete duty of care is imposed is that risk, which society views with greater severity, in a manner that it requires that reasonable precautionary measures be taken to prevent it.' (The *Vaknin* matter [11], **Ibid**.).

And thus determined Justice M. Cheshin:

'Every injury has a name in medicine, but not every injury has a name of the one responsible by law.  Not for every injury that can be foreseen (in a theoretical manner), does the law impose normative responsibility...' [CA 371/90 *Subachi v. Israel Train* [12] at p. 349].

As for the responsibility of one who holds lands for the harmful act of a third party it has already been said that the duty of care of a landholder as to a visitor to land in his possession '. . . is not limited to the duty of the holder no to cause harm to the visitor but **extends also to the anticipated activities of a given person (another invitee, or licensee or trespasser)**.' (A. Barak, 'Liability for the Actions of Others', in G. Tedeschi ed., *The Law of Torts – the General Doctrine of Torts* [31], at p. 465; emphases mine E.R).  And the meaning is not that a duty of care never arises in the case of a regular risk, or that one is to release the tortfeasor, instantly and in every case, from liability, but it is to be said that at times negligent conduct does not occur in a concrete case because reasonable precautionary measures were undertaken taking the risk into account.

In CA 915/91 *State of Israel v. Levi* (hereinafter: 'the *Levi* case' [13]) at p. 67 the Court lists different circumstances in which one will hesitate to derive the existence of 'proximity' from the existence of foreseeability, and they include: when it is a matter of an omission of the defendant rather than an action, and when the injury was caused by a third party, and not directly by the defendant.  However, even the existence of these circumstances does not suffice to instantly rule out the existence of a duty of care.  '. . . in such a case there will be a need for more careful examination of the existence of proximity between the parties.'  (**Ibid**. at p. 67).

14.  This careful examination will take place in light of the tests that we discussed, including: whether the defendant was aware of the impending occurrence of the criminal act (in this context one it to examine not only the spontaneity and the suddenness of the criminal act itself, but also the behavior of the criminal prior to the act); whether in the past similar incidents occurred at the place of the incident; whether criminal acts are common in that area; whether the criminal act that occurred is a common event or exceptional in its character; whether the defendant had the control and supervision over the criminal or the place of the occurrence; whether, and taking into consideration the substance of the relationship between the parties, the plaintiff could reasonably rely on the fact that the defendant would undertake reasonable precautionary measures to protect his safety from criminals (as to the reliance factor compare the *Levi* matter [13], at p. 68); whether it is possible to learn of the existence of the duty from the totality of the other circumstances of

the case.

Once these have all been weighed in the appropriate circumstances considerations of public policy will also be examined, for which the court may refrain from determining that there exists a duty of care between the parties. (The *Levi* matter [13], at p. 69-70).

15.   When we take all these into account it will be necessary to make determinations as to several factual questions before it will be possible to decide on the question of *Egged*'s liability toward the appellant.   The court may refer to the question of the frequency of criminal acts of the type under discussion at the bus station and the question as to how widespread purposeless wandering of groups of thugs at such early morning hours is in the stations and its environs.   The question of the behavior of the defendant prior to the attack may also be relevant.   (See *Burgess v. Chicopee Savings Bank* (1957) [28].  It is possible that it will be necessary to examine what the relationship is between the actions of the police to prevent criminal acts in the area of the bus station and *Egged*'s actions in this matter, and so too the question of what the social and economic ramifications are of *Egged* not taking precautionary measures and the ramifications are of in fact imposing liability in such a situation.   These questions–and others – are worthy of deliberation during the course of the trial.  In their light it will be possible to make a determination whether the risk of attack without prior provocation at the Central Bus Station is a reasonable risk, which is to be accepted as an integral part of said activity, or whether it is a risk, '. . . which society views with a heightened sense of severity, in a manner that it requires that reasonable precautionary measures be taken to prevent it.' (The *Vaknin* matter [11] at p. 127).

At this stage in the proceedings, and before said questions have been decided, it was not appropriate to determine that an incident of a sudden ganging up by criminals on innocent passengers waiting at the Central Bus Station was (technically) unforeseeable, and it would not be appropriate to say that as a question of legal policy, the respondent is exempt from undertaking any precautionary measures to prevent such criminal activity.

16.   There is in the determination on the question of the duty of care – as to both of its aspects, the concrete and the conceptual – an aspect of creation of a liability rule in torts.   Therefore, in fact, there is a broadening or narrowing of the boundaries of the liability in torts (I. Gilead, 'On the Elements of the Tort of Negligence in Israeli Tort Law' [32] at pp. 337-338; I. England, 'The Contribution of Case Law to Developments in Tort Law – Its Self Image and Reality' [33], at p. 76].   Although it is proper that tort liability for failure to undertake measures to prevent crime should be applied uniformly, in my view the very fact that the occurrence of a specific attack incident was spontaneous and without advance provocation does not instantly remove it from the realm of tort liability.   The specific circumstances of the case are to be examined according to the tests delineated above, and with the presumption that a duty of care exists, it is to be further examined whether a duty was breached and whether there exists a factual and legal

causal connection between the negligent conduct and the injury that was caused to the plaintiff.

