# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Docket no. 08-01460 (RCL)

SHERYL WULTZ, individually, as personal
representative of the Estate of Daniel Wultz, and as
the natural guardian of plaintiff Abraham Leonard Wultz
2526 Jardin Dr.
Weston, FL 33327-1516

YEKUTIEL WULTZ, individually, as personal
representative of the Estate of Daniel Wultz, and as
the natural guardian of plaintiff Abraham Leonard Wultz,
2526 Jardin Dr.
Weston, FL 33327-1516

AMANDA WULTZ
2526 Jardin Dr.
Weston, FL 33327-1516

and

ABRAHAM LEONARD WULTZ, minor, by his next
friends and guardians Sheryl Wultz and Yekutiel Wultz,
2526 Jardin Dr.
Weston, FL 33327-1516

PLAINTIFFS,

vs.

THE ISLAMIC REPUBLIC OF IRAN
Ministry of Foreign Affairs
Khomeini Ave. United Nations St.
Teheran, Iran

THE IRANIAN MINISTRY OF INFORMATION AND SECURITY
Pasdaran Ave. Golestan Yekom Teheran, Iran

AYATOLLAH ALI HOSEINI KHAMENEI
Supreme Leader of the Islamic Republic of Iran
Office of the Supreme Leader
Palestine St. Teheran, Iran

ALI YUNESI
c/o the Iranian Ministry of Information and Security
Pasdaran Ave. Golestan Yekom Teheran, Iran

GHOLAM HOSSEIN MOHSENI-EJEHEI
c/o the Iranian Ministry of Information and Security
Pasdaran Ave. Golestan Yekom Teheran, Iran

IRANIAN DOES 1-10
Teheran, Iran

THE SYRIAN ARAB REPUBLIC
c/o Foreign Minister Walid al-Mualem
Ministry of Foreign Affairs
Shora, Muhajireen, Damascus, Syria

THE SYRIAN MINISTRY OF DEFENSE
Omayad Square
Damascus, Syria

MUSTAFA TLASS
Syrian Ministry of Defense
Omayad Square
Damascus, Syria

SYRIAN MILITARY INTELLIGENCE
(aka Shu'bat al-Mukhabarat al-'Askariyya)
Syrian Ministry of Defense
Omayad Square
Damascus, Syria

HASSAN KHALIL
Syrian Military Intelligence
(aka Shu'bat al-Mukhabarat al-'Askariyya)
Syrian Ministry of Defense
Omayad Square
Damascus, Syria

ASSEF SHAWKAT
Syrian Military Intelligence
(aka Shu'bat al-Mukhabarat al-'Askariyya)
Syrian Ministry of Defense
Omayad Square
Damascus, Syria

ALI DOUBA
Syrian Military Intelligence
(aka Shu'bat al-Mukhabarat al-'Askariyya)
Syrian Ministry of Defense
Omayad Square
Damascus, Syria

THE SYRIAN AIR FORCE INTELLIGENCE DIRECTORATE

(aka Idarat al-Mukhabarat al-Jawiyya)
Syrian Ministry of Defense
Omayad Square
Damascus, Syria

IBRAHIM HUEIJI
Syrian Air Force Intelligence Directorate
(aka Idarat al-Mukhabarat al-Jawiyya)
Syrian Ministry of Defense
Omayad Square
Damascus, Syria

SYRIAN DOES 1-10
Damascus, Syria

and

BANK OF CHINA LIMITED
444 South Flower St., 39th Floor
Los Angeles, California 90071

DEFENDANTS.

**FIRST AMENDED COMPLAINT**

Plaintiffs, by counsel, complain of the Defendants and allege for their First Amended Complaint as follows:

**INTRODUCTION**

1.      This is a civil action for wrongful death, personal injury and related torts pursuant to the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. § 1602 *et seq.*, and the Antiterrorism Act ("ATA") 18 U.S.C. § 2333, arising from a suicide bombing carried out by the Palestine Islamic Jihad ("PIJ") terrorist organization on April 17, 2006, in Tel Aviv, Israel ("Terrorist Bombing").

2.      The Terrorist Bombing was carried out by the PIJ using material support and resources provided by defendants the Islamic Republic of Iran, the Syrian Arab Republic and the Bank of China Limited.

3.     Decedent Daniel Wulz, a sixteen year-old American citizen domiciled in Florida, was severely injured in the Terrorist Bombing, and died of his injuries on May 14, 2006. Daniel's father, plaintiff Yekutiel Wultz, also an American citizen from Florida, was seriously injured in the Terrorist Bombing but survived.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter and over the defendants pursuant to 28 U.S.C. §§ 1330–1332, 1367, 1605A and 18 U.S.C. §§ 2333–2334. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4) and the rules of pendent venue.

## THE PARTIES

5.     Plaintiffs Sheryl Wultz and Yekutiel Wultz at all times relevant hereto are and were American citizens domiciled in Florida, and the parents, heirs and personal representatives of the estate of decedent Daniel Wultz, who was murdered in the Terrorist Bombing. Plaintiffs Sheryl Wultz and Yekutiel Wultz bring this action individually, on behalf of the estate of Daniel Wultz, and as natural guardians of their minor son plaintiff Abraham Leonard Wultz.

6.     Plaintiff Amanda Wultz at all times relevant hereto is and was an American citizen domiciled in Florida, and the sister of decedent Daniel Wultz.

7.     Plaintiff Abraham Leonard Wultz, minor, at all times relevant hereto was and is an American citizen domiciled in Florida and the brother of decedent Daniel Wultz.

8.     Defendant Islamic Republic of Iran (hereinafter "Iran") is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603, designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Iran provided material support and resources for the commission of acts of

extrajudicial killing, within the meaning of 28 U.S.C. § 1605A, including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

9.    Defendant The Iranian Ministry of Information and Security ("MOIS") is the Iranian intelligence service. Within the scope of its agency and office, MOIS provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

10.    Defendant Ayatollah Ali Hoseini Khamenei ("Khamenei") is the Supreme Leader of Iran and an official, employee and agent of Iran. Within the scope of his office, employment and agency, Khamenei provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

11.    Defendant Ali Yunesi ("Yunesi") was Iran's Minister of Information and Security and an official, employee and agent of Iran during the period between 1999 and approximately August 2005. Within the scope of his office, employment and agency, Yunesi provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

12.    Defendant Gholam Hossein Mohseni-Ejehei ("Ejehei") is and was Iran's Minister of Information and Security and an official, employee and agent of Iran during the period between approximately August 2005 and the date of the Terrorist Bombing. Within the scope of his office, employment and agency, Ejehei provided material support and resources for the

commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

13.  Defendants Iranian Does 1-10 are, and at all times relevant hereto were, officials, employees and agents of Iran, who within the scope of their office, employment and agency provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

14.  Defendant The Syrian Arab Republic (hereinafter "Syria") is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603, designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Syria provided material support and resources for the commission of acts of extrajudicial killing, within the meaning of 28 U.S.C. § 1605A, including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

15.  Defendant The Syrian Ministry of Defense (hereinafter "SMD") is, and at all times relevant hereto was, responsible for operating and controlling Syria's armed forces and intelligence services. Within the scope of its agency and office, SMD provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

