UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

SHERYL WULTZ, individually, as personal
representative of the Estate of Daniel Wultz,
and as the natural guardian of plaintiff
Abraham Leonard Wultz; YEKUTIEL
WULTZ, individually, as personal
representative of the Estate of Daniel Wultz,
and as the natural guardian of plaintiff
Abraham Leonard Wultz; AMANDA
WULTZ; and ABRAHAM LEONARD
WULTZ, minor, by his next friends and
guardians Sheryl Wultz and Yekutiel Wultz,

**OPINION & ORDER**

**11 Civ. 1266 (SAS)**

Plaintiffs,

- against -

BANK OF CHINA LIMITED,

Defendant.

---------------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

This suit arises out of the death of Daniel Wultz and the injuries of

Yekutiel Wultz, suffered in a 2006 suicide bombing in Tel Aviv, Israel.  Four

members of the Wultz family brought suit against Bank of China ("BOC"),

alleging acts of international terrorism and aiding and abetting international

1

terrorism under the Antiterrorism Act ("ATA"), among other claims.[1]  The general

facts and procedural history of the case were laid out in previous opinions, and

familiarity with them is assumed.[2]  Plaintiffs' attempts to obtain discovery from

and related to BOC have a long, complex, and contested history that I will discuss

below as necessary.[3]

      Before the Court is plaintiffs' motion to compel defendant BOC and

non-party the Office of the Comptroller of the Currency ("the OCC") to produce

various investigative files and U.S. regulatory communications.[4]  For the reasons

stated below, I grant plaintiffs' motion to compel with regard to BOC, and deny

---

[1]     *See* 18 U.S.C. § 2333.

[2]     *See, e.g.*, *Wultz v. Bank of China Ltd.*, — F. Supp. 2d —, No. 11 Civ. 1266, 2012 WL 5378961, at *1 & n.3 (S.D.N.Y. Oct. 29, 2012) (collecting earlier opinions).  *See also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012) (granting default judgment to plaintiffs).

[3]     *See generally* 2/1/13 Memorandum of Law in Support of Plaintiffs' Motion to Compel Production of Investigative Files and U.S. Regulatory Communications ("Pl. Mem.") at 2–7; 2/15/13 Memorandum of Law on Behalf of Bank of China, Ltd. in Opposition to Plaintiffs' Motion to Compel Discovery ("BOC Opp.") at 3–6; 2/19/13 Non-Party Office of the Comptroller of the Currency's Response in Opposition to Plaintiffs' Motion to Compel Production of Investigative Files and U.S. Regulatory Communications ("OCC Opp.") at 2–11; Pl. Mem. at 1–2.

[4]     Plaintiffs have also filed a motion to compel BOC to produce various communications with the Chinese government and BOC-internal Chinese documents.  The motion is now fully briefed and I will address it in a subsequent opinion.

plaintiffs' motion without prejudice with regard to the OCC.

## II.   APPLICABLE LAW

### A.   Motion to Compel

As noted above, plaintiffs seek an order compelling the production of documents from two sources:  defendant BOC and non-party the OCC.  The two requests are governed by different legal standards.  I address each in turn, summarizing the procedural history of this case where necessary.

### 1.   Materials from the OCC

The Second Circuit has held that "motions to compel agency compliance with discovery requests" are governed by "the administrative exhaustion requirement of [Administrative Procedure Act ("APA")] § 704."[5]  This is so because

> [a]bsent a waiver of sovereign immunity, a federal agency, as representative of the sovereign, cannot be "compel[led] . . . to act."  But the federal government, in enacting the APA, waived its immunity with respect to those "action[s] in a court of the United States" which seek review of "agency action."  . . . [W]e [have] held that a motion to compel agency compliance with a [discovery request] qualified as an "action" seeking review of "agency action" for purposes of APA § 702, and, therefore, that a federal court's consideration of such a motion did not violate sovereign

---

[5]   *In re S.E.C. ex rel. Glotzer*, 374 F.3d 184, 190 (2d Cir. 2004).

immunity.[6]

Because the federal government's waiver of sovereign immunity occurred through the enactment of the APA, "a party seeking judicial review of an agency's non-compliance with a [discovery request] must first exhaust his or her administrative remedies pursuant to APA § 704. Judicial review under APA § 702 is expressly conditioned, under APA § 704, on the existence of a 'final' agency action."[7]

Here, plaintiffs served the OCC with a subpoena *duces tecum* on April 4, 2011, requesting a broad range of documents related to the OCC's enforcement actions against BOC, and placing no time limit on the documents requested: regardless of when the documents were created, plaintiffs' subpoena requested them. The OCC objected to the subpoena, and instructed plaintiffs to submit an administrative request for documents.[8]

Like other federal banking regulators, the OCC has developed

---

[6]     *Id.* at 190 (quoting *United States EPA v. General Elec. Co.* ("*EPA v. GE I*"), 197 F.3d 592, 597–99 (2d Cir. 1999), *opinion amended on reh'g*, 212 F.3d 689 (2d Cir. 2000)) (citations and footnotes omitted).

[7]     *Id.* at 192.

[8]     *See* OCC Opp. at 5–6; Pl. Mem. at 5–6.

4

administrative regulations governing the release of non-public information.[9]  Such

regulations, promulgated pursuant to the so-called "Housekeeping Statute," 5

U.S.C. § 301, are known as *Touhy*" regulations, after the Supreme Court decision

upholding the validity of such regulations in *United States ex rel. Touhy v. Ragen*.[10]

The OCC's *Touhy* regulations appear at 12 C.F.R. §§ 4.31 *et seq.*

      The parties' submissions do not clearly distinguish between the

governing law in the Second Circuit and elsewhere.  But other courts, such as the

District of Columbia Circuit, the Ninth Circuit, and the Sixth Circuit, have

approached conflicts between *Touhy* regulations and the Federal Rules of Civil

Procedure very differently than the Second Circuit.[11]  For example, the D.C.

Circuit offered the following analysis of some of the issues addressed by the

Second Circuit in *Glotzer*:

> When a litigant seeks to obtain documents from a non-party
> federal governmental agency, the procedure varies depending on
> whether the underlying litigation is in federal or in state court.  In

---

[9]    *See generally* OCC Opp. at 3–4.

[10]    340 U.S. 462 (1951).  *Accord EPA v. GE I*, 197 F.3d at 595.

[11]    *See, e.g.*, *Linder v. Calero-Portocarrero*, 251 F.3d 178, 181 (D.C. Cir. 2001) (reviewing conflicts between the Circuits and reiterating that in the D.C. Circuit, sovereign immunity does not insulate the federal government from complying with a third-party subpoena, "because in federal court the government has waived its sovereign immunity for actions 'seeking relief other than money damages' in 5 U.S.C. § 702").

state court the federal government is shielded by sovereign immunity, which prevents the state court from enforcing a subpoena.  . . .  Thus, a state-court litigant must request the documents from the federal agency pursuant to the agency's regulations . . . .

A federal-court litigant, on the other hand, can seek to obtain the production of documents from a federal agency by means of a federal subpoena.  In federal court, the federal government has waived its sovereign immunity, *see* 5 U.S.C. § 702, and neither the Federal Housekeeping Statute nor the *Touhy* decision authorizes a federal agency to withhold documents from a federal court.  To the extent that the Comptroller's regulation . . . may be to the contrary, it conflicts with Federal Rule of Civil Procedure 45 and exceeds the Comptroller's authority under the Housekeeping Statute.[12]

Setting aside the details of the doctrinal disputes that underlie the various Circuits' positions, the practical effect of the disagreement is that the Second, Fourth and Tenth Circuits as a general rule give primacy to agencies' *Touhy* regulations over

