UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X



SHERYL WULTZ, individually, as personal
representative of the Estate of Daniel Wultz,
and as the natural guardian of plaintiff
Abraham Leonard Wultz; YEKUTIEL
WULTZ, individually, as personal
representative of the Estate of Daniel Wultz,
and as the natural guardian of plaintiff
Abraham Leonard Wultz; AMANDA
WULTZ; and ABRAHAM LEONARD
WULTZ, minor, by his next friends and
guardians Sheryl Wultz and Yekutiel Wultz,

                  Plaintiffs,

           - against -

BANK OF CHINA LIMITED,

              Defendant.

     **OPINION & ORDER**

     **11 Civ. 1266 (SAS)**

------------------------------------------------------------ X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

       This suit arises out of the death of Daniel Wultz and the injuries of

Yekutiel Wultz, suffered in a 2006 suicide bombing in Tel Aviv, Israel. Four

members of the Wultz family brought suit against Bank of China ("BOC"),

1

alleging acts of international terrorism under the Antiterrorism Act ("ATA"),[1] among other claims.

All of plaintiffs' non-federal claims against BOC have now been dismissed.[2] In addition, plaintiffs' attempt to hold BOC liable for aiding and abetting international terrorism under the ATA has been categorically foreclosed by the Second Circuit.[3] Thus, plaintiffs' only remaining claim against BOC is for acts of international terrorism under the ATA, based on BOC allegedly having provided material support and resources to a terrorist organization.[4]

Before this Court is plaintiffs' second motion to compel BOC to produce documents that BOC argues it is prohibited from producing under the banking laws of the People's Republic of China ("the Chinese government," or

---

[1] "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."  18 U.S.C. § 2333(a).

[2] *See Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266, 2013 WL 1641179 (S.D.N.Y. Apr. 16, 2013) (dismissing plaintiffs' remaining non-federal claim as time-barred under New York "borrowing statute").

[3] *See In re Terrorist Attacks on September 11, 2001*, — F.3d —, No. 11 Civ. 3294, 2013 WL 1591883, at *2–3 (2d Cir. 2013) ("[A] defendant cannot be liable under the ATA on an aiding-and-abetting theory of liability." (citing *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013))).

[4] *See* First Amended Complaint ("FAC") ¶¶ 106–115.

"the PRC").[5]  For the reasons stated below, plaintiffs' motion is granted in part.

## II.   BACKGROUND

Plaintiffs summarize their allegations as follows:

> [I]n 2005, a year before the terrorist attack in Israel that killed 16-year old U.S. citizen Daniel Wultz and seriously wounded his father Yekutiel Wultz (also a U.S. citizen), Israeli officials began a series of meetings with Chinese government officials to warn the Chinese government and BOC about various BOC account-holders, including Said al-Shurafa ("Shurafa"). Subsequently, U.S. officials initiated similar meetings in China concerning the use of BOC by state sponsors of terrorism, such as Iran, and terrorist organizations supported by Iran, such as the Palestinian Islamic Jihad ("PIJ") and Hamas.  These meetings all covered BOC's facilitation of terrorist violence in Israel.  They included BOC's bank regulator, the People's Bank of China ("PBOC"), and other agencies responsible for foreign affairs, security, and law enforcement in China, including the Ministry of Foreign Affairs ("MFA"), Ministry of State Security ("MSS"), and Ministry of Public Security ("MPS["]) (together with PBOC, the "PRC Agencies").  Some meetings are believed to have also included BOC officials, including Geng Wei, BOC's Chief Compliance Officer.
>
> During approximately ten meetings that took place in China from 2005–2007, Israeli officials asked the PRC Agencies to take action to ensure that BOC — which was at the time, and remains today, a majority state-owned bank — stop[ped] supporting the PIJ and Hamas, and close[d] the accounts of Shurafa and his affiliates (the "Shurafa Accounts").  BOC nonetheless continued to process numerous wire transfers through the Shurafa Accounts for the benefit of PIJ and Hamas, up to and after the murder of

---

[5]      For the opinion addressing the first motion, see *Wultz v. Bank of China Ltd.*, — F. Supp. 2d —, No. 11 Civ. 1266, 2012 WL 5378961 (S.D.N.Y. Oct. 29, 2012).

Daniel Wultz.[6]

In 2008, after Daniel Wultz's survivors sent a demand letter to BOC threatening this lawsuit, BOC conducted an internal investigation and, according to plaintiffs, "finally began closing the Shurafa Accounts."[7]

Plaintiffs' attempts to obtain discovery from BOC have a long, complex, and contested history.  This has been especially true of plaintiffs' attempts to obtain evidence concerning BOC's communications with the PRC, and

---

[6]    2/14/13 Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion to Compel Production of Communications with the Chinese Government and BOC-Internal Communications ("Pl. Mem.") at 1–2 (citing FAC ¶ 77) (citations omitted).  Plaintiffs' current allegations go beyond FAC ¶ 77, which does not refer to warnings from U.S. officials, and only describes a meeting with Israeli officials in April 2005.  I assume that plaintiffs' allegations reflect discovery and research undertaken in the years since the FAC was filed on January 13, 2009.  For its part, BOC states that plaintiffs have not previously disclosed or supported the allegation that there were "visits of foreign officials asking that [the Shurafa] accounts be closed."  2/28/13 Memorandum of Law on Behalf of Bank of China, Ltd. in Opposition to Plaintiffs' Motion to Compel Discovery Prohibited Under the Law of the People's Republic of China ("BOC Opp.") at 8 (referring to plaintiffs' "recent Amended Initial Disclosures," not included in BOC's submission). However, the allegation that foreign officials asked that the accounts be closed is effectively implied by plaintiffs' allegation in FAC ¶ 77 that "Israeli officials demanded that the PRC officials take action to prevent BOC" from making further transfers involving the Shurafa accounts ("PIJ Transfers").

[7]    Pl. Mem. at 2.  *See Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266, 2013 WL 1453258, at *5 (S.D.N.Y. Apr. 9, 2013) (noting BOC's "'internal investigation . . . conducted in response to Plaintiffs' demand letter dated January 23, 2008'" (quoting 2/15/13 Memorandum of Law on Behalf of Bank of China, Ltd. in Opposition to Plaintiffs' Motion to Compel Discovery at 2–3)).

internal BOC communications located in China.[8]

In an order issued on October 29, 2012 ("the October 29 Order"), I addressed plaintiffs' first motion to compel BOC to produce various categories of documents in contravention of Chinese law.[9]  Applying the Second Circuit's seven-factor comity test,[10] I granted plaintiffs' motion in part, ordering BOC to produce documents requested by plaintiffs that would be discoverable under the Federal Rules of Civil Procedure, but that BOC was withholding because production of the documents would violate Chinese bank secrecy laws.  I created a single, narrow exclusion from this general rule:  "to the extent that plaintiffs' narrowed discovery requests call for the production of confidential regulatory documents *created by the Chinese government* whose production is clearly prohibited under Chinese law, I decline to order production of such regulatory documents."[11]  I added in a footnote:  "To be perfectly clear, this exception does not apply to materials created by BOC and provided to the Chinese government in

---

[8]      The background of the parties' disputes is summarized in *Wultz*, 2012 WL 5378961, at *1–2.

[9]      *See id.*

[10]      *See Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 438–39 (E.D.N.Y. 2008) (citing *Minpeco S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987)).

[11]      *Wultz*, 2012 WL 5378961, at *5.

the course of regulatory reviews."[12]

Rather than resolving the parties' dispute, the October 29 Order had little effect. On November 9, 2012, BOC responded to plaintiffs' third set of document requests by "reiterating its objection to producing regulatory communications and filings barred by the laws and regulations of the PRC."[13] It eventually became clear that BOC was refusing to produce the requested Chinese documents not only based on the bank secrecy laws discussed in the October 29 Order, but also based on other laws, including laws primarily concerned with combating money laundering and other illegal financial transactions.[14] With the benefit of hindsight, BOC's briefing prior to the October 29 Order contains references to such laws.[15] Instead of promptly bringing to the Court's attention the

---

[12]     *Id.* at *5 n.46.

[13]     BOC Opp. at 4.

