# EXHIBIT 2

Linde v. Arab Bank, PLC, 262 F.R.D. 136 (2009)

262 F.R.D. 136
United States District Court,
E.D. New York.

Courtney LINDE, et al., Plaintiffs,
v.
ARAB BANK, PLC, Defendant.

No. CV–04–2799 (NG)(VVP).¹ | May 22, 2009.

**Synopsis**
**Background:** In consolidated actions under the Anti–Terrorism Act (ATA) and the Alien Tort Claims Act (ATCA), seeking damages for bank's alleged involvement in suicide bombings and other terrorist attacks in Israel, the West Bank, and Gaza, bank moved to compel production of documents by three nonparty banks and to compel depositions by certain of those banks' employees.

**Holdings:** The District Court, Viktor V. Pohorelsky, United States Magistrate Judge, held that:

[1] subsidiary of Israeli bank did not have control over its parent's documents;

[2] service on subsidiary of subpoena for production of documents was not effective against parent;

[3] jurisdictional discovery was not warranted;

[4] Israeli laws relating to self-incrimination and commercial secrets did not provide a basis for denying motion to compel discovery of nonparty bank's documents; and

[5] factors weighed in favor of recognizing Israel's bank confidentiality laws as a bar to discovery.

Motions granted in part and denied in part.

West Headnotes (25)

[1]  **Witnesses**
 Subpoena duces tecum

For purposes of a subpoena commanding a nonparty to produce documents that are in its possession, custody, or control, control is defined not only as possession, but as the legal right to obtain the documents requested upon demand; control may also be found where an entity has access to and the ability to obtain the documents. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

4 Cases that cite this headnote

[2]  **Witnesses**
 Subpoena duces tecum

Party seeking to compel a subsidiary to produce the documents of its foreign parent has burden of showing that the documents are within the local subsidiary's control. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

3 Cases that cite this headnote

[3]  **Witnesses**
 Subpoena duces tecum

American subsidiary of Israeli bank did not have control over its parent's documents, as required to support subpoena for their production; subsidiary submitted sworn statements that it did not have access to its parent's documents in the regular course of business, parent and subsidiary had separate computer systems and neither could access information in the other's system, the two entities did not share confidential information concerning their customers or transactions, and there was no evidence that the documents sought flowed freely between subsidiary and parent. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

3 Cases that cite this headnote

[4]  **Federal Courts**

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

⮞Agent within district; parent and subsidiary

For New York courts to acquire personal jurisdiction over a parent corporation based on a subsidiary's presence in the state, the parent's control over the subsidiary's activities must be so complete that the subsidiary is, in fact, merely a department of the parent. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

[5] **Federal Courts**
⮞Agent within district; parent and subsidiary
**Federal Courts**
⮞Aliens or alien corporations

Determination whether a subsidiary is a mere department of its parent, as would render service on the subsidiary of a subpoena effective against nonresident parent, for purposes of acquiring personal jurisdiction, requires a fact-specific inquiry into their relationship, taking into consideration (1) common ownership, (2) the financial dependency of the subsidiary on the parent, (3) degree to which parent interferes in the selection and assignment of subsidiary's executive personnel and fails to observe corporate formalities, and (4) degree of control exercised by parent over subsidiary's marketing and operational policies. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

1 Cases that cite this headnote

[6] **Witnesses**
⮞Subpoena duces tecum

American subsidiary of Israeli bank was not a mere department of its parent, and thus service on subsidiary of subpoena for production of documents was not effective against parent despite their common ownership; subsidiary was not financially dependent on parent, subsidiary typically appointed its executive level personnel without consulting its parent, subsidiary observed corporate formalities, and parent did not exert control over subsidiary's marketing and operational policies. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

[7] **Corporations and Business Organizations**
⮞Remedies and Procedure
**Witnesses**
⮞Subpoena duces tecum

Subsidiary bank was not financially dependent on its parent, weighing in favor of finding that subsidiary was not a mere department of its parent, as would render service of a subpoena on the subsidiary effective against parent; subsidiary paid its own business expenses, including the salaries of all of its personnel, without assistance from parent, it did not borrow money from parent, and it did not receive funds for its own account from parent. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

[8] **Corporations and Business Organizations**
⮞Remedies and Procedure
**Witnesses**
⮞Subpoena duces tecum

Subsidiary bank typically appointed its executive level personnel without consulting its parent, weighing in favor of finding that subsidiary was not a mere department of parent, as would render service of a subpoena on the subsidiary effective against parent, even though parent recommended a candidate for subsidiary's Chief Executive Officer (CEO) who was ultimately selected for the position and even though three of subsidiary's twelve-member board were directors or officers of parent; board members from parent were not also executives of employees of subsidiary. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

[9] **Corporations and Business Organizations**

⇐Identity of directors, officers, or shareholders

Having common directors and officers is a normal business practice of a multi-national corporation and absent complete control it is no justification to labeling a subsidiary a mere department of the parent.

1 Cases that cite this headnote

[10] **Corporations and Business Organizations**
⇐Identity of directors, officers, or shareholders

Overlapping officers and directors are intrinsic to a parent-subsidiary relationship, and such overlap is not determinative as to whether the subsidiary is a mere department of the parent.

[11] **Corporations and Business Organizations**
⇐Remedies and Procedure
**Witnesses**
⇐Subpoena duces tecum

Subsidiary observed corporate formalities, weighing in favor of finding that it was not a mere department of its parent, as would render service of a subpoena on the subsidiary effective against parent; subsidiary had its own board of directors, which held regular meetings, it held annual shareholder meetings, and it maintained separate books and records from its parent and prepared its own financial statements. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

[12] **Corporations and Business Organizations**
⇐Remedies and Procedure
**Witnesses**
⇐Subpoena duces tecum

Israeli bank did not exert control over its American subsidiary's marketing and operational policies, weighing in favor of finding that subsidiary was not a mere department of its parent, as would render service of a subpoena on the subsidiary effective against parent; subsidiary ran its own day-to-day operations, determined marketing and operational policies without interference by parent, and hired, trained, and paid its own employees, and the two entities had separate computer and phone systems and maintained separate customer records and accounts. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

[13] **Federal Civil Procedure**
⇐Jurisdictional discovery

Showing necessary to obtain jurisdictional discovery is committed to the sound discretion of the district court on a case-by-case basis without "bright-line" limits.

1 Cases that cite this headnote

[14] **Federal Civil Procedure**
⇐Jurisdictional discovery

Jurisdictional discovery, for purpose of examining the range of Israeli bank's contact with the United States, as well as the nature of its dealings with its American subsidiary, was not warranted; parent had only a limited relationship to the underlying litigation, jurisdictional discovery was not likely to lead to a finding of personal jurisdiction, and information that might be obtained would be of limited relevance to the claims and defenses in the case, and might not be admissible.

[15] **Privileged Communications and Confidentiality**
⇐Trade secrets; commercial information
**Witnesses**
⇐Privilege as to production of documents

Israeli laws relating to self-incrimination and commercial secrets did not provide a basis for denying motion to compel discovery of nonparty bank's documents; Israeli law did not prohibit disclosure of documents subject to the self-incrimination privilege, but only made the privilege available, to be used or waived, such that documents which bank believed to be subject to the privilege could be itemized on a privilege log that would permit applicability of the privilege to be tested, and there was no Israeli legal prohibition of the discovery of documents constituting commercial secrets. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

[16]     **Privileged Communications and Confidentiality**
         ⇐Bank and customer; bank records

Fact that the bulk of the documents and information sought from nonparty bank, and the individuals who created and maintained the documents, originated in or were located in Israel, rather than the United States, weighed in favor of recognizing Israel's bank confidentiality laws as a bar to discovery in action alleging that defendant provided services to terrorists.

