# EXHIBIT 2

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| SHERYL WULTZ, et al., | ) |
|---|---|
| *Plaintiff* | ) |
| v. | ) Civil Action No. 11-cv-01266 (SAS/GWG) |
| BANK OF CHINA LTD., | ) |
| | ) (If the action is pending in another district, state where: |
| *Defendant* | )                                              ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Bank Hapoalim B.M., 1177 Avenue of Americas, New York, NY 10036

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
See Schedule A.

| Place: Patton Boggs LLP, 1185 Avenue of the Americas, 30th Floor, New York, New York 10036 | Date and Time: 07/23/2013 10:00 am |
|---|---|

The deposition will be recorded by this method: __Stenographically and by videotape__

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: 6/20/13

_____  OR  _____
*Signature of Clerk or Deputy Clerk*         *Attorney's signature*

CLERK OF COURT

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* __Bank of China Limited__ , who issues or requests this subpoena, are:
Elissa J. Glasband, Esq.; Patton Boggs LLP; 1185 Avenue of the Americas, 30th Floor, New York, NY 10036; (646) 557-5100; eglasband@pattonboggs.com

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 11-cv-01266 (SAS/GWG)

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## SCHEDULE A

### Section I - Scope of Subpoena

This subpoena requires you to designate, pursuant to Federal Rule of Civil Procedure 30(b)(6), one or more employees, representatives or other Persons who consent to testify on Bank Hapoalim's behalf and who are knowledgeable to testify about information known or reasonably available to Bank Hapoalim with respect to the topics identified in Section III below on July 23, 2013, beginning at 10:00 a.m. at the offices of Patton Boggs LLP, located at 1185 Avenue of the Americas, New York, NY 10036, or at such other time and place that may be mutually agreed upon between counsel for BOC and Bank Hapoalim, and continuing day-to-day from that date and time until complete.

You are requested to provide to the undersigned counsel for BOC a written designation of the name(s) and employment title(s) of the Person(s) designated to testify on your behalf and a list of the topic(s) for which such person is designated. Such written designation is requested at least five days before the commencement of the deposition.

Pursuant to Rules 28 and 30 of the Federal Rules of Civil Procedure, the deposition will be conducted upon oral examination under oath by an officer authorized or designated to take such testimony and will be recorded by stenographic means. The deposition also may be recorded by audio or visual means, using real-time transcription technology, or both.

### Section II - Instructions and Definitions

In addition to the specific instructions and definitions below, the instructions set forth in Rules 26 and 30 of the Federal Rules of Civil Procedure and the definitions and instructions set forth in Local Civil Rules 26.2 and 26.3 of the U.S. District Court for the Southern District of New York are incorporated herein by reference.

#### Instructions

1. Unless otherwise indicated, the topics identified in Section III are concerning the time period of January 1, 2003 to January 31, 2008.

2. If, in interpreting any of the topics identified in Section III, you feel any part of a topic is ambiguous, the topic shall be construed in the broadest manner possible so as to bring within the scope of that topic all information that might otherwise be construed as outside its scope.

3. In the topics identified in Section III, the use of any tense of any verb shall include also within its meaning all of the tenses of that verb.

Definitions

1. "Action" means the civil action captioned on the first page of the subpoena and filed by Plaintiffs against BOC on August 22, 2008 in the United States District Court for the District of Columbia, Case No. 08-1460 (RCL), and subsequently transferred to the United States District Court for the Southern District of New York, Case No. 1:11-cv-01266 (SAS).

2. "AML" means anti-money laundering.

3. "Bank Hapoalim" and "the Bank" each mean Bank Hapoalim B.M., which is the bank (i) founded in 1921 by the central institutions of the Jewish Settlement (the Yishuv) at the time, the Zionist Histadrut and the Histadrut-General Federation of Hebrew Workers in Eretz Yisrael; (ii) incorporated as a limited company under the Companies Ordinance; (iii) that currently is a "banking corporation"; and (iv) that holds a "bank" license under the directives of Israel's Banking Law.