17.   Moreover, even if the conditions established in *Egged*'s business license are not sufficient to impose on it a duty to also ensure security from criminal activity in the area of station, and even if the entire purpose of the security instructions of the Israel Police is to prevent hostile acts – there is still no doubt that these instructions reveal the control and supervision of *Egged* over what goes on in the area of the station, as well as the means at its disposal to ensure the safety of the visitors at the station.  It is possible that they can serve as an indication of the level of conduct required of the landowner or the reasonable business owner.  The preventative costs for *Egged* ostensibly seem smaller than the expectation of the expected damage, if one takes into account the fact that in any case *Egged* must, according to the terms of the business license, maintain security and guarding arrangements, and the fact that these arrangements are also intended to prevent damage to its own property.  This damage is added to the severity of damage which is weighed against the costs of prevention.

However these considerations belong, as stated, at the stage of examination of the question whether *Egged* breached the duty of care imposed on it.  At this stage we are only dealing with the question whether there was a concrete duty of care imposed on *Egged*.  As to this matter, as stated, it is not to be determined already at this preliminary stage that the said incident was so unusual, that it is proper to remove it from the realm of required foreseeability, to the extent that *Egged* is not to be required to take **any** precautionary measures to prevent it. (R. Cooter, A. Porat 'Does Risk to Oneself Increase the Care Owed to Others? Law and Economics in Conflict' [38]).

The District Court rightly noted that absolute protection of the safety of visitors to the bus station is not possible.  Indeed, it is not possible and not reasonable to demand from *Egged* that it prevent every criminal act that takes place at the station.  As in the words of President Barak in the *Vaknin* matter [11] at p. 131:

> 'A tortfeasor, who **owes the injured party a concrete duty of care**, is not liable to him in every case, in which injury was caused to the injured party due to the behavior of the tortfeasor . . .  **the question is not what is the measure that prevents the injury in the physical sense, but the question is what is the measure that is to be demanded to be undertaken in the circumstances of the case**.  The court must balance between the interest of the individual injured party for his personal security, and the interest of the tortfeasor for freedom of movement, and all this against the background of the public interest in continuation or cessation of that activity.  The court must consider the danger and its extent.  It must consider the social importance of the activity.  It must weigh the means necessary to prevent it. . .' (Emphases mine – E.R.).

*The Causal Connection*

Justice E. Rivlin

18.   The lower court also based its decision on the determination that even if there was negligent conduct on *Egged*'s part – in not placing a security person – then there is no causal connection between the negligent conduct and the harm to the appellant.  This determination was not appropriate at this stage.

The question of the causal connection and the question of the remoteness of the harm where a third party intervenes in the chain of causation with an independent, intentional criminal act indeed are not easy.  But it was not appropriate to decide them in the negative at this stage.  A criminal act committed by another, who is within the realm of an intervening third party, will not be considered as a determinative cause for the harm which relieves the first negligent party from tort liability, where the criminal act was foreseeable, as one of the possible outcomes of the original negligent behavior.  I. Englard explained this.

'...a deliberate wrongful intervention of a third party was not to be considered too remote an event, as long as it could be considered a foreseeable risk created by the conduct of the defendant. However, in view of the fact that foreseeability is not an objective, empirical test, but rather a normative notion – referring to what a person 'ought to foresee' – the imposition of liability is the result of a judicial policy decision' (Englard *supra* [30], at p. 176).

(See also CA 704/71 *Agabrya v. Hameiri* [14])

In this episode it is not to be determined already now that the action of the respondent no. 2 was '. . .  so uncommon in its character and so appalling in its implementation and outcomes, that according to common sense it certainly cannot be explained.' (CA 796/80 [5] *supra* at p. 345).

19.   The court assumed that even if a security person were in the area, he would not have had the chance to assist the appellant, and it was very doubtful whether his presence would have deterred the attackers in advance.  The fact is, so noted the learned judge, that the presence of passersby in the area did not deter the attacker.  In this matter I accept the claim of the appellant that in terms of the deterrence effect the presence of citizen passersby is not like the presence of a security person.  The presence of an armed and uniformed security person certainly might deter criminals from purposeless ganging up on innocent citizens, as it can turn the criminal act into a 'high risk behavior' (Bazyler, *supra*, [36], at p. 733).  In any event, as said, the premise that the presence of a security person would have prevented the damaging outcome is not to be ruled out, already at this preliminary stage.

I therefore suggest that the appeal be granted, the decision of the District Court be overturned and the case returned to the District Court to be determined on the merits.  Respondent no. 1 will pay attorneys' fees in a total sum of 15,000 NIS.

**President A. Barak**

I agree.

CrimA 3510/99                    Wallace v. 'Egged'                    18

Justice E. Rivlin

**Justice J. Türkel**

I agree.

It was decided as per the decision of Justice A. Rivlin.

17 Av 5761
6 August 2001