16.  Defendant Mustafa Tlass (hereinafter "Tlass") at all times relevant hereto was the Syrian Minister of Defense and an official, employee and agent of Syria and SMD. Within the scope of his office, employment and agency, Tlass provided material support and resources for

the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

17.  Defendant Syrian Military Intelligence, also known as Shu'bat al-Mukhabarat al-Askariyya, (hereinafter "SMI") is, and at all times relevant hereto was, Syria's military intelligence agency. Within the scope of its agency and office, SMI provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

18.  Defendant Hassan Khalil (hereinafter "Khalil") is, and at all times relevant hereto was, the commander of SMI and an official, employee and agent of Syria, SMD and SMI. Within the scope of his office, employment and agency, Khalil provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

19.  Defendant Assef Shawkat (hereinafter "Shawkat") is, and at all times relevant hereto was, the deputy commander of SMI and an official, employee and agent of Syria, SMD and SMI. Within the scope of his office, employment and agency, Shawkat provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

20.  Defendant Ali Douba (hereinafter "Douba") is the former commander of SMI and an official, employee and agent of Syria, SMD and SMI. Within the scope of his office, employment and agency, Douba provided material support and resources for the commission of

acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

21.    Defendant The Syrian Air Force Intelligence Directorate, also known as Idarat al-Mukhabarat al-Jawiyya, (hereinafter "SAFID") is, and at all times relevant hereto was, an agency of defendant Syria specifically assigned to plan, fund, facilitate and carry out Terrorist Bombings. Within the scope of its agency and office, SAFID provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

22.    Defendant Ibrahim Hueiji (hereinafter "Hueiji") is, and at all times relevant hereto was, the commander of SAFID and an official, employee and agent of Syria, SMD and SAFID. Within the scope of his office, employment and agency, Hueiji provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

23.    Defendants Syrian Does 1-10 are, and at all times relevant hereto were, officials, employees and agents of Syria, who within the scope of their office, employment and agency provided material support and resources for the commission of acts of extrajudicial killing including the Terrorist Bombing, and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

24.    Defendant Bank of China Limited ("BOC") is a corporation organized under the laws of the People's Republic of China ("PRC") and headquartered in the PRC. Defendant BOC has branches in California and New York, does extensive business throughout the United States and holds significant assets in the United States.

25.     Defendant BOC provided material support and resources to the PIJ and performed other actions that caused the Terrorist Bombing and harm to the plaintiffs herein.

## STATEMENT OF FACTS

### The Palestine Islamic Jihad

26.     The Palestine Islamic Jihad ("PIJ") was formed in the Gaza Strip during the early 1980s.

27.     The PIJ is a radical terrorist organization. The PIJ's openly-declared goal is the creation of an Islamic state in the territory of Israel, the West Bank and the Gaza Strip, and the destruction of the State of Israel and the murder or expulsion of its Jewish residents. The PIJ seeks to achieve this goal by carrying out terrorist attacks against Jewish civilians in Israel, the West Bank and the Gaza Strip. The PIJ proudly and openly acknowledges that it uses terrorism to achieve its political goals.  The PIJ uses terrorism in an effort to coerce, intimidate and influence government decision-makers and the public in Israel to accept the PIJ's demands.

28.     Between the time of its founding and April 17, 2006 (and until the present day), PIJ has carried out thousands of terrorist attacks in Israel, the West Bank and the Gaza Strip, in which scores of Israeli and U.S. citizens were murdered and hundreds more wounded.

29.     Between the time of its founding and April 17, 2006, PIJ's policy and practice of carrying out terrorist attacks was and is notorious and well known to the public at large, including the defendants.

30.     Between 1999 and April 17, 2006, the courts of the United States, including this Court, published a number of decisions finding that PIJ was responsible for terrorist attacks in which American and Israeli citizens were killed or injured.

31.     The PIJ has been designed by the United States as a Foreign Terrorist Organization ("FTO") continuously since 1997 and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001.

32.     Since 1988 and until the present day, the PIJ's headquarters have been continuously located in Damascus, Syria.

### Iran's Provision of Material Support and Resources to the PIJ

33.     Since 1984 until the present time, defendant Iran has been continuously designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

34.     Defendant Iran remains designated as a state sponsor of terrorism because, *inter alia*, it provides material support and resources to the PIJ. The United States government has repeatedly informed Iran that its provision of material support and resources to the PIJ is a threat to the United States and its citizens, many of whom have been murdered or harmed by acts of terrorism carried out by the PIJ, and demanded – to no avail – that Iran cease its provision of material support and resources to the PIJ.·

35.     During the period relevant hereto, including the several year period immediately preceding the Terrorist Bombing, defendants Iran, MOIS, Khamenei, Yunesi, Ejehei and Iranian Does 1-10 ("Iranian defendants") provided the PIJ with massive financial support with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the Terrorist Bombing. Such financial support was provided continuously, routinely and in furtherance and as implementation of a specific policy and practice established and maintained by Iran, in order to assist the PIJ achieve goals shared by

Iran. These goals included terrorizing the Jewish civilian population in Israel, and weakening Israel's economy, social fabric, and military strength and preparedness.

36.     The Iranian defendants provided this financial support to the PIJ pursuant to an agreement reached between Iran and the PIJ in the 1980s which remains in force until today. Under that agreement, the PIJ undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, the West Bank and Gaza, and in return Iran undertook to provide the PIJ with financial support to carry out such extrajudicial killings and Terrorist Bombings. The purpose of this agreement was to achieve the goals detailed in the preceding paragraph.

37.     The Iranian defendants gave substantial aid, assistance and encouragement to one another and to the PIJ, and provided massive financial support the PIJ, and thereby aided and abetted the PIJ, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the Terrorist Bombing. The Iranian defendants did so with actual knowledge that the PIJ had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their aiding, abetting and provision of material support and resources to the PIJ.

38.     The Iranian defendants knowingly and willingly conspired, agreed and acted in concert with one another and with the PIJ, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing and international terrorism including the Terrorist Bombing. The Iranian defendants did so with actual knowledge that the PIJ had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their conspiracy with the PIJ.

39.     At all times relevant hereto, defendant MOIS was an agency, instrumentality and/or office of defendant Iran, and performed acts on behalf of defendant Iran, in furtherance of the interests and policy of defendant Iran and within the scope of its agency and office, within the meaning of 28 U.S.C. § 1605A(a)(1) and 28 U.S.C. § 1605A(c), which caused the Terrorist Bombing and harm to the plaintiffs herein, in that defendant MOIS implemented and acted as a conduit and instrumentality for Iran's provision of funds to the PIJ for the commission of acts of extrajudicial killing and international terrorism including the Terrorist Bombing.