---

[12]     *Houston Bus. Journal, Inc. v. Office of Comptroller of Currency, U.S. Dep't of Treasury*, 86 F.3d 1208, 1212 (D.C. Cir. 1996) (citations omitted). *Accord In re Bankers Trust Co.*, 61 F.3d 465, 469–71 (6th Cir. 1995) (noting that general statutory authorities relied on by bank regulating agency, including 5 U.S.C. § 301, "simply do not give [the agency] the power to promulgate regulations in direct contravention of the Federal Rules of Civil Procedure," and concluding "we find no compelling reason to discard the relatively straightforward discovery methods outlined in the Federal Rules of Civil Procedure simply because [the agency] has attempted to mandate a different procedure"); *Exxon Shipping Co. v. United States Dep't of Interior*, 34 F.3d 774, 777–78 (9th Cir. 1994) (noting that Congress amended 5 U.S.C. § 301 in 1958 out of concern that it was being "twisted from its original purpose as a 'housekeeping' statute into a claim of authority to keep information from the public." Congress added to the statute: "This section does not authorize withholding information from the public or limiting the availability of records to the public.").

the Federal Rules of Civil Procedure when the two conflict, requiring litigants to exhaust their administrative remedies before moving to compel production from a governmental agency, while the D.C., Ninth, and Sixth Circuits generally give primacy to the Federal Rules over conflicting *Touhy* regulations.[13]

Here, plaintiffs partially circumvented the conflict by submitting, on September 7, 2012, an administrative request to the OCC for the production of documents pursuant to 12 C.F.R. § 4.33 (the "*Touhy* request").[14]  The *Touhy* request was limited to documents in the OCC's control between July 1, 2003 and December 31, 2006, but was otherwise broader than the earlier subpoena *duces tecum*.  Like the subpoena, plaintiffs' *Touhy* request sought documents associated with *any* OCC examination of BOC.  But plaintiffs' *Touhy* request also sought documents concerning the Shurafa accounts, Shurafa, or Shurafa affiliates; and documents concerning BOC's provision of banking services to the Palestinian

---

[13]     For the position of the Tenth Circuit, see, for example, *In re Gray*, 162 F.3d 1172 (table), 1998 WL 712663, at *1 (10th Cir. 1998) (unpublished) (quashing state court order to enforce subpoena against subordinate federal agent, where agent did not have authorization from superior to comply with subpoena, and noting that requestor's remedies included "an action in federal court pursuant to the Administrative Procedure Act"); *Quezada v. Mink*, No. 10 Civ. 00879, 2010 WL 4537086, at *3–5 (D. Colo. Nov. 3, 2010) (collecting cases, and concluding "this Circuit has interpreted *Touhy* to allow federal officials to limit subordinates' authority to produce documents or provide testimony pursuant to duly-enacted regulations").

[14]     *See* OCC Opp. at 6–7; Pl. Mem. at 5–6.

Islamic Jihad, Hamas, Iran, or Syria.[15]  On October 29, 2012, the OCC issued a final agency decision in response to plaintiffs' *Touhy* request, largely denying plaintiffs' requests, and only producing two letters from the OCC to BOC in 2006.[16]

As the OCC correctly argues, plaintiffs have failed to exhaust their administrative remedies with respect to any documents not described in their *Touhy* request.[17]  There has been no "'final' agency action"[18] with respect to such documents.  Consequently, under the Second Circuit's rulings in *Glotzer*, this Court lacks the power to review the OCC's refusal to produce any documents not mentioned in plaintiffs' *Touhy* request.  This includes any documents that the OCC only controlled before July 1, 2003 or after December 31, 2006.  Plaintiffs' inclusion of these documents in their 2011 subpoena *duces tecum* does not alter this analysis.[19]

---

[15]     *See id.*

[16]     *See* OCC Opp. at 8–10; Pl. Mem. at 6–7.

[17]     *See* OCC Opp. at 14–15.

[18]     *Glotzer*, 374 F.3d at 192.

[19]     Because I conclude that under the reasoning of *Glotzer*, the federal government's sovereign immunity deprives this Court of the power to order the OCC to produce documents requested in plaintiffs' 2011 subpoena but not in the 2012 *Touhy* request, it is unnecessary to reach the issue of whether this Court would have jurisdiction to enforce the 2011 subpoena, which was issued out of the

Under the APA, an agency decision will be upheld "if it is not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A), or 'unsupported by substantial evidence,' *id.* § 706(2)(E)."[20]   Under this deferential standard of review, the court "'must assess, among other matters, whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"[21]   The court will set aside the agency's decision only if the agency

> "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[22]

The Second Circuit has expressly declined to decide whether a final agency decision regarding a discovery request must be reviewed using the deferential standard under APA § 706 or under the Federal Rules of Civil

---

U.S. District Court for the District of Columbia.  *See* OCC Opp. at 11.

[20]     *Bechtel v. Administrative Review Bd., U.S. Dep't of Labor*, — F.3d —, 2013 WL 791334, at *2 (2d Cir. Mar. 5, 2013).

[21]     *Id.* (quoting *Judulang v. Holder*, 132 S. Ct. 476, 484 (2011) (quotation marks omitted)).

[22]     *Id.* (quoting *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quotation marks omitted)).

9

Procedure.[23]  Other courts are divided on the appropriate standard.[24]

### 2.    Materials from BOC

"The Supreme Court has acknowledged the 'fundamental maxim of discovery that [m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.'"[25]  "'To that end, either party may compel the

---

23      *See Glotzer*, 374 F.3d at 191 (citing *United States EPA v. General Elec. Co.* ("*EPA v. GE II*"), 212 F.3d 689, 690 (2d Cir. 2000)).  *See also SEC v. Chakrapani*, No. 09 Civ. 325, 2010 WL 2605819, at *9 (S.D.N.Y. June 29, 2010) ("The Second Circuit has not yet articulated the correct standard of review for a denial of a *Touhy* request."); *Solomon v. Nassau Cnty.*, 274 F.R.D. 455, 458 (E.D.N.Y. 2011) ("'The Second Circuit has not decided which standard of review applies in determining whether a federal agency has properly refused to comply with a subpoena:  the arbitrary and capricious standard of the APA, . . . or the standard set forth in Rule 45 of the Federal Rules of Civil Procedure . . . .'" (quoting *Abdou v. Gurrieri*, No. 05 Civ. 3946, 2006 WL 2729247, at *4 (E.D.N.Y. Sept. 25, 2006))).

24      *See Glotzer*, 374 F.3d at 191–92 (comparing *Linder*, 251 F.3d at 180–81 (holding that APA § 706 does not apply to motion to compel agency compliance with subpoena *duces tecum*); *Exxon Shipping*, 34 F.3d at 778–79 (same), with *COMSAT Corp. v. National Sci. Found.*, 190 F.3d 269, 277 (4th Cir. 1999) (holding that because a federal court's power to review an agency's refusal to comply stems solely from APA § 702, such power must be exercised in accordance with the other provisions of the APA, including APA § 706); *Edwards v. United States Dep't of Justice*, 43 F.3d 312, 315 (7th Cir.1994) (reviewing motion to compel pursuant to standards set forth in APA § 706(2)(A))).

25      *S.E.C. v. Rajaratnam*, 622 F.3d 159, 180–81 (2d Cir. 2010) (quoting *Société Nationale Industrielle Aérospatiale v. United States Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 540 n.25 (1987)) (some quotation marks omitted).

other to disgorge whatever facts [it] has in [its] possession.'"[26]

Plaintiffs' motion to compel BOC to produce documents is governed by the Federal Rules of Civil Procedure, and in particular Rule 26(b)(1), which embodies the principles of full discovery articulated by the Supreme Court.  Rule 26(b)(1) states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," and that, "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."

## B.    Bank Examination Privilege

"Stated broadly, the bank examination privilege is a qualified privilege that protects communications between banks and their examiners in order to preserve absolute candor essential to the effective supervision of banks."[27]  "It

---

[26]     *Id.* (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)).