[14]     *See Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266, 2013 WL 132664, at *1–2 (S.D.N.Y. Jan. 10, 2013) (distinguishing between Chinese anti-money laundering ("AML") laws and Chinese bank secrecy laws as bars to production).

[15]     *See* 9/4/12 Memorandum of Bank of China Limited in Opposition to Plaintiffs' Motion to Compel Production of Documents ("BOC 9/4/12 Opp.") at 2 (presenting "PRC laws that require banks to maintain the confidentiality of customer account information, *and of bank communications with and reports to regulators*" as bars to discovery (emphasis added)); *id.* at 4 n.5 (citing Chinese AML law "authorizing sanctions on financial institutions for violating confidentiality provisions concerning customer information *and regulatory reporting of suspicious activity*" (emphasis added)); *id.* at 8 (noting that "PRC law

importance of these laws to BOC's position, however, BOC failed to comply with the Court's order and claimed that its behavior was justified by the language in the footnote quoted above.  Once again:  the October 29 Order stated that BOC was required to produce relevant documents *except* "confidential regulatory documents created by the Chinese government whose production is clearly prohibited under

---

expressly requires financial institutions to 'keep confidential information of their anti-money laundering work such as reporting of suspicious transactions, [and their] cooperation with the People's Bank of China in suspicious transactions investigation[s]'" (quoting The Rules for Anti-Money Laundering by Financial Institutions (Nov. 14, 2006), Arts. 15, 25; citing Declaration of James V. Feinerman ("Feinerman Decl."), Exhibit ("Ex.") 3 to 9/4/12 Declaration of Mitchell R. Berger, Counsel for BOC, ¶¶ 25–28)); *id.* at 9 n.15 (repeating that both PRC and U.S. law bar unauthorized disclosure of regulatory communications). Each of these references appeared in the context of BOC's primary argument that the Hague process should be allowed to run its course, and that plaintiffs' requests should be narrowed regardless of the outcome of the Hague request.  *See id* at ii, 3–10.  BOC's brief did not make clear that a detailed analysis of these laws (the subject of this Opinion) would be needed before discovery could proceed. Plaintiffs' reply brief also did not divine the central importance of AML laws to BOC's position.  *See* 9/10/12 Plaintiffs' Reply Memorandum of Law in Support of Their Motion to Compel Production of Documents (making no reference to Chinese AML laws).  In addition, while the parties cited several cases addressing discovery in contravention of Chinese bank secrecy laws, the present case appears to be the first one to address discovery in contravention of Chinese AML laws. *See, e.g.*, BOC 9/4/12 Opp. at 2–3 (citing *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 150–51 (S.D.N.Y. 2011) (discussing Chinese bank secrecy laws); *Gucci Am., Inc. v. Weixing Li*, No. 10 Civ. 4974, 2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011), *reconsideration denied*, 2012 WL 1883352 (S.D.N.Y. May 18, 2012) (same); *Tiffany (NJ) LLC v. Forbse*, No. 11 Civ. 4976, 2012 WL 1918866, at *4 (S.D.N.Y. May 23, 2012), *reconsideration denied*, 2012 WL 3686289 (S.D.N.Y. Aug. 23, 2012) (same)).

Chinese law."[16]  The Order emphasized in a footnote that this exception did "*not*

apply to materials created by BOC and provided to the Chinese government in the

course of regulatory reviews."[17]  Despite the absence of any statement in the Order

that BOC was permitted to withhold documents created by BOC and provided to

the Chinese government *outside* the course of regulatory review — which would

have been a significant exclusion — BOC claimed to believe that this exclusion

was implied simply by the Court's use of the phrase "in the course of regulatory

reviews" in the footnote.[18]

---

[16]      *Wultz*, 2012 WL 5378961, at *5.

[17]      *Id.* at *5 n.46 (emphasis added).

[18]      *See* Transcript ("Tr.") of 11/20/12 Conference at 18:10–23 (emphasis added).  The issue arose again at a conference on December 26, 2012:

> THE COURT:   I said [in the October 29 Order] that communications from the bank, that the bank creates, are not protected.  Now the defendant is just saying basically, without any reargument or anything else, you're wrong and we are not going to do it.  Is that right, Mr. Saperstein?
> MR. SAPERSTEIN:  No, your Honor.
> THE COURT:  Then how do you get around my opinion where I said if the bank created a document, it's not protected and has to be produced?  . . .
> MR. SAPERSTEIN:  . . . That's not what we are saying.  . . . First, during the November 20th status conference . . ., we raised this issue and you instructed us to submit a log, which is what we will do this Friday.  Second of all, turning to . . . footnote number 46 in your October 29th order, you say that the exception does not apply to materials created by BOC and provided to the Chinese

In an order on January 10, 2013 ("January 10 Order"), I rejected

BOC's interpretation of the footnote in the October 29 Order,[19] but recognized the

validity of BOC's concerns regarding materials whose production is prohibited

---

government in the course of the regulatory reviews.

What I would submit, your Honor, is that the information [withheld by BOC], to the extent that the bank submitted it to its regulators, was in compliance with its regulatory obligation and not part of a regulatory review.

Tr. of 12/26/12 Conference at 18:7–19:1. In an example of BOC's bad faith discovery conduct, discussed at greater length below, BOC did not make clear during this exchange, or at any point during the December 26 conference, that it might not be producing *any* documents, as it stated to plaintiffs two days later, and that its "log" would not list *any* specific documents, but would instead consist solely of a brief statement of two general categories of communications that BOC would be withholding, "to the extent those documents exist." 12/28/12 Letter from Lanier Saperstein, Counsel for BOC, to Lee Wolosky, Counsel for Plaintiffs ("First Log Letter"), Ex. 5 to 2/14/13 Declaration of Marilyn C. Kunstler, Counsel for Plaintiffs ("Kunstler Decl."), at 1. Plaintiffs and the Court were aware that BOC might be providing a category-level log for certain documents whose existence cannot be disclosed, *see* Tr. 11/20/12 Conference at 19:3–7, but BOC provided no indication during the December 26 conference that *every requested document* located in China might be subject to this limitation.

Instead, BOC allowed the Court to persist in assuming that at least some documents would be produced after the conference, and that any unproduced documents would be listed in a standard log. BOC offered no correction when the Court summarized BOC's next steps as follows: "You collect your documents, you log those that you are not going to turn over, you produce the remainder." Tr. of 12/26/12 Conference at 34:23–25.

[19]   *See Wultz*, 2013 WL 132664, at *2 ("The [October 29] Order states that BOC materials provided to the Chinese government in the course of regulatory reviews are not exempt from the order to produce. This does not imply that BOC materials provided to the Chinese government *outside* the course of regulatory reviews *are* exempt.").

9

under Chinese laws other than the bank secrecy laws addressed in the October 29

Order.[20]  The January 10 Order concluded that under the multi-factor comity test,

Chinese laws that are "primarily concerned not with protecting the confidentiality

of bank clients, but with combating money laundering and other illegal financial

transactions" would offer stronger protection to BOC than Chinese bank secrecy

laws.[21]  As a result, I held that BOC would not be required *automatically* to

produce "communications from BOC to the Chinese government whose disclosure

is specifically and categorically prohibited under" several Chinese laws cited by

BOC:[22]

> "Article 5(1) of the Anti-money Laundering Law of the PRC;
> Articles 7, 15(2) and 16 of the Rules for Anti-money Laundering
> by Financial Institutions; and Article 6 of the Measures for the
> Administration on Financial Institutions' Reports of Large-sum
> Transactions and Suspicious Transactions."[23]

I also provisionally accepted BOC's representation that two specific types of

---

[20]    *See id.* at *1 (noting that while "[t]he October 29 Order concluded that
the Second Circuit's multi-factor comity test argued in favor of ordering plaintiffs
to produce documents in contravention of Chinese *bank secrecy* laws," a different
result would follow from the application of the comity test to the production of
documents in contravention of Chinese AML laws).

[21]    *Id.*

[22]    *Id.*

[23]    *Id.* (quoting First Log Letter at 1).

document transmitted from banks to Chinese regulators — Suspicious Transaction
Reports ("STRs") and Large-value Transaction Reports ("LTRs") — are analogous
to Suspicious Activity Reports ("SARs"), which U.S. regulations prohibit banks
from producing in discovery.[24]  But I invited the parties to provide further briefing
regarding the laws cited by BOC as the basis for its withholding of Chinese
discovery materials despite the October 29 Order.[25]  That briefing is the subject of

---

[24]     *See id*.; *Wultz*, 2013 WL 1453258, at *5 (noting SAR privilege).