1 Cases that cite this headnote

[17]     **Privileged Communications and Confidentiality**
         ⇐Bank and customer; bank records

Fact that the importance of the documents requested from nonparty bank to the litigation was in question weighed in favor of recognizing Israel's bank confidentiality laws as a bar to discovery in action alleging that defendant bank provided services to terrorists, where the requested documents bore on argument that defendant should have known that the charitable entities for which it was processing transactions and holding accounts were terrorist fronts; evidence supporting that argument did not appear sufficient to establish the asserted claims.

[18]     **Privileged Communications and Confidentiality**
         ⇐Bank and customer; bank records

Fact that some evidence defendant bank was seeking to discover was based on its own transactions with a nonparty bank weighed in favor of recognizing Israel's bank confidentiality laws as a bar to discovery in action alleging that defendant provided services to terrorists; defendant had alternative means of obtaining some of the account and transactional evidence sought, and some of the information was publicly available.

[19]     **Privileged Communications and Confidentiality**
         ⇐Bank and customer; bank records

Compliance with requests for discovery of documents of a nonparty bank would undermine important Israeli interests, including maintaining the privacy rights of bank clientele and the confidentiality of sensitive communications with Israel's central bank, weighing in favor of recognizing Israel's bank confidentiality laws as a bar to discovery in action alleging that defendant bank provided services to terrorists, particularly since noncompliance with the requests would not greatly undermine important interests of the United States.

[20]     **Privileged Communications and Confidentiality**
         ⇐Bank and customer; bank records

Fact that the potential hardship that would be imposed on nonparty bank by an order

compelling requested discovery could be significant weighed in favor of recognizing Israel's bank confidentiality laws as a bar to discovery in action alleging that defendant bank provided services to terrorists; violation of those laws could lead to substantial civil liability and criminal punishment for the nonparty bank, particularly since it had only a limited relationship to the litigation.

[21] **Federal Civil Procedure**
⇒Failure to respond; sanctions

An order compelling production should be imposed on a nonparty only in extreme circumstances.

[22] **Privileged Communications and Confidentiality**
⇒Bank and customer; bank records

The specificity of defendant bank's requests for documents and information from nonparty bank weighed against recognizing Israel's bank confidentiality laws as a bar to discovery in action alleging that defendant provided services to terrorists.

[23] **Privileged Communications and Confidentiality**
⇒Bank and customer; bank records
**Witnesses**
⇒Subpoena duces tecum

Bank was entitled, in action alleging that it provided services to terrorists, to an order compelling discovery, from nonparty bank, of requested documents containing (1) relevant account, transactional information, and investigatory documents, (2) compliance practices, procedures and regulations, to the extent they are not implicated by the Israeli confidentiality laws, and (3) nonparty bank's business relationship with defendant bank. Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

[24] **Federal Civil Procedure**
⇒Officers and employees of corporations

Bank was entitled, in action alleging that it provided services to terrorists, to depose certain individuals employed by two nonparty banks, to extent depositions were limited to topics delimited by the permitted document discovery. Fed.Rules Civ.Proc.Rule 30(b)(6), 28 U.S.C.A.

[25] **Federal Civil Procedure**
⇒Officers and employees of corporations

Bank failed, in action alleging that it provided services to terrorists, to demonstrate a sufficient basis for requiring specific identified individual employees of two nonparty banks to appear for depositions. Fed.Rules Civ.Proc.Rule 30(b)(6), 28 U.S.C.A.

**Attorneys and Law Firms**

\*140 Mark S. Werbner, Sayles Werbner, Dallas, TX, Peter A. Binkow, Law Offices of Lionel Z. Glancy, Neal Dublinsky, Glancy Binkow & Goldberg LLP, Los Angeles, CA, Steven M. Steingard, Neil L. Glazer, Stephen H. Schwartz, Kohn, Swift & Graf, PC, Philadelphia, PA, Aaron Schlanger, Gary M. Osen, Ari Ungar, Osen LLC, Oradell, NJ, James P. Bonner, Shalov Stone & Bonner LLP, Andrew David Friedman, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY, for Plaintiffs.

Kevin Walsh, Steven J. Young, Dewey & Leboeuf LLP,

Linde v. Arab Bank, PLC, 262 F.R.D. 136 (2009)

New York, NY, Eric L. Lewis, Baach Robinson & Lewis, Washington, DC, Sean Gorman, Leboeuf, Lamb, Greene & Macrae LLP, Houston, TX, for Defendant.

**Opinion**

## MEMORANDUM AND ORDER

VIKTOR V. POHORELSKY, United States Magistrate Judge.

The defendant Arab Bank plc ("Arab Bank") has moved to compel the production of documents by nonparty respondents Israel Discount Bank of New York ("IDBNY"), Israel Discount Bank Ltd. ("IDB"), and Bank Hapoalim ("Hapoalim"), and to compel depositions of certain persons employed by the respondents. As discussed below, Arab Bank's motions are granted in part, and denied in part.

## BACKGROUND

The above-captioned related actions involve claims under the Anti–Terrorism Act, 18 U.S.C. § 2332 *et seq.* and the Alien Tort Claims Act, 28 U.S.C. § 1350, for damages arising from injuries and deaths caused by suicide bombings and other attacks in Israel, the West Bank, and Gaza, primarily since the onset of the second intifada in 2000. Arab Bank is alleged by the plaintiffs to have knowingly sponsored such attacks by providing banking and administrative services to various organizations identified by the United States and Israeli governments as terrorist organizations. Many of the transactions that Arab Bank is alleged to have processed were for the benefit of charities that were actually fronts for the terrorist organizations that committed the attacks at issue. The various complaints include allegations that Arab Bank "knew," or was "willfully blind to" the fact that its conduct would cause injury to the plaintiffs. Some of the complaints also allege that Arab Bank "should have known" or "recklessly disregarded" that its conduct would cause plaintiffs' injuries.

The documents Arab Bank seeks to obtain from respondents include account and transaction records for charitable entities, documents concerning compliance protocols, and documents demonstrating the respondents' knowledge of the nature of the terrorist front organizations. It argues that evidence that Israeli banks processed transactions for the very same terrorist front organizations that Arab Bank allegedly assisted is essential to counter the plaintiffs' allegations that it "should have known" the charitable entities were terrorist fronts. After this motion was briefed, Arab Bank moved by letter to compel the respondents to produce certain individuals for depositions.

IDBNY has substantially complied with the subpoena, but opposes Arab Bank's motion to the extent that the subpoena requests that IDBNY produce documents held by IDB in Israel. IDB opposes Arab Bank's motion on the grounds that this court lacks personal jurisdiction over it. Hapoalim, on the other hand, does not contest jurisdiction, but opposes discovery by Arab Bank on the grounds that various Israeli laws prohibit disclosure of the information sought, that international comity weighs against compelling production, and that the requests are overly broad and burdensome. The arguments concerning document discovery are discussed seriatim below, with the last section addressing the issue of depositions.

## DISCUSSION

### I. ISRAEL DISCOUNT BANK NEW YORK & ISRAEL DISCOUNT BANK

Respondent nonparty IDBNY is a bank chartered by the State of New York, with headquarters in New York City. It is an indirect, wholly-owned subsidiary of respondent nonparty IDB, an Israeli corporation with headquarters in Israel. On October 31, **\*141** 2006, Arab Bank served on IDBNY a subpoena seeking the production of three categories of documents. The subpoena sought documents comprising transactions, related accounts, and any related regulatory actions or investigations concerning thirty-four charities that have been alleged by plaintiffs to be fronts for terrorist organizations. Next, it sought the production of documents related to an investigation of Israel Discount Bank concerning violations of the Bank Secrecy Act and the U.S. Patriot Act, as well as compliance protocols in place with respect to business entities in the Palestinian Territories. Finally, it sought documents concerning the relationship between IDBNY and Arab Bank.