4. "BOC" and "Defendant" each mean the Bank of China Limited, a corporation organized under the laws of the People's Republic of China.

5. "CDD" means customer due diligence.

6. "CTF" means counter-terrorism financing.

7.  "FAC" means the First Amended Complaint filed by Plaintiffs against BOC in this Action on January 13, 2009 in the United States District Court for the District of Columbia, Case No. 08-1460 (RCL), as Docket Number 12.

8.  "Government of Israel" means any component of the government of the State of Israel, including without limitation all of its ministries, agencies, bureaus, and Persons employed by or affiliated with such components.

9.  "KYC" means know-your-customer.

10. "Person" means individuals, limited liability companies, corporations, partnerships, associations, governmental agencies and entities, and all other legal entities.

11. "Plaintiffs" mean plaintiffs in the above-captioned case—Sheryl Wultz, Yekutiel Wultz, Amanda Wultz, and Abraham Leonard Wultz—and decedent Daniel Wultz.

12. "Plaintiffs' Counsel" includes all attorneys, their agents, or other Persons working in any way on behalf of Plaintiffs in this Action, regardless of whether or not such counsel is located in the United States or has entered an appearance in this Action, and including without limitation Nitsana Darshan-Leitner and any other lawyers working on behalf or at the direction of Plaintiffs or any of Plaintiffs' Counsel employed by, or affiliated with, the Israel Law Center or otherwise practicing law from anywhere in the State of Israel.

13. "Shurafa" means the Person who was the beneficiary of the Shurafa Wire Transfers (see below), whose name may be spelled in any of the following ways: (a) Said al-Shurafa; (b) Said Z.R. al Shurafa; (c) Said Surafa; (d) Said al Surafa; (e) Said el Shorafa; (f) Said

3

Z.A. Alshurafa; (g) S.Z.R. Alshurafa (h) Said ZR Alshurafa; or (i) any other variation of the name of the Person who was the beneficiary of the Shurafa Wire Transfers.

14. "Shurafa Transactional Documents" means documents produced by Bank Hapoalim to BOC in response to Document Request #1 of the subpoena that BOC served on or about September 28, 2012 on Bank Hapoalim in this Action, which requested "[a]ll documents concerning any transactions from the period of January 1, 2003 to January 31, 2008, that involve or are related to any of the following individuals: (a) Said al-Shurafa; (b) Said Z.R. al Shurafa; (c) Said Surafa; (d) Said al Surafa; (e) Said el Shorafa; (f) Said Z.A. Alshurafa; or (g) S.Z.R. Alshurafa, including ... (i) Any documents relating to BOC accounts numbered 4750401-0188-150882-6 or 4762307-0188-034456-6; and/or (ii) Any documents relating to transfers to the above-listed entities occurring on June 16, 2006; July 7, 2006; July 21, 2006; April 11, 2007; and November 16, 2007."

15. "Shurafa Wire Transfers" means the wire transfers reflected in the Shurafa Transactional Documents.

16. The terms "you," "your," and "yourself" means Bank Hapoalim, any agent, officer, director, employee, attorney, consultant, investigator, or representative of Bank Hapoalim, and each Person acting or having authority to act on behalf of Bank Hapoalim. This definition relates to all such Persons past or present.

**Section III** - Rule 30(b)(6) Deposition Topics

1.  The Shurafa Transactional Documents, including, but not limited to: (a) authentication of the documents; (b) explanation of the content of the documents; (c) explanation as to why information was redacted from the documents; (d) explanation as to why any documents concerning the Shurafa Wire Transfers were not produced; (e) explanation as to why other types of documents typically associated with wire transfers were not produced for the Shurafa Wire Transfers; and (f) identification of any information on the Shurafa Transactional Documents indicating that a transaction was considered suspicious.