40.     Defendant Iran authorized, ratified and approved the acts of defendant MOIS.

41.     Accordingly, defendant Iran is vicariously liable for the acts of defendant MOIS.

42.     At all relevant times, defendants Khamenei, Yunesi, Ejehei and Iranian Does 1-10 were agents, officers and employees of defendant Iran and performed acts on behalf of defendant Iran, in furtherance of the interests and policy of defendant Iran within the scope of their agency and office, within the meaning of 28 U.S.C. § 1605A(a)(1) and 28 U.S.C. § 1605A(c), which caused the Terrorist Bombing and harm to the plaintiffs herein, in that defendants Khamenei, Yunesi, Ejehei and Iranian Does 1-10 authorized, planned and caused the provision of funds by Iran to the PIJ for the commission of acts of extrajudicial killing and international terrorism including the Terrorist Bombing.

43.     Defendant Iran authorized, ratified and approved the acts of defendants Khamenei, Yunesi, Ejehei and Iranian Does 1-10.

44.     Accordingly, defendant Iran is vicariously liable for the acts of defendants Khamenei, Yunesi, Ejehei and Iranian Does 1-10.

### Syria's Provision of Material Support and Resources to the PIJ

45.     Since 1979 until the present time, defendant Syria has been continuously designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

46.     Defendant Syria remains designated as a state sponsor of terrorism because, *inter alia*, it provides material support and resources to the PIJ. The United States government has repeatedly informed Syria that its provision of material support and resources to the PIJ is a threat to the United States and its citizens, many of whom have been murdered or harmed by acts of terrorism carried out by the PIJ, and demanded – to no avail – that Syria cease its provision of material support and resources to the PIJ.

47.     During the period relevant hereto, including the several year period immediately preceding the Terrorist Bombing, defendants Syria, SMD, Tlass, SMI, Khalil, Shawkat, Douba, SAFID, Hueiji and Syrian Does 1-10 ("Syrian defendants") provided the PIJ with material support and resources within the meaning of 28 U.S.C. § 1605A(a)(1), described in detail below, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the Terrorist Bombing. Such support was provided continuously, routinely and in furtherance and as implementation of a specific policy and practice established and maintained by Syria, in order to assist the PIJ achieve goals shared by Syria. These goals included terrorizing the Jewish civilian population in Israel, and weakening Israel's economy, social fabric, and military strength and preparedness.

48.     The Syrian defendants provided the material support and resources detailed below to the PIJ pursuant to an agreement reached between Syria and the PIJ in the late 1980s which remains in force until today. Under that agreement, the PIJ undertook to carry out acts of

extrajudicial killing and terrorism against Jews in Israel, the West Bank and Gaza, and in return Syria undertook to provide the PIJ with material support and resources to carry out such extrajudicial killings and terrorist attacks. The purpose of this agreement was to achieve the goals detailed in the preceding paragraph.

49.     The material support and resources which were provided by the Syrian defendants to the PIJ in the years immediately prior to the Terrorist Bombing for the purpose of facilitating acts of extrajudicial killing and terrorism included *inter alia*: provision of financial support to the PIJ for the purpose of carrying out terrorist attacks; provision of military-grade explosives, military firearms and other weapons and matériel to the PIJ; provision of specialized and professional military training for the planning and execution of terrorist attacks (hereinafter: "terrorist training") to the PIJ; providing use of Syria-owned and operated training bases and military facilities in which terrorist training was provided to the PIJ and its terrorist operatives; providing the PIJ and its terrorist operatives with safe haven and refuge from capture in Syria and in areas of Lebanon controlled by Syria; providing the PIJ means of electronic communication and electronic communications equipment for carrying out terrorist attacks; financial services, including banking and wire transfer services, provided to the PIJ by financial institutions owned and controlled by Syria at Syria's direction, which services were intended to and did enable the PIJ to surreptitiously transfer funds used to finance terrorist attacks; and means of transportation, including allowing terrorist operatives of the PIJ passage and transportation on Syrian-owned aircraft to allow them to avoid detection and carry out further terrorist attacks.

50.     At all times relevant hereto, the Syrian defendants provided the PIJ and its terrorist operatives with terrorist training at military training bases, camps and facilities operated

and/or funded and/or controlled by the Syrian defendants and located in Syria and in areas of Lebanon controlled by Syria, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the Terrorist Bombing. This terrorist training, which was professional and extensive and included the use of explosives, firearms and other weapons, was provided by and through Syrian military and intelligence officials, and other agents, employees and officials of the Syrian defendants acting within the scope of their agency and employment and under the express command and authorization of the Syrian defendants.

51.     In addition, at all times relevant hereto, the Syrian defendants provided terrorist training, weapons, and funds to be used to carry out terrorist attacks to the PIJ and its terrorist operatives, by and through the agency of other terrorist organizations which received material support and resources from the Syrian defendants, and which acted as instrumentalities, agents and proxies of the Syrian defendants for the purpose of providing terrorist training and other material support and resources to the PIJ.

52.     At all times relevant hereto, the Syrian defendants provided the PIJ and its terrorist operatives with lodging, safe haven and shelter in Syria and in areas of Lebanon controlled by Syria, with the specific intention of preventing their apprehension and permitting them to plan and carry out acts of extrajudicial killing and international terrorism freely and unhindered. This lodging, safe haven and shelter was provided on military bases and facilities, and in residences, owned and controlled by Syria.

53.     Additionally, since 1988 and until the present day, the Syrian defendants have continuously permitted and enabled the PIJ to maintain its headquarters in Damascus, Syria. Since 1988 and until the present day, the Syrian defendants have continuously provided the PIJ

with material support and resources necessary for the maintenance and operation of the PIJ's headquarters in Damascus, including without limitation land, physical facilities and buildings, and vital utilities such as electricity, water and electronic communications services (including telephone, facsimile, internet connection and electronic mail).

54.     The material support and resources described in the previous paragraph have enabled the PIJ, since 1988 and until the present day, to use the PIJ headquarters in Damascus: to organize, build and expand the PIJ's terrorist infrastructure in the West Bank, Gaza Strip and Israel; to plan, coordinate and direct the activities of the PIJ's operatives in the West Bank, Gaza Strip and Israel; and to plan and direct the execution of acts of terrorism in the West Bank, Gaza Strip and Israel including the Terrorist Bombing.

55.     The Syrian defendants gave substantial aid, assistance and encouragement to one another and to the PIJ, and provided the massive material support and resources described above to the PIJ, and thereby aided and abetted the PIJ, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism including the Terrorist Bombing. The Syrian defendants did so with actual knowledge that the PIJ had killed and injured numerous U.S. citizens in terrorist bombings and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their aiding, abetting and provision of material support and resources to the PIJ.

56.     The Syrian defendants knowingly and willingly conspired, agreed and acted in concert with one another and with the PIJ, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing and international terrorism including the Terrorist Bombing. The Syrian defendants did so with actual knowledge that the PIJ had killed and injured numerous U.S. citizens in terrorist bombings

and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their conspiracy with the PIJ.

57.     At all times relevant hereto, defendants SMD, SMI and SAFID were agencies, instrumentalities and/or offices of defendant Syria, and performed acts on behalf of defendant Syria, in furtherance of the interests and policy of defendant Syria and within the scope of their agency and office, within the meaning of 28 U.S.C. § 1605A(a)(1) and 28 U.S.C. § 1605A(c), which caused the Terrorist Bombing and harm to the plaintiffs herein, in that defendants SMD, SMI and SAFID implemented and acted as conduits and instrumentalities for Syria's provision of funds, terrorist training and other material support and resources to the PIJ for the commission of acts of extrajudicial killing and international terrorism including the Terrorist Bombing.