[27]     *Linde v. Arab Bank, PLC*, No. 04 Civ. 2799, 2009 WL 3055282, at *1 (E.D.N.Y. Sept. 21, 2009) (citing *In re Bankers Trust Co.*, 61 F.3d at 471; *In re Subpoena Served upon Comptroller of Currency* ("*Fleet*"), 967 F.2d 630, 634 (D.C. Cir. 1992)).  *Accord In re Citigroup Bond Litig.*, No. 08 Civ. 9522, 2011 WL 8210671, at *1 (S.D.N.Y. Dec. 5, 2011) (citing *In re Bankers Trust Co.*, 61 F.3d at 471; *Bank of China v. St. Paul Mercury Ins. Co.*, No. 03 Civ. 9797, 2004 WL 2624673, at *4 (S.D.N.Y. Nov. 18, 2004)).  *See also McKinley v. Board of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 340 (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 1026 (2012) (noting that supervised institutions frequently provide bank examiners with "highly sensitive commercial information . . . that they do not customarily disclose to the public" (citation and quotation marks omitted)).

arises out of the practical need for openness and honesty between bank examiners and the banks they regulate, and is intended to protect the integrity of the regulatory process by privileging such communications."[28]

"The bank examination privilege belongs solely to . . . banking regulatory entities, and may not be asserted by third parties on behalf of the banking agencies."[29] "'[W]here a claim of the privilege is appropriate, the [banking agency] must be allowed the opportunity to assert the privilege and the opportunity to defend its assertion.'"[30] "The agency asserting the privilege has the burden of establishing its applicability to the documents at issue."[31] Some courts have held that this burden includes "demonstrat[ing] that the materials are deliberative rather than factual," and that "the deliberative portions cannot be redacted from the

---

[28]    *Merchants Bank v. Vescio*, 205 B.R. 37, 42 (D. Vt. 1997).  The doctrinal basis for the bank examination privilege has not always been clear.  As the D.C. Circuit noted, the "privilege has been referred to variously as an aspect of the privilege for 'official information,' or 'intragovernmental opinions,' or even of the 'deliberative process privilege.'"  *Fleet*, 967 F.2d at 633 (quoting *Delozier v. First Nat'l Bank of Gatlinburg*, 113 F.R.D. 522, 525 (E.D. Tenn. 1986); *Lundy v. Interfirst, Corp.*, 105 F.R.D. 499, 502 (D.D.C. 1985); *Seafirst Corp. v. Jenkins*, 644 F. Supp. 1160, 1163 (W.D. Wash. 1986)).

[29]    *Merchants Bank*, 205 B.R. at 42 (citing *In re Bankers Trust*, 61 F.3d at 472).

[30]    *Id.* (quoting *In re Bankers Trust*, 61 F.3d at 472).

[31]    *Schreiber v. Society for Sav. Bancorp, Inc.*, 11 F.3d 217, 220 (D.C. Cir. 1993).

documents."[32]  "Purely factual material falls outside the privilege, whereas

opinions and deliberative processes do not."[33]

        "If the documents fall within the privilege, a court can override the

privilege if the requesting party demonstrates 'good cause.'"[34]  "[T]he privilege

may be defeated 'where necessary to promote the paramount interest of the

Government in having justice done between litigants, . . . or to shed light on

---

[32]      *In re Providian Fin. Corp. Sec. Litig.*, 222 F.R.D. 22, 26 (D.D.C. 2004) (citing *Schreiber*, 11 F.3d at 220).

[33]      *Merchants Bank*, 205 B.R. at 42 (citing *In re Bankers Trust*, 61 F.3d at 471).  Plaintiffs argue that "documents that postdated agency decision-making cannot be privileged, as they are generated *after* the agency's deliberations."  Pl. Mem. at 11 (citing *Seafirst*, 644 F. Supp. at 1163 (stating that privileged materials must be "predecisional")).  According to the iterative model of regulation described by the D.C. Circuit in *Fleet*, however, agency deliberations are often ongoing.  *See Fleet*, 967 F.2d at 633.  As a result, a bright-line distinction between predecisional and postdecisional materials would be inappropriate in the case of the bank examination privilege.  By contrast, such a rule applies under the deliberative process privilege to agency decisionmaking processes that culminate in the adoption of a policy.  *See, e.g.*, *National Day Laborer Org. Network v. United States Immigration & Customs Enforcement Agency*, 811 F. Supp. 2d 713, 742 (S.D.N.Y. 2011), *amended on reconsideration* (Aug. 8, 2011) ("'The most basic requirement of the [deliberative process] privilege is that a document be *antecedent* to the adoption of an agency policy.'" (quoting *Judicial Watch, Inc. v. United States Postal Serv.*, 297 F. Supp. 2d 252, 260 (D.D.C. 2004)) (citations and some quotation marks omitted)).  *Accord United W. Bank v. Office of Thrift Supervision*, 853 F. Supp. 2d 12, 15 (D.D.C. 2012), *on reconsideration in part* (Apr. 4, 2012).

[34]      *In re Citigroup*, 2011 WL 8210671, at *1 (citing *In re Bankers Trust*, 61 F.3d at 471).  *Accord Merchants Bank*, 205 B.R. at 42.

alleged government malfeasance, . . . or in other circumstances when the public's

interest in effective government would be furthered by disclosure.'"[35]  In order to

evaluate claims of "good cause," courts "balance the competing interests of the

party seeking the documents and those of the government,"[36] taking into account

factors such as the following:

> 1) the relevance of the evidence sought to be protected;
> 2) the availability of other evidence;
> 3) the "seriousness" of the litigation and the issues involved;
> 4) the role of the government in the litigation; and
> 5) the possibility of future timidity by government employees
> who will be forced to recognize that their secrets are violable.[37]

"The performance of this balancing of interests may require examination of

disputed documents *in camera*."[38]  "Redaction and a protective order may be

appropriate to ensure that sensitive information, particularly with regard to third

parties, is not unnecessarily disclosed."[39]

## C.    Attorney-Client Privilege

---

[35]    *Merchants Bank*, 205 B.R. at 42 (quoting *Fleet*, 967 F.2d at 634) (some quotation marks omitted).

[36]    *In re Bankers Trust*, 61 F.3d at 472 (quotation marks omitted).

[37]    *Fleet*, 967 F.2d at 634 (quoting *In re Franklin Nat'l Bank Sec. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979) (Weinstein, J.) (omitting citations collecting cases)) (formatting altered).

[38]    *Merchants Bank*, 205 B.R. at 42 (citing *Fleet*, 967 F.2d at 634).

[39]    *Id.*

"Attorney-client privilege 'is one of the oldest recognized privileges for confidential communications.'"[40]  The privilege is designed to "encourage full and frank communication between attorneys and their clients.'"[41]  It "'protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance.'"[42]  "It is well settled that '[t]he burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it.'"[43]

### D.   Work-Product Privilege

"The work-product privilege is . . . more broad than the attorney-client privilege."[44]  It "exists to protect 'attorneys' mental impressions, opinions or legal

---

[40]   *Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954, 2007 WL 3406928, at *2 (S.D.N.Y. Nov. 15, 2007) (quoting *Swidler Berlin v. United States*, 524 U.S. 399, 403 (1998)).

[41]   *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

[42]   *Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. United States Dep't of Justice*, 697 F.3d 184, 207 (2d Cir. 2012) (citing *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011)).

[43]   *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) (quoting *United States v. International Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997)) (some quotation marks omitted).

[44]   *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 520 (S.D.N.Y. 2001) (citing *In re Grand Jury Proceedings*, 219 F.3d at 190).

theories concerning specific litigation' from discovery."[45]  "Notwithstanding the

importance of the doctrine, work product immunity is a 'qualified privilege' as

opposed to the 'absolute privilege' granted to attorney-client communications."[46]

The principles of the work-product privilege are codified at Federal Rule of Civil

Procedure 26(b)(3),[47] which states in part that if a court orders discovery of

materials prepared in anticipation of litigation by or for another party or its

representative, "it must protect against disclosure of the mental impressions,

conclusions, opinions, or legal theories of a party's attorney or other representative

concerning the litigation."

        "The Second Circuit has interpreted the 'in anticipation of litigation'

requirement broadly.  Documents should therefore be deemed prepared in

'anticipation of litigation' if 'in light of the nature of the document and the factual

situation in the particular case, the document can fairly be said to have been

---

[45]        *Id.* (quoting *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 12 (2d Cir. 1989)).

[46]        *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc.*, 130 F.R.D. 28, 32 (S.D.N.Y. 1990) (citing Fed. R. Civ. P. 26(b)(3); *United States v. Nobles*, 422 U.S. 225, 237 (1975)).

[47]        *See Strougo*, 199 F.R.D. at 520 (citing *Hickman*, 329 U.S. at 67).

prepared or obtained because of the prospect of litigation.'"[48]

### E.    SAR Privilege

Regulations promulgated under the Annunzio-Wylie Act, 31 U.S.C.