[25]     *See Wultz*, 2013 WL 132664, at *2; Tr. of 1/30/13 Conference
("1/30/13 Tr.") at 58 (ordering briefing).  The January 10 Order also narrowed the
scope of the discovery requests that plaintiffs had originally labeled Nos. 7–9 in
their first set of requests, dated June 16, 2011, to the following:

> BOC is ordered to produce all documents, including
> communications, concerning any examination, investigation, or
> sanction of BOC's New York Branch, BOC's Guangdong Branch,
> and BOC's Head Office by the U.S. or PRC governments or any
> of their agencies regarding Anti-Money Laundering (AML),
> Counter-Terrorism Financing (CTF), and AML or CTF problems
> or deficiencies from January 1, 2003 to September 2008, subject
> to the restriction involving SRTs, LTRs, and other documents as
> stated above.

*Wultz*, 2013 WL 132664, at *2.  *Cf.* Plaintiffs' First Set of Requests for Production
of Documents to Defendant Bank of China Limited, Ex. 4 to Kunstler Decl., at 6.
In a footnote, I emphasized that this narrowed order also continued to exclude "'the
production of confidential regulatory documents *created by the Chinese
government* whose production is clearly prohibited under Chinese law.'"  *Wultz*,
2013 WL 132664, at *2 n.12 (quoting *Wultz*, 2012 WL 5378961, at *5).  But I
added that "[i]f BOC is withholding the production of any materials on this basis, it
is ordered to identify the documents in a log and specify the basis in Chinese law
prohibiting production of such documents."  *Id.*

11

this Opinion.

## III.   APPLICABLE LAW

### A.   Multi-Factor Comity Analysis

In *Société Nationale Industrielle Aérospatiale*, the Supreme Court

established that the use of the Hague Convention process is optional, not

mandatory, and does not deprive a District Court of the jurisdiction it would

otherwise possess "to order a foreign national party before it to produce evidence

physically located within a signatory nation."[26]  At the same time, the Supreme

Court emphasized that "international comity" ("the spirit of cooperation in which a

domestic tribunal approaches the resolution of cases touching the laws and

interests of other sovereign states") "requires in this context a . . . particularized

analysis of the respective interests of the foreign nation and the requesting

nation."[27]

When evaluating the propriety of an order directing the production of

information or documents in contravention of foreign law, courts in the Second

Circuit consider the following five factors, drawn from *Aérospatiale*:

(1) the  importance  to  the  investigation  or  litigation  of  the

---

[26]     *Société Nationale Industrielle Aérospatiale v. United States Dist. Ct.
for the Southern Dist. of Iowa*, 482 U.S. 522, 539–40 (1987).

[27]     *Id.* at 543–44 & n.27.

documents or other information requested;

(2) the degree of specificity of the request;

(3) whether the information originated in the United States;

(4) the availability of alternative means of securing the information; and

(5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.[28]

Courts in the Second Circuit also consider:

(6) the hardship of compliance on the party or witness from whom discovery is sought; and

(7) the good faith of the party resisting discovery.[29]

### B.    Chinese Law

The party objecting to a discovery motion based on foreign law bears

the burden "'of demonstrating that such law actually bars the production or

testimony at issue.'"[30]  "'In order to meet that burden, the party resisting discovery

---

[28]    *See Strauss*, 249 F.R.D. at 438–39 (citing *Aérospatiale*, 482 U.S. at 544 n.28; RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 442(1)(c)).  *See also Gucci Am.*, 2011 WL 6156936, at *5.

[29]    *See Strauss*, 249 F.R.D. at 438–39 (citing *Minpeco S.A.*, 116 F.R.D. at 523).

[30]    *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 207 (E.D.N.Y. 2007) (quoting *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993)).

must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law.'"[31]  The party must describe, among other things, "'the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case.'"[32]

"'Foreign law, though formerly treated as an issue of fact, is now recognized as an issue of law, to be established by any relevant source, including testimony.'"[33]  Federal Rule of Civil Procedure 44.1 establishes that "[t]he court's determination [of foreign law] must be treated as a ruling on a question of law."

Chinese courts do not routinely issue opinions:  "'[t]here is no system of guidance by precedent, judges deciding cases do not issue explanatory published opinions, and their judgments do not bind co-ordinate or lower courts in other

---

[31]     *Id.* (quoting *Alfadda*, 149 F.R.D. at 34).

[32]     *Id.* (quoting *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 586 (2d Cir. 2005)).

[33]     *Wultz v. Bank of China Ltd.*, 860 F. Supp. 2d 225, 230 (S.D.N.Y. 2012) (quoting *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987)). *Accord In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 562 (E.D.N.Y. 2011) ("A determination of foreign law is, like choice of law analysis, a preliminary matter to be resolved by the court.  Therefore, any disputed facts underlying that determination must also be resolved by the court.").

cases.'"[34]   As I noted in a prior opinion in this case, "[t]he interpretation of Chinese law should be informed by attention to the general practices and features of China's legal institutions, rather than by relying solely on inferences drawn from indeterminate legal language."[35]

> [T]he contemporary history of Chinese law began only in 1978, when Deng Xiaoping instituted a policy of legal reform in the wake of the lawlessness of the Cultural Revolution.  Since that time, the Chinese legal system has undergone exceptional growth and development, but it continues to lack some characteristics of the rule of law commonly assumed in the West.  Black letter law in the PRC is often "general and vague," "poorly drafted," "subject to frequent change," "out-of-date," and, perhaps most significantly for the current case, "at odds with reality and current practices."  . . .  The discrepancy between language and legal reality in Chinese law calls into question the attempt to deduce Chinese law simply from the language of Chinese legal sources, without critical attention to the practices of Chinese legal institutions.[36]

## IV.   DISCUSSION

In the present motion to compel, plaintiffs request the following categories of documents from BOC's Chinese operations:  "internal

---

[34]     *Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266, 2012 WL 5431013, at *4 n.43 (S.D.N.Y. Nov. 5, 2012) (quoting Declaration of Professor George W. Conk, Ex. 1 to 9/21/12 Declaration of Marilyn C. Kunstler, Counsel for Plaintiffs, ¶ 26).

[35]     *Id.* at *4 (footnotes omitted) (quoting and citing, among other sources, RANDALL PEERENBOOM, CHINA'S LONG MARCH TOWARD RULE OF LAW (2002)).

[36]     *Id.*

communications and communications with the Chinese government about the
Shurafa accounts, visits of foreign officials asking that those accounts be closed,
and . . . money-laundering and terrorist financing generally."[37]  Plaintiffs state that
BOC has withheld these documents because it claims it is prohibited from
producing these documents under Chinese laws.  Plaintiffs argue, however, that the
Chinese laws cited by BOC do not create the protections that BOC claims, and that
this Court should order production.[38]

BOC provides no definitive statement of the categories of requested
documents it is withholding based on the Chinese laws discussed in its brief.[39]
Elsewhere, in a privilege log, BOC has identified three "categories of potentially
responsive *regulatory communications*, to the extent such communications exist,
that BOC is prohibited under PRC law and regulations from disclosing."[40]

---

[37]    Pl. Mem. at 1.

[38]    *See id.*

[39]    *See* BOC Opp. at 1 (referring, without further specification, to "the
discovery plaintiffs seek"); *id.* at 8 (referring, without further specification, to "the
document requests at issue").

[40]    1/18/13 Letter from Lanier Saperstein to Lee Wolosky ("Second Log
Letter"), Ex. 1 to Kunstler Decl., at 1 (emphasis added).  BOC defines the three
categories as follows:

> (1)    Reports, if any, that BOC would have submitted to the PRC
>         government regulators, including the PBOC, from July

2003 to January 2008 relating or referring to the individuals and companies identified in Requests 4 and 5 of Plaintiffs' First Set of Requests for Production of Documents . . . and prepared outside the course of a regular regulatory review, and which are subject to non-disclosure under Article 5(1) of the Anti-money Laundering Law of the PRC; Articles 7, 15(2) and 16 of the Rules for Anti-money[] Laundering by Financial Institutions; and Article 6 of the Measures for the Administration on Financial Institutions' Reports of Large-value Transactions and Suspicious Transactions.