IDBNY has essentially complied with the subpoena. It has searched for and produced responsive documents within its possession, custody, or control, apart from those documents which are protected from disclosure under the bank examination privilege. To the extent that the subpoena seeks privileged documents and IDBNY locates such documents, IDBNY has agreed to identify such

documents in a privilege log. (*See, e.g.,* Resps. to Doc. Reqs. 3, 7, 8, 9.) It has made only limited objections to the requests on the grounds of relevance. (*See* Resp. to Doc. Req. 8.) It lodged a general objection, however, to the extent that the subpoena purported to require IDBNY to produce IDB documents located in Israel. (Objs. and Resps. of IDBNY to Subpoena, Ex. 4 to Young Decl., at 3.) Arab Bank argues that IDBNY should be compelled to produce these documents because IDBNY has the practical ability to obtain documents from its foreign parent.

Arab Bank also attempted to serve on IDBNY a subpoena seeking the production of identical information from its parent, IDB; IDBNY accepted service only on behalf of itself, however, not of IDB. Arab Bank argues that IDB should be compelled to respond to the latter subpoena served on IDBNY, because IDBNY is a "mere department" of IDB such that it establishes IDB's presence in New York for purposes of personal jurisdiction.

### A. *IDBNY Should Not Be Compelled to Produce Documents Held By IDB in Israel*

Under Rule 45(a)(1)(C) of the Federal Rules of Civil Procedure, a subpoena may command a nonparty served to produce documents that are in its "possession, custody, or control." Arab Bank asserts that IDBNY has "control" over the documents in IDB's possession, and accordingly, should be compelled to produce them. As the submissions make plain, however, IDBNY does not have "control" over IDB's documents, and is thus unable to produce them.

[1] [2] "Control is defined not only as possession, but as the legal right to obtain the documents requested upon demand." *Searock v. Stripling,* 736 F.2d 650, 653 (11th Cir.1984).[2] "Control" may also be found where an entity has "access to" and the "ability to obtain the documents." *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.,* 171 F.R.D. 135, 144 (S.D.N.Y.1997); *see also, e.g., In re Ski Train Fire of November 11, 2000 Kaprun Austria,* 2006 WL 1328259, *5 (S.D.N.Y.2006) (same); *Addamax Corp. v. Open Software Found., Inc.,* 148 F.R.D. 462, 467 (D.Mass.1993) (same). The party seeking to compel a subsidiary to produce the documents of its foreign parent has the burden of showing that the documents are within the local subsidiary's control. *See, e.g., State of New York v. Nat'l R.R. Passenger Corp.,* 233 F.R.D. 259 (N.D.N.Y.2006). "Access" and "ability to obtain documents" have been found where "documents ordinarily flow freely between" parent and subsidiary. *Hunter Douglas, Inc. v. Comfortex Corp.,* No. CIV. A. M8–85, 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999).

[3] IDBNY has submitted sworn statements that IDBNY does not have access to its parent's documents in the regular course of business. IDBNY and IDB have separate computer systems, and neither can access information in the other's system. (Cappello ***142** Decl. ¶ 11, Speigel Decl. ¶ 12.) The two entities do not share confidential information concerning their customers or transactions with each other. (Capello ¶ 12, Speigel Decl. ¶ 11.) Moreover, IDBNY does not even expect that IDB would provide documents about a customer to IDBNY so that IDBNY could defend itself in a litigation. (Capello ¶ 14.)

There is no evidence to indicate that the documents sought "flow[ed] freely" between subsidiary and parent. *Hunter Douglas Inc.,* 1999 WL 14007, at *3. The three pieces of evidence upon which Arab Bank relies entirely to establish that IDBNY has access to and the practical ability to obtain IDB documents are negligible. First, Arab Bank points to a single memorandum written by an IDBNY executive noting a lunch with a friend who works at Arab Bank, carbon-copied to IDB employees, and IDBNY's statement that the exchange of such memoranda constituted a routine practice among the international banking departments of IDB and IDBNY. (IDBNY Am. Mem. at 9–10.) The exchange of the very limited information contained in the memorandum, even if done routinely, is not evidence of a free flow of documents between the two entities. *Cf. Hunter Douglas Inc.,* 1999 WL 14007, at *3 (finding control where affiliate could generally obtain documents from its foreign parent to assist itself in litigation.) Next, Arab Bank relies on a regulatory order which states that, in the course of pursuing for the acquisition of IDBNY, the majority shareholders of IDB "committed to make available ... such information on the operations of [IDB] and its affiliates that [is] deem[ed] necessary to determine and enforce compliance" with various laws. (Young Decl. in Supp. of Mot. to Compel Prod'n by IDB, Ex. 1.) But clearly, a commitment by a parent to make its subsidiary's information available does not establish the converse—that the subsidiary has access to the parent's information.

Finally, Arab Bank argues that an agreement by IDBNY to service seven loans originated by IDB through a Florida branch is evidence that IDBNY uses IDB's documents in the regular course of business. The agreement at issue provided that IDBNY's office in Florida would service a small number of loans issued by IDB, after ownership of the Florida office was transferred from IDB to IDBNY. As a result, IDBNY had access to a

number of IDB customer files related to the loans—none of which was located in Israel. This was apparently an isolated event which fails to demonstrate that, in the regular course of business, IDBNY has access to IDB customer files, and the fact that a separate agreement was needed in order to govern the access to the files only confirms that, as a general matter, IDBNY does not have such access.

These three pieces of evidence are insufficient to overcome the showing made by IDBNY that it lacks control over the documents Arab Bank seeks from IDB. Accordingly, Arab Bank's motion to compel IDBNY to produce documents of IDB is denied.

**B. *IDBNY Is Not A "Mere Department" Of IDB***
[4] [5] Arab Bank next argues that IDB should be compelled to comply with the subpoena because service on it through its subsidiary IDBNY was effective. For New York courts to acquire personal jurisdiction over the parent based on a subsidiary's presence in New York, the parent's "control over the subsidiary's activities ... must be so complete that the subsidiary is, in fact, merely a department of the parent." *Delagi v. Volkswagenwerk A.G. of Wolfsburg, Germany*, 29 N.Y.2d 426, 432, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972); *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir.1996). This determination requires a fact-specific inquiry into the relationship between the parent and subsidiary, taking into consideration (1) common ownership between the parent and subsidiary; (2) the financial dependency of the subsidiary on the parent corporation; (3) the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and (4) the degree of control over the marketing and operational policies of the subsidiary exercised by the parent. *Volkswagenwerk* *143 *Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120–22 (2d Cir.1984).

[6] There is no dispute in the instant case that IDBNY is wholly owned by IDB. The first factor—common ownership between the parent and subsidiary—is perhaps better characterized as a prerequisite to the assertion of jurisdiction over a foreign related corporation by a New York court. *See, e.g., Delagi*, 29 N.Y.2d at 432, 328 N.Y.S.2d 653, 278 N.E.2d 895; *Andrulonis v. United States*, 526 F.Supp. 183, 186–87 (N.D.N.Y.1981). Such facts are not enough on their own to establish jurisdiction over IDB. *See, e.g., Philip Morris Inc., v. Otamediai*, 02 CV 7575, 2004 U.S. Dist. LEXIS 10930, *11–12, 2004 WL 1348987 (S.D.N.Y. Jun. 14, 2004) (finding no jurisdiction when common ownership was present but no other factor was established). Based on the sworn affidavits of IDBNY, all of the remaining factors weigh against a finding that IDBNY is a "mere department" of IDB.

[7] As to the second factor, IDBNY, with significant assets of its own, is not financially dependent on IDB. It pays its own business expenses, including the salaries of all of its personnel, without assistance from IDB. IDBNY does not borrow money from IDB, nor does it receive funds for its own account from IDB.