2.  The ordering and execution of the Shurafa Wire Transfers, including, but not limited to: (a) the form and manner in which the Shurafa Wire Transfers were ordered; (b) the information that was available to Bank Hapoalim about the Shurafa Wire Transfers, and the Persons involved in them, at the time Bank Hapoalim received any instructions or requests (electronic or otherwise) to process the Shurafa Wire Transfers; (c) the information that Bank Hapoalim requested, required, collected, or reviewed in executing the Shurafa Wire Transfers; (d) the systems used to process and execute the Shurafa Wire Transfers; (e) the banks involved in the Shurafa Wire Transfers; (f) the communications or messages between the banks involved in the Shurafa Wire Transfers; (g) the information provided to BOC in processing the Shurafa Wire Transfers; and (h) any communications or messages to or from the Government of Israel in the execution of the Shurafa Wire Transfers.

3.  The compliance policy and procedures followed by Bank Hapoalim with respect to the Shurafa Wire Transfers, including, but not limited to: (a) verification that Bank Hapoalim followed its AML, KYC, CDD, and CTF policies and procedures in executing the Shurafa Wire

Transfers; (b) identification of any suspicious aspects of the Shurafa Wire Transfers with respect to the Bank's AML, KYC, CDD, and CTF policies or Israeli law, raised by the Shurafa Wire Transfers; and (c) any inquiry or investigation (internal, governmental, or other) into the Shurafa Wire Transfers or the circumstances surrounding them.

4. Any inquiry or investigation conducted by Bank Hapoalim or the Government of Israel into the Bank's customer (Sharkawi Hafiz) who ordered the Shurafa Wire Transfers.

5. Any inquiry or investigation conducted by Bank Hapoalim or the Government of Israel into the beneficiary (Shurafa) of the Shurafa Wire Transfers.

6. Any communications or meetings between Bank Hapoalim and the Government of Israel concerning (a) the Shurafa Wire Transfers; (b) Sharkawi Hafiz; (c) Shurafa; or (d) wire transactions to BOC generally.

7. Any communications or meetings between Bank Hapoalim and BOC concerning (a) the Shurafa Wire Transfers; (b) Sharkawi Hafiz; or (c) Shurafa.

8. To the extent applicable to the Shurafa Wire Transfers, Bank Hapoalim's AML, CTF, KYC, and CDD policies and procedures, including, but not limited to: (a) authentication of the policy and procedure documents produced by Bank Hapoalim to BOC in this Action; (b) the AML, CTF, KYC, and CDD policies and procedures applicable to international wire transfers originating at the Bank's branches in Israel; (c) the AML, CTF, KYC, and CDD policies and procedures applicable to MT 202 (bank-to-bank) transactions; (d) the AML, CTF, KYC, and CDD policies and procedures concerning manual versus automatic/computerized review of wire

6

transactions; and (e) the systems and software utilized for automatic/computerized review of wire transactions.

9. To the extent applicable to the Shurafa Wire Transfers, Bank Hapoalim's due diligence policies and procedures with respect to investigating the <u>beneficiary</u> of wire transfers originating at the Bank's branches in Israel, including, but not limited to: (a) beneficiary information that is requested, required, collected, or reviewed; (b) the Bank's review process of beneficiary information; (c) governmental lists, standards or databases against which the beneficiary information is checked; (d) other lists, standards or databases (including internal Bank lists or databases) against which the beneficiary information is checked; (e) beneficiary information that is reported internally or externally; and (f) the Bank unit or department to which the beneficiary information is reported internally or the Person to whom the beneficiary information is reported externally.

10. The authentication of, and explanation for, statements in Bank Hapoalim's 2005 and 2006 Annual Report regarding the organizational structure and size of the Bank.

11. For each of: (i) the Legal Department of Bank Hapoalim; (ii) the Compliance Department of Bank Hapoalim; and (iii) Supervisor of the Prohibition of Money Laundering and Prevention of Terrorism Financing at Bank Hapoalim, their roles and responsibilities with respect to (a) drafting, reviewing, implementing, and overseeing the Bank's AML, KYC, CDD, and CTF policies and procedures; (b) responding to situations or transactions that raise money laundering or terrorism financing issues or concerns; (c) communicating with the Government of Israel on AML, KYC, CDD, and CTF issues; and (d) the Israeli laws, regulations, rules, and orders that govern their implementation of AML, KYC, CDD, and CTF policies and procedures.