58.     Defendant Syria authorized, ratified and approved the acts of defendants SMD, SMI and SAFID.

59.     Accordingly, defendant Syria is vicariously liable for the acts of defendants SMD, SMI and SAFID.

60.     At all relevant times, defendants Tlass, Khalil, Shawkat, Douba, Hueiji and Syrian Does 1-10 were agents, officers and employees of defendants Syria, SMD, SMI and SAFID, and performed acts on behalf of defendants Syria, SMD, SMI and SAFID, in furtherance of the interests and policy of defendant Syria, SMD, SMI and SAFID and within the scope of their agency and office, within the meaning of 28 U.S.C. § 1605A(a)(1) and 28 U.S.C. § 1605A(c), which caused the Terrorist Bombing and harm to the plaintiffs herein, in that defendants Tlass, Khalil, Shawkat, Douba, Hueiji and Syrian Does 1-10 authorized, planned and caused the provision of funds, terrorist training and other material support and resources by

Syria, SMD, SMI and SAFID to the PIJ for the commission of acts of extrajudicial killing and international terrorism including the Terrorist Bombing.

61.     Defendants Syria, SMD, SMI and SAFID authorized, ratified and approved the acts of defendants Tlass, Khalil, Shawkat, Douba, Hueiji and Syrian Does 1-10.

62.     Accordingly, defendants Syria, SMD, SMI and SAFID are vicariously liable for the acts of defendants Tlass, Khalil, Shawkat, Douba, Hueiji and Syrian Does 1-10.

### Bank of China's Provision of Material Support and Resources to the PIJ

63.     The PIJ is subject to strict economic sanctions programs imposed by the United States as the result of its designation as an FTO and SDGT (collectively hereinafter: "U.S. Sanctions Regime").

64.     The U.S. Sanctions Regime is intended to prevent PIJ from conducting banking activities, and thereby limit its ability to plan, to prepare and to carry out terrorist attacks.

65.     The U.S. Sanctions Regime is effective when it is observed and enforced. PIJ is unable to conduct banking activities via banks and other financial institutions which observe and enforce the U.S. Sanctions Regime.

66.     If all banks and financial institutions around the world observed and enforced the U.S. Sanctions Regime, the ability of PIJ to conduct banking activities would be severely restricted, and PIJ's ability to plan, to prepare and to carry out terrorist attacks would be significantly reduced.

67.     Nearly all banks and financial institutions around the world observe and enforce the U.S. Sanctions Regime. The PIJ is therefore forced to conduct its banking activities using those very few banks and financial institutions which do not observe and enforce the U.S. Sanctions Regime.

68.     Defendant BOC does not observe or enforce the U.S. Sanctions Regime.

69.     Beginning in July 2003, BOC began to provide extensive banking services to PIJ. Specifically, between 2003 and the date of the Terrorist Bombing, BOC executed dozens of dollar wire transfers for the PIJ, totaling several million dollars. These dollar transfers were initiated by the PIJ leadership in Iran, Syria and elsewhere in the Middle East, and were executed by and through BOC's branches in the United States. Most of these transfers were made to account number 4750401-0188-150882-6 at a BOC branch in Guanzhou, China, in the name of "S.Z.R Alshurafa." The owner of the account, Said al-Shurafa ("Shurafa") is a senior officer and agent both of the PIJ and of the Hamas terrorist organization. Other dollar transfers were made by PIJ via BOC's branches in the United States to another account belonging to Shurafa at the same BOC branch in Guanzhou, account number 4762307-0188-034456-6. The wire transfers referred to in this paragraph are referred to collectively hereinafter as "PIJ Transfers."

70.     Pursuant to the PIJ's instructions, upon receiving the PIJ Transfers in his BOC accounts Shurafa moved the sums to the PIJ terrorist leadership in Israel, the West Bank and the Gaza Strip, for the purpose of planning, preparing for and executing terrorist attacks.

71.     Terrorist organizations such as PIJ need wire transfer and other banking services in order to plan, to prepare for and to carry out terrorist attacks.

72.     Provision of wire transfer or other banking services to PIJ enables PIJ to plan, to prepare for and to carry out terrorist attacks, and enhances PIJ's ability to plan, to prepare for and to carry out such attacks.

73.     PIJ carried out the PIJ Transfers in order to transfer and receive funds necessary for planning, preparing and carrying out the PIJ's terrorist activity, including bombing attacks against civilians generally and the Terrorist Bombing specifically.

74.     The PIJ Transfers substantially increased and facilitated PIJ's ability to plan, to prepare for and to carry out bombing attacks on civilians, including the Terrorist Bombing.

75.     The PIJ Transfers were enabled, facilitated and proximately caused by the conduct of defendant BOC described herein. As the result of BOC's conduct, the PIJ was able to transfer several million dollars in funds to its terrorist leadership in Israel, the West Bank and the Gaza Strip, which substantially increased and facilitated PIJ's ability to plan and carry out terrorist attacks, including the Terrorist Bombing. The Terrorist Bombing was thereby enabled, facilitated and proximately caused by the conduct of defendant BOC described herein.

76.     Plaintiffs' injuries are therefore the direct and proximate result of defendant BOC's' conduct.

77.     At all times, BOC had actual knowledge that the PIJ Transfers were being made by the PIJ for the purpose of carrying out terrorist attacks, and that the PIJ Transfers enhanced the PIJ's ability to plan, prepare for and carry out such attacks. In April 2005, officials of the counterterrorism division of the Office of the Prime Minister of the State of Israel (collectively hereinafter: "Israeli officials") met with officials of the PRC's Ministry of Public Security and the PRC's central bank (collectively hereinafter: "PRC officials") regarding the PIJ Transfers. At that meeting in April 2005, the Israeli officials emphasized to the PRC officials that the PIJ Transfers were being made by the PIJ for the purpose of carrying out terrorist attacks, and that the PIJ Transfers enhanced the PIJ's ability to plan, prepare for and carry out such attacks. At that April 2005 meeting, the Israeli officials demanded that the PRC officials take action to prevent BOC from making further such transfers. In April 2005, the PRC officials notified the BOC of the Israeli officials' statements that the PIJ Transfers were being made by the PIJ for the purpose of carrying out terrorist attacks and that the PIJ Transfers enhanced the PIJ's ability to

plan, prepare for and carry out such attacks. At the same time (i.e. in April 2005) the PRC officials also notified BOC of the Israeli officials' demand the BOC halt the PIJ Transfers, but the BOC (with the approval of the PRC) ignored this demand and continued to carry out further PIJ Transfers between April 2005 and the date of the Terrorist Bombing (and subsequently).