§ 5318(g), require specified financial institutions to file a Suspicious Activity

Report ("SAR") when they detect a known or suspected violation of federal law or

a suspicious transaction related to a money laundering activity or a violation of the

Bank Secrecy Act.[49]  According to the OCC's SAR regulations:

> Any national bank, and any director, officer, employee, or agent
> of any national bank that is subpoenaed or otherwise requested to
> disclose a SAR, *or any information that would reveal the
> existence of a SAR*, shall decline to produce the SAR or such
> information . . . .[50]

A court in the Western District of New York has concluded that the OCC's

prohibition on the disclosure of the existence or content of a SAR is broader than

the prohibition in the authorizing statute, but notes that the regulation has been

---

[48]    *Strougo*, 199 F.R.D. at 520 (quoting *United States v. Adlman*, 134
F.3d 1194, 1202 (2d Cir. 1998)) (some quotation marks omitted).

[49]    *See Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir. 1999) (citing
12 C.F.R. § 208.20(d) (1997) (Office of Thrift Supervision SAR regulation), now
12 C.F.R. § 563.180(d)).

[50]    12 C.F.R. § 21.11(k)(1)(i) (emphasis added).

held consistent with the statute by the Eastern District of New York.[51]

## III. DISCUSSION

### A. Motion to Compel BOC to Produce Materials

BOC does not contest plaintiffs' characterization of BOC as

withholding the following four categories of documents, all of which fall within

the previously ordered scope of discovery:[52]

> (1) *BOC's 2008 Shurafa investigative files* [(the "Shurafa Investigative Files")]. These files relate to an internal investigation that BOC conducted in response to Plaintiffs' demand letter dated January 23, 2008 and ended with a report. The investigation concerned Said al-Shurafa and Shurafa's wire transfer patterns, which BOC eventually concluded were not suspicious.

> (2) *BOC's periodic AML/CTF and other compliance communications* [("BOC's Communications")]. These communications concern periodic risk reports, self-analyses of BOC's compliance systems, proposed actions and changes to BOC's compliance procedures, and other

---

[51] *See United States v. Holihan*, 248 F. Supp. 2d 179, 185 (W.D.N.Y. 2003) (citing *Weil v. Long Island Sav. Bank*, 195 F. Supp. 2d 383, 387–88 (E.D.N.Y. 2001)).

[52] In an Order published on January 10, 2013, I stated: "BOC is ordered to produce all documents, including communications, concerning any examination, investigation, or sanction of BOC's New York Branch, BOC's Guangdong Branch, and BOC's Head Office by the U.S. or PRC governments or any of their agencies regarding Anti-Money Laundering (AML), Counter-Terrorism Financing (CTF), and AML or CTF problems or deficiencies from January 1, 2003 to September 2008," subject to certain restrictions stated earlier in the Order. *Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266, 2013 WL 132664, at *2 (S.D.N.Y. Jan. 10, 2013).

communications that the OCC, having found deficiencies in BOC's compliance function, required BOC to submit to the OCC over approximately seven years during the relevant period.

(3)   *OCC reports and communications* [("OCC's Communications")]. These documents include the OCC's bank examination reports, evaluations of BOC policies and practices, recommendations to BOC, and other communications related to problems or deficiencies in BOC's [Anti-Money Laundering and Counter–Terrorism Financing ("AML/CTF")] compliance function.

(4)   *General information related to BOC's SAR filing practices* [("SAR Information")]. This information includes BOC's SAR filing practices, the aggregate number of SARs filed during the relevant years, and the compliance areas to which those SARs relate.[53]

BOC has offered three general justifications for not producing the documents requested by plaintiffs:  the bank examination privilege; the attorney-client and work product privileges; and federal law prohibiting the disclosure of SARs.[54]  I will address each justification in turn.

First, however, I address BOC's argument that before this Court orders *BOC* (not the OCC) to produce any non-public OCC information not listed in plaintiffs' 2012 *Touhy* request — including any documents predating July 1, 2003 or postdating December 31, 2006 — plaintiffs are required to file a *Touhy*

---

[53]   BOC Opp. at 2–3.

[54]   *See id.* at i.

request for those additional documents.[55]  BOC cites section 4.37(b) of the OCC's *Touhy* regulations, which prohibits banks from producing non-public OCC information unless the requester has followed the OCC's *Touhy* procedures and a federal court has ordered production "in a judicial proceeding in which the OCC has had the opportunity to appear and oppose discovery."[56]

BOC misunderstands the nature of this Court's deference to the OCC's *Touhy* regulations.  Under Second Circuit law, this deference is "grounded in the doctrine of sovereign immunity.  Absent a waiver of sovereign immunity, a federal agency, as representative of the sovereign, cannot be 'compel[led] . . . to act.'"[57]  As noted earlier, there is a dispute between the Circuits regarding the extent of a federal court's power to order a *federal agency* to produce documents in contravention of the procedures laid out in the agency's *Touhy* regulations.[58]  But neither the OCC nor BOC cite any precedent for concluding that the OCC may promulgate regulations under the Housekeeping Statute that limit a federal court's ability to order *private litigants* to produce documents under the Federal Rules of

---

[55]    *See id.* at 1 n.1.

[56]    12 C.F.R. § 4.37(b)(1)(i).  *See* BOC Opp. at 1.

[57]    *Glotzer*, 374 F.3d at 190 (quoting *EPA v. GE I*, 197 F.3d at 597).

[58]    *See id.* at 191–92.

Civil Procedure.  BOC is not covered by the OCC's sovereign immunity, nor may the OCC extend the shelter of its immunity to the BOC through regulations promulgated under a statute intended to deal with internal housekeeping matters. When a federal court, after duly considering the bank examination privilege,[59] orders a bank to produce non-public OCC information under the bank's control, the sovereign is not "compelled to act," nor is there any risk of the federal government being turned into a "'speakers' bureau for private litigants.'"[60]

_____

[59]     Some courts have held that the bank examiner must be granted "'the opportunity to assert the privilege and the opportunity to defend its assertion.'" *Merchants Bank*, 205 B.R. at 42 (quoting *In re Bankers Trust*, 61 F.3d at 472).  If so, this is a matter of federal common law, grounded in policy considerations, and not a consequence of any agency's *Touhy* regulations.

[60]     *Exxon Shipping Co.*, 34 F.3d at 779 (quoting appellee's brief).  To preempt any confusion, I also note that the OCC's housekeeping regulations do not possess any general priority over the Federal Rules of Civil Procedures, which to the contrary "are deemed to have 'the force [and effect] of a federal *statute.*'" *Bright v. United States*, 603 F.3d 1273, 1279 (Fed. Cir. 2010) (quoting *Sibbach v. Wilson & Co.*, 312 U.S. 1, 13 (1941)) (emphasis added).  Through the Rules Enabling Act, Congress affirmed the Supreme Court's "power to prescribe general rules of practice and procedure . . . for cases in the United States district courts" and indeed stated that "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect."  *See* 28 U.S.C. § 2072.  If the OCC were to rely on section 4.37(b) of its *Touhy* regulations to penalize a bank for complying with a federal court order issued in accordance with the Federal Rules, questions might be raised about the validity of the penalty on various grounds, including: whether the Housekeeping Statute purports to grant the OCC the legal authority to penalize a bank for complying with an otherwise valid federal court order; if so, whether the Rules Enabling Act invalidates that authority; and either way, whether separation-of-powers concerns argue against upholding such a penalty.

### 1.   Bank Examination Privilege

The bank examination privilege must be asserted by the banking

regulator, and the regulator has the burden of establishing that the privilege applies

to the documents at issue.[61]   BOC argues that three of the categories of documents

sought by plaintiffs are subject to the bank examination privilege.  Using the

shorthand introduced earlier, these three categories are:  (i) the Shurafa

Investigative Files, (ii) BOC's Communications, and (iii) OCC's

Communications.[62]  Plaintiffs specifically claim in their opening brief that the OCC

up to that point in time had not asserted any privilege over three categories of

documents, which overlap with categories (i) to (iii) in ways noted below: (a)

BOC's internal reports and communications, including the Shurafa investigative

report, along with attachments, supporting documents, and related investigative

files; (b) documents that BOC submitted to the OCC other than in response to OCC

communications regarding Matters Requiring Attention ("MRAs"); and (c) factual

matter.[63]  Thus, this Court's first task is to determine whether the OCC has in fact

---

[61]     *Merchants Bank*, 205 B.R. at 42 (citing *In re Bankers Trust*, 61 F.3d at 472); *Schreiber*, 11 F.3d at 220.