Further to the Court's instructions, *see* January 10 Order at 5 n.11, this category of communications does not include any communications other than Suspicious Transaction Reports ("STRs") and Large-value Transaction Reports ("LTRs"), to the extent such documents exist.

(2)     The communications that BOC sent to the PRC government from January 23, 2008, the date of plaintiffs' demand letter, to September 2008, immediately after the filing of plaintiffs' complaint, regarding plaintiffs' allegations as made initially in the demand letter and subsequently in plaintiffs' complaint, implicating BOC's compliance with anti-money laundering ("AML") and counterterrorism financing ("CTF") laws and rules, which are subject to non-disclosure under the PRC laws and regulations specified above in (1).

(3)     The communications by and between BOC and the PRC government "concerning any examination, investigation, or sanction" of BOC "regarding Anti-Money Laundering (AML), Counter-Terrorism Financing (CTF), and AML or CTF problems or deficiencies from January 1, 2003 to September 2008," *see* January 10 Order at 6, which are subject to non-disclosure under the PRC laws and regulations specified above in (1), as well as by the Law of the People's Republic of China on Guarding State Secrets.

17

BOC's three withheld categories of PRC regulatory communications, however, do not encompass all of the materials that plaintiffs describe as the subject of the current motion.  For example, there may be as-yet unproduced internal communications by BOC in China that are "about the Shurafa accounts, visits of foreign officials asking that those accounts be closed, [or] money-laundering and terrorist financing generally," but that do not contain or reveal the materials listed on the log.  Such materials do not appear to be covered by any category on the privilege log.[41]  More generally, the reference to "potentially responsive *regulatory communications*" that precedes the three categories of the log raises the possibility that BOC may be withholding, based on as-yet unstated arguments, materials located in China that are *not* regulatory communications, but that fall within the scope of plaintiffs' requests in the present motion.

Due to the gaps and ambiguities in and between the categories of BOC's privilege log, plaintiffs' definition of the materials at issue in this motion is the only explicit and comprehensive definition in the parties' submissions. Accordingly, I adopt plaintiffs' definition of the subject matter of the motion.

---

*Id.* at 1–2.  *Accord* BOC Opp. at 2 (summarizing these categories).

[41]     The scope of the privilege log is further obscured by the convoluted language of the first category and its complicated logical relationships to the other two categories, which I will not attempt to clarify here.

Plaintiffs have requested (a) BOC's internal communications in China, and (b) BOC's communications with the Chinese government, about (i) the Shurafa accounts, (ii) visits of foreign officials asking that those accounts be closed, and (iii) money-laundering and terrorist financing generally.[42]  These materials are clearly relevant to plaintiffs' claim, and BOC has not argued that they fall outside plaintiffs' pending discovery requests.  Moreover, plaintiffs' opening brief put BOC on notice that plaintiffs sought these materials in the current motion to compel.

BOC's arguments against production, interpreting BOC's assertions of privilege as broadly as possible, are as follows.  *First*, BOC argues that it is prohibited by various PRC laws related to AML and CTF from disclosing requested STRs, LTRs, any other requested communications between BOC and the PRC, and any requested internal BOC materials that it has not already produced.[43]

---

[42]     *See* Pl. Mem. at 1.  Subjects (i) to (iii) apply to communications of type (a) and (b).

[43]     According to BOC, the relevant PRC laws relating to AML and CTF are:

(a)     Article 5 of the Anti-Money Laundering Law of the PRC ("AML Law");

(b)     Articles 5, 7, 15 and 16 of the Rules for Anti-Money Laundering by Financial Institutions ("PBOC AML Provisions");

*Second*, BOC asserts that "all communications between BOC and the PBOC" have been classified by PBOC as "most confidential," "classified," and/or "confidential," and thus BOC is barred from producing these communications under the PRC State Secrets Law.[44]  With respect to both the AML/CTF laws and the State Secrets Law, BOC also argues that under *Aérospatiale*, it should not be

_____

      (c)     Article 6 of the Measures for the Administration on Financial Institutions' Reports of Large-Value Transactions and Suspicious Transactions ("LTR and STR Measures");

      (d)     Article 5 of PBOC's On-Site Anti-Money Laundering Inspection Measures (Trial Implementation) ("PBOC On-Site Measures") and article 7 of PBOC's Off-Site Anti-Money Laundering Supervision Measures ("PBOC Off-Site Measures").

*See* BOC Opp. at ii, 5–6, 9–11 (citing Second Log Letter; 2/28/13 Declaration of Randall Peerenboom ("Peerenboom Decl."); 2/28/13 Letter from King & Wood Mallesons, PRC Counsel for BOC, to Lanier Saperstein ("King & Wood Letter"), Ex. A to 2/28/13 Declaration of Eric B. Epstein, Counsel for BOC); Peerenboom Decl. at 10–12.  I assume that the production of some or all of these materials is also prohibited by the PRC bank secrecy laws considered in the October 29 Order, and I continue to give weight to the considerations discussed in the earlier analysis.

    [44]    King & Wood Letter at 8, *cited by* BOC Opp. at 10.  The King & Wood Letter also refers to other alleged legal barriers to the production of requested materials.  Because BOC has not provided briefing regarding these additional legal barriers in its submission to the Court, I assume that BOC is not withholding documents on the basis of these barriers.  In addition, given the importance of the PRC's AML/CTF and State Secrets Laws to the materials requested by plaintiffs, and the significant interests reflected in those laws, it is unlikely that the consideration of any other laws would alter this Court's conclusions.

ordered to produce requested materials in contravention of these laws.  *Third*, BOC

argues that some or all of its internal communications "may also be immune from

disclosure under the attorney-client or work product privileges."[45]

### 1.     PRC AML/CTF and State Secrets Laws

BOC bears the burden of establishing that Chinese law prohibits BOC

from complying with plaintiffs' discovery requests.[46]  In support of that

conclusion, BOC offers a lengthy declaration from Dr. Randall Peerenboom, an

expert on Chinese law, arguing that "PRC laws and regulations impose broad

confidentiality obligations on PRC banks and financial institutions."[47]  This Court

relied on Dr. Peerenboom's general views on Chinese law in its November 5

Order, concluding that "[t]he interpretation of Chinese law should be informed by

attention to the general practices and features of China's legal institutions, rather

than by relying solely on inferences drawn from indeterminate legal language."[48]

This conclusion was based in part on Dr. Peerenboom's observations concerning

---

[45]     BOC Opp. at 7 n.3.

[46]     *See Strauss*, 242 F.R.D. at 207.

[47]     Peerenboom Decl. at 7.

[48]     *Wultz*, 2012 WL 5431013, at *4.  As a general matter, this Court gives
great weight to Dr. Peerenboom's opinions on Chinese law, in part because of his
"extensive empirical work on the Chinese court system."  Peerenboom Decl. at 4.

Chinese law, including that black letter law in the PRC is often "'at odds with reality and current practices.'"[49]

Despite Dr. Peerenboom's general expertise, however, the conclusions in his declaration are for the most part not based on empirical evidence of how the laws he discusses have (or have not) been implemented.  Dr. Peerenboom's conclusions are instead based largely, though not entirely, on interpretations of the general, abstract language of Chinese laws and regulations, supplemented by his own considerations of policy.[50]  As Dr. Peerenboom concedes, "the Chinese anti-money laundering and counter-terrorist regimes are relatively new and still in the process of developing, and . . . the rules cannot be expected to be as comprehensive, specific or consistent in their details as similar rules in other jurisdictions."[51]  Indeed, Dr. Peerenboom repeatedly phrases his overarching conclusions not as statements of what Chinese law *is*, but as statements of how it "*should be* interpreted."[52]

Nevertheless, Dr. Peerenboom's arguments concerning Chinese law

---

[49]     *Wultz*, 2012 WL 5431013, at *4 (footnotes omitted) (quoting PEERENBOOM, CHINA'S LONG MARCH).

[50]     *See* Peerenboom Decl. at 6–16.

[51]     *Id.* at 15–16 (footnote omitted).