[8] [9] [10] The third factor similarly weighs in favor of IDBNY. IDBNY typically appoints its executive level personnel without consulting IDB. IDB appears to have been involved in the appointment of only one executive, in which its role was simply to recommend a candidate for CEO, whom IDBNY ultimately selected. While three of IDBNY's twelve-member board are directors or officers of IDB, they are not also executives or employees of IDBNY. In any event, "[h]aving common directors and officers is a normal business practice of a multi-national corporation and absent complete control [it] is no justification to labeling a subsidiary a mere department of the parent." *In re Ski Train Fire*, 230 F.Supp.2d at 412 (citing *Jerge v. Potter*, No. 99 Civ. 0312E, 2000 WL 1160459, at *2–*3 (W.D.N.Y. Aug. 11, 2000)) (subsidiary not a mere department of foreign parent even though two of its non-executive directors sat on parent's board and one of them was parent's CEO). "It has been established that overlapping officers and directors are 'intrinsic to the parent-subsidiary relationship,' and that they are not determinative as to whether the subsidiary is a 'mere department' of the parent." *Id.* (quoting *J.L.B. Equities v. Ocwen Fin. Corp.*, 131 F.Supp.2d 544, 550 (S.D.N.Y.2001)); *see also Jerge*, 2000 WL 1160459, at *3 (subsidiary not mere department of foreign parent even though parent "directly controls the selection of the president" of subsidiary, and half of the officers of subsidiary are directors or officers of parent); *Morse Typewriter Co. v. Samanda Office Comm'ns Ltd.*, 629 F.Supp. 1150, 1153 (S.D.N.Y.1986) (subsidiary was not a mere department of foreign parent even though two of three members of the subsidiary's board were officers of parent).

[11] Moreover, IDBNY observes corporate formalities: it has its own board of directors, which holds regular meetings, holds annual shareholder meetings, and maintains separate books and records from its parents and prepares its own financial statements. *See, e.g., Stutts v. De Dietrich Group*, 465 F.Supp.2d 156, 163–65 (E.D.N.Y.2006) (subsidiary was not a "mere department" where subsidiary kept its own books and records, filed its

own tax returns, and otherwise observed all corporate formalities).[4]

**\*144** Arab Bank finds it notable that, as a result of a request by IDB that holders of a controlling interest in IDB not serve as directors in companies within its subsidiaries, three board members of IDBNY's Board of Directors ended their tenure, two leaving voluntarily, and one voted off after refusing to resign. (Lee Decl. in Supp. of Surreply of IDB in Opp'n to Mot. to Compel, Ex. A.) These facts do not indicate a level of "interfere[nce]" with a subsidiary's selection of executive personnel that would support jurisdiction over the parent. The officers of a parent normally control the board of directors of a subsidiary in their capacity as representatives of the controlling stockholder. *Beech Aircraft,* 751 F.2d at 121. Moreover, it is notable that IDB recommended the removal of directors who were too close to IDB, and the result was the establishment of a greater separation between the IDB and its subsidiaries.

[12] Finally, IDB does not exert control over IDBNY's marketing and operational policies. IDBNY runs its own day-to-day operations, determines marketing and operational policies without interference by IDB, and hires, trains, and pays its own employees. The two entities have separate computer and phone systems, and the computer systems cannot access each other. They also maintain separate customer records and accounts, which they treat as highly confidential, and lack access to each other's customers' information. IDBNY designs and pays for its own advertising and promotional materials, including its website, as well as its own forms for banking transactions, without parental interference. Finally, it publishes its own policy manuals without prior review by IDB. (Spiegal Decl. ¶¶ 15–19). IDBNY's operational independence stands in stark contrast to the subsidiary in *Beech Aircraft,* where the court found the parent maintained "tight" operational control by (1) controlling virtually every aspect of the subsidiary's marketing; (2) prescribing the subsidiary's advertising campaigns; and (3) training the subsidiary's employees. 751 F.2d at 122.

IDBNY's showing of operational and marketing independence is not overcome by the three facts relied on by Arab Bank to undermine that conclusion. First, Arab Bank focuses on IDB's promise to banking regulators to "act to the best of its ability to assure the fulfillment of [IDBNY's] commitments" to correct compliance deficiencies. (Young Decl., Ex. 6 at 51). But there is no indication that IDB exerted any operational control, took any measures to influence IDBNY's regulatory compliance, or assisted IDBNY in paying $20.5 million in related fines. IDB's assurances that IDBNY would comply with the regulators "to the best of its ability" is not a declaration of "tight control," but rather of limited influence.

Similarly, the brief two paragraph memorandum written by Ilan Hadani, a Senior Vice–President of International Banking about his lunch with a banking contact at Arab Bank and carbon copying IDB executives does not reflect that IDB maintains operational control over IDBNY.[5] There is no indication that Hadani was operating under the direction of IDB or IDBNY; rather, Hadani states that the meeting was "informal and social," and that its primary purpose was to "remain in touch with an old friend and business colleague." (Hadani Decl. ¶ 5.)

Finally, caselaw strongly supports the conclusion that IDB's reference to IDBNY as an "overseas office" and an "Israeli bank operating abroad" is nothing more than a general description of a global enterprise of the kind typically found in advertising that does not demonstrate the parent's control over the subsidiary's marketing and operational policies. *See, e.g., Jazini v. Nissan Motor Co.,* 148 F.3d 181, 185 (2d Cir.1998) (references in annual report to desire to become a "truly **\*145** global company" with "global operations ... contributing to the company as a whole" did not show "pervasive control over subsidiary that 'mere department' standard requires); *J.L.B. Equities,* 131 F.Supp.2d at 550 (website treatment of parent and subsidiary as "one" insufficient to show control, not equivalent to a showing that parent exercises any control over subsidiary's operational or marketing operations); *Jerge,* 2000 WL 1160459, at \*3 (website listing subsidiary as "one of the operating units" of the foreign parent did not bear on subsidiary's status as "mere department").

The caselaw relied on by Arab Bank for the argument that IDBNY is a "mere department" of IDB only serves to show how far they are from meeting the standard set out in *Beech Aircraft.* In *Taca Int'l Airlines, S.A. v. Rolls–Royce of England, Ltd.,* 15 N.Y.2d 97, 101, 256 N.Y.S.2d 129, 204 N.E.2d 329 (N.Y.1965) where a subsidiary was found to be a mere department of its parent, the parent trained the subsidiary's employees and provided principal personnel, developed and provided marketing literature, supplied all the goods sold by subsidiary and provided warranties to the subsidiary's customers. Similarly, in *ESI, Inc. v. Coastal Corporation,* the subsidiaries were found to be "wholly dependent on the [parent's] financial support to stay in business," the parent guaranteed obligations and liabilities of subsidiaries, there was "massive overlap" of corporate officers and directors, evidence showed the subsidiaries were "merely holding companies formed to finance, own,

operate and manage" certain projects, and the parents had "complete control over the policies and operations" of the subsidiaries. 61 F.Supp.2d 35, 51–57 (S.D.N.Y.1999).

Arab Bank also asserts that two inconsistencies emerge from the respondent's submissions which are evidence that IDB has greater control than it admits, or at the very least, raises a question as to the level of control it exerts over IDBNY. The first is a discrepancy between IDBNY's initial statement that it lacked all authority to accept service of legal process on behalf of IDB, and its amended position that it has authority to accept service of process only to comply with the USA PATRIOT Act.[6] This limited clarification does not suggest that IDBNY is under the control of IDB. The second is that IDB first stated that it can "make recommendations" to IDBNY as to executive personnel, while IDBNY has stated that only one recommendation had been made. These two statements are clearly not inconsistent. Neither "discrepancy"—if they may even be so characterized—is of great moment.