7

12. The procedures Bank Hapoalim follows for communicating with the Government of Israel concerning AML, KYC, CDD, and CTF issues.

13. The authentication of, and explanation for, the following statements in the "The Supervisor of the Prohibition of Money Laundering and Financing of Terrorism" section of the 2005 Annual Report of Bank Hapoalim concerning the Bank's adherence to and implementation of Israel's AML and CTF laws:

- "The Bank's policy document regarding the prohibition of money laundering, which was ratified in 2002, was reformulated in 2005. The policy guidelines were updated, giving expression to the commitment of the Bank Group to ensure the strictest compliance with the laws governing the prohibition of money laundering and financing of terrorism, and the directives of the Supervisor of Banks, also taking into account the recommendations of international bodies, and the experience accumulated and conclusions drawn and applied to the Bank Group." (p.137)

- "Systems for identification and location of customers and accounts that constitute money laundering risks were put into operation at the Bank, at the banks, and at the credit card companies within the Bank Group. The systems use administrative information combined with areas of activity, characteristics of activity, and monetary volumes." (p. 137)

- "The Bank also completed the update of its procedures and control systems in accordance with the directives of the Prohibition of the Financing of Terrorism Law and the amendments to Proper Conduct of Banking Business Directive No. 411, which were published and took effect in 2005. In accordance with the Prohibition of the Financing of Terrorism Law, a system was put into operation to locate and identify individuals and organizations on the State of Israel's list of prohibited associations. Upon operation of the system, a scan of customer information in the customer identification files of banks within the Group was performed." (p. 138)

- "As of the date of approval of the financial statements, the regulations required under the Prohibition of Financing of Terrorism Law to determine the manner in which terrorist organizations and operatives are to be declared as such have not been put in place." (p. 138)

- "[S]ince the law ... also applies to corporations, non-affiliated groups, and individuals that have not been declared to be connected with terrorist acts, the Bank doubts whether it can fulfill the task with which it has been charged, in the

8

absence of tools that could be used to identify terrorist organizations and operatives that have not been declared as such by government agencies." (p. 138)

- "The Bank has alerted the Minister of Justice, the Attorney General, and the Supervisor of Banks to the aforesaid difficulties in the implementation of the law. The Minister of Justice's response dated August 3, 2005, stated, inter alia, that, 'offences under Sections 9 and 10 of the law are offences requiring criminal intent. Therefore, in the absence of the foundations requiring criminal intent, criminal liability shall not be imposed under these Sections.'" (p. 138)

- "[T]he Bank is reassessing its contacts with Palestinian and Arab banks operating in the Occupied Territories; the process includes application to the relevant State authorities." (p. 138)

- "The Anti-Money Laundering Department is continuing and expanding its initiatives and activities in the areas of training and absorption, applying the conclusions drawn from events in Israel and elsewhere. Concurrently, the number of reports handled by the Unit increased substantially. ... Due to the expansion of the Unit's responsibilities and the increase in its assignments, its staff was enlarged, and existing positions were augmented. In addition, the appointment of senior employees as compliance and money laundering prevention officers was completed at all Bank branches, regional administrations, and at the headquarters of Retail Banking, the Corporate Area, and the Global Private Banking Area, in Israel and abroad." (p. 138)

- "In 2006, the Bank will continue to allocate resources to operational systems, improvement of the system of information about Group customers, implementation of controls, and training. At the international level, cooperation with the Bank's representative offices and subsidiaries abroad will be expanded." (p. 138)

14. The authentication of, and explanation for, the following statements in the "The Supervisor of the Prohibition of Money Laundering and Prevention of Terrorism Financing" section of the 2006 Annual Report of Bank Hapoalim concerning the Bank's adherence to and implementation of Israel's AML and CTF laws:

- "During 2006, the development and improvement of control systems and the system for reporting to the Israel Money Laundering Prohibition Authority continued. Information systems regarding customers with public exposure were added and enhanced, and a system was set up to scan names against international lists of entities and individuals that pose a risk in relation to the prohibition on money laundering and prevention of the financing of terrorism." (p.153)