78.     Even prior to the Israeli officials' demand to halt the PIJ Transfers, BOC knew and/or should have known that the PIJ Transfers were being made for illegal purposes, *inter alia* in light of the following facts:

a.   Most of the PIJ Transfers were made in cash;

b.   Most of the PIJ Transfers were withdrawn by Shurafa on the same day they were received or on the following day, often in cash;

c.   The sums involved were large, mostly in the range of $100,000 or more;

d.   The intervals between transfers were often short (weeks or days) and the sums transferred were often identical or similar. For example, many of the transfers were for $99,960, $99,970 or $99,990;

e.   Many of the transfers were for round figures;

f.   Many of the transfers were structured to be slightly less than round figures. For example, many of the transfers were for $99,960, $99,970, $99,990 or $199,965;

g.   This pattern of transfers continued for a period of years;

h.   The PIJ Transfers have no business or apparent lawful purpose, and there was no reasonable explanation for them.

79. The facts enumerated in the previous paragraph are universally recognized by all professional bankers, including BOC and its employees, as typical indicia of transactions made for illegal purposes.

80. Even prior to the Israeli officials' demand to halt the PIJ Transfers, BOC knew and/or should have known that the PIJ Transfers were being made for illegal purposes because BOC had and has statutory duties, *inter alia* under United States law and under the rules promulgated by the Financial Action Task Force ("FATF"), to monitor, report and refuse to execute suspicious and/or irregular banking transactions. The PIJ Transfers were facially suspicious and irregular in light of each and all of the facts enumerated in paragraph 78. By executing the PIJ Transfers, BOC breached its statutory duties to monitor, report and refuse to execute suspicious and/or irregular banking transactions.

81. Even prior to the Israeli officials' demand to halt the PIJ Transfers, BOC knew and/or should have known that the PIJ Transfers were being made for illegal purposes because BOC had and has statutory duties, *inter alia* under United States law and the rules promulgated by FATF, to know its customers and perform due diligence. By executing the PIJ Transfers, BOC breached its statutory duties to know its customers and perform due diligence.

**The Terrorist Bombing**

82. For several months prior to April 17, 2006, the PIJ planned, conspired and made preparations to murder and injure Jewish civilians by carrying out a suicide bombing in a crowded public location in Tel Aviv, Israel.

83. Pursuant to the aforementioned plan, on April 17, 2006, at approximately 1:30 pm, an agent and operative of the PIJ, Sami Salim Mohammed Hammed ("Hammed"), arrived at

the Rosh Ha'ir restaurant near the old central bus station in Tel Aviv, which was packed with diners, in order to carry out the suicide bombing on behalf and at the direction of the PIJ.

84.     Hammed was carrying a powerful explosive device covered with nails and other metallic projectiles with which he had been provided by the PIJ for the specific purpose of carrying out the bombing.

85.     Hammed set off the explosive device shortly after 1:30 pm. The explosion killed eleven people and wounded dozens of others.

86.     Among the wounded were Daniel Wultz and Yekutiel Wultz, who were visiting Israel for the Passover holiday.

87.     Daniel Wultz was critically injured in the bombing, and underwent multiple surgeries and other procedures to save his life, but succumbed to his injuries on May 14, 2006. Daniel Wultz was conscious immediately after the bombing and throughout much of his hospitalization. Between the time of the bombing and his death, Daniel endured extreme conscious physical pain and suffering, as well as severe emotional pain as the result of his conscious awareness of both the fact and extent of his injuries, and the likelihood that he would die.

88.     Plaintiff Yekutiel Wultz suffered serious physical injuries in the bombing, as well as resultant psychological and emotional harm.

89.     Plaintiff Yekutiel Wultz was sitting next to his son Daniel at the time of the bombing. One moment Yekutiel and Daniel were enjoying a father-son lunch; the next moment Yekutiel saw his son Daniel on the ground, obviously critically wounded and covered in blood.

90.     The Syrian defendants and the Iranian defendants conspired and acted in concert with the PIJ, in pursuit of their common goals, design and agreements with the PIJ, discussed

above, to carry out the Terrorist Bombing on April 17, 2006, and other such acts of extrajudicial killing and international terrorism, and that Terrorist Bombing was carried out by the PIJ further to and as implementation of its aforementioned agreement and conspiracy with the Syrian defendants and the Iranian defendants.

91.     The PIJ carried out the Terrorist Bombing utilizing funds, weapons, terrorist training and other material support, resources, aid and assistance provided by the Syrian defendants and the Iranian defendants for the specific purpose of carrying out that attack and other such acts of extrajudicial killing and international terrorism.

92.     The PIJ planned, made the preparations necessary for and carried out the Terrorist Bombing utilizing funds received by the PIJ as part of the PIJ Transfers, and/or utilizing funds received by the PIJ in exchange or consideration for the PIJ Transfers, and/or utilizing funds that were freed up and/or otherwise made available to the PIJ as a result of the PIJ Transfers, and/or using funds drawn from a pool of funds created in part by the PIJ Transfers.

**FIRST COUNT**
**ON BEHALF OF ALL PLAINTIFFS**
**AGAINST THE SYRIAN DEFENDANTS AND THE IRANIAN DEFENDANTS**
**ACTION FOR DAMAGES UNDER 28 U.S.C. § 1605A(c)**

93.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

94.     Syria is a foreign state that since 1979 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

95.     Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

96.     The Syrian defendants and the Iranian defendants provided material support and resources to the PIJ, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Bombing.

97.     Defendants SMD, SMI and SAFID, Tlass, Khalil, Shawkat, Douba, Hueiji and Syrian Does 1-10 are officials, employees, and/or agents of Syria, and they provided the PIJ with the material support and resources which caused and facilitated the Terrorist Bombing, within the scope of their office, employment and/or or agency.

98.     Defendants MOIS, Khamenei, Yunesi, Ejehei and Iranian Does 1-10 are officials, employees, and/or agents of Iran and they provided the PIJ with the material support and resources which caused and facilitated the Terrorist Bombing, within the scope of their office, employment and/or or agency.

99.     The Terrorist Bombing was an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

100.    Decedent Daniel Wultz was severely injured by the Terrorist Bombing and died as a result of those injuries. The maiming and murder of Daniel Wultz caused decedent, his estate and plaintiffs Sheryl Wultz, Yekutiel Wultz, Amanda Wultz and Abraham Leonard Wultz severe injury, including: conscious pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

101.    Plaintiff Yekutiel Wultz suffered severe physical, psychological, emotional and other injuries as a result of the Terrorist Bombing, including: disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss

of consortium; severe emotional distress and mental anguish; loss of solatium; and loss of future income.

102.    The injuries suffered by plaintiff Yekutiel Wultz in the Terrorist Bombing caused plaintiffs Sheryl Wultz, Amanda Wultz and Abraham Leonard Wultz severe harm, including: loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and pecuniary loss and loss of income.

103.    As a direct and proximate result of the conduct of the Syrian defendants and the Iranian defendants decedent Daniel Wultz was murdered and the plaintiffs suffered the harm described herein

104.    The Syrian defendants and the Iranian defendants are therefore jointly and severally liable under 28 U.S.C. § 1605A(c) for the full amount of plaintiffs' damages.