[62]     *See* BOC Opp. at 2.

[63]     *See* Pl. Mem. at 12–13.  The reasoning behind plaintiffs' claim regarding the OCC's assertion of privilege could be questioned.  In a September 11, 2012 letter to this Court, the OCC stated:  "Documents such as OCC

asserted privilege over some or all of the documents in categories (i) to (iii) and (a) to (c).

I note at the outset that the OCC's detailed description of the history of plaintiffs' discovery requests shows that the OCC is aware of the nature and extent of plaintiffs' requests, including the requests for the documents in categories (i) to (iii), and the claim that the OCC has not asserted privilege over the documents in categories (a) to (c).[64] Thus, the OCC has been given "'the opportunity to assert the [bank examination] privilege and the opportunity to defend its assertion.'"[65] While the OCC states that plaintiffs are "incorrect[]" to suggest that the OCC waived the bank examination privilege with respect to categories (a) and (b),[66] the OCC offers no basis for concluding that documents

---

examination reports, Supervisory Letters and communications about Matters Requiring Attention, and the bank's response to the same, are clearly protected by the bank examination privilege, as explained in [*Fleet*, 967 F.2d at 633–34]." Excerpts from the 2/20/13 Declaration of John Beauchemin, Exhibit ("Ex.") 8 to 2/25/13 Declaration of Olav A. Haazen ("Haazen Decl."), at 1. Ignoring that the OCC's list of privileged documents was illustrative rather than exhaustive, plaintiffs inferred that the OCC did *not* assert privilege over the materials in categories (a) to (c). *See* Pl. Mem. at 12. Nevertheless, plaintiffs' claim shifted the burden to the OCC to assert privilege over the contested materials.

[64]     *See* OCC Opp. at 5–11.

[65]     *Merchants Bank*, 205 B.R. at 42 (quoting *In re Bankers Trust*, 61 F.3d at 472).

[66]     OCC Opp. at 20.

falling under categories (a) or (b) are in fact, as a legal matter, covered by the bank examination privilege.  The OCC merely states in the abstract that "[i]t would be a mistake to assume that any category of documents . . . would automatically fall outside the scope of the bank examination privilege without subjecting any specific document belonging to such a category to a privilege analysis using the *Fleet* factors."[67]

The OCC's convoluted construction — that is, its statement that it does not necessarily *not* assert the bank examination privilege over the documents in categories (a) and (b) — is inadequate to serve as an assertion of the privilege. It does not establish the applicability of the bank examination privilege to the documents at issue.[68]  As a result, the documents in categories (a) and (b) do not fall under the bank examination privilege.  Because category (a) encompasses the Shurafa Investigative Files (that is, category (i)), these Files do not fall under the privilege.  Likewise, because category (b) encompasses all of BOC's Communications (that is, category (ii)) except documents submitted by BOC to the OCC in response to OCC communications regarding MRAs, the latter documents are the only materials in BOC's Communications that are covered by the privilege.

---

[67]     *Id.*

[68]     *See Schreiber*, 11 F.3d at 220.

Finally, the OCC attempts to assert the bank examination privilege over the entirety of its bank examination reports.[69]  The OCC's position contradicts the well-established principle that factual materials fall outside the bank examination privilege,[70]  and the consistent finding by numerous courts that the OCC's bank examination reports are at least partly factual:  "'[E]very court that has examined the nature of bank examination reports thus far has found them to be at least partly factual.'"[71]  As a court in the Eastern District of New York recently noted, "[t]he OCC takes a limited view of what constitutes purely factual

---

[69]     *See* OCC Opp. at 18–19.

[70]     *See Merchants Bank*, 205 B.R. at 42 (citing *In re Bankers Trust*, 61 F.3d at 471).

[71]     *In re Providian*, 222 F.R.D. at 26 (quoting *Schreiber*, 11 F.3d at 221). *See also id.* at 27–28 (finding that OCC attempted to assert bank examination privilege over purely factual materials).  Earlier, a court in the Eastern District of New York reached similar conclusions in a case involving FDIC bank examination reports:

> Several courts have addressed the question of whether bank examination reports and related correspondence are factual or deliberative.  It is very persuasive that some district courts have actually examined bank examiners' reports *in camera* and found them to be all or partially factual.

*Principe v. Crossland Sav., FSB*, 149 F.R.D. 444, 448 (E.D.N.Y. 1993) (citing *Seafirst*, 644 F. Supp. at 1163; *Delozier*, 113 F.R.D. at 525; *In re Franklin*, 478 F. Supp. at 585).

25

material."[72]   Even more recently, after bank regulators including the OCC asserted

that the bank examination privilege should not be overridden with regard to

hundreds of documents, a court in the Southern District of New York completed a

"laborious" *in camera* review of the documents, only to conclude that dozens of

them were not privileged to begin with.[73]   The OCC does not explain why these

numerous judicial precedents were incorrectly decided.[74]   I conclude, in agreement

with the case law, that the factual portions of the OCC's bank examination reports,

as well as all other factual materials (that is, category (c)), by definition fall outside

the scope of the bank examination privilege.   Thus, BOC must produce all factual

portions of the documents in categories (i) to (iii) — where "factual" has its

ordinary meaning, and not any narrower meaning adopted by the OCC.[75]

---

[72]   *Linde*, 2009 WL 3055282, at *1.

[73]   *In re Citigroup*, 2011 WL 8210671, at *1–2.

[74]   The closest that the OCC comes to a defense of its decision not to permit the production of the factual portions of its bank examination reports is to suggest that the application of Judge Weinstein's *Franklin* factors somehow leads to this result.  *See* OCC Opp. at 18–19.  But this misunderstands the role of the factors:  they are not used to determine what falls within the bank examination privilege, but to determine whether materials falling within the privilege should nevertheless be produced.  Materials that do not fall within the bank examination privilege, such as factual materials, cannot be brought within the privilege by applying the *Franklin* factors.

[75]   If, after BOC has produced all factual material that it has withheld based on the bank examination privilege, plaintiffs believe that BOC has applied

To summarize the analysis up to this point:  BOC has withheld the

materials in categories (i) to (iii) in part based on the possibility that the OCC

would assert the bank examination privilege over those documents.  Despite

plaintiffs' explicit and detailed request for these materials in plaintiffs' opening

brief, the OCC failed to assert and establish the bank examination privilege with

regard to the materials in categories (i) to (iii) *except* the non-factual portions of the

OCC's Communications, and the non-factual portions of documents submitted by

BOC in response to OCC communications regarding MRAs.

With regard to these latter two categories of documents, plaintiffs

argue that the bank examination privilege should be overridden.[76]  The burden is on

plaintiffs to demonstrate "good cause" for production based on factors such as

those articulated by Judge Jack B. Weinstein of the Eastern District of New York

in *In re Franklin*.[77]  With regard to relevance, I have already ruled that such

---

an incorrect definition of "factual," this Court will, if necessary, conduct an *in
camera* review of the contested materials, or of a sample of the materials.

[76]    *See* 2/25/13 Reply Memorandum of Law in Support of Plaintiffs'
Motion to Compel Production of Investigative Files and U.S. Regulatory
Communications ("Pl. Reply") at 1 (arguing that "*all* categories of documents
Plaintiffs seek, including BOC's responses to MRAs and the OCC's bank
examination reports and opinions, must be produced because Plaintiffs have a
substantial evidentiary need for these uniquely relevant documents").

[77]    *See Merchants Bank*, 205 B.R. at 42; *In re Franklin*, 478 F. Supp. at
583.

documents are relevant to plaintiffs' claims, because the documents may show

whether BOC had notice of criticisms of its AML/CTF practices, and if so, how it

responded to such notice.[78]   Whether recovery under section 2333(a) of the ATA

requires "that a defendant knew that the group it supported targeted American

nationals," or instead may be satisfied merely by recklessness,[79] evidence that BOC

knew of problems in its AML/CTF practices yet failed to correct those problems

could play a significant role in determining BOC's liability.