[52]     *Id.* at 7, 8, 16.

22

are more persuasive than those of plaintiffs' experts, which I will not discuss at length.[53]   Based on the parties' submissions, it is more likely than not that BOC is prohibited under Chinese laws and regulations from producing the materials requested by plaintiffs in the present motion.   The clearest statement of the prohibition appears in article 15(2) of the PBOC AML Provisions, which states: "'Financial institutions and their staff shall keep confidential . . . suspicious transaction reports, their cooperation with the PBOC in the investigation of suspicious transactions[,] and other information related to anti-money laundering activities, which shall not be provided to clients *or others* in violation of regulations.'"[54]

Especially in light of the numerous other laws indicating the Chinese

---

[53]   For example, one of plaintiffs' experts argues that because PRC laws and regulations do not generally have retroactive force, and the PRC AML/CTF laws cited by BOC were enacted in 2007, the laws do not prohibit BOC from producing materials prepared before 2007.  *See* Declaration of Stanley B. Lubman ("Lubman Decl."), Ex. 11 to Kunstler Decl., at ¶¶ 14–16 (citing Law on Legislation of the People's Republic of China, art. 84 (Mar. 15, 2000)); Pl. Mem. at 10–11.  BOC rightly responds that plaintiffs' present motion "does not involve a 'retroactivity' issue, as it does not have to do with past conduct of BOC, but rather the present or future actions of BOC as to disclosure."  BOC Opp. at 12.

[54]   Peerenboom Decl. at 12 (quoting AML Provisions art. 15(2)) (emphasis added).  One of plaintiffs' experts provides an alternate translation with no material differences.  *See* 2/13/13 Letter from Li Wang, Senior Partner of the Liaoning Shenyang Law Firm, to Lee Wolosky ("Wang Letter"), Ex. 10 to Kunstler Decl., at 4.

government's intention to impose broad confidentiality obligations on Chinese banks,[55] the most plausible interpretation of article 15(2) is that BOC, a financial institution, must keep confidential, and not produce to others (such as plaintiffs or this Court),[56] the following categories of materials:  (i) STRs, (ii) information related to BOC's cooperation with PBOC in the investigation of suspicious transactions, and (iii) any other information related to anti-money laundering activities.  With regard to STRs, article 6 of PBOC's LTR and STR Measures provides an additional source of confidentiality.[57]  This suggests that STRs, and perhaps LTRs as well, are especially confidential under PRC law, just as SARs are accorded special protections under U.S. law.[58]

It would be highly implausible to conclude that the PBOC intended article 15(2) to imply a distinction between "anti-money laundering activities" and

---

[55]     *See* Peerenboom Decl. at 8–13.

[56]     *See id.* at 18 n.14 (noting that "others" or "other individuals" [*qitaren*] could encompass "natural persons, organizations and entities such as administrative agencies and judicial organs").

[57]     *See id.* at 12 ("Financial institutions and their staff shall keep confidential information on the reporting of suspicious transactions, which shall not be provided to any entity or individual in violation of regulations." (quoting LTR and STR Measures art. 6)).

[58]     *See Wultz*, 2013 WL 1453258, at *5 (discussing SAR privilege under 31 U.S.C. § 5318(g) and related regulations).

"counter-terrorist financing activities," and to prohibit the production of information related to the former but not the latter.  In any case, the parties' briefing indicates no basis for drawing distinctions between the two activities. Thus, article 15(2) is most likely intended to prohibit BOC from producing any information related to either AML or CTF activities.  As a result, article 15(2) prohibits BOC from producing any of the documents that plaintiffs request in the present motion:  "internal communications and communications with the Chinese government about the Shurafa accounts, visits of foreign officials asking that those accounts be closed, and . . . money-laundering and terrorist financing generally"[59] are all examples of information related to BOC's AML/CTF activities in China.

Plaintiffs' argument that article 15(2) implicitly permits BOC to disclose confidential information in a legal proceeding in a foreign court is unpersuasive.[60]  Nothing in the language of article 15(2) indicates such a permission, nor have plaintiffs cited any other provision of Chinese law authorizing a bank to disclose confidential information to a foreign court or in the course of foreign litigation.  Instead, plaintiffs cite the analysis of a senior partner at a Chinese law firm, who concludes that the laws cited by BOC "do not prevent *a*

---

[59]     Pl. Mem. at 1.

[60]     *See id.* at 9 (citing Wang Letter at 4).

*Chinese court* from compelling production of documents as part of a civil

litigation."[61]  Obviously, a rule permitting a *Chinese* court to compel the

production of confidential documents from BOC does not imply that BOC is

legally permitted under Chinese law to produce such documents pursuant to a

*foreign* court's order.[62]

In addition to relying on the AML/CTF laws above, BOC also argues

that some of the documents requested by plaintiffs — including "all

---

[61]   Wang Letter at 3 (emphasis added).  *See* Pl. Mem. at 9.  More
specifically, the senior partner concludes:

> In sum, each of the AML, PBOC AML Rules, and PBOC
> Measures BOC cited allows disclosing information in accordance
> with the law.  The Civil Procedure Law and Evidence Provisions
> provide laws *for the People's Court* to demand the provision of
> evidence.  This is true although "evidence under the investigation
> and collection application is documentary materials that are kept
> by relevant State instrumentalities" or even "involving a State
> secret, a trade secret or individual privacy" because Evidence
> Provisions Article 17 permits such disclosure.

Wang Letter at 7 (citing, among other sources, Civil Procedure Law art. 66)
(emphasis added).

[62]   *Accord* Peerenboom Decl. at 25–26 ("Mr. Wang does not cite any law
or regulation that permits the BOC or the PBOC . . . to disclose any confidential
information . . . directly to a foreign court for the purposes of a civil litigation.  To
the best of my knowledge, no such law or regulation exists"); *id.* at 26 ("[T]he laws
and interpretations cited by Mr. Wang all apply to civil proceedings in China, in
PRC courts.  They do not apply to civil litigation in the United States or other
foreign courts.").

communications between BOC and the PBOC" — have been classified by PBOC as "most confidential," "classified," and/or "confidential," and that BOC is thus barred from producing these communications under the PRC State Secrets Law.[63] Article 3 of the State Secrets Law states:  "'All . . . enterprises, institutions and citizens shall have the obligation to guard state secrets.'"[64]  Article 30 provides an exception, but only after approval has been obtained from the proper government authority.[65]  Plaintiffs do not contest the statement by BOC's Chinese counsel that "[t]he exceptions of Article 30 do not apply here, because approval has not been obtained from the central government."[66]

### 2.    Multi-Factor Comity Analysis

Based on the foregoing discussion, plaintiffs' present motion is a request to compel BOC to produce materials in contravention of Chinese law.  To determine whether BOC should be ordered to do so — and if so, to what extent —

---

[63]    King & Wood Letter at 8, *cited by* BOC Opp. at 10.  Dr. Peerenboom was not asked to comment on the application of the State Secrets Law to this case. *See* Peerenboom Decl. at 8 n.3.

[64]    King & Wood Letter at 7 (quoting Law of the People's Republic of China on Guarding State Secrets ("State Secrets Law") art. 3).

[65]    *See id.* (citing State Secrets Law art. 30).

[66]    *Id.* at 8.  *See* BOC Opp. at 12; Pl. Reply at 2 (not contesting that PRC authorities have not granted approval to BOC to disclose state secrets).

this Court must again apply the multi-factor comity test discussed in the October

29 and January 10 Orders.[67]

   With regard to the importance to the litigation of the requested

materials and the specificity of the request, it is now possible to say with greater

confidence than in the October 29 Order that plaintiffs' requests are specifically

tailored to their claims, and highly important to the success of their claims.  BOC's

internal communications and communications with the Chinese government about

the Shurafa accounts are crucial to establishing whether BOC was put on notice

that the Shurafa accounts were being used to fund terrorism (if, in fact, they were),

and how BOC responded to any such notice.  BOC's internal communications and

communications with the Chinese government about visits of foreign officials

asking that the Shurafa accounts be closed are perhaps the most essential pieces of

evidence in this category.  Finally, BOC's internal communications and

communications with the Chinese government about money-laundering and

terrorist financing generally are important to establishing the scienter element of

plaintiffs' claim, and may also lead to the identification of other evidence relevant

to this case.