In conclusion, Arab Bank's motion to compel IDB to comply with the IDB subpoena served on IDBNY is denied because this court does not have personal jurisdiction over IDB through IDBNY's presence in New York.

**C. *Jurisdictional Discovery is Unwarranted***
[13] In the alternative, Arab Bank seeks jurisdictional discovery to examine the range of IDB's contact with the United States as well as the nature of its dealings with IDBNY. Courts have broad discretion in determining whether to permit jurisdictional discovery. Some courts have required movants seeking such discovery to first establish a *prima facie* case of personal jurisdiction over the targeted party. *Jazini,* 148 F.3d at 186; *In re Ski Train Fire,* 230 F.Supp.2d at 412. The Second Circuit has made clear, however, that a *prima facie* case is not absolutely necessary for a court to grant jurisdictional discovery. *See Ehrenfeld v. Mahfouz,* 489 F.3d 542, 550 n. 6 (2d Cir.2007). Rather the showing necessary to obtain jurisdictional discovery is committed to the sound discretion of the district court on a case-by-case basis without "bright-line" limits. *Id.*

*146 In the two recent Second Circuit cases that address the issue—*Jazini* and *Mahfouz*—the question arose in the context of appeals from the dismissal of complaints on grounds of lack of personal jurisdiction. In this context, *Mahfouz* stated that it would be legal error to require all plaintiffs to make a *prima facie* showing of jurisdiction before allowing discovery, because at the motion to dismiss stage, "legally sufficient allegations of jurisdiction" (*quoting In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir.2003))—not a *prima facie* showing—are sufficient to establish jurisdiction. 489 F.3d at 550. Here, however, there is no complaint to assess whether there are legally sufficient allegations of jurisdiction. Thus, the considerations for permitting jurisdictional discovery must of necessity differ when the issue concerns whether to require a non-party to provide evidence rather than whether to permit a lawsuit to proceed against a defendant. And it is at least arguable that a somewhat greater showing is necessary with respect to jurisdictional discovery for the former purpose than for the latter.

[14] Thus, the court's determination concerning whether to permit jurisdictional discovery in the context of a non-party subpoena is informed by several factors, including the relationship of the non-party from whom discovery is sought to the litigation, the likelihood, based on the information before the court, that personal jurisdiction will be established, and the likely usefulness of any information that may be obtained if jurisdiction is established. The party from whom discovery is sought—IDB—has a limited relationship to the litigation. It apparently had some involvement in processing some transactions of interest in this litigation, but the court has already determined that IDB's role cannot serve as a basis for the imposition of any third-party liability on it. The few facts asserted by Arab Bank to suggest personal jurisdiction do not persuade the court that jurisdictional discovery is likely to lead to a finding of personal jurisdiction. Indeed, none of the evidence suggests that IDB had anything more than an insignificant involvement in the affairs of its independently managed and operated subsidiary, giving "this [c]ourt ... no reason to ignore the corporate form between the entities." *Gurvey v. Cowan, Liebowitz & Latman, PC,* 2009 WL 691056, *3 (S.D.N.Y.2009).[7] Finally, as discussed in further detail in the following section addressing the subpoena served on Hapoalim, even if personal jurisdiction were to be established, the information that would be obtained is of attenuated relevance to the claims and defenses in this case, and may not be admissible.

While it may be difficult for Arab Bank to establish jurisdiction over IDB without the benefit of discovery, this is but the consequence of seeking discovery from a nonparty "foreign corporation that has carefully structured its business so as to separate itself from the operation of its wholly-owned subsidiaries in the United States." *Jazini,* 148 F.3d at 186. "The rules governing establishment of jurisdiction over such a foreign corporation are clear and settled, and it would be

inappropriate ... to deviate from them or create to create an exception to them" due to Arab Bank's problems meeting this standard. *Id.* It bears noting that a denial of Arab Bank's requests here would not prevent Arab Bank from asserting claims or defending itself in the underlying litigation. Moreover, it would not prevent Arab Bank from seeking the information it desires from IDB through the Hague Convention. Accordingly, the request for jurisdictional discovery is denied.

**\*147 II. HAPOALIM**
Arab Bank served on Hapoalim subpoenas calling for the production of twelve categories of documents. Requests 1 and 4 seek documents concerning account transactions on behalf of fifteen charitable entities that involved Hapoalim facilities in New York and Israel, respectively; Requests 2 and 5 seek detailed account information for accounts held on behalf of those entities in New York and Israel, respectively. Requests 3 and 6 seek documents concerning regulatory, judicial, and investigatory inquiries with respect to accounts held for any of the fifteen charitable entities at New York and Israeli Hapoalim facilities. Request 7 seeks documents pertaining to investigations of Hapoalim's compliance practices and procedures, including those related to a December 2005 investigation by Israeli prosecutors for Hapoalim's failure to report suspicious money transfers, and the possible indictment of Hapoalim Hayarkon branch managers and others for failure to maintain proper procedures concerning suspicious money transfers. Request 8 seeks documents concerning rules, guidelines, or restrictions issued by regulatory authorities in Palestine, Israel, the United States, and New York State that reference Hapoalim's procedures for possibly suspicious entities, transactions, or accounts. Request 9 seeks documents concerning any communications between the above-mentioned regulatory authorities and Hapoalim involving instructions to exercise caution with respect to a transaction for, or account held by, a Palestinian or Arab entity. Request 10 seeks documents concerning Hapoalim's potential or actual failure to comply with Israeli money laundering laws, especially as they may relate to statements in Hapoalim's 2005 Annual Report expressing doubts about, and difficulty with, compliance. Request 11 seeks documents related to the October 2006 decision by Israeli authorities to rescind an injunction that had required the reporting by all Israeli banks of all transactions with banks in the Palestinian Territories, and agreeing to grant Israeli Banks immunity from criminal prosecution for money transfers through banks in the Palestinian Territories. Finally, Request 12 seeks documents relating to Hapoalim's relationship with Arab Bank.

There is no dispute that Hapoalim is subject to personal jurisdiction in this court, and therefore, the issue that remains is the extent to which it should be compelled to comply with the above document requests. Hapoalim argues that much of the information sought is protected from discovery under a host of Israeli laws, that international comity weighs against compelling production, and that the requests are overly broad.

*A. Hapoalim's Objections Based on Israeli Law*
At the outset, Hapoalim argues that some of the information Arab Banks seeks is protected from disclosure by Israeli bank-client privilege laws, a regulatory ordinance, money laundering and anti-terrorism laws, laws against self-incrimination, and laws protecting commercial secrets. Arab Bank does not dispute that these laws are applicable, arguing instead that Hapoalim "stands in no different a position in this Court than Arab Bank with regard to the imposition of objections based on foreign bank secrecy law and similar foreign restrictions against disclosure," and that they should be overruled as Arab Bank's objections were in the Court's Decision and Order of Nov. 25, 2006. The court, however, must first analyze whether the requests indeed implicate the production of documents prohibited from disclosure by Israeli law.[8]

[15] Upon review, it is clear that the laws against self-incrimination and protecting commercial secrets do not prohibit discovery of documents sought by Arab Bank, and that appropriate measures can be taken to address Hapoalim's concerns. First, Hapoalim asserts that several of the Requests call for documents that would violate Hapoalim's right against self-incrimination, and that an Israeli court would be unlikely to compel their production. Israeli law provides a privilege against self-incrimination which protects persons, including corporate entities, **\*148** from giving evidence that would be incriminating to themselves. (Arzi Decl.¶¶ 63–64 (citing Section 47 of Israel's Evidence Ordinance (New Version) 5731–1971).) This privilege is not absolute, and an Israeli court may waive the privilege if it determines that the likely benefits of revealing an incriminating document outweigh the likely harm to the person asked to supply the evidence. (*Id.* ¶ 66.) Israeli courts can guarantee that documents as to which the privilege has been waived will not be used against the person in any criminal proceeding. (*Id.*) Of course, there is no reason privilege could not be waived by the holder of the privilege. Second, Hapoalim asserts that, to the extent that the Requests call upon Hapoalim to reveal its internal documents—which purportedly contain commercial

secrets and private business information—they are protected by Section 5 of Israel's Commercial Wrongs Law, 5759–1999, and that Israeli courts would give them some protection from disclosure.