9

- "Training and implementation of legal directives continued, with an emphasis on international banking activity and on accounts of foreign residents, relying extensively on lessons learned from events in Israel and elsewhere. Concurrently, there was a significant increase in the number of reports handled by the unit headed by the Supervisor of the Prohibition of Money Laundering and Prevention of Terrorism Financing." (p. 153)

- "The unit continues its initiatives in the area of developing new control tools and improving existing systems, in order to reinforce its ability to identify and examine activities that appear to be unusual in the context of the prohibition of money laundering or activities that appear to be related to terrorism financing. The unit is responsible for prevention of the performance of such acts by or through the Bank and for reporting them to the Israel Money Laundering Prohibition and/or to the Israel Police, as relevant." (p. 153)

- "The Supervisor of the Prohibition of Money Laundering is solidifying and expanding measures to ensure implementation of the policy throughout the Bank Group, in Israel and globally. Within this effort, the Bank completed a special audit of its branches and of subsidiaries in Western Europe, designed to examine the degree of compliance at these corporations, and its findings serve as the basis for updates of procedures and controls." (p. 154)

- "As of said date, the regulations required under the Prohibition of Financing of Terrorism Law to determine the manner in which terrorist organizations and operatives are to be declared as such have not been put in place." (p. 154)

- "[F]ollowing a reassessment of the Bank's business relationships with Palestinian and Arab banks operating in the Palestinian Authority, in accordance with agreements previously made with these banks, the Bank notified these banks of the cessation of its business relationships with them." Although the cessation was partially carried out, "in accordance with a request by the Governor of the Bank of Israel, the Bank agreed to continue these relationships until November 1, 2006, with the intention that by that date a satisfactory legal and operational solution would be found that would enable the Bank to provide services to these banks and their customers after that date as well." (p. 154)

- "At the end of October 2006, the Bank was notified that the Minister of Finance intended to ... grant permission to all banks operating in Israel, as well as a special permission to the Bank ... in its position as a correspondent of Palestinian banks and the representative of these banks to the Inter-Bank Clearing House in Israel, allowing the Bank to continue to provide services to the Palestinian banks with which it has entered into the aforesaid agreements, and to continue to provide its customers with services involving the execution of monetary transactions with banks operating in the Palestinian Authority and their customers." (p. 154)

10

- The Minister of Finance granted the Bank permission, in part, because an "amendment to the Anti-Money Laundering and Prohibition of Terrorism Financing Order" required banking corporations to "check against a list of 'declared terrorist organizations and operatives' (i.e. a list prepared by State defense agencies) whether individuals or organizations included in the list are parties to transactions which the Israeli banks are asked to perform. Furthermore, the banking corporations were charged with broader-than-usual reporting obligations with regard to monetary transactions conducted with banks operating in the Palestinian Authority and with their customers. A bank that fulfills the obligations explicitly imposed upon it in the Order will not be exposed to criminal liability should it transpire that it performed transactions in which one of the parties was involved in terrorist activity, though not declared as a terrorist operative by government agencies, unless it is proven that the bank was aware of the fact that said party to the transaction was a terrorist operative." (p. 155)

- The amendment to the Anti-Money Laundering and Prohibition of Terrorism Financing Order added "operational directives and clarifications" to streamline the process and to improve "the scope and quality of information accrued, in order to strengthen government agencies' ability to effectively enforce the directives of the relevant laws." (p. 155)

15. The process by which the Government of Israel discloses to, or otherwise informs, Bank Hapoalim of terrorist organizations or operatives (whether designated, suspected or potential), "watch lists," or suspicious Persons or entities in the regular course of business, including, but not limited to: (a) the form of communication; (b) the frequency of communication; (c) the Bank's ability to access the Government of Israel's information or lists concerning suspicious or designated Persons and entities; (d) the entity or entities within the Government of Israel responsible for creating and distributing such information or lists; and (e) the Person or department at Bank Hapoalim responsible for interfacing with the Government of Israel concerning suspected terrorists or suspicious Persons.

16. Bank Hapoalim's record retention policy.