105.    The conduct of the Syrian defendants and the Iranian defendants was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## SECOND COUNT
## ON BEHALF OF ALL PLAINTIFFS AGAINST DEFENDANT BANK OF CHINA INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333

106.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

107.    The actions of defendant BOC subsequent to April 2005 (at which time the PRC officials notified the BOC of the Israeli officials' statements that the PIJ Transfers were being made by the PIJ for the purpose of carrying out terrorist attacks and that the PIJ Transfers enhanced the PIJ's ability to plan, prepare for and carry out such attacks, and at which time the

PRC officials notified BOC of the Israeli officials' demand the BOC halt the PIJ Transfers), constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

108.     As required by § 2331, the actions of defendant BOC constituted a violation of the criminal laws of the United States including, without limitation, the criminal provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C, which prohibit the provision of material support and resources to terrorist organizations.

109.     As required by § 2331, BOC's actions were dangerous to human life, since the PIJ is a violent terrorist organization which since its establishment has murdered scores of innocent Israeli and American civilians, and openly proclaims its intention to murder other such innocent civilians.

110.     As required by § 2331, BOC's actions transcended national boundaries in terms of the means by which they were accomplished, the persons they appeared intended to intimidate or coerce, and the locales in which BOC operates.

111.     Section 2331(1)(B) defines "international terrorism" as "activities that ... appear to be intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion." However, § 2331(1)(B) does not impose "a state-of-mind requirement; it is a matter of external appearance rather than subjective intent," *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 694 (7th Cir. 2008). This condition was satisfied here by the fact that subsequent to April 2005 BOC knowingly continued to carry out the PIJ Transfers after being expressly warned of the consequences of its actions and asked to desist, since that conduct – defiantly continuing to assist the PIJ – created the objective "external appearance" required by § 2331(1)(B) that BOC shared the PIJ's goals of intimidating

and coercing a civilian population and of influencing the policy of a government by intimidation and coercion.

112.    Alternatively, to the extent that § 2331(1)(B) imposes a subjective state-of-mind requirement, that requirement was met here by the following facts:

a.    The PRC considers itself a potential rival and competitor of the United States. In order to strengthen its own position and undermine that of the United States, among other reasons, the PRC has acquired substantial political and economic interests in the Middle East and Islamic regions of Africa.

b.    To further its foreign policy goals, the PRC, along with the Communist Party of China (the "Party") and the Chinese central government (the "Central Government"), have been willing to facilitate the ongoing campaign of terrorism against Israel conducted by terrorist groups such as the PIJ and Hamas. The PRC, the Party and the Central Government do so in order to influence the policy of the Israeli government and intimidate the civilian population in Israel and thereby to strengthen the PRC's own position and undermine an ally of the United States.

c.    The PRC is an authoritarian state whose citizens and enterprises are expected and required to support and advance the policies and goals of the Party and the Central Government.

d.    As such, banking institutions in the PRC are regulated and supervised by agencies controlled by the Party. The Party, through various mechanisms that include the Leading Group on Financial and Economic Affairs, all of which exist alongside the boards of directors, monitors the banks' activities. Accordingly, the Party strongly influences the decision-making process in Chinese banks while monitoring their regular banking activities. The Party

makes sure that the policy decisions of the boards of directors reflect and advance the policies and goals of the Party and Central Government.

   e.    At all times, including the period during which it carried out the PIJ Transfers, defendant BOC acted to advance the Party's and Central Government's policies and goals, including the Party's and Central Government's policies and goals vis-à-vis the PIJ and Hamas and their terrorist activities.

   f.    Defendant BOC carried out the PIJ Transfers, and refused to halt the PIJ Transfers, because BOC acted in accordance with the directions of the Party and Central Government so as to facilitate the PIJ's use of terrorism to intimidate the Israeli government and public.

   g.    Thus, the actions of defendant BOC described herein appear to be intended, and were in fact intended, to intimidate and coerce a civilian population, and to influence the policy of a government by intimidation and coercion.[1]

   113.   The actions of defendant BOC subsequent to April 2005 therefore constituted "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333.

   114.   As a direct and proximate result of BOC's conduct decedent Daniel Wultz was murdered, plaintiff Yekutiel Wultz was wounded, and the plaintiffs suffered the harm described herein.

---

   [1]    In its motion to dismiss plaintiffs' original complaint, defendant BOC feigned ire at plaintiffs' allegations that BOC supports PIJ's terrorism out of allegiance to the PRC's policies, and termed these allegations "fanciful," an "absurdity" and "scurrilous." *See* dkt. # 3 at 17-18. Lest the Court be misled by BOC's carefully staged indignation on this point, plaintiffs attach hereto as Exhibit A the Declaration of Gordon G. Chang, an expert on the PRC and its banking system, which fully supports plaintiffs' allegations in this regard.

115.    Defendant BOC is therefore liable for all of plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

## THIRD COUNT
## ON BEHALF OF ALL PLAINTIFFS AGAINST DEFENDANT BANK OF CHINA AIDING AND ABETTING INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333

116.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

117.    The PIJ uses terrorism in an effort to coerce, intimidate and influence government decision-makers and the public in Israel to accept the PIJ's demands.

118.    The PIJ's actions described herein were dangerous to human life and constituted a violation of the criminal laws of the United States, since the PIJ is a violent terrorist organization which since its establishment has murdered scores of innocent Israeli and American civilians, and openly proclaims its intention to murder other such innocent civilians.

119.    The PIJ's described herein actions transcended national boundaries in terms of the means by which they were accomplished, the persons they appeared intended to intimidate or coerce, and the locales in which PIJ operates.

120.    The actions of the PIJ described herein therefore constituted "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333.

121.    Defendant BOC knowingly provided PIJ with ongoing, substantial banking services which enabled, facilitated, supported and assisted PIJ to carry out the Terrorist Bombing.

122.    The actions of defendant BOC therefore constituted aiding and abetting the PIJ's "acts of international terrorism" within the meaning of 18 U.S.C. §§ 2331 and 2333.

123.    To the extent, if any, that aiding and abetting liability under § 2333 requires that the aider and abettor seek to advance the goals of the primary tortfeasor, that condition is met here by the following facts:

a.      The PRC considers itself a potential rival and competitor of the United States. In order to strengthen its own position and undermine that of the United States, among other reasons, the PRC has acquired substantial political and economic interests in the Middle East and Islamic regions of Africa.

b.      To further its foreign policy goals, the PRC, along with the Communist Party of China (the "Party") and the Chinese central government (the "Central Government"), have been willing to facilitate the ongoing campaign of terrorism against Israel conducted by terrorist groups such as the PIJ and Hamas.

c.      The PRC is an authoritarian state whose citizens and enterprises are expected and required to support and advance the policies and goals of the Party and the Central Government.

d.      As such, banking institutions in the PRC are regulated and supervised by agencies controlled by the Party. The Party, through various mechanisms that include the Leading Group on Financial and Economic Affairs, all of which exist alongside the boards of directors, monitors the banks' activities. Accordingly, the Party strongly influences the decision-making process in Chinese banks while monitoring their regular banking activities. The Party makes sure that the policy decisions of the boards of directors reflect and advance the policies and goals of the Party and Central Government.

e.      At all times, including the period during which it carried out the PIJ Transfers, defendant BOC acted to advance the Party's and Central Government's policies and

goals, including the Party's and Central Government's policies and goals vis-à-vis the PIJ and Hamas and their terrorist activities.

      f.    Defendant BOC carried out the PIJ Transfers, and refused to halt the PIJ Transfers subsequent to April 2005, because BOC acted in accordance with the directions of the Party and Central Government so as to facilitate the PIJ's use of terrorism.

      g.    Thus, the actions of defendant BOC described herein were intended to advance the goals of the PIJ.