        The OCC is correct that plaintiffs' *Touhy* request for "[d]ocuments

associated with any OCC examination of BOC" is too broad and would require

production of irrelevant materials.[80]  As the OCC notes, "OCC examination reports

usually cover many topics with no relevance to [the] pending litigation," such as

the "discussion of BOC's asset quality and . . . credit risk."[81]  Plaintiffs have

_____

        [78]     *See Wultz*, 2013 WL 132664, at *2.  *Accord* Transcript of 12/26/12
Conference at 23–26.

        [79]     *Gill v. Arab Bank, PLC*, — F. Supp. 2d —, 2012 WL 4960358, at
*30–31 (E.D.N.Y. Oct. 17, 2012) (concluding, as a matter of first impression, that
proof of recklessness is sufficient).

        [80]     10/29/12 Letter from Michael L. Brosnan, Senior Deputy
Comptroller, Comptroller of the Currency, to Lee Wolosky, Counsel for Plaintiffs
("OCC *Touhy* Letter"), Ex. E to 2/15/13 Declaration of Eric B. Epstein in
Opposition to Plaintiffs' Motion to Compel Discovery, at 2.  *See also* OCC Opp. at
9, 13.

        [81]     OCC *Touhy* Letter at 2.

remedied this overbreadth, however, in category (iii) of their current document requests.  Plaintiffs now seek only OCC reports and communications "'related to problems or deficiencies in BOC's AML/CTF compliance function.'"[82]

With regard to the availability of substitutes for the requested evidence, the OCC argues that materials already available to plaintiffs provide a "reasonably suitable" substitute for the requested non-factual portions of OCC reports and communications.[83]  For example, the OCC notes that BOC has produced records related to wire transfers to Shurafa's accounts in China, internal compliance manuals, and audit reports.[84]  BOC states that piercing the bank examination privilege "'likely would only give plaintiffs access to opinions, analysis and deliberations regarding the data that plaintiffs already have received.'"[85]

In this case, however, the opinions, analysis, and deliberations communicated by the OCC to BOC are themselves relevant to the issue of scienter under the ATA.  Merely showing that problems existed in BOC's AML/CTF

---

[82]     OCC Opp. at 11 (quoting Pl. Mem. at 1–2).

[83]     *See id.* at 9, 13.

[84]     *See id.* at 9.

[85]     BOC Opp. at 17.

practices may not show that BOC was aware of those problems.[86]  Moreover, if

BOC is unable to produce communications with its Chinese banking regulators,[87]

then the OCC might be the only external entity in a position to have put BOC on

notice of problems with its AML/CTF practices.  There is no substitute for the

requested non-factual portions of the OCC's Communications.

With regard to the seriousness of the litigation and the role of the

government, I have already ruled that this case implicates "[t]he interest of the

United States in depriving international terrorist organizations of funding that

could be used to kill American citizens," which is a "'profound and compelling

interest.'"[88]  The Second Circuit recently stated in an ATA case involving a foreign

bank's failure to comply with discovery orders:

> [T]he interests of the United States weigh heavily in this case,
> even though it is a private lawsuit brought by individual victims
> of terrorism. . . .  [P]rivate lawsuits can, by virtue of the statutory
> rights upon which they rely, be so "infused with the public
> interest" that the distinction between private civil suits and public
> enforcement actions is of reduced significance.
> . . . [T]he ATA's legislative history reflects that Congress

---

[86]    Plaintiffs cite evidence that the OCC did, in fact, criticize BOC
practices related to AML/CTF.  *See* Pl. Mem. at 15.

[87]    As noted earlier, this dispute is addressed in a separate, pending
motion.

[88]    *Wultz*, 2012 WL 5378961, at *7 (quoting *Strauss v. Credit Lyonnais,
S.A.*, 249 F.R.D. 429, 443–44 (E.D.N.Y. 2008)).

conceived of the ATA, at least in part, as a mechanism for protecting the public's interests through private enforcement. One of the Act's sponsors . . . declared that the Act would "empower[] victims with all the weapons available in civil litigation, including: [s]ubpoenas for financial records, [and] banking information [of alleged terrorists]."[89]

In addition, as plaintiffs note, the D.C. District has already entered a default judgment in excess of three hundred million dollars against the Iranian and Syrian defendants in this case.[90]   The financial stakes of the litigation are serious.

The OCC's role in this case is its submission, which largely concerns itself with the fifth of the *Franklin* factors, the risk of a chilling effect,[91] to which I now turn.  OCC and BOC reiterate the importance of maintaining candor in communications between OCC examiners and the bank, echoing the familiar arguments made by the D.C. Circuit in *Fleet*.[92]   While the public interest in candor is a serious concern, it is present in every case involving the bank examination privilege — and yet the privilege remains qualified, not absolute.  There must be

---

[89]   *Linde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013) (quoting *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 520 (S.D.N.Y. 1987), and citing 137 Cong. Rec. S. 1771 (daily ed. Feb. 7, 1991) (Senator Charles Grassley commenting after enactment)).

[90]   *See Wultz*, 864 F. Supp. 2d at 43.

[91]   *See* OCC Opp. at 15–20.

[92]   *See* BOC Opp. at 20–22; OCC *Touhy* Letter at 3.

31

cases in which the other factors discussed above outweigh the public interest in candor between banking regulators and banks.  I conclude this is one such case. The relevance of the non-factual portions of the OCC's Communications, the lack of adequate substitutes, and in particular the seriousness of the litigation and the role of the government in passing the ATA, outweigh the risk of a chilling effect.

Moreover, just as the party seeking to uphold the bank examination privilege can point as a matter of course to the importance of maintaining candor between bank examiners and banks, so the party seeking to override the bank examination privilege can routinely offer reasons to believe that the risk of a chilling effect has been overstated.  Plaintiffs provide several of the latter arguments, including:  that banks are required by law to cooperate with their regulators, and "banks willing to take the risk of withholding relevant information . . . are unlikely to be swayed by whether 'their communication with the examiner [is] privileged as opposed to merely confidential;'"[93] that a protective order is sufficient to protect the government's legitimate interests in confidentiality;[94] and that permitting BOC to avoid discovery "would create a perverse incentive for

[93]     Pl. Reply at 6 & n.5 (quoting *Seafirst*, 644 F. Supp. at 1163).  *See also* Pl. Mem. at 18 (citing *Principe*, 149 F.R.D. at 449).

[94]     *See* Pl. Reply at 6.  *See also* Pl. Mem. at 18 (citing *Schreiber*, 11 F.3d at 222; *Lundy*, 105 F.R.D. at 502).

financial institutions to voluntarily submit documents to the OCC just to avoid discovery in private litigation."[95]

I also note, without placing a great deal of weight on these considerations, that the D.C. Circuit's regulatory model in *Fleet* was developed over two decades ago, based in part on materials written by bank regulators.[96]  The description of the "iterative process" of communication between banks and regulators in *Fleet* is more the prescription of an ideal than the description of an observed state of affairs.[97]  *Fleet* describes the "extensive and informal" communications between the regulated banking firm and the bank regulatory agency as follows:

> The supervisory relationship . . . calls for adjustment, not adjudication.  In the process of comment and response, the bank may agree to change some aspect of its operation or accounting; alternatively, if the bank and the examiners reach impasse, then their dispute may be elevated for resolution at higher levels within the bank regulatory agency. . . .
>
> Because bank supervision is relatively informal and more or less continuous, so too must be the flow of communication between the bank and the regulatory agency.  Bank management

---

[95]     Pl. Reply at 6.

[96]     *See Fleet*, 967 F.2d at 634 (citing OFFICE OF THE COMPTROLLER OF THE CURRENCY, COMPTROLLER'S HANDBOOK FOR NATIONAL BANK EXAMINERS § 1.1, at 1–3 (1990); BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, COMMERCIAL BANK EXAMINATION MANUAL § 1.1 at 1–2 (1988)).