---

[67]  With regard to the third factor, I note at the outset that plaintiffs'
requested information originated outside the United States.  Thus, the third factor
continues to weigh against ordering production.

The precise scope of the materials requested by plaintiffs, and BOC's precise grounds for refusing to produce them, have not always been apparent.  This is due to a combination of factors, including the inevitable difficulty of asserting and defending privileges over documents whose existence cannot be acknowledged; BOC's obfuscation (discussed below); the overbreadth of plaintiffs' initial requests; and BOC's failure to highlight the significance of Chinese AML laws in its submissions prior to the October 29 Order.  However, the potential stakes of plaintiffs' discovery requests in the present motion are now sufficiently clear.  If BOC is not ordered to produce plaintiffs' requested materials in contravention of PRC law, there may be no alternative source of evidence for establishing one of the central elements of plaintiffs' claim — that BOC had notice that the Shurafa accounts were being used to fund the terrorist organization whose attack on April 17, 2006 killed Daniel Wultz and injured Yekutiel Wultz.[68]  If BOC

---

[68]     With regard to the availability of alternative means of securing plaintiffs' requested material, I note that BOC has challenged plaintiffs' proposed deposition of a former Israeli intelligence agent "who purportedly has knowledge of the alleged April 2005 meeting between Israeli and Chinese government officials."  4/2/13 Letter from Lanier Saperstein to the Court at 4.  BOC has also challenged plaintiffs' use of classified U.S. documents that may be relevant to plaintiffs' claims.  See 1/30/13 Tr. at 12 (discussing WikiLeaks cable).  In addition, BOC and the OCC challenge the April 9 Order concerning U.S. discovery materials.  See 4/22/13 Non-Party Office of the Comptroller of the Currency's Memorandum in Support of Motion for Reconsideration; 4/23/13 Memorandum of Law in Support of Motion by Bank of China, Ltd. for Reconsideration of April 9 and April 17, 2013 Orders ("BOC Reconsideration Mem.").  Both of the latter

did, in fact, have such notice, and otherwise satisfied the conditions for liability under the ATA, then denial of plaintiffs' present motion could prevent the vindication of the interests that Congress sought to protect through passage of the ATA.  In this scenario, a bank that recklessly or knowingly funded the terrorists who murdered an American citizen would continue to operate with impunity in the United States, with the benefits and protections of U.S. laws.  Obviously, such an outcome would undermine important interests of the United States — the fifth factor under the comity test.

Under the fifth factor, however, this Court also considers the extent to which BOC's compliance with plaintiffs' request would undermine important Chinese interests.  As I noted in the January 10 Order, China's AML/CTF laws are concerned with "depriving international terrorist and other criminal organizations of funding."[69]  There is a risk that ordering BOC to produce internal communications or communications with the Chinese government concerning AML/CTF matters could have a chilling effect on future communications by

---

motions are pending.  Regardless of the outcome of these disputes, BOC has provided no evidence that the information contained in the materials requested in the present motion could be obtained without contravening PRC law.

[69]     *Wultz*, 2013 WL 132664, at *1.

Chinese banks, leading suspicious transactions to go unreported.[70]  This would

undermine the interests of both China and the United States.  In addition, ordering

production of materials designated by PBOC as state secrets, to the extent that such

documents were properly designated, would risk infringing China's sovereignty

and violating the spirit of international comity in a way that this Court has sought

to avoid.[71]

It is deeply troubling that BOC did not explicitly mention the State

Secrets Law until January 18, 2013, over a year after it described the Chinese laws

prohibiting production of plaintiffs' requested materials.[72]  If plaintiffs' requested

materials genuinely contain significant state secrets, it is hard to believe that BOC

---

[70]      *Cf. Wultz*, 2013 WL 1453258, at *9–11 (discussing chilling effect in U.S. regulatory context).

[71]      *See Wultz*, 2012 WL 5378961, at *5 (denying plaintiffs' requests for documents created by the Chinese government because doing so "may infringe the sovereignty of the foreign state and violate principles of international comity to a far greater extent than the ordered production of private account information in contravention of foreign bank secrecy laws").

[72]      *Compare* Second Log Letter at 2, *with* Feinerman Decl. at 3–4.  *See* Pl. Reply at 2 (arguing that "BOC's 'state secret' argument is waived, as BOC waited to raise it until January 18, 2013, after BOC already sent multiple letters purporting to set forth 'the legal basis of BOC's obligations under the applicable PRC law and regulations' . . . and the Court issued multiple orders regarding disclosure under China's confidentiality laws" (citations omitted)).  It is unnecessary to determine whether BOC's "state secret" argument was waived, because I order production under the multi-factor analysis despite any protections created by the State Secrets Law.

would have failed to raise this potent ground for non-production during over a year of heated discovery disputes.  In addition, it cannot be ignored that the PRC has a majority interest in BOC,[73] and thus has a special interest in protecting BOC from discovery and the risk of liability.  If the "state secret" that PBOC wishes to keep confidential is that BOC received warnings regarding the Shurafa accounts and may be liable under the ATA for a terrorist attack on American citizens, then the U.S. interest in deterring terrorist attacks and seeing justice done between the parties would strongly outweigh even this Court's respect for the Chinese government's interest in preserving the confidentiality of its state secrets.

Finally, the Second Circuit directs this Court to consider BOC's hardship in complying with plaintiffs' discovery requests, and the good faith of BOC.[74]  With regard to hardship, it remains the case that BOC has produced no evidence of a bank or its employees being meaningfully punished for disclosing confidential information to a U.S. court in contravention of Chinese law.[75]  As Dr. Peerenboom states: "the Chinese authorities have apparently not yet actually

---

[73]     *See Wultz*, 2012 WL 5378961, at *3 n.27 (citing *Forbse*, 2012 WL 1918866, at *9).

[74]     *See Strauss*, 249 F.R.D. at 438–39 (citing *Minpeco S.A.*, 116 F.R.D. at 523).

[75]     *See* Peerenboom Decl. at 28; Wang Letter at 8; *Wultz*, 2012 WL 5378961, at *3, *7–8.

sanctioned a bank for disclosing confidential information to a foreign court under threat of sanctions in violation of Chinese law."[76]  I continue to agree with the remarks of Dr. William Alford, another scholar of Chinese law, who concluded in a case somewhat similar to this one that PRC sanctions against BOC for complying with a U.S. court's discovery orders were unlikely, in part because of the PRC's relationship to BOC.[77]

With regard to the final factor, the evidence is now sufficient to conclude that BOC has shown bad faith toward its discovery obligations.  Judge Naomi Reice Buchwald recently reached a similar conclusion in another case involving BOC's resistance to the production of discovery materials in contravention of Chinese law:

> BOC's actions reflect a conscious decision to selectively disclose information pertinent to the case, and to the discovery dispute more specifically, only as it suits BOC's litigation interests.  Such a course of action is precisely the type of conduct that the Court may consider in undertaking the applicable comity analysis.[78]

---

[76]     Peerenboom Decl. at 28 & n.25.

[77]     *See id.* at 5, 27; 5/24/11 Declaration of William P. Alford in *Tiffany (NJ) LLC v. Qi Andrew*, No. 10 Civ. 9471 (S.D.N.Y.) at 9–13; *Wultz*, 2012 WL 5378961, at *7–8.

[78]     *Forbse*, 2012 WL 3686289, at *6.

33

BOC has not only shown bad faith in its interactions with plaintiffs,[79]

it has also shown bad faith in its responses to this Court's orders.  On more than

one occasion, BOC has failed to comply with an order, said nothing to the Court,

waited for plaintiffs to bring BOC's noncompliance to the Court's attention, and

---

[79]     For example, rather than simply stating shortly after the issuance of the October 29 Order that it believed it was not permitted to disclose any of the regulatory communications encompassed by plaintiffs' discovery requests Nos. 7–9, BOC apparently engaged in lengthy negotiations with plaintiffs over the precise language of plaintiffs' requests.  Pl. Mem. at 15 (citing Ex. 14 to Kunstler Decl.); BOC Opp. at 9; 12/26/12 Tr. at 12–14.  Only after this Court resolved the dispute, two months after the October 29 Order, did BOC finally reveal that it believed itself to be "strictly prohibited under PRC law" from producing *any* of the requested documents, including all of the documents that would have been encompassed by its own proposed language.  *See* Pl. Mem. at 15 (citing Second Log Letter at 1); *Wultz*, 2013 WL 132664, at *2 (defining scope of disputed discovery request).  For BOC to participate in negotiations over the precise language of a discovery request, without acknowledging that it intended to refuse production regardless of the outcome of negotiations, shows BOC's bad faith during the discovery process.