These laws do not present a true conflict with United States law such that a comity analysis is necessary. *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for Southern Dist. of Iowa*, 482 U.S. 522, 555, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (threshold question in a comity analysis is whether there is in fact a true conflict between domestic and foreign law). "What is required to establish a true conflict is an allegation that compliance with the regulatory laws of both countries would be impossible." *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir.1998) (*quoting In re Maxwell Comm'n Corp.*, 93 F.3d 1036, 1050 (2d Cir.1996)). Here, there are no such allegations. The Arzi Declaration makes clear that Israeli law does not *prohibit* the disclosure of documents subject to the self-incrimination privilege—it simply makes the privilege available, to be used or waived. Thus, documents that Hapoalim believes are subject to this privilege against self-incrimination could be itemized on a privilege log which would permit the applicability of the privilege to be tested. Similarly, there is no Israeli legal prohibition on the discovery of documents constituting commercial secrets. To the extent that Hapoalim demonstrates that the discovery sought reaches confidential commercial information, an appropriate protective order may be entered or the subpoena may be modified. But, insofar as the Israeli laws relating to self-incrimination and commercial secrets do not prohibit disclosure, they serve as no basis for denying the motion to compel.

The remaining laws, however, do erect prohibitions on disclosure that raise a true conflict between United States discovery rules and Israeli confidentiality laws. First, Israeli bank-confidentiality laws protect bank customer account and transactional information from disclosure to third parties.[9] The infringement of a bank customer's privacy by the disclosure of his bank account and transactional information may result in civil and criminal penalties, including imprisonment for up to five years. (Arzi Decl. ¶ 39.) Hapoalim asserts that such laws protect the documents requested in Requests 4, 5, 6 and 9, all of which seek details about Hapoalim's customers, their accounts, and their transactions, and that Hapoalim would risk incurring civil or criminal penalties if it were to comply with them. (*Id.* ¶¶ 35–40.)

In addition, Section 15A of Israel's Banking Ordinance of 1941 imposes a duty of confidentiality upon any bank exchanging information or documents with the Bank of Israel, Israel's banking regulatory authority. The violation of this duty may result in fines or imprisonment of up to one year. (*Id.* ¶¶ 41–43). This provision has been interpreted by the Israeli high court to immunize information or documents sought in civil discovery, due to the public interest in having commercial banks freely exchange information with the Bank of Israel without fear that it will be used as evidence in civil litigation. (*Id.* ¶¶ 46–47) (citing Leave to Civil Appeal *149 6546/94, *Union Bank of Israel Ltd. v. Azulai* PD 49(4) 54 (1995).) Requests 6 and 8 through 11 call for the production of various documents concerning communications with regulatory authorities, including the Bank of Israel, and Hapoalim asserts that Israeli law bars it from complying with these requests to the extent that they seek information exchanged with the Bank of Israel.

Finally, under Israeli law, a bank must maintain the confidentiality of information it receives pursuant to the provisions of the Prohibition on Money Laundering Law, 5760–2000, and the Prohibition on Terror Financing Law, 5765–2005. (*Id.* ¶ 51). The Prohibition on Money Laundering Law obligates providers of financial services to report the activities of their clients to a centralized authority, which analyzes the information and determines whether further executive or prosecutorial actions are required. (*Id.* ¶¶ 52–54). The Prohibition on Terror Financing Law sets up a reporting mechanism. (*Id.* ¶ 60). Civil and criminal sanctions apply to the disclosure of information reported to the centralized authority, even if it occurs through negligence. (*Id.* ¶ 56, (quoting Section 31A of the Prohibition on Money Laundering Law), 60 (quoting 48(b) of the Prohibition on Terror Financing Law)). Hapoalim asserts that disclosure of certain of the documents requested under Requests 4, 7, 9, and 10, to the extent that they refer to information collected pursuant to the Prohibition on Money Laundering Law and the Prohibition on Terror Financing Law, would constitute an infringement of the accompanying obligations of confidentiality, and would lead to the imposition of criminal sanctions on Hapoalim.

Thus, of the twelve requests, eight—Requests 4, 5, 6, 7, 8, 9, 10, and 11—are asserted by Hapoalim to be seeking documents that are protected by bank confidentiality provisions. (It bears noting that implicit in Hapoalim's failure to make these arguments with respect to the requests seeking account-related information held by Hapoalim in its New York facility—Requests 1, 2, and 3—is the assumption that the Israeli laws at issue do not apply extraterritorially.) Hapoalim concedes that only those documents requested by Requests 6, 8, 9 10 and 11 which were exchanged with the Bank of Israel are prohibited from disclosure under the Banking Ordinance,

and that only those documents requested by Requests 4, 7, 9, and 10 that are reports of information disclosed to the administrative enforcement mechanism are protected by the Prohibition on Money Laundering Law and the Prohibition on Terror Financing Law. The court will refer to this subset of materials, along with the documents in Requests 4, 5, 6 and 9, all of which are asserted to be prohibited from disclosure pursuant to bank confidentiality laws, as the "Protected Materials." The comity analysis below addresses whether Israel's laws relieve Hapoalim from producing the Protected Materials.

**B. *International Comity Analysis***
As discussed in the court's Decision and Order of Nov. 25, 2006, *Linde v. Arab Bank, PLC,* 463 F.Supp.2d 310 (E.D.N.Y.2006), section 442 of the *Restatement (Third) of the Foreign Relations Law of the United States* (hereinafter *"Restatement"*) articulates a series of factors which courts have considered in deciding whether to exercise their power to compel production of protected documents and information. These factors include: (1) the importance of the investigation or litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would underline important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located. *Restatement* § 442(1)(c); *see, e.g., British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.,* No. 90 Civ. 2370, 2000 WL 713057, at *8–9 (S.D.N.Y. June 2, 2000); *Madanes v. Madanes,* 186 F.R.D. 279, 286 (S.D.N.Y.1999). Courts have also taken into consideration the nonparty status of the party from whom the discovery is sought when evaluating the hardship that would be imposed by compelling compliance. *150 First Am. Corp. v. Price Waterhouse LLP,* 154 F.3d 16, 21 (2d Cir.1998); *Minpeco, S.A. v. Conticommodity Servs., Inc.,* 118 F.R.D. 331, 332 (S.D.N.Y.1988); *Minpeco, S.A. v. Conticommodity Servs., Inc.,* 116 F.R.D. 517, 526 (S.D.N.Y.1987). Of the above considerations, all but one weigh in favor of recognizing Israel's bank confidentiality laws as a bar to discovery.

[16] First, it is undisputed that, with respect to the Protected Materials, the bulk of the documents and information sought, and the individuals who created and maintained those documents, originated in or are located in Israel, not the United States.

[17] Second, the importance of the documents requested to the litigation is in question. Arab Bank asserts that evidence of Hapoalim's failure to successfully identify terrorist organizations and operations and to prevent the completion of transactions involving these entities, as well as Hapoalim's lack of knowledge of the impropriety of such transactions, is relevant to Arab Bank's defense that, to the extent it also failed to prevent such transactions, it did so in good faith. (Mem. of Law. of Arab Bank plc in Supp. of its Mot. to Compel Prod'n by Hapoalim, at 18.) In other words, if the documents discovered pursuant to the requests relating to customer accounts and transactions and to compliance protocols reveal that Hapoalim performed banking services for terrorist front organizations and employed similar compliance procedures as Arab Bank, they will be useful in refuting the plaintiffs' allegations that Arab Bank exercised insufficient caution in dealing with entities that it "should have known" were terrorist fronts.