124.    As a direct and proximate result of BOC's conduct decedent Daniel Wultz was murdered, plaintiff Yekutiel Wultz was wounded, and the plaintiffs suffered the harm described herein.

125.    Defendant BOC is therefore liable for all of plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**FOURTH COUNT**
**ON BEHALF OF ALL PLAINTIFFS AGAINST DEFENDANT BOC**
**<u>NEGLIGENCE</u>**
**Under the Law of the State of Israel**

126.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

127.    Pursuant to Fed.R.Civ.P. 44.1 plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.

128.    Causes of action in tort in Israeli law are codified in the *Civil Wrongs Ordinance (New Version) - 1968*, (hereinafter "CWO"). The CWO provides that any person injured or harmed by the civil wrongs enumerated in the CWO is entitled to relief from the person liable or responsible for the wrong.

129.    CWO § 35 creates a "civil wrong" of Negligence.

130.    CWO § 35 provides that a person is liable for the civil wrong of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

131.    CWO § 36 provides that the obligation stated in the last sentence of § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

132.    Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

133.    By carrying out the PIJ Transfers defendant BOC performed acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

134.    Defendant BOC refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO, in that, *inter alia*, defendant BOC failed to comply with its statutory obligations under United States law and the FATF rules to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

135.    Defendant BOC did not, in the performance of its occupation, use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, within the meaning of the CWO, in that, *inter alia*, BOC carried out the PIJ Transfers, failed to comply with its statutory obligations to know its customers and perform due diligence, and failed to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

136.    Defendant BOC acted negligently in connection with the decedent and the plaintiffs, toward whom, in the circumstances described herein, defendant BOC had an obligation not to act as it did. Defendant BOC was obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, persons such as the decedent and the plaintiffs were liable to be harmed by defendant BOC's acts and omissions described herein.

137.    Defendant BOC's behavior constitutes Negligence under the CWO, and that negligent behavior was the proximate cause of the plaintiffs' harm, which includes: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

138.    Defendant BOC is therefore liable for the full amount of plaintiffs' compensatory damages.

139.    Under Israeli case law a plaintiff harmed by an act of Negligence caused by intentional or reckless conduct is entitled to punitive damages.

140.    Defendant BOC's conduct was criminal in nature, dangerous to human life, outrageous, intentional, reckless and malicious, and so warrants an award of punitive damages.

## FIFTH COUNT
### ON BEHALF OF ALL PLAINTIFFS AGAINST DEFENDANT BOC

## BREACH OF STATUTORY DUTY
### Under the Law of the State of Israel

141.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

142.    CWO § 63 creates a civil wrong of Breach of Statutory Duty defined as the failure to comply with an obligation imposed under any "enactment," if the enactment is intended for the benefit or protection of another person, and if the breach of the enactment caused that person damage of the kind or nature intended to be prevent by the enactment.

143.    Under Israel's *Interpretation Ordinance (New Version)*, an "enactment" within the meaning of the CWO is defined to mean "every law and every regulation," while the terms "law" and "regulation" are defined in turn as acts of the Knesset (Israel's parliament) and of "any authority in Eretz Israel or in Israel," respectively.

144.    CWO § 63(b) provides that for the purpose of CWO § 63, an enactment is deemed to have been enacted for the benefit or protection of a specific person, if it is intended for the benefit or protection of that person, or for the benefit or protection of persons in general, or of persons of a category or definition to which that specific person belongs.

145.    Defendant BOC breached and failed to comply with obligations imposed upon it by numerous enactments, which were intended for the benefit and protection of persons in general, and for the benefit and protection of persons of the type, category and definition to which plaintiffs and the decedent belong, within the meaning of the CWO.

146.    The statutory obligations breached by defendant BOC include, without limitation, the provisions of the following enactments:

    a.  Section 4 of Israel's *Prevention of Terrorism Ordinance, 5708 – 1948* (which criminally prohibits the provision of material support to terrorist organizations such as PIJ);

    b.  Sections 145 and 148 of Israel's *Penal Law, 5737 – 1977* (which criminally prohibit the provision of material support to terrorist organizations such as  PIJ);

    c.  Section 85 of Israel's *Defense Regulations (Emergency Period) – 1945* (which criminally prohibits the provision of services and other material support to terrorist organizations such as PIJ).

147.   The conduct of Defendant BOC described herein breached the enactments listed above, despite the fact that Defendant BOC's conduct did not take place in Israel, because Israel has extraterritorial criminal jurisdiction over crimes against the security of the State of Israel and over crimes against the lives and persons of Israeli citizens as such, pursuant to § 13 of Israel's *Penal Law, 5737 – 1977*.

148.   All of the enactments listed above are intended for the benefit and protection of persons in general, for the specific benefit and protection of innocent civilians such as the plaintiffs and the decedent, in that all of the statutory enactments listed above are intended to protect all such persons from terrorist attacks and from all the damages which terrorist attacks are liable to inflict.

149.   Defendant BOC's breach of its statutory obligations was the proximate cause of the harm to the plaintiffs and the death of the decedent, and caused plaintiffs and the decedent damage of the kind and nature intended to be prevented by the statutory enactments which were breached by BOC, including: death; severe physical injuries, pain and suffering; loss of

pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium, in a sum in excess of the minimum jurisdictional limits of this court.

150.    Defendant BOC committed the civil wrong of Breach of Statutory Duty under CWO § 63, and is therefore liable for the full amount of plaintiffs' damages.

151.    Under Israeli case law a plaintiff harmed by an intentional or reckless Breach of Statutory Duty is entitled to punitive damages.

152.    Defendant BOC's conduct was criminal in nature, dangerous to human life, outrageous, intentional, reckless and malicious, and so warrants an award of punitive damages.

## SIXTH COUNT
### ON BEHALF OF ALL PLAINTIFFS AGAINST DEFENDANT BOC
### VICARIOUS LIABILITY
#### Under the Law of the State of Israel

153.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

154.    Defendant BOC provided PIJ with banking services which enabled, facilitated, supported and assisted PIJ to carry out the Terrorist Bombing.

155.    Vicarious liability principles are recognized in Israeli law in § 12 of the CWO, which provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

156.    Defendant BOC assisted PIJ to carry out the Terrorist Bombing and is therefore liable for the full amount of plaintiffs' damages under CWO § 12.

157.    Under Israeli case law a plaintiff harmed by intentional or reckless conduct is entitled to punitive damages.

158.   Defendant BOC's conduct was criminal in nature, dangerous to human life, outrageous, intentional, reckless and malicious, and so warrants an award of punitive damages.