[97]     *Id.* at 633.

must be open and forthcoming in response to the inquiries of bank examiners, and the examiners must in turn be frank in expressing their concerns about the bank.[98]

Against *Fleet*'s idealized model of the regulatory process, compare a recent Senate report describing the actual, observed process of communication between the OCC and one of the nation's largest banks:

> Prior to media reports of the whale trades in April 2012, JPMorgan Chase provided almost no information about the CIO's Synthetic Credit Portfolio [("SCP")] to its primary regulator, the Office of the Comptroller of the Currency (OCC) . . . .
>
> . . . Both the OCC and JPMorgan Chase bear fault for the OCC's lack of knowledge — at different points, the bank was not forthcoming and even provided incorrect information, and at other points the OCC failed to notice and follow up on red flags . . . . [T]he bank [filed] risk reports with the OCC disclosing that the CIO repeatedly breached [its] stress limits in the first half of 2011, triggering them eight times, on occasion for weeks at a stretch, but the OCC failed to follow up with the bank.  . . .
>
> . . .
>
> Beginning in January and continuing through April 2012, . . . multiple breaches of CIO risk limits . . . were disclosed on an ongoing, timely basis in standard risk reports provided by the bank to the OCC, yet produced no reaction at the time from the agency.  . . .
>
> On April 6, 2012, when media reports unmasked the role of JPMorgan Chase in the whale trades, the OCC told the Subcommittee that it was surprised to read about the trades and immediately directed inquiries to the bank for more information.
>
> . . .
>
> It was not until May 2012, a few days before the bank was forced to disclose $2 billion in SCP losses in its public SEC filings, that the OCC learned of the problems besetting the

---

[98]    *Id.* at 634.

portfolio.  On May 12, OCC staff told staff for a Senate Banking Committee member that the whale trades would have been allowed under the draft Volcker Rule, an assessment that, a few days later, the OCC disavowed as "premature."  At the instruction of the OCC's new Comptroller, Thomas Curry, the OCC initiated an intensive inquiry into the CIO's credit derivatives trading activity.  Even then, the OCC told the Subcommittee that obtaining information from JPMorgan Chase was difficult, as the bank resisted and delayed responding to OCC information requests and sometimes even provided incorrect information.

. . .

JPMorgan Chase had dodged OCC oversight of the SCP for years by failing to alert the agency to the establishment of the portfolio, failing to provide any portfolio-specific information in CIO reports, and even disputing OCC access to daily CIO profit-loss reports.[99]

In the course of documenting what the OCC ultimately acknowledged as multiple

failures of oversight,[100] the report presents scenes such as the following:

[T]he OCC Examiner-In-Charge at JPMorgan Chase told the Subcommittee that it was "very common" for the bank to push back on examiner findings and recommendations.  He recalled one instance in which bank executives even yelled at OCC examiners and called them "stupid."  . . . [At one meeting,] a single risk manager . . . was, in his words, "ambushed" by all the heads of risk divisions from all the lines of business at the bank . . . [T]he bank's risk personnel criticized the OCC's findings and recommendations, and the meeting assumed a loud and "combative" tone. . . .

Still another instance involved profit and loss reports. . . .

---

[99]    STAFF OF SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS, JPMORGAN CHASE WHALE TRADES: A CASE HISTORY OF DERIVATIVES RISKS AND ABUSES 8–10, 12 (Mar. 15, 2013).

[100]    *See id.* at 10.

> [T]he bank informed [the OCC] that Chief Executive Officer
> Jamie Dimon had ordered the bank to cease providing the
> Investment Bank's daily P&L reports, because he believed it was
> too much information to provide to the OCC.[101]

Apart from such anecdotes, questions have repeatedly been raised about the OCC's

independence from the banks it oversees.[102]

---

[101]    *Id.* at 224–225 (citations omitted).

[102]    *See, e.g.*, *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 533
(2009) (rejecting OCC interpretation of National Banking Act and presenting OCC
as "attempt[ing] to do what Congress declined to do:  exempt national banks from
all state banking laws, or at least state enforcement of those laws"); Gillian E.
Metzger, *Federalism and Federal Agency Reform*, 111 COLUM. L. REV. 1, 27
(2011) (noting that "[f]ederal agency failure loomed particularly large in the
background of *Cuomo*, with the OCC repeatedly characterized as an agency
captured by the entities it was charged with regulating, the classic example of
agency failure" (citing amicus brief and scholarship)); Keith R. Fisher, *Toward A
Basal Tenth Amendment: A Riposte to National Bank Preemption of State
Consumer Protection Laws*, 29 HARV. J.L. & PUB. POL'Y 981, 1028–29 (2006)
("OCC largely subsists . . . on fees paid by the institutions they regulate . . . .
Those financial incentives make the agency's decision-making process susceptible
to error in ways that are not as likely when the decision maker is an elected
body."); Arthur E. Wilmarth, Jr., *The OCC's Preemption Rules Exceed the
Agency's Authority and Present a Serious Threat to the Dual Banking System and
Consumer Protection*, 23 ANN. REV. BANKING & FIN. L. 225, 232 (2004) ("Given
the OCC's financial self-interest and its empire-building agenda, the OCC faces a
clear conflict of interests (and the risk of regulatory capture) whenever the agency
considers the desirability of . . . taking vigorous enforcement measures against one
of its most important constituents.").  *See also* SHEILA BAIR, BULL BY THE HORNS:
FIGHTING TO SAVE MAIN STREET FROM WALL STREET AND WALL STREET FROM
ITSELF 41 (2012) (former FDIC Chairman noting that "the deeper I got into
interagency discussions, the more convinced I became that the OTS and OCC
generally took whatever positions were most advantageous to their larger
institutions"); Jeff Horwitz & Maria Aspan, *How Promontory Financial Became
Banking's Shadow Regulator*, AM. BANKER (online), Mar. 15, 2013 (noting

The details of the OCC's regulatory processes are not at issue in this case. But to the extent that *Fleet* rested in part on judge-made hypotheses regarding the likely effects of overriding the bank examination privilege, it is at least worth noting that the *Fleet* court's observations on the regulatory process were not statements of immutable law, nor the result of empirical investigation. While the risk of a chilling effect is serious, the risk of regulatory inaction is as well — as the U.S. Congress recognized through the ATA by empowering private parties to enforce the public interest using the weapons of civil litigation. Given the limited resources of bank regulators, the OCC's supervisory mission might in some cases be helped as much as hindered by the intervention of private litigants.

With these considerations in mind, and based on the preceding analysis of the *Franklin* factors, I conclude that plaintiffs have shown good cause to override the bank examination privilege with regard to the non-factual portions of the OCC's Communications.[103]   BOC is ordered to produce all such materials in

---

"revolving door" between the OCC and Promontory Financial, a banking consulting firm founded by a former Comptroller of the Currency).

[103]   These materials will include the non-factual portions of communications regarding MRAs that address problems or deficiencies in BOC's AML/CTF practices.

accordance with the existing protective order, or, if necessary, a modified order.[104]

### 2.    Attorney-Client and Work Product Privileges

BOC argues that the Shurafa Files are covered by the attorney-client and work-product privileges.[105]  BOC's argument does not clearly distinguish between the two privileges, instead asserting generally that the Shurafa investigative material "is privileged because it was prepared in connection with a BOC investigation that was prompted by the receipt of Plaintiffs' demand letter."[106]  BOC also states that the "investigation was led by in-house counsel at BOC, as well as [outside] counsel of BOC who were retained promptly after receipt of the demand letter."[107]

Plaintiffs note that BOC's submission to the Court, which addresses plaintiffs' *second* motion to compel, is the first time that BOC has raised either the attorney-client or work-product privileges:

---

[104]    *See* Pl. Reply at 6 & n.6 (inviting use of modified protective order, if necessary, and noting that BOC drafted the existing protective order and stated that it was needed because "'BOC operates under confidentiality requirements established by both U.S. and PRC law'" (quoting 8/10/11 Letter from Mitchell R. Berger, Counsel for BOC, to the Court, Ex. 7 to Haazen Decl., at 2)).

[105]    *See* BOC Opp. at 22.