Plaintiffs persuasively make a similar point regarding BOC's insistence on distinguishing between communications "inside" and "outside" the course of regulatory reviews.  *See* Pl. Mem. at 15.  As described above, BOC apparently invented the distinction as a justification for not producing materials provided to the PRC "outside" the course of regulatory review, despite the plain meaning of the October 29 Order.  But at the same time, BOC also failed to produce any communications provided to the PRC *inside* the course of regulatory review.  Thus, BOC's arguments concerning the distinction appear to have been little more than a source of distraction and delay.

As further examples of bad faith, plaintiffs note that "BOC has yet to produce a single e-mail or discuss search terms and custodians," and also argue that BOC has failed to collect and review certain documents located in New York.  *See id.*  BOC contents the latter accusation, *see* BOC Opp. at 8, but — remarkably — does not contest that at the time of the parties' briefing, after years of discovery, it had failed to produce *a single e-mail* of any kind in this case.

then, when confronted with its noncompliance, claimed to believe that the Court

intended something other than what the Court clearly said.  One example has

already been noted above:  BOC's bad-faith interpretation of the October 29 Order

as permitting BOC to withhold materials provided to the Chinese government

"outside the course of regular regulatory reviews."[80]  Another, less egregious

example of BOC's pattern of noncompliance occurred in response to this Court's

April 9 and April 11 Orders concerning plaintiffs' motion to compel the production

of U.S. regulatory materials.  As summarized in an April 17 Memorandum Opinion

and Order:

> On April 9, 2013, this Court ordered defendant Bank of
> China Limited ("BOC") to produce ["the Shurafa Investigative
> Files"]. . . . On April 10, 2013, plaintiffs informed this Court that

---

[80]    *See Wultz*, 2013 WL 132664, at *2 (quotation marks omitted).  Even
after this Court explicitly rejected "BOC's suggestion that documents created by
BOC and communicated to the Chinese government outside the course of 'regular
regulatory reviews' need not be produced, as a rule, under the October 29 Order,"
*id.*, BOC inexplicably continued to rely on the distinction between documents
prepared inside and outside "the course of a regular regulatory review" as a rule
included in its definition of the categories of documents it refused to produce.
Second Log Letter at 1.

        BOC's Second Log Letter also appears to state that the only materials
it has withheld as communications "prepared outside the course of a regular
regulatory review" are STRs and LTRs (if it has withheld any communications at
all).  *See* Second Log Letter at 1.  If this is the case, and BOC could simply have
stated from the outset that it was withholding any STRs and LTRs — rather than
inventing the distinction between communications inside and outside the course of
regulatory review — then its invented distinction is an even stronger proof of bad
faith.

BOC had stated (in plaintiffs' words) "it currently has no intention of producing the Shurafa Investigative Files or other documents that the Court ordered BOC to disclose, because BOC might file a motion for reconsideration."  Plaintiffs requested the Court to order BOC to produce the Shurafa Investigative Files . . . by the close of business on Thursday, April 11, 2013, so that plaintiffs would be able to use the documents at the Rule 30(b)(6) depositions of BOC taking place in Hong Kong . . . .

After reviewing a response letter from BOC, this Court filed a letter endorsement on April 11, 2013 . . . ordering BOC to produce the Shurafa Investigative Files by close of business on Thursday, April 11, 2013 . . . .  Rather than complying with the Court's order, BOC produced, according to a letter from plaintiffs submitted to the Court on April 12, a highly redacted version of [the Shurafa Investigative Report].  BOC had apparently redacted every portion of the document reflecting BOC's opinions, analysis, deliberations, or narrative descriptions of the transactions at the center of this lawsuit. . . .

BOC responded to plaintiffs' letter three days later, on April 15, 2013, arguing [to the Court] . . . that the redactions "are of the same character as those approved by this Court" in its discussion of the SAR privilege in the April 9 Order.[81]

However, as this Court concluded, "BOC's production was not . . . what the Court intended in its April 11 Order.  Indeed, it is plain that BOC has violated the April 11 Order.  BOC's interpretation of the April 9 Order is baseless."[82]  There are two distinct issues here: *first*, whether BOC adopted a bad-faith misinterpretation of the plain meaning of the April 9 and April 11 Orders; and

---

[81]    April 17 Memorandum Opinion and Order at 1–4 (footnotes and citations omitted).

[82]    *Id.* at 4.

*second*, whether there was a persuasive argument for partial non-production that BOC could have raised prior to the April 9 and April 11 Orders, but failed to raise — an argument that might have altered the holding in those Orders if BOC had adequately raised it.[83]  While it may be the case that parts of the Shurafa Investigative Files are protected from production by a privilege that BOC cannot waive through inadequate briefing, it remains troubling that BOC did not candidly bring this issue to the Court's attention, but instead required the Court to infer BOC's arguments from its noncompliance.  There are better, less dilatory ways of asserting even the most sensitive privileges.

In light of my finding that BOC has engaged in discovery at least partly in bad faith, as well as my findings in the foregoing multi-factor comity analysis, plaintiffs' motion to compel is granted in part, as described below.  Before stating the terms of the order, however, I address several final considerations related to comity.  BOC states in its opposition brief to the present motion that it "is only asking the Court to give the same regard to PRC laws as is given to similar U.S. laws in U.S. courts."[84]  In fact, following *Aérospatiale*'s call

---

[83]     *See* April 24 Order (ordering briefing on BOC's and the OCC's motions for reconsideration).

[84]     BOC Opp. at 13.

for sensitivity to the concerns of foreign states and litigants,[85] the present order

arguably gives *greater* deference to PRC laws than the April 9 Order gave to

analogous U.S. laws — and does so despite the lingering questions surrounding the

application of the Chinese AML/CTF and State Secrets Laws to the materials at

issue in this case.  The present order is in many ways narrower than this Court's

April 9 Order granting plaintiffs' motion to compel the production of non-public

U.S. regulatory materials.[86]

   This Court recognizes the seriousness of this Order, yet views it as

compatible with the goals of international comity, including the notion of

reciprocity.[87]  If the circumstances were reversed, and a U.S. bank operating in

China were accused of funding a terrorist organization responsible for the death of

a Chinese citizen, it would be appropriate in the wake of an ineffective Hague

request for a Chinese court to order the U.S. bank to produce equally sensitive

---

[85]  *See Aérospatiale*, 482 U.S. at 545–46.

[86]  *See Wultz*, 2013 WL 1453258, at *11 (ordering production of certain
non-factual regulatory materials, including those created by banking regulator).

[87]  *See Aérospatiale*, 482 U.S. at 555 ("Comity is not just a vague
political concern favoring international cooperation when it is in our interest to do
so.  Rather it is a principle under which judicial decisions reflect the systemic value
of reciprocal tolerance and goodwill.").  Dr. Peerenboom notes that "China . . .
attaches great significance to the principle of reciprocity."  Peerenboom Decl. at 36
& n.35 (citing PRC Civil Procedure Law art. 262).

documents — appropriately redacted and under protective order, as here.  If the U.S. bank had shown itself unwilling to engage in discovery in good faith, as BOC has in this case, it might similarly be appropriate for a Chinese court to order the production of especially sensitive materials solely for *in camera* review, as I do below.[88]

Dr. Peerenboom states that past decisions by U.S. courts ordering the production of discovery materials in contravention of Chinese law "have been widely discussed, and widely criticized in PRC legal circles and even the more popular press."[89]  This opposition "to unilateral actions by foreign courts that seek to compel China's entities to divulge information protected under Chinese law is best understood in light [of] China's history," including past abuses by foreign powers.[90]  I emphasize, however, that the present Order would be no different if the

---

[88]    In addition, by ordering the production of documents protected under China's AML and State Secrets Laws, this Court acts within the bounds permitted to Chinese courts under Chinese law.  *See* Wang Letter at 5–8; 3/8/13 Letter from Li Wang to Lee Wolosky, Ex. 1 to 3/11/13 Declaration of Marilyn C. Kunstler, at 2–4.  *Cf. Gucci Am.*, 2011 WL 6156936, at *10 (concluding that the ability of the People's Court, among other organs, to waive China's bank secrecy laws, "strongly suggests" that China's bank secrecy laws do not "reflect a national policy entitled to substantial deference").  To deny a foreign court's competence to exercise those powers possessed by domestic courts defeats the goal of reciprocity.