The relevance and importance of the Protected Materials, therefore, depends on the extent to which plaintiffs will be permitted to argue that, based on publicly available information at the time, Arab Bank *should have known* that the charitable entities for which it was processing transactions and holding accounts were terrorist fronts. It appears, at this juncture, however, that evidence of what Arab Bank "should have known" will be insufficient to establish the claims against it. In *Linde v. Arab Bank, PLC,* Judge Gershon indicated that the plaintiffs will have to prove more than recklessness to be successful on their claims against Arab Bank. 384 F.Supp.2d 571, 585 (E.D.N.Y.2005) (stating, "To the extent that plaintiffs have pled reckless conduct ... [t]here is ... no statutory basis for plaintiffs' argument that recklessness would be sufficient to meet the statutory requirements.") Thus, it appears that evidence that Arab Bank "should have known," which is akin to evidence that Arab Bank was negligent, and therefore not even reckless, will be insufficient to establish the plaintiffs' claims. Indeed, it may not even be admissible. If it is not, then the need, if any, for the Protected Materials in order to rebut such evidence is limited.

It bears noting that the analysis regarding the relevance of the documents sought by Arab Bank from Hapoalim is not the same as the analysis in the court's November 25, 2006 Order regarding the relevance of the documents sought from Arab Bank by the plaintiffs. The documents sought by the plaintiffs which were protected by bank secrecy laws were essential to their claims: the very transactions that were at issue could constitute direct evidence of Arab Bank's liability. Here, however, the connection between the evidence sought and the litigation is much more attenuated. The documents sought by Arab

Linde v. Arab Bank, PLC, 262 F.R.D. 136 (2009)

Bank here would not be direct evidence of a claim or defense; at best, they would serve as circumstantial evidence of Arab Bank's lack of knowledge. They would not serve to prove that Arab Bank did not know that the organizations about whom information is sought from Hapoalim were terror fronts.

[18] Third, because Arab Bank seeks to discover evidence which is based on its own transactions with Hapoalim, Arab Bank has alternative means of obtaining some of the account and transactional evidence sought in Requests 4 and 5. In addition, some of the information Arab Bank is demanding is publicly available information.[10]

*151 [19] Fourth, compliance with the requests would undermine important Israeli interests, including maintaining the privacy rights of bank clientele and the confidentiality of sensitive communications with Israel's central bank. As articulated in the Arzi Declaration, the bank-client privilege embodies Israel's interest in maintaining public trust in the security and confidentiality of the banking system. (¶ 24.) The Banking Ordinance reflects an interest in maintaining efficient supervision over the banking system, the stability and credibility of banks, the protection of public funds, and the encouragement of cooperation between the banks and the supervisory authorities. (Id. ¶ 46.) Finally, the Prohibition on Money Laundering and the Prohibition on Terror Financing Laws, and the restrictions they impose on revealing information communicated pursuant to its reporting mechanism, manifest Israel's interest in maintaining the confidentiality of bank client information while monitoring such information for possible money laundering and terrorist links. (Id. ¶¶ 51–62.) Moreover, in contrast to the November 25, 2006 Decision and Order, Arab Bank has brought to the court's attention no policies by Israel recognizing the subordination of bank secrecy to the interest in fighting terrorism.[11] To the contrary, Israel's laws appear to have balanced those interests by coupling bank confidentiality with an administrative enforcement mechanism that monitors bank activities internally.

Unlike the circumstances addressed in the November 25, 2006 Decision and Order, noncompliance with the requests here would not greatly undermine important interests of the United States. There, the discovery sought concerned transactions and the provision of financial services for which Congress, through statutes which some of the claims in the litigation rested, had expressly criminalized and provided a tort remedy. The court observed, "Without discovery, the interests expressed in the statutes will be difficult if not impossible to vindicate in this action." *Linde*, 463 F.Supp.2d at 315. Although the United States has an interest in fostering full and fair litigation, that interest is mitigated by the fact that the Protected Materials are of only indirect and attenuated significance to the issues to be decided.

[20] [21] Fifth, the potential hardship that would be imposed on Hapoalim by an order compelling the requested discovery of the Protected Materials could be significant. As discussed above, violation of the confidentiality provisions in the bank-client privilege law, the Banking Ordinance, and anti-money laundering/terrorism laws could lead to substantial civil liability and criminal punishment for Hapoalim. Moreover, Hapoalim's status as a nonparty in this litigation weighs against issuing an order, as "an order compelling production should be imposed on a nonparty ... only in extreme circumstances." *Minpeco, S.A. v. Conticommodity Services, Inc.*, 118 F.R.D. 331, 332 (S.D.N.Y.1988); see also *Minpeco, S.A. v. Conticommodity Services, Inc.*, 116 F.R.D. 517, 526–527 (S.D.N.Y.1987) (observing that "where the party sought to be compelled to produce documents in violation of foreign secrecy laws is merely a neutral source of information, and not itself a target of a criminal investigation or an adverse party in litigation, some courts have found the hardship to weigh more heavily in the balance.") (citing *United States v. First Nat'l Bank of Chicago*, 699 F.2d 341, 346 (7th Cir.1983)). Arab Bank maintains that Hapoalim should not be considered an uninvolved neutral party because its records reflect that Hapoalim processed and approved some of the transactions that form the basis of plaintiffs' allegation. As discussed above in the context of jurisdictional discovery, Hapoalim, like IDB, has a limited relationship to the litigation. It may have had some involvement in processing some transactions of interest in this litigation, but the court has already determined that its role cannot serve *152 as a basis for the imposition of any third-party liability on it. Therefore, Hapoalim should be treated as a nonparty. *Cf. Minpeco, S.A. v. Conticommodity Services, Inc.*, 116 F.R.D. at 527 (finding it significant to hardship analysis that, while entity from whom discovery was sought was nonparty, it was only as a result of recent settlements, prior to which it was a key defendant that "had placed itself in the thick of things").

[22] Thus, the above factors weigh in favor of denying Arab Bank's discovery of the Protected Materials. The sole remaining factor—the specificity of the Bank's requests—weighs in favor of disclosure because the requests are reasonably specific. But that is hardly enough to outweigh the others and avoid the conclusion that an order compelling Hapoalim to produce documents in violation of the foreign confidentiality laws discussed above is inappropriate. This conclusion is limited, however, to those documents that actually fall within the

confidentiality provisions of those laws—the Protected Materials—which are but a subset of the requested material.

Discovery of the remaining documents, as to which the non-disclosure laws do not apply, and to which comity deference is not applicable, is subject only to limitations imposed by United States law. These documents include (1) account, transactional information, and investigatory documents related to accounts held at charitable entities in Hapoalim's New York Facility (Reqs. 1–3), (2) compliance practices, procedures and regulations, to the extent they are not implicated by the confidentiality provisions in the Bank Ordinance and Prohibition on Money Laundering Law and the Prohibition on Terror Financing Law (Reqs. 7, 8, 9, 10 and 11), and (3) Hapoalim's business relationship with Arab Bank (Req. 12).

[23] The relevance of these documents is, to some extent, predicated on the extent to which the plaintiffs are permitted to argue that Arab Bank "should have known" about the terrorist front organizations, or that inadequate compliance protocols were ultimately responsible for Arab Bank's provision of financial services to the charitable entities. As discussed above, the information sought is of admittedly limited relevance, in that it does not appear that the plaintiffs will be able to use this type of evidence to establish their claims. However, the question at this stage is one of discovery, and to the extent that *plaintiffs* may be permitted at trial to use evidence about what Arab Bank "should have known," Arab Bank should be afforded the means to meet that evidence by showing that Hapoalim, an Israeli bank, employed the same or similar compliance protocols as Arab Bank, held accounts and processed transactions for the same or similar entities as Arab Bank, and had access to the same kinds of information as Arab Bank.