**WHEREFORE**, plaintiffs demand judgment as follows:

A.   Judgment against all defendants, jointly and severally, for compensatory damages in the amount of $300,000,000 (three hundred million dollars);

B.   Judgment against defendant BOC for treble damages pursuant to 18 U.S.C. § 2333;

C.   Judgment against all defendants, jointly and severally, for punitive damages in an amount to be determined at trial;

D.   Plaintiffs' costs and expenses;

E.   Plaintiffs' attorneys' fees;

F.   Such further relief as the Court finds just and equitable.

January 13, 2009

Plaintiffs, by their attorneys,

*S/ Robert J. Tolchin*

Robert J. Tolchin
D.C. Bar No. NY0088
JAROSLAWICZ & JAROS, LLC
225 Broadway, 24th floor
New York, New York 10007
(212) 227-2780

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-----------------------------------------------------------------X

SHERYL WULTZ, *et al.*

               Plaintiffs,

    v.

THE ISLAMIC REPUBLIC OF IRAN, *et al.*

               Defendants.
-----------------------------------------------------------------X

Civil No. 08-01460 (RCL)

## DECLARATION OF GORDON G. CHANG

Gordon G. Chang declares pursuant to 28 U.S.C. §1746 as follows:

    1.    This affirmation is submitted in support of the allegations made by the plaintiffs in the above-captioned matter that, pursuant to the standing policies of the People's Republic of China ("PRC"), the defendant the Bank of China ("BOC") supports the use of terrorism by organizations such as the Palestine Islamic Jihad ("PIJ") in order to intimidate and influence the Israeli and American governments and publics.

**Professional Background**

    2.    I am an American citizen and I currently reside in New Jersey. For most of my professional career, I have practiced banking, finance and tax law, including almost two decades as an attorney practicing in Hong Kong and China. Since 1999, I have dedicated myself to studying, writing and lecturing about the PRC and its legal, financial and political systems.

FROM : Gordon G.Chang    Case 1:11-cv-01266-SAS -GWG  Document 123  Filed 01/13/09  1:23:04AM  Page 1 of 44    P3

3.     I hold a B.A. from Cornell University and J.D. from Cornell Law School. I was admitted to practice law in New York and Hong Kong and am currently admitted to practice in California (inactive).

4.     Between 1976 and 1981, I was an associate at Caldwalader, Wickersham & Taft in New York. In 1981, I moved to Hong Kong and was an associate at Heller, Ehrman, White and McAuliffe until 1982. Between 1982 and 1984, I was employed as an associate at Baker & McKenzie's Hong Kong office. In 1984, I became a partner of that firm and continued my practice there until 1991. Between 1991 until 1996 I was a partner in the San Diego office of Baker & McKenzie. Between 1996 and 1999, I was counsel to Paul, Weiss, Rifkind, Wharton & Garrison in Beijing.

5.     I am the author of two books: The Coming Collapse of China (Random House 2001) and Nuclear Showdown: North Korea Takes On the World, (Random House 2006). I have also written numerous articles relating to the PRC including: *GITIC Lenders Learn the Value of Compliance with Foreign Exchange Rules*, China Law & Practice, December 1998/January 1999, p. 21, *Campaign to Control Foreign Exchange Transactions Intensifies*, China Law & Practice, November 1998, p. 51 and *1998 Bank Regulatory Developments*, China Law & Practice, October 1998, p. 21. Other articles I have written have appeared in *The New York Times*, *The Wall Street Journal*, the *Far Eastern Economic Review*, the *International Herald Tribune*, *Commentary*, *The Weekly Standard*, *Forbes*, and *Barron's*.

6.     Since 2001 until the present I have been invited to lecture regarding the PRC and its foreign and economic policies at numerous universities including Columbia, Cornell, Princeton and Yale. Additionally, I have lectured about the PRC's foreign and

2

economic policies at The Brookings Institution, The Heritage Foundation, the Cato Institute, RAND, the American Enterprise Institute, the Council on Foreign Relations, and other institutions. Moreover, I have been invited to give briefings regarding the PRC at the National Intelligence Council, the Central Intelligence Agency, the State Department, and the Pentagon. I have also spoken before industry and investor groups including Bloomberg, Sanford Bernstein, and Credit Lyonnais Securities Asia regarding the PRC.

7.    In 2001 and 2006 I appeared before the U.S.-China Economic and Security Review Commission, and I have delivered to the Commission a report on the future of China's economy. Outside of the United States I have given lectures in Beijing, Shanghai, Taipei, Hong Kong, Seoul, Singapore, Tokyo, The Hague, London, Toronto, and Vancouver regarding the PRC and its policies. I have frequently appeared in the media on CNN, Fox News Channel, CNBC, MSNBC, the BBC, and Bloomberg Television as an expert on the PRC and Asia in general.

8.    During the course of my professional career I have obtained information from interviews, reviews of documents, periodicals, reports and scholarly books as well as my own observations and experiences living and practicing law in Hong Kong and China for almost two decades, which make me an expert on the PRC and its policies, goals, activities and conduct, including, among other times, during the year 2005.

9,    Further details of my resume are annexed hereto as Exhibit "A".

**The BOC Acts to Advance the PRC's Policy of Facilitating Terrorism Against Israel**

10.    The PRC considers itself a potential rival and competitor of the United States. In order to strengthen its own position and undermine that of the United States,

FROM :Gordon Gadani1:11-cv-01266-SAS -GWG. Doeen74Bt 2G38   Filed 01/13/09   1P3ge431362991M   P5

among other reasons, the PRC has acquired substantial political and economic interests in the Middle East and Islamic regions of Africa.

11.     To further its foreign policy goals, the PRC, along with the Communist Party of China (the "Party") and the Chinese central government (the "Central Government"), have been willing to facilitate the ongoing campaign of terrorism against Israel conducted by terrorist groups such as the PIJ and Hamas. The PRC, the Party and the Central Government do so in order to influence the policy of the Israeli government and intimidate the civilian population in Israel and thereby to strengthen the PRC's own position and undermine an ally of the United States.

12.     The PRC is an authoritarian state whose citizens and enterprises are expected and required to support and advance the policies and goals of the Party and the Central Government.

13.     As such, banking institutions in the PRC are regulated and supervised by agencies controlled by the Party. The Party, through various mechanisms that include the Leading Group on Financial and Economic Affairs, all of which exist along side the boards of directors, monitors the banks' activities. Accordingly, the Party strongly influences the decision-making process in Chinese banks while monitoring their regular banking activities. The Party makes sure that the policy decisions of the boards of directors reflect and advance the policies and goals of the Party and Central Government.

14.     At all times, including the period during which it carried out the PIJ Transfers described in the complaint in this action, defendant BOC acted to advance the Party's and Central Government's policies and goals, including the Party's and Central Government's policies and goals vis-à-vis the PIJ and Hamas and their terrorist activities.

4

15. Therefore, the plaintiffs' allegation that the BOC carried out the PIJ Transfers, and refused to halt the PIJ Transfers, because BOC acted in accordance with the directions of the Party and Central Government so as to facilitate the PIJ's use of terrorism in order to intimidate and coerce a civilian population and to influence the policy of a government by intimidation and coercion, within the meaning of 18 U.S.C. § 2331, is well founded and comports fully with the typical and expected conduct of banking institutions within the PRC.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

January 12, 2009

Gordon G. Chang