[106]    *Id.*

[107]    *Id.*

> BOC has waived any privileges by failing to assert that the Report is protected by privilege until now, nearly two years after Plaintiffs requested such documents, and after numerous letters to Plaintiffs and the Court purporting to state BOC's objections to producing the Report.[108]

In addition, plaintiffs argue that even if the privileges were not waived, they would not apply to the Shurafa Investigative Files "because BOC's investigation of the Shurafa transactions was conducted by and at the initiative of the New York Compliance and Clearing Departments, not BOC's legal counsel."[109]  According to plaintiffs, "BOC's counsel had no involvement beyond being notified of the investigation by BOC's Chief Compliance Officer."[110]

Plaintiffs have failed to carry their burden of establishing that the Shurafa Files contain "'communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance,'"[111] or "'attorneys' mental impressions, opinions or legal theories concerning specific litigation.'"[112]  The

---

[108]   Pl. Reply at 8.

[109]   *Id.* at 9.

[110]   *Id.*

[111]   *Brennan Ctr.*, 697 F.3d at 207 (quoting *Mejia*, 655 F.3d at 132).

[112]   *Strougo*, 199 F.R.D. at 520 (quoting *Horn & Hardart Co.*, 888 F.2d at 12).

evidence cited by both parties consists solely of an excerpt from the deposition of

BOC's Chief Compliance Officer John Beauchemin as well as his declaration.[113]

These materials do not show that any attorneys were involved in the preparation of

the Shurafa Files, nor that the Files contain attorney work-product or attorney-

client communications.  As plaintiffs suggest, the cited materials indicate that after

Beauchemin received plaintiffs' demand letter, he called outside counsel, then set

about performing the investigation within the Compliance Department — without

the involvement of any counsel, and not for the purpose of obtaining legal

assistance.[114]

---

[113]   *See* BOC Opp. at 22–24 (citing excerpts from 12/5/12 Deposition of John Beauchemin, BOC Chief Compliance Officer ("Beauchemin Dep. Tr."), Ex. 3 to Haazen Decl.; 2/20/13 Declaration of John Beauchemin ("Beauchemin Decl."), Ex. 8 to Haazen Decl.); Pl. Reply at 8–10 (citing Beauchemin Dep. Tr.).  BOC also cites a page of the deposition transcript that was not included in the excerpt.  *See* BOC Opp. at 22 (citing Beauchemin Dep. Tr. at 255).

[114]   Beauchemin stated:  "[W]hen we got the demand letter, we did an investigation . . . and we provided the result[s] of that investigation to the OCC."  Beauchemin Dep. Tr. at 248.  Asked whether anyone else was involved in the investigation, Beauchemin replied:  "I was and Bertha produced records and that's what I recall now."  *Id.* at 252.  It is true that Beauchemin stated, when asked whether he talked to anyone during the investigation:  "Thomas Fung, in-house counsel."  *Id.* at 253.  Elsewhere in the transcript, however, Fung was identified not as in-house counsel but as the head of the risk management department.  *See id.* at 67, 220.  Plaintiffs' reply brief clarifies that "[s]ince referring to Mr. Fung as 'in-house counsel' in its Opposition . . ., BOC has confirmed that Mr. Fung was not BOC's in-house counsel at that time, and may not even be a lawyer."  Pl. Reply at 9 n.10.  Beauchemin's declaration also presented the preparation of the report as solely the work of BOC's Compliance Department.  *See* Beauchemin Decl. ¶ 17.

3.      **SAR Privilege**

The SAR Information requested by plaintiffs consists of general information related to BOC's SAR filing practices:  "This information includes BOC's SAR filing practices, the aggregate number of SARs filed during the relevant years, and the compliance areas to which those SARs relate."[115]  The OCC emphasizes the importance of protecting the confidentiality of SARs and the act of filing a SAR, but does not address or take a position on whether producing the general information requested by plaintiffs would violate any law or privilege.[116]  BOC argues that producing this general information would violate federal law prohibiting the disclosure of whether a SAR was filed and what its contents were.[117]

However, as already noted, the OCC's SAR regulations, at their most expansive, prohibit the disclosure of "any information that would reveal the existence of a SAR."[118]  BOC's argument that the production of the general

_____

Because I conclude that BOC has failed to carry its burden to establish the existence of either the attorney-client or work product privileges, I do not reach the remainder of plaintiffs' arguments.

[115]    Pl. Mem. at 2.

[116]    *See* OCC Opp. at 20–22.

[117]    *See* BOC Opp. at 3.

[118]    12 C.F.R. § 21.11(k)(1)(i).

41

information requested by plaintiffs could indirectly indicate whether a particular SAR was filed is unpersuasive.[119]  "For example," BOC argues, "if, hypothetically, BOC has filed zero SAR[s] from 2003 through the present, this data would reveal to Plaintiffs whether or not a SAR was filed with respect to Shurafa."[120]  But the OCC's regulations prohibit the disclosure of information that would reveal the *existence* of a particular SAR,[121] not the *non*-existence of any SARs.

It is true that in some circumstances, requiring a bank to answer sufficiently detailed questions about when it did *not* file SARs could indirectly reveal the existence of a SAR filing.  A questioner might ask whether the bank filed a SAR in response to a number of specific incidents; each time the bank refused to answer, rather than answering that it not file a SAR, the bank's refusal would reveal the existence of a SAR.  But such concerns are not present here.  At most, discovery of the requested information will reveal a year in which BOC filed no SARs.  It is difficult to see how such a revelation could harm the law enforcement interests that 31 U.S.C. § 5318(g) was intended to promote.[122]  If

---

[119]    BOC Opp. at 24.

[120]    *Id.* at 25.

[121]    12 C.F.R. § 21.11(k)(1)(i).

[122]    *See Cotton v. PrivateBank & Trust Co.*, 235 F. Supp. 2d 809, 815 (N.D. Ill. 2002) ("Release of [a] SAR could compromise an ongoing law

anything, such a revelation would seem more likely to promote future vigilance and thorough reporting by BOC and other banks.

For the foregoing reasons, I conclude that the general information sought by plaintiffs is not covered by the SAR privilege, and must be produced by BOC.

**B.      Motion to Compel the OCC to Produce Materials**

Based on the broad discovery ordered from BOC, I deny without prejudice plaintiffs' motion to compel the production of documents from the OCC. Because it is unclear whether the OCC possesses any relevant and discoverable documents that are not in the possession of BOC, it is not yet necessary to confront the difficult issues that might be involved in reviewing the OCC's denials of plaintiffs' requests.

If BOC's production reveals that certain materials in categories (i) to (iv) can only be obtained through the OCC, plaintiffs may move again to compel the OCC to produce the materials.  As noted earlier, based on *Glotzer*, plaintiffs may only move to compel the OCC to produce documents that plaintiffs have requested through the OCC's *Touhy* procedures.  With regard to the documents that plaintiffs already sought from the OCC in the September 2012 *Touhy* request,

enforcement investigation, tip off a criminal wishing to evade detection, or reveal the methods by which banks are able to detect suspicious activity.").

no further input from the OCC will be necessary — though the OCC may choose to provide further briefing.  If plaintiffs seek the production of documents not requested in the first *Touhy* request, however, a second request to the OCC will be necessary.

   If plaintiffs find it necessary to file a second motion to compel production from the OCC, the parties' briefs should include arguments addressing whether the OCC's rejection(s) of plaintiffs' requests should be reviewed under the arbitrary and capricious standard, or another standard; and whether the subject of review should be the OCC's *Touhy* decision(s), the OCC's submission(s) to this Court, or both.

## IV. CONCLUSION

   For the foregoing reasons, plaintiffs' motion to compel is granted with respect to BOC and denied without prejudice with respect to the OCC.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:  April 9, 2013
    New York, New York

44

**- Appearances -**

**For Plaintiffs:**

Lee S. Wolosky, Esq.
Steven I. Froot, Esq.
Marilyn C. Kunstler, Esq.
Jaime Sneider, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2350

**For Defendant:**

Mitchell R. Berger, Esq.
Patton Boggs LLP (DC)
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-5601

Zachary Carter, Esq.
Lanier Saperstein, Esq.
Neil McDonell, Esq.
Eric Epstein, Esq.
Daniel Goldberger, Esq.
Dorsey & Whitney LLP
51 West 52nd Street
New York, NY 10019
(212) 415-9309