[89]    Peerenboom Decl. at 29 n.25.

[90]    *Id.* at 31–32.

AML/CTF and state secrets laws at issue were the laws of a European, African, or South American state.  Indeed, the closest precedent for the present order is *Strauss v. Credit Lyonnais, S.A.*, which involved a U.S. court's decision to compel a French bank to produce discovery in contravention of French AML/CTF and other laws.[91]  As in the present case, the defendant bank in *Strauss* argued that it might be subject to punishment, including fines and imprisonment, if it complied with plaintiffs' discovery requests.[92]  After consideration of this risk, as well as of the foreign state's "profound and compelling interest in eliminating terrorist financing,"[93] the court in *Strauss* ultimately determined that ordering the defendant bank to provide plaintiffs with discovery "would not 'undermine the important interests of the state where the information is located,' but rather, enforce them."[94]  The court noted that the state where the information was located was "a participant in the multi-national Financial Action Task Force, which 'calls upon all countries to take the necessary steps to bring their national systems for combating . . .

---

[91]   *See Strauss*, 249 F.R.D. at 447 (citing Articles L 561-1 to L 563-5 of France's Monetary and Financial Code).

[92]   *See id.* (citing Article L 574-1 of France's Monetary and Financial Code and Article 226-13 of France's Criminal Code).

[93]   *Id.* at 443.

[94]   *Id.* at 454 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 442).

terrorist financing into compliance with the new FATF Recommendations.'"[95]

China is also a member of FATF,[96] and the same conclusions apply to it in this case

as applied to France in *Strauss*. In particular, I note that Recommendation 37 of

the 2012 FATF Recommendations states: "Countries should rapidly,

constructively and effectively provide the widest possible range of mutual legal

assistance in relation to . . . terrorist financing investigations, prosecutions, and

related proceedings."[97]

---

[95]    *Id.* at 452 (citing FINANCIAL ACTION TASK FORCE ON MONEY
LAUNDERING, THE FORTY RECOMMENDATIONS, JUNE 20, 2003 (incorporating the
amendments of Oct. 22, 2004) ("2004 FATF Recommendations"); *Weiss v.
National Westminster Bank PLC*, 453 F. Supp. 2d 609, 619 (E.D.N.Y. 2006)).

[96]    *See* Pl. Mem. at 13; Lubman Decl. at 8–12.

[97]    FATF, INTERNATIONAL STANDARDS ON COMBATING MONEY
LAUNDERING AND THE FINANCING OF TERRORISM & PROLIFERATION: THE FATF
RECOMMENDATIONS 27 (Feb. 2012), *available at* http://www.fatf-gafi.org/ (search
"FATF Recommendations").

> Countries should ensure that . . . powers and investigative
> techniques available to their competent authorities . . . relating to
> the production, search and seizure of information, documents or
> evidence (including financial records) from financial institutions
> or other persons, and the taking of witness statements . . . are also
> available for use in response to requests for mutual legal
> assistance, and, if consistent with their domestic framework, in
> response to direct requests from foreign judicial or law
> enforcement authorities to domestic counterparts.

*Id.* at 28. *Accord Strauss*, 249 F.R.D. at 452 (citing 2004 FATF Recommendation 36).

Finally, I emphasize that if, as BOC has suggested, there is no evidence providing a reasonable basis for plaintiffs' claims,[98] this case will be resolved at the summary judgment stage,[99] BOC will face no trial and no liability, and many or perhaps all of the sensitive materials produced to plaintiffs will never become public.[100]  If BOC seeks that outcome, the shortest route to it is through prompt, good-faith compliance with its discovery obligations and this Court's orders.  Any alternative route will invite sanctions.[101]

---

[98]      BOC argues elsewhere that "over four years into this litigation, plaintiffs have failed to offer any evidence supporting their essential allegation, without which their claims are not viable:  namely, that Said al-Shurafa is a terrorist."  BOC Reconsideration Mem. at 1.

[99]      As an example of an ATA claim dismissed at the summary judgment stage based on insufficient evidence, see *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 546 (E.D.N.Y. 2012).

[100]      *See, e.g.*, *Strauss v. Credit Lyonnais, S.A.*, No. 06 Civ. 702, 2011 WL 4736359, at *5 (E.D.N.Y. Oct. 6, 2011) (allowing confidential bank documents to be filed under seal for the purposes of summary judgment briefing).

[101]      Consider *Linde v. Arab Bank, PLC*, where the defendant bank repeatedly failed "over several years and despite multiple discovery orders, to produce certain documents relevant to plaintiffs' case," arguing "that the documents are covered by foreign bank secrecy laws."  *Linde v. Arab Bank, PLC*, 706 F.3d 92, 95 (2d Cir. 2013).  Pursuant to Federal Rule of Civil Procedure 37(b), the district court imposed a sanctions order taking the form of "a jury instruction that would permit — but not require — the jury to infer from the Bank's failure to produce these documents that the Bank provided financial services to designated foreign terrorist organizations, and did so knowingly.  The order also precludes the Bank from introducing for the jury's consideration certain evidence related to the undisclosed materials."  *Id.*  The Second Circuit denied the defendant bank's

Based on the foregoing analysis, BOC is ordered to produce the following materials:

*First*, with regard to documents created by the Chinese government, BOC is ordered to produce any communications from the Chinese government to BOC from prior to January 23, 2008 (the date of plaintiffs' demand letter) concerning Shurafa or the Shurafa Accounts. BOC may redact these communications (if any exist) to remove any non-factual materials. BOC is ordered to produce unredacted versions of these communications to the Court solely for the purpose of *in camera* review to verify that the redactions were properly executed.

*Second*, with regard to documents not created by the Chinese government, BOC is ordered to produce (i) all materials concerning AML or CTF problems or deficiencies at BOC's Guangdong Branch from January 1, 2003 to September 2008; (ii) all materials concerning AML or CTF problems or deficiencies at BOC's Head Office from January 1, 2003 to September 2008, to the extent that those problems or deficiencies related to the PIJ, Hamas, or any terrorists allegedly involved with those organizations; and (iii) all materials concerning Shurafa or the Shurafa accounts, including visits of foreign officials

_____

petition for a writ of mandamus directing vacatur of the sanctions order. *See id.*

43

related to those topics.  The preceding order is subject to two exceptions:  (1) BOC may withhold from plaintiffs any STRs and LTRs encompassed by the order. These materials, if they exist, must be produced to this Court under seal solely for *in camera* review to determine that the documents are in fact STRs or LTRs.  Any materials upon which these STRs or LTRs are based, however, must be produced to plaintiffs in full.  (2) BOC may withhold from plaintiffs any items subject to the attorney-client or work-product privileges.  These items must be listed in a document-level privilege log produced to plaintiffs, providing enough information to determine whether the documents are in fact privileged.[102]

## V.    CONCLUSION

For the foregoing reasons, plaintiffs' motion is granted in part.  BOC must complete all ordered production by twenty days from the date of this Order.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      May 1, 2013
            New York, New York

---

[102]      *See* BOC Opp. at 7 n.3.

44

**- Appearances -**

**For Plaintiffs:**

Lee S. Wolosky, Esq.
Steven I. Froot, Esq.
Marilyn C. Kunstler, Esq.
Jaime Sneider, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2350

**For Defendant:**

Mitchell R. Berger, Esq.
Patton Boggs LLP (DC)
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-5601

Zachary Carter, Esq.
Lanier Saperstein, Esq.
Neil McDonell, Esq.
Eric Epstein, Esq.
Daniel Goldberger, Esq.
Dorsey & Whitney LLP
51 West 52nd Street
New York, NY 10019
(212) 415-9309