The court rejects Hapoalim's argument that Arab Bank is required to show a substantial need for all the requested material under Rule 45(c)(3)(B)(i), given that it provides no support for the assertion that internal compliance protocols and procedures are commercial secrets. The court also rejects Hapoalim's argument that the subpoena is overbroad because Arab Bank had previously accused Hapoalim of engaging in transactions with only five of the fifteen charitable entities that are named in the requests. Hapoalim's concern that some of the requests are overly broad temporally has merit, however. The requests are accordingly limited to documents for the time period covering the events alleged in this action—January 1, 1995 through the present.

### III. DEPOSITIONS

[24] [25] The remaining issue is Arab Bank's motion to compel depositions of certain individuals employed by IDBNY and Hapoalim. Arab Bank is entitled to conduct depositions of IDBNY and Hapoalim limited to the documents those banks have produced (or will produce as a result of this decision) and the issues those documents concern. Thus, Arab Bank may serve subpoenas on IDBNY and Hapoalim pursuant to Rule 30(b)(6) seeking testimony on topics delimited by the permitted document discovery. It will be up to IDBNY and Hapoalim to identify the individuals who will provide testimony. Arab Bank has not demonstrated a sufficient basis for requiring the specific individuals *153 they have identified to appear for depositions and therefore the motion to compel their depositions is denied.

### CONCLUSION

For the foregoing reasons, Arab Bank's motion is denied in part and granted in part. If the parties, after working together to resolve any other issues concerning burdensomeness, are unable to resolve their dispute, they may submit letters, supported by detailed affidavits, as to what the issues are and how they should be resolved.

**SO ORDERED.**

Footnotes

1  The following related cases have been consolidated with the instant case for purposes of discovery and other pretrial proceedings: *Philip Litle, et al. v. Arab Bank, PLC*, CV–04–5449 (NG)(VVP), *Oran Almog, et al. v. Arab Bank, PLC*, CV–04–5564 (NG)(VVP), *Robert L. Coulter Sr., et al. v. Arab Bank, PLC*, CV–05–365 (NG)(VVP), *Gila Afriat–Kurtzer, et al. v. Arab Bank, PLC*, CV–05–388 (NG)(VVP), *Michael Bennett et al. v. Arab Bank, PLC*, CV–05–3183 (NG)(VVP), *Arnold Roth, et al. v. Arab Bank, PLC*, CV–05–3738 (NG)(VVP), *Stewart Weiss, et al. v. Arab Bank, PLC*, CV–06–1623 (NG)(VVP), and *Joseph Jesner, et al. v. Arab Bank, PLC*, CV–06–3869 (NG)(VVP).

2  *Searock* discussed the meaning of "control" in the context of Rule 34, which governs discovery from parties. The meaning of "control" is the same under Rule 45, which governs discovery from nonparties. See *First Am. Corp. v. Price Waterhouse LLP*, 154

F.3d 16, 21 (2d Cir.1998).

3   As of June 30, 2006, IDBNY had $9.1 billion in assets, and $6.9 billion in depositor liabilities. (Am. IDBNY Mem. in Opp'n, 5.)

4   It is unremarkable that IDB issues consolidated financial statements that include IDBNY's income. Generally Accepted Accounting Principles ("GAAP") require the consolidation for subsidiaries that are more than 50 percent owned; consolidation, therefore, does not distinguish between independent and controlled subsidiaries under New York Law. *Beech Aircraft Corp.,* 751 F.2d at 121 n. 3. Arab Bank's efforts to use the consolidated financial statements as evidence of operational control, discussed below, are to no avail for the same reason. Similarly, it is irrelevant to the issue of whether IDBNY is a "mere department" of IDB that IDB must consent to the sale of IDBNY, a right which is also incidental to its stock ownership.

5   Arab Bank also asserts that the memorandum reveals that Hadani was operating as an "agent" of IDB. For a local subsidiary to qualify as "agent" such that the foreign parent may be subject to jurisdiction for discovery purposes it must perform services for the parent so important to the parent's business that it would have otherwise have its own officials to perform them. *Stutts v. De Dietrich Group,* 465 F.Supp.2d 156, 162 (E.D.N.Y.2006). There is no indication that the Hadani meeting was either a service performed for IDB, or something that IDB would have done on its own had Hadani not been available. Jurisdiction over IDB is not available under an "agent" relationship with IDBNY.

6   Initially, IDBNY asserted that it had no authority to accept service of legal process on behalf of IDB. (Mastragiacomo Decl. ¶¶ 3–4, Cappello Decl. ¶¶ 10, 13.) IDB, however, asserted that IDBNY is authorized to accept service of legal process albeit under limited circumstances not present in this instance (Misholi Decl. in Opp'n to Mot. to Compel ¶ 16), and it was later clarified that IDBNY is authorized to accept service on behalf of IDB, pursuant to the USA PATRIOT ACT for purposes of accepting service from the Secretary of the Treasury or the Attorney General of the United States. (*See* Misholi Decl. in Supp. of Surreply of IDB in Opp'n to Mot. to Compel, ¶ 3; Lee Decl. in Supp. of Surreply of IDB in Opp'n to Mot. to Compel, ¶ 8.)

7   Arab Bank relies on *Daventree Ltd. v. Republic of Azerbaijan* in urging this court to grant jurisdictional discovery. 349 F.Supp.2d 736, 765 (S.D.N.Y.2004). In *Daventree,* the court stated, "If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction[al] discovery is appropriate even in the absence of a *prima facie* showing as to the existence of jurisdiction." *Id.* Had Arab Bank identified a genuine issue of jurisdictional fact that would bear critically on the issue of whether IDBNY was a "mere department" of IDB, the court would be inclined to grant jurisdictional discovery. Arab Bank has not been successful in that endeavor. Moreover, it is not clear that *Daventree* states the appropriate standard, since the court in *Daventree* was deciding the issue of jurisdictional discovery where the movant's jurisdictional theory rested on a party's own contacts with the forum jurisdiction, not on theory that a subsidiary was a mere department of a foreign parent. *Id.*

8   In conducting this analysis, the court has considered the Declaration made by Ehud Arzi concerning the applicable Israeli laws pursuant to Fed.R.Civ.P. 44.1.

9   This protection is rooted in Israel's quasi-constitutional Basic Laws relating to the Protection of Privacy, 5741–1981, and Human Dignity and Liberty, 1992, which defines privacy as a "basic right." (Arzi Decl. ¶ 25.) Section 2(8) of the Protection of Privacy Law prohibits "infringing a duty of secrecy laid down by express or implied agreement in respect of a person's private affairs," and Section 2(9) prohibits "using, or passing on to another, information on a person's private affairs otherwise than for the purpose for which it was given." (Arzi Decl. ¶ 38.)

10  While Hapoalim suggests that an alternative way to obtain information concerning banking protocols and practices could be obtained from an expert witness with knowledge of Middle Eastern banking practices, the court is not sure how adequate a substitute this would be, given that the expert would require a factual basis for any testimony he gives.

11  The Decision and Order noted that Jordan and Lebanon, the foreign states where the information was located, had signed a Memorandum of Understanding, which contained provisions that specifically renounced bank secrecy as a basis for refusing requests for mutual legal assistance in money laundering and terrorist financing investigations. *Linde v. Arab Bank, PLC,* 463 F.Supp.2d 310, 316 n. 5 (E.D.N.Y.2006).

End of Document                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Linde v. Arab Bank, PLC, 262 F.R.D. 136 (2009)

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.