UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

SHERYL WULTZ, individually, as personal
representative of the Estate of Daniel Wultz,
and as the natural guardian of plaintiff
Abraham Leonard Wultz; YEKUTIEL
WULTZ, individually, as personal
representative of the Estate of Daniel Wultz,
and as the natural guardian of plaintiff
Abraham Leonard Wultz; AMANDA
WULTZ; and ABRAHAM LEONARD
WULTZ, minor, by his next friends and
guardians Sheryl Wultz and Yekutiel Wultz,

     **Plaintiffs,**

    - against -

BANK OF CHINA LIMITED,

     **Defendant.**

------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/25/13

OPINION AND ORDER

11 Civ. 1266 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

    This suit arises out of the death of Daniel Wultz and the injuries of

Yekutiel Wultz, suffered in a 2006 suicide bombing in Tel Aviv, Israel.  Four

members of the Wultz family brought suit against Bank of China ("BOC"),

1

alleging acts of international terrorism under the Antiterrorism Act ("ATA"),[1] among other claims.

All of plaintiffs' non-federal claims against BOC have been dismissed.[2]  In addition, plaintiffs' attempt to hold BOC liable for aiding and abetting international terrorism under the ATA has been categorically foreclosed by the Second Circuit.[3]  The plaintiffs' only remaining claim against BOC is for acts of international terrorism under the ATA, based on BOC allegedly having provided material support and resources to a terrorist organization.[4]

The general facts and procedural history of this case and plaintiffs' numerous attempts to obtain discovery from BOC were laid out in previous opinions and familiarity with them is assumed.[5]  Before this Court is plaintiffs'

---

[1]      *See* 18 U.S.C. § 2333(a).

[2]      *See Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266, 2013 WL 1641179 (S.D.N.Y. Apr. 16, 2013) (dismissing plaintiffs' remaining non-federal claim as time-barred under New York "borrowing statute").

[3]      *See In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 123 (2d Cir. 2013) ("[A] defendant cannot be liable under the ATA on an aiding-and-abetting theory of liability." (citing *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013))).

[4]      *See* First Amended Complaint ¶¶ 106–115.

[5]      The background of the parties' disputes is summarized in *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 551-52 (S.D.N.Y. 2012) ("*Wultz I*") and *Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266, 2013 WL 1832186, at *1-4 (S.D.N.Y. May 1, 2013) ("*Wultz II*").

third motion to compel BOC to produce documents located in China in BOC's control.[6]  BOC argues that the documents are protected by the attorney-client privilege and/or the work-product doctrine.  For the reasons stated below, plaintiffs' motion is granted in part.

## II.   BACKGROUND

I first addressed plaintiffs' motion to compel BOC to produce various documents in its possession, specifically documents located in China pertaining to anti-money laundering ("AML") and compliance procedures and investigations in an order issued on October 29, 2012 ("the October 29 Order").[7]  BOC argued that the requested production of documents would violate China's bank secrecy laws.  Applying the Second Circuit's seven-factor comity test,[8] I granted plaintiffs' motion in part and ordered BOC to produce relevant documents except "confidential regulatory documents created by the Chinese government whose production is clearly prohibited under Chinese law."[9]

---

[6]     The first two motions were addressed in *Wultz I*, 910 F. Supp. 2d at 551-52 and *Wultz II*, 2013 WL 1832186, at *1-4.

[7]     *Wultz I*, 910 F. Supp. 2d at 551-52.

[8]     *See Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 438-39 (E.D.N.Y. 2008) (citing *Minpeco S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987)).

[9]     *Wultz I*, 910 F. Supp. 2d at 556.

Rather than comply with the October 29 Order, BOC continued to object to its discovery obligations and raised alternative provisions of Chinese law – those relating to combating money laundering and other illegal financial transactions – which allegedly prevented the disclosure of any document whose production was ordered.[10]

In an opinion issued on May 1, 2013 ("the May 1 Order"), I granted plaintiffs' second motion to compel in part, again applying the Second Circuit's multi-factor comity test. The May 1 Order required BOC to produce documents pertaining to (1) "communications from the Chinese government to BOC from prior to January 23, 2008" concerning Said al-Shurafa ("Shurafa") and related accounts, (2) "materials concerning AML or [counter-terrorist financing] ("CTF") problems or deficiencies at BOC's Guangdong Branch from January 1, 2003 to September 2008," (3) documents "concerning AML or CTF problems or deficiencies at BOC's Head Office from January 1, 2003 to September 2008, to the extent that those problems or deficiencies related to the [Palestinian Islamic Jihad ("PIJ")], Hamas or any terrorists allegedly involved with those organizations," and (4) documents concerning Shurafa and related accounts, "including visits of

---

[10]     *See* 2/28/13 Memorandum of Law on Behalf of Bank of China Ltd. in Opposition to Plaintiffs' Motion to Compel Discovery Prohibited Under the Law of the People's Republic of China, at 9-12.

foreign officials related to those same topics."[11]

The May 1 Order to produce was subject to two exceptions. *First*, BOC could withhold Suspicious Transaction Reports or Large-Value Transaction Reports, provided they were produced to the Court for *in camera* review.[12] Second, BOC could withhold "items subject to the attorney-client or work-product privileges," provided that the items were "listed in a document-level privilege log produced to plaintiffs, providing enough information to determine whether the documents are in fact privileged."[13]

Following the May 1 Order, BOC "produced a variety of documents" including "reports to its Chinese regulators concerning Said al-Shurafa," "minutes in its possession for meetings between BOC officials and representatives of the People's Bank of China," "policies and procedures related to" AML and CMF, and "internal audits of its United States branches for AML and CTF compliance during the relevant time period . . . as well as all reports prepared by outside auditors Grant Thornton and KPMG."[14]   In sum, "BOC has produced more than 200,000

---

[11]   *Wultz II*, 2013 WL 1832186, at *12.

[12]   *See id.*

[13]   *Id*.

[14]   9/17/13 Memorandum of Law on Behalf of Bank of China, Ltd. in Opposition to Plaintiffs' Motion to Compel Production of Documents Withheld as

pages."[15]

Plaintiffs claim that BOC's main production, made on May 21, 2013, "consisted largely of publicly available materials, previously-produced account records, and other filler."[16]  According to plaintiffs, the May 21 production was the only "substantial production from the files of [BOC's] Chinese employees" and consisted of "5,751 documents."[17]

BOC subsequently provided two privilege logs, dated June 7, 2013 ("the June 7 Log")[18] and June 20, 2013, amended on August 6, 2013 ("the August 6 Log").[19]  The two logs combined consist of 6,253 entries over which BOC asserts attorney-client privilege, work-product protection, or both.[20]  Plaintiffs estimate that, in total, BOC has withheld 13,953 documents - "a figure more than double the

_____

Privileged ("Def. Opp."), at 5.

[15]    *Id*. at 3.

[16]    9/3/13 Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion to Compel Production of Documents Located in China Improperly Withheld as Privileged ("Pl. Mem."), at 6.

[17]    *Id*.

[18]    *See* Exhibit ("Ex.") 9 to 09/03/13 Declaration of Olav A. Haazen, Counsel for Plaintiffs ("Haazen Decl.").

[19]    *See* Exs. 7-8 to Haazen Decl.

[20]    *See* Pl. Mem. at 6-7; Def. Opp. at 8.

number of documents that BOC has actually produced from China in response to the May 1 Order."[21]

## III.    APPLICABLE LAW

### A.    Choice of Law

Under Federal Rule of Evidence 501, questions of privilege are "governed by the principles of common law."[22]  "The 'common law' applied under Rule 501 includes 'choice of law' questions."[23]  "In determining which country's law applies to claims of privilege involving foreign documents, courts in the Second Circuit have adopted the 'touch base' approach applied in *Golden Trade* [*S.r.L. v. Lee Apparel Co.*]"[24]  "Under this analysis, the Court applies 'the law of

---

[21]    Pl. Mem. at 7.  Of the 6,253 entries on the combined privileged logs, 3,911 are categorized as "Email With Attachments." Plaintiffs estimate of the total number of documents is based on a rough calculation that estimates each email as containing two attachments.  Because BOC does not clarify the total number of withheld documents in its submissions, I adopt plaintiffs' calculation for the purposes of this opinion.  The large number of withheld documents in comparison to the number of documents in its main production, is not relevant to determinations of privilege but is illustrative of BOC's approach to its discovery obligations.

[22]    *Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 521 (S.D.N.Y. 1992) (citing Fed. R. Evid. 501).

[23]    *Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, 97 (S.D.N.Y. 2002).

[24]    *Gucci America, Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 64 (2010).

the country that has the predominant or the most direct and compelling interest in whether [the] communications should remain confidential, unless that foreign law is contrary to the public policy of this forum.'"[25] "The country with the 'predominant interest' is either 'the place where the allegedly privileged relationship was entered into' or 'the place in which that relationship was centered at the time the communication was sent.'"[26] "Thus, American law typically applies to communications concerning 'legal proceedings in the United States' or 'advice regarding American law,' while communications relating to 'foreign legal proceeding[s] or foreign law' are generally governed by foreign privilege law."[27]

## B.   Chinese Law

The party objecting to a discovery motion based on foreign law bears the burden "'of demonstrating that such law actually bars the production or testimony at issue.'"[28] "'In order to meet that burden, the party resisting discovery must provide the Court with information of sufficient particularity and specificity

---

[25]   *Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 118, 2013 WL 3369084, at *1 (S.D.N.Y. Jul. 8, 2013) (quoting *Astra*, 208 F.R.D at 98).

[26]   *Astra*, 208 F.R.D. at 98 (quoting *Golden Trade*, 143 F.R.D. at 522).

[27]   *Anwar*, 2013 WL 3369084, at *1 (quoting *Gucci*, 271 F.R.D. at 65).

[28]   *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 207 (E.D.N.Y. 2007) (quoting *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993)).

to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law.'"[29]  The party must describe, among other things, "'the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case.'"[30]

"'Foreign law, though formerly treated as an issue of fact, is now recognized as an issue of law, to be established by any relevant source, including testimony.'"[31]  Federal Rule of Civil Procedure ("Rule") 44.1 establishes that "[t]he court's determination [of foreign law] must be treated as a ruling on a question of law."

Chinese courts do not routinely issue opinions:  "'[t]here is no system of guidance by precedent, judges deciding cases do not issue explanatory published opinions, and their judgments do not bind co-ordinate or lower courts in other

---

[29]     *Id.* (quoting *Alfadda*, 149 F.R.D. at 34).

[30]     *Id.* (quoting *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 586 (2d Cir. 2005)).

[31]     *Wultz v. Bank of China Ltd.*, 860 F. Supp. 2d 225, 230 (S.D.N.Y. 2012) (quoting *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987)). *Accord In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 562 (E.D.N.Y. 2011) ("A determination of foreign law is, like choice of law analysis, a preliminary matter to be resolved by the court.  Therefore, any disputed facts underlying that determination must also be resolved by the court.").

cases.'"[32]  As I noted in two prior opinions in this case, "[t]he interpretation of Chinese law should be informed by attention to the general practices and features of China's legal institutions, rather than by relying solely on inferences drawn from indeterminate legal language."[33]

### C. Attorney-Client Privilege

"The attorney-client privilege is one of the oldest recognized privileges for confidential communications."[34]  The privilege is designed to "encourage full and frank communication between attorneys and their clients."[35]  The privilege serves the dual purpose of shielding "from discovery advice given by the attorney as well as communications from the client to the attorney, made in pursuit of or in facilitation of the provision of legal services."[36]  However, because the attorney-client privilege "stands in derogation of the public's 'right to every

---

[32]    *Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266, 2012 WL 5431013, at *4 n.43 (S.D.N.Y. Nov. 5, 2012) (quoting Declaration of Professor George W. Conk, Ex. 1 to 9/21/12 Declaration of Marilyn C. Kunstler, Counsel for Plaintiffs, ¶ 26);  *Wultz II,* 2013 WL 1832186, at *4.

[33]    *Wultz II,* 2013 WL 1832186, at *4 (footnotes omitted) (quoting and citing, among other sources, RANDALL PEERENBOOM, CHINA'S LONG MARCH TOWARD RULE OF LAW (2002)).

[34]    *Swidler Berlin v. United States*, 524 U.S. 399, 403 (1998).

[35]    *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[36]    *Id.*

man's evidence' . . . '[i]t ought to be strictly confined within the narrowest possible limits consistent with the logic of the principle.'"[37]

"It is well settled that '[t]he burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it.'"[38] "In order to prevail on an assertion of the attorney-client privilege the party invoking the privilege" must show that:

> "(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."[39]

---

[37]    *In re Grand Jury Proceedings*, 219 F. 3d 175, 182 (2d Cir. 2000) (quoting *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1980)).

[38]    *Id.* (quoting *United States v. International Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997)) (some quotation marks omitted).

[39]    *Colton v. United States*, 306 F.2d 633, 637 (2d Cir. 1962) (quoting *United States v. United Shoe Machinery Corp.*, 189 F. Supp. 357, 358-59 (D. Mass. 1950). *Accord Gucci America, Inc. v. Guess?, Inc.*, No. 09 Civ 4373, 2011 WL9375, at *1 (S.D.N.Y. Jan. 3, 2011); *SEC v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 138 (S.D.N.Y. 2004).

### D.     Work-Product Doctrine

Work-product protection is "'broader than the attorney-client privilege.'"[40]   It protects "an attorney's mental impressions, opinions or legal theories concerning specific litigation" from discovery.[41]   Rule 26(b)(3), which codifies the work-product protection, states in part that if a court orders discovery of materials prepared in anticipation of litigation by or for another party or its representative, "it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."   Unlike the protection granted to attorney-client communications, "[t]he privilege derived from the work-product doctrine is not absolute."[42]   Like other qualified privileges, it may be overcome by a showing of substantial need.[43]

The Second Circuit has interpreted the 'in anticipation of litigation'

---

[40]     *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003) (quoting *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975)).

[41]     *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 12 (2d Cir. 1989).

[42]     *Nobles*, 422 U.S. at 239.

[43]     *See In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 184-87 (2d Cir. 2007) (citing Rule 26(b)(3) and *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

requirement broadly.  Documents should therefore be "deemed prepared in 'anticipation of litigation' if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'"[44]

## IV.    DISCUSSION

Plaintiffs request that BOC "be compelled to produce every document in China that is listed on its logs."[45] Plaintiffs make several arguments in support of this request.  *First*, because "the documents . . . are located in China and were sent to and from Chinese personnel at a Chinese state bank, Chinese law," which does not recognize the attorney-client privilege or the work-product doctrine, "governs BOC's privilege claims" and compels production.[46]  *Second*, BOC would be unable to satisfy its burden even under United States privilege law, because a large number of the communications are not to or from licensed attorneys.[47]  Finally, "BOC's privilege logs are grossly inadequate on their face and fail to comply with

---

[44]    *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 *Federal Practices & Procedures* § 2024, at 343 (1994)).

[45]    Pl. Mem. at 2.

[46]    *Id.*

[47]    *See id.* at 3.

the most rudimentary requirements for a log [or with] the detailed requirements of Local Civil Rule 26.2."[48]

BOC, in turn, makes several arguments against production. *First*, the Court should apply United States privilege law, because applying Chinese privilege law would be "contrary to public policy and principles of comity" as "there is no law in China that allows courts to require attorneys to testify against their clients, and in practice, no court has done so or would do so."[49] *Second*, BOC's privilege claims are supported under United States law even if the communications do not involve a licensed attorney if the individuals involved in the communication "serve as the functional equivalents of lawyers."[50] Finally, BOC's privilege logs "provide all of the information required by Local Rule 26.2."[51]

### 1. Choice of Law Analysis

"Courts in the Second Circuit have adopted the 'touch base' approach applied in *Golden Trade*" to determine which country's privilege should apply to

---

[48]   *Id.* at 2.

[49]   Def. Opp. at 2.

[50]   *Id.*

[51]   *Id.*

foreign documents.[52]  The "touch base" analysis typically considers which country "has the 'predominant' or 'the most direct and compelling interest' in whether those communications should remain confidential, unless that foreign law is contrary to the public policy of this forum."[53]

In *Golden Trade*, the court found that communications between an Italian corporation and its patent agents in Norway, Germany and Israel regarding patent law in those respective countries did not "touch base" with the United States because they "related to matters solely involving" foreign countries.[54]  The court held that the applicable privilege law should be of those "countries [that] have the predominant interest in whether those communications should remain confidential," which are the nations "where the allegedly privileged relationship was entered into."[55]  By contrast, courts have found that communications relating to legal proceedings in the United States or communications providing advice on American law do "touch base" with the United States and should be governed by

---

[52]     *Gucci*, 271 F.R.D. at 64.

[53]     *Astra*, 208 F.R.D. at 98 (citing *Golden Trade*, 143 F.R.D. at 522).

[54]     *Golden Trade*, 143 F.R.D. at 520-22.

[55]     *Id.* at 521.

American privilege law.[56]

      Plaintiffs argue that the jurisdiction with the "predominant interest" in this matter is China because "[a]ll of the documents in question are located in China and BOC's privilege logs indicate that the individuals involved in the communications are Chinese BOC employees who work in China, and communicate almost exclusively with other BOC employees located in China."[57]

      BOC argues that applying Chinese privilege law would be unfair and would force BOC to "produce a wide range of documents in accordance with broad U.S. discovery requirements while enjoying none of the protections of U.S. privilege law."[58]  Rather, BOC urges that the Court follow the reasoning of *Astra Aktiebolag v. Andrx Pharmaceuticals* and reject the application of Chinese law because of principles of comity and public policy.[59]

      In *Astra*, the court held that Korean law would apply to documents pertaining to four legal proceedings held in Korean courts under the traditional

---

     [56]    *See, e.g.*, *Gucci*, 271 F.R.D. at 66-70 (holding that American law applies to documents located in Italy pertaining to United States trademark law and lawsuit in United States federal court).

     [57]    Pl. Mem. at 16-17.

     [58]    Def. Opp. at 12.

     [59]    *See id*. at 13.

"touch base" framework.[60]   Korean law recognizes neither the attorney-client privilege nor the work-product doctrine.[61]   However, the *Astra* court found that "these documents would not be subject to production, whether through a discovery process or by court order, in a Korean civil lawsuit.  Under Korean law, a court may only issue an order to compel document production under specific limited circumstances designated by statute."[62]   Because production of the documents in question could not be compelled in Korea based on the statutes governing civil discovery in Korea, the court held that compelling their production in the United States "would violate principles of comity and would offend the public policy of this forum."[63]

BOC urges the Court to follow *Astra*'s reasoning and apply United States privilege law instead of Chinese law.  BOC argues that, as in Korea, these documents would not be subject to production in civil discovery in China because

---

[60]     *See Astra*, 208 F.R.D. at 99 ("When a Korean attorney is representing a foreign client in a Korean proceeding, the Korean attorney will generally anticipate that the Korean law of privilege will apply to the attorney's communications with the client and the work product created for that proceeding.") (quotation omitted).

[61]     *See id*. at 100-01.

[62]     *Id*. at 101.

[63]     *Id*. at 102.

"[i]n practice, no Chinese court would order an attorney to divulge such confidences" and compelling the production in an American court would violate the principles of comity and public policy mentioned in *Astra*.[64]  Plaintiffs respond that *Astra* stands for the proposition that "applying Korean privilege law in a procedure governed by U.S. discovery rules would result in production that neither Korean civil procedure nor U.S. privilege law would have permitted on its own."[65] Plaintiffs argue that in this case, "Chinese law is vastly different from the law of Korea" and permits courts "to compel production of attorney-client communications and require attorneys to testify in court."[66]

BOC's primary argument against applying Chinese law to these documents is that "the kind of discovery that has taken place in this case would never occur in China, where a plaintiff must collect and submit its own

---

[64]     Def. Opp. at 14.

[65]     Pl. Mem. at 21.

[66]     *Id*.  *Accord* 9/23/13 Reply Memorandum of Law in Support of Plaintiffs' Motion to Compel Production of Documents Located in China Improperly Withheld as Privileged ("Rep. Mem."), at 6 (". . . China has developed many discovery mechanisms similar to those available in U.S. courts, and Chinese courts do have the power to order production of attorney-client communications – a power that is actually exercised by authorities in China.").

18

evidence."[67]  However *Astra* does not stand for the proposition that principles of comity forbid the application of foreign privilege law of any jurisdiction where discovery practices are more circumscribed than in the United States.  BOC's preferred choice of law analysis would always require the application of U.S. law as there are few, if any, countries in the world where "the kind of discovery that has taken place in this case" would be permitted.

The critical inquiry in *Astra* is not whether the disclosure of attorney-client communications *would* happen, but rather whether it *could* happen.  The court in *Astra* made clear that the documents at issue could not be produced under the "specific limited circumstances designated by statute" and the opposing party had "no independent legal right to the documents under Korean law."[68]

Here, even BOC's expert, Randall Peerenboom, admits "[t]here are general provisions in [Chinese] law that allow judges to compel parties to provide certain information under certain circumstances."[69]  For example, Article 67 of the

---

[67]    Def. Opp. at 13.  *See also* 10/15/13 Defendant's Surreply Memorandum in Opposition to Plaintiffs' Motion to Compel Production of Documents Withheld as Privileged, at 2 ("The extensive discovery, motion practice, and letter-application campaigns that have taken place in this matter would never happen in a Chinese court.").

[68]    *Astra*, 208 F.R.D. at 101.

[69]    09/17/13 Declaration of Randall Peerenboom ("Peerenboom Decl.") ¶ 6.

Civil Procedure Law of the People's Republic of China ("PRC") states: "The people's court shall have the right to investigate and take evidence from the relevant work units or individuals, and such work units or individuals should not refuse to cooperate."[70]  In addition, Article 72 states: "All work units and individuals that have knowledge of the circumstances of a case ought to give testimony in court."[71]  While Mr. Peerenboom asserts that, "PRC courts would not compel lawyers to disclose confidential information . . . in a civil case,"[72] nothing in Chinese law prevents the disclosure of these documents in the same way that Korean law prevented the disclosure of the documents in question in *Astra*. Indeed, according to an article on BOC's Chinese counsel's website "[t]he said provisions of the Civil Procedure Law create the basis for lawyers to be compelled to testify on a client's confidential information, and these laws prevail over any ethical duty of a lawyer to protect a client's information under attorney-client privilege. . . . [A]ttorneys and their clients are not exempt from disclosing information that would otherwise be protected by attorney-client privilege outside

---

[70]     *Id*. ¶ 16.

[71]     *Id.*

[72]     10/9/13 Supplemental Declaration of Randall Peerenboom ("Peerenboom Sup. Decl.") ¶ 3.

[China]."[73]  Because attorney-client and work-product communications and

documents could be subject to discovery under Chinese law, applying Chinese

privilege law does not "violate principles of comity" or "offend the public policy

of this forum."[74]

On BOC also argues that "the bulk of documents BOC withheld that were

dated after January 28, 2008 [the date of plaintiffs' demand letter] concerned

litigation in an American court related to claims under American law" and should

---

[73]     Gui Hongxia and Li Xiang, *Attorney-client privilege: Is this Privilege Extended to Foreign Lawyers in China?*, Ex. 1 to Haazen Decl., at 1-2.  Mr. Hongxia submitted a declaration in support of BOC's motion in opposition to clarify that the "key point of the [a]rticle was that an attorney may not refuse to testify before a Chinese court on the basis that the information sought concerns confidential communication with his or her client," and was not intended as a "comment on the pre-trial discoverability of attorney-client communications." 09/17/13 Declaration of Gui Hongxia ¶ 3.  The distinction is irrelevant for purposes of the *Astra* analysis because Chinese courts can and do compel pre-trial discovery.  As Mr. Peerenboom stated in a declaration submitted in an earlier case involving BOC, courts are critical to the discovery process in China: "If litigants encounter difficulties in obtaining evidence, they may petition the court to assist in discovery in accordance with Article 64," which requires the court to "investigate and collect evidence which litigants and their representatives cannot collect because of objective reasons, or evidence which the people's court deems necessary for the hearing."  03/15/09 Declaration of Randall Peerenboom, Ex. G to 09/23/13 Declaration of Marilyn C. Kunstler, Counsel for Plaintiffs ("Kunstler Decl.") ¶ 34.  "The court may also conduct discovery on its own initiative to obtain evidence that the court deems necessary for the hearing."  *Id*. ¶ 39.  The Chinese Civil Procedure Law also provides for "pretrial exchange of evidence" in accordance with the law.  *Id*. ¶ 40 (citing Article 37 of the Civil Procedure Law).

[74]     *Astra*, 208 F.R.D. at 102.

be governed by American privilege law under the "touch base" analysis.[75]

Plaintiffs respond that BOC should be judicially estopped from making this

argument, because it has previously argued that Chinese law should govern the

production of documents located in China.[76]  Plaintiffs also argue that BOC cannot

show that "all of its documents generated after January 23, 2008" concerned

American litigation.[77]

Plaintiffs are incorrect in stating that judicial estoppel bars BOC from

asserting a "touch base" argument.  Judicial estoppel "'prevents a party from

prevailing in one phase of a case on an argument and then relying on a

contradictory argument to prevail in another phase.'"[78]  "Absent success in a prior

proceeding, a party's later inconsistent position introduces no 'risk of inconsistent

court determinations,' and thus poses little threat to judicial integrity."[79]  In this

instance, even if BOC's current position is contrary to its prior argument that

Chinese law should govern discovery in this case, judicial estoppel is not

---

[75]      Def. Opp. at 16.

[76]      *See* Rep. Mem. at 5.

[77]      *Id*.

[78]      *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich,* 530 U.S. 211, 227, n.8 (2000)).

[79]      *Id*. at 750-51 (quoting *United States v. C.I.T. Constr. Inc.*, 944 F.2d 253, 259 (5th Cir. 1991)).

appropriate or necessary because BOC did not prevail in its earlier arguments.

Based on the *Golden Trade* "touch base" analysis, U.S. privilege law applies to all

documents created after January 28, 2008 that do in fact relate to the demand letter

and the subject matter that gave rise to this lawsuit, because those documents

pertain to American law "or the conduct of litigation in the United States."[80]

### 2.    Documents Governed by Chinese Law

BOC does not seriously contest the proposition that Chinese law does

not include the attorney-client privilege or work-product doctrine as understood in

American law.[81]  Both parties agree that Chinese law creates a duty of

confidentiality instead.[82]

---

[80]    *Astra*, 208 F.R.D. at 99.

[81]    At most, BOC states that Chinese courts, as a matter of practice, might not compel the disclosure of confidences.  *See* Def. Opp. at 14 ("[T]here is no clear statute giving Chinese courts the authority to order attorneys to divulge confidential information about their clients . . . . In practice, no Chinese court would order an attorney to divulge such confidences.").  The statements of Mr. Peerenboom on this issue are vague, inconclusive, and inconsistent.  *See, e.g.*, Peerenboom Decl. ¶ 6 ("[It] would be extremely unlikely that a [Chinese] court would order a lawyer to divulge confidential client information"); *id.* ¶ 16 ( "[T]here is a debate among academics about . . . whether such provisions would allow a [Chinese] court to order lawyers to divulge confidential client information.").

[82]    *See* Pl. Mem. at 17-18; Def. Opp. at 14.  *See also* Peerenboom Decl. ¶ 11 ("Article 38 of the Lawyers Law provides: 'A lawyer shall maintain the confidentiality . . . of the circumstances and information of the client and others learned while practicing law which they do not wish to be disclosed' except in

23

While violations of the duty of confidentiality may trigger certain sanctions under Chinese law, including suspension of a legal license and potential criminal punishment,[83] the duty of confidentiality is an ethical obligation and not an evidentiary protection analogous to the attorney-client privilege or work-product doctrine.[84]

Because Chinese law does not recognize the attorney-client privilege or the work-product doctrine, BOC must produce those items listed on its privilege log which are governed by Chinese privilege law.  The responsive documents are those: (1) dated prior to January 28, 2008 and (2) documents dated after January 28, 2008 that do not relate to plaintiffs' demand letter.

### 3.   Documents Governed by United States Law

Plaintiffs contend that BOC "cannot meet its burden of showing that its in-house documents would be privileged under U[nited] S[tates] law," even if

---

instances of a crime the client is preparing to commit that endangers national security, public security or safety.").

[83]      *See* Peerenboom Decl. ¶ 8.

[84]      *See Bristol–Myers Squibb Co. v. Rhone–Poulenc Rorer, Inc.*, No. 95 Civ. 8833, 1998 WL 158958, at *3 (S.D.N.Y. Apr. 2, 1998) ("[T]he  fact that a statute requires a party to keep clients' affairs secret does not mean that a privilege exists. In this country, those with access to trade secrets, bankers, telephone companies and others are required not to divulge secrets of their clients' affairs absent court proceedings.  Those laws do not create a privilege equivalent to the attorney/client privilege.").

American law applied.[85]  Plaintiffs argue that attorney-client privilege requires

communications involving licensed attorneys.[86]  According to plaintiffs, in-house

counsel in China are "not required to have legal degrees or bar certificates" and

"simply passing the judicial exam . . . does not suffice to constitute a license to

practice law."[87]  Plaintiffs claim that because the record does not reflect that the

members of BOC's Legal and Compliance Department and other departments are

members of the Chinese bar, "their communications with other BOC employees (or

among themselves) are not protected by any type of U.S. attorney-client privilege,

and must be disclosed in their entirety."[88]  Plaintiffs also contend that the

documents should not be protected under the work-product doctrine because that

protection can be overcome by a showing of substantial need.  Plaintiffs argue that

the Court's previous rulings, such as its order on April 9, 2013 ("the April 9

Order"), support plaintiffs' substantial need argument.[89]

---

[85]     Pl. Mem. at 23.

[86]     *See id*.

[87]     *Id*. at 24 (citing 09/03/13 Declaration of Li Wang, Senior Partner, Liaoning Shenyang Law Firm, Ex. 18 to Haazen Decl. ¶ 3).

[88]     *Id*.

[89]     *See* Pl. Mem. at 25 ("[The Court] expressly *rejected* BOC's argument that Plaintiffs' need for BOC's communications with regulators regarding its AML/CTF practices was insufficient to override the bank examiner's privilege.") (citing *Wultz v. Bank of China*, No. 11 Civ. 1266, 2013 WL 1453258, at *7-11

BOC responds that "the application of a strict rule denying a Chinese company the protection of the attorney-client privilege makes little sense" because even though Chinese law does not require in-house counsel to be licensed, their role is the "functional equivalent" of a lawyer and they are permitted to give legal advice.[90] According to BOC, "a reasonable application of the American law of privilege" would recognize that BOC's in-house legal staff, even if unlicensed, "serves all of the same functions as outside lawyers."[91]  BOC also asserts that plaintiffs have not shown substantial need for overcoming the work-product protection.  Even if the April 9 Order found that plaintiffs' need for communications with regulators overcame the bank examiner's privilege, BOC argues that the analysis under the work-product doctrine is different.  Alternatively, BOC argues that the documents listed on the June 7 and August 6 privilege logs over which BOC asserts work-product protection are dated after January 28, 2008 and "significantly differ[] [from] the documents addressed" in the April 9 Order as those documents pertained to the issue of BOC's scienter in regard to events in

---

(S.D.N.Y. Apr. 9, 2013)).

[90]     Def. Opp. at 17-19 (citing Peerenboom Decl. ¶ 26).

[91]     *Id*. at 20.

2006.[92]

Defendant has failed to carry its burden of establishing that the documents contain "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance, or attorneys' mental impressions, opinions or legal theories concerning specific litigation."[93]  As I discussed in *Gucci America v. Guess*, attorney-client privilege requires a showing "that the person to whom the communication was made 'is a member of the bar of a court.'"[94] BOC argues that this rule is too rigid and that attorney-client privilege should be extended to anyone who serves as the "functional equivalent of a lawyer."[95]

BOC cites two lower court cases from other Circuits in support of its proposed "functional equivalent" test.  In *Renfield Corp. v. E. Remy Martin & Co.*, a Delaware trial court held that because the French legal system did not have a "clear equivalent [to] an American bar, the requirement for the availability of the attorney-client privilege should be a "functional one of whether the individual is

---

[92]     *Id.* at 21.

[93]     *Wultz*, 2013 WL 1453258, at *12 (quotations omitted).

[94]     *Gucci*, 2011 WL 9375, at *2 (quoting *United Shoe*, 89 F. Supp. at 358-59).

[95]     Def. Opp. at 20.

27

competent to render legal advice and is permitted by law to do so."[96]  In

*Heidelberg Harris, Inc. v. Mitsubishi Heavy Industries, Ltd.*, an Illinois trial court

held that the attorney-client privilege applies to communications with German

patent agents who were "engaged in the substantive lawyering process." [97]

Neither of these cases is persuasive and neither case has been

followed elsewhere.[98]  In *Honeywell, Inc. v. Minolta Camera Co.*,[99] a New Jersey

trial court explicitly rejected *Renfeld* as inconsistent with *United Shoe*, a case often

---

[96]      98 F.R.D. 442, 444 (D. Del. 1982).

[97]      No. 95 Civ. 0673, 1996 WL 732522, at *10 (N.D. Ill. Dec. 18, 1996).

[98]      Magistrate Judge Michael Dolinger rejected *Renfeld* in *Malletier v. Dooney & Bourke, Inc.*, No. 04 Civ. 5316, 2006 WL 3476735, at *17 (S.D.N.Y. Nov. 30, 2006), holding that there is "no compelling reason for deviating from the consistent line of authority that holds to the contrary."  The *Heidelberg Harris* decision is similarly unpersuasive, given existing American case law which grants attorney-client privilege to registered patent agents as a specified exception, not based on a general rule of "functional equivalency."  *See Buyer's Direct, Inc. v. Belk, Inc.*, No. 12 Civ. 00370, 2012 WL 1416639, at *3 (C.D. Cal. Apr. 24, 2012) ("[T]he congressional goal of allowing clients to choose between an attorney and a patent agent representative in proceedings before the [United States Patent and Trade Office] would be frustrated if the attorney-client privilege were not available to communications with registered patent agents. . . . However, the privilege is limited to communications related to presenting and prosecuting applications before the USPTO, as this is the extent to which Congress has granted patent agents the same status as an attorney representative.").

[99]      *See* No. 87 Civ. 4847, 1990 WL 66182, at *2-3 (D.N.J. May 15, 1990).

cited in this district and in the Second Circuit.[100]

As BOC's own submissions and numerous declarations make clear, there are cognizable distinctions between a "lawyer" and an "in-house counsel" in Chinese law, most critically that it is "not essential" for in-house counsel to be members of a bar or have "some form of legal credentials."[101]  In an analogous recent opinion from this district, Magistrate Judge Frank Maas found that where "in-house counsel lawyers in the Netherlands are permitted to be, and frequently are, unlicensed," there can be no "reasonable mistake" as to whether an in-house counsel served as a licensed attorney.[102]

The *United Shoe* principle justifies the protection of the attorney-client privilege for circumstances where a lawyer – whose authority derives from her position as a member of the bar – is engaged to provide legal advice.  While the Chinese legal system may be developing, the distinctions between lawyer and in-

---

[100]   *See, e.g.*, *Colton*, 306 F.3d at 637; *Davis v. City of New York*, 10 Civ. 699, 2012 WL 612794, at *10 (S.D.N.Y. Feb. 27, 2012); *In re Rivestigmine Patent Litig.*, 237 F.R.D. 69, 73 (S.D.N.Y. 2006); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 441 (S.D.N.Y. 1995).

[101]   09/18/13 Declaration of Xu Na Ke, Chief of the Compliance Management Section in the Legal and Compliance Department of the Guangdong Branch ("Xu Decl.") ¶ 7. *See also* Def. Opp. at 17-20; Peerenboom Decl.  ¶¶ 25-33.

[102]   *Anwar*, 2013 WL 3369084, at *2.

29

house counsel are clear and presumably exist for a good reason.  I see no

compelling reason to depart from the long-standing principle of *United Shoe* and

create a "functional equivalency" test for the invocation of the attorney-client

privilege when applying United States law.   To the extent BOC has claimed

privilege over communications from, to and among members of legal or other

departments who are not licensed attorneys, the attorney-client privilege does not

apply.[103]

         BOC has also claimed work-product protection over post-January 28,

2008 documents pertaining to BOC's investigations into the allegations of

plaintiffs' demand letter.  I already held in the April 9 Order that neither the

attorney-client privilege nor work-product protection apply to these documents

because the record indicates that after BOC's Chief Compliance Officer "received

plaintiffs' demand letter, he called outside counsel, then set about performing the

---

[103]    Even if some Chinese in-house counsel do provide legal advice, BOC does not address whether the same in-house counsel also provides business advice, as is common for American in-house counsel.  Business advice, even when provided by licensed attorneys, is not protected by the attorney-client privilege. *See, e.g.*, *Georgia-Pacific Corp. v. GAF Roofing Mfg. Corp.*, No. 93 Civ. 5125, 1996 WL 29392, at *4 (S.D.N.Y. Jan. 25, 1996) (privilege does not attach to in-house counsel's advice addressing environmental risks because it is business advice as opposed to a legal opinion).  Even if certain members of BOC's in-house legal team were licensed attorneys, it is unclear from the record whether those members also had duties and rendered business advice that would fall outside the realm of attorney-client privilege.

investigation within the Compliance Department – without the involvement of any counsel, and not for the purpose of obtaining legal assistance."[104]  Privilege does not apply to "an internal corporate investigation . . . made by management itself."[105]

### 4.  Sufficiency of Privilege Logs

Local Civil Rule 26.2(a)(2)(A) requires a privilege log to include the following information:

> (i) the type of document, *e.g.*, letter or memorandum; (ii) the general subject matter of the document, (iii) the date of the document; and (iv) the author of the document, the addressees of the document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

While plaintiffs highlight inconsequential minor errors, such as inconsistencies in spelling, the primary and most substantial basis for plaintiffs' argument is that BOC "has asserted privilege  protection over communications between various business units . . . without showing any involvement of any individual lawyer" and that BOC has asserted privilege over communications involving "entire departments at BOC" without identifying the members of the

---

[104]   *Wultz*, 2013 WL 1453258, at *12.

[105]   *In re Grand Jury Subpoena,* 599 F. 2d 504, 511 (2d Cir. 1979) (citing *United Shoe*, 89 F. Supp. at 358).

31

department, the individual involved in the communication and "whether that person was an attorney."[106]

BOC responds that the "vast majority of entries in the logs" have complete descriptions for the required categories and offers to make several amendments to clarify certain minor issues.[107]  However, BOC fails to address plaintiffs' chief concern, which is that the logs claim privilege over communications between departments without providing sufficient information to determine whether the recipients or creators of the documents were attorneys or were providing legal advice.

Plaintiffs have now raised this issue on numerous occasions.[108]  BOC has consistently failed to address plaintiffs' request for further detail, stating in a conclusory fashion that the documents "were prepared or received by the Legal and

---

[106]   Pl. Mem. at 14-15.

[107]   Def. Opp. at 9-10.

[108]   *See, e.g.*, 05/28/13 Letter from Lee Wolosky, Counsel for Plaintiffs, to Lanier Saperstein, Counsel for BOC, Ex. C to Kunstler Decl., at 1 ("BOC's privilege log lists as . . . privileged many communications and other documents that appear not to involve BOC's attorneys, but rather entire BOC departments, entire BOC branches, and individuals who are not lawyers . . . . Please explain BOC's basis for asserting the attorney-client and work product privileges over such materials."); 06/25/13 Letter from Haazen, to Saperstein, Ex. 10 to 09/18/13 Declaration of H. Alex Iliff, Counsel for BOC ("Iliff Decl."), at 2 ("BOC's log refers only . . . to the "New York branch," "the Compliance Department," . . . or other departments.").

Compliance Department, and that they involved requests for or provision of legal advice."[109]  In further support of its claim that "a privilege log need not identify all of the individuals involved in a given communication to support a claim of privilege," BOC misleadingly cites *Export-Import Bank of the United States v. Asia Pulp & Paper Co.* for the proposition that "limited logs – including those that 'provide only the name of a law firm' – may be adequate."[110]  The case, however, supports the opposite proposition:  "Descriptions of the documents are bare-boned. . . . Some entries are undated, fail to identify the author of the document, provide only the name of a law firm, or fail to identify recipients of the document. The log is inadequate."[111]

BOC's own submissions demonstrate the need for detail regarding recipients and senders when asserting attorney-client privilege and work-product protection in logs.  In its August 22, 2013 letter to the Court, BOC stated that the Legal and Compliance Department consisted of twelve employees in 2006, six of

---

[109]     07/04/13 Letter from Iliff to Haazen, Ex. 11 to Iliff Decl. at 3.

[110]     Def. Opp. at 23 (quoting *Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 111 (S.D.N.Y. 2005)).

[111]     *Export-Import Bank*, 232 F.R.D. at 111.

whom were licensed attorneys.[112]  As discussed above, this fact has a significant

impact on the privilege determinations and only bolsters plaintiffs' need for similar

breakdowns for all departments where BOC has claimed a group privilege over

communications.

The declaration from Xu Na Ke, the Chief of the Compliance

Management Section in the Legal and Compliance Department of the Guangdong

Branch states that the department "routinely provided legal advice" and that it was

the "general practice" of the group "to sign responses to requests for legal advice"

as a unit, but confirms that it was "not essential" to be a member of the Chinese bar

to join the Department.[113]  In fact, the declaration clarifies that not all

communications from the Legal and Compliance Department, or other business

departments, consisted of legal advice to and from licensed attorneys.[114]

---

[112]     *See* 08/22/13 Letter from Saperstein to the Court, Ex. 8 to Iliff Decl.,
at 1.

[113]     Xu Decl. ¶¶ 4, 6-7.

[114]     Not only does the Xu Declaration concede that members of the
Department were not necessarily licensed attorneys, it also does not categorically
state that the Department only provided legal advice, as opposed to business
advice.  Even if every communication from the Department was from a licensed
attorney, further detail is required as to the context of the communications to
ensure that the communication satisfies the other elements of attorney-client
privilege or work-product protection.  *See, e.g.*, *Nextg Networks of NY, Inc. v. City
of New York*, No. 03 Civ. 9672, 2005 WL 857433, at *2 (S.D.N.Y. Apr. 13, 2005)
("Even where a communication is identified as having involved a lawyer, there is

I understand that collecting and reviewing a large volume of documents maintained in a foreign country for production in the United States is challenging, and providing adequate data for a privilege log is an unfamiliar task. However, BOC's privilege logs are not sufficient to allow either plaintiffs or this Court to evaluate what, if any, claims of privilege BOC may have.  BOC shall have one final opportunity to amend its privilege logs only as to the documents dated after January 23, 2008 pertaining to plaintiffs' demand letter.  The amended logs must provide adequate  information about the individual authors and recipients, as well as a basis for claiming either attorney-client privilege or work-product protection consistent with this Order.  BOC shall submit its amended privilege logs within ten days.  If BOC again fails to submit adequate logs, it will have waived any claims of privilege over those documents.[115]

---

no evidence that it was created for the purpose of providing or obtaining legal rather than business advice, that it was intended to remain confidential, and that the privilege has not been waived.").

[115]   *See Aurora Loan Serv., Inc. v. Posner, Posner & Assoc., P.C.*, 499 F. Supp. 2d 475, 479 (S.D.N.Y. 2007) ("Failure to furnish an adequate privilege log is grounds for rejecting a claim of attorney client privilege.") (citing *United States v. Constr. Prod. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996)).

## V.    CONCLUSION

For the foregoing reasons, plaintiffs' motion is granted in part.  BOC must complete all ordered production within twenty days from the date of this Order.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      October 24, 2013
            New York, New York

36

**- Appearances -**

**For Plaintiffs:**

Lee S. Wolosky, Esq.
Steven I. Froot, Esq.
Marilyn C. Kunstler, Esq.
Jaime Sneider, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2350

**For Defendant:**

Mitchell R. Berger, Esq.
Patton Boggs LLP (DC)
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-5601

Zachary Carter, Esq.
Lanier Saperstein, Esq.
Neil McDonell, Esq.
Eric Epstein, Esq.
Daniel Goldberger, Esq.
Dorsey & Whitney LLP
51 West 52nd Street
New York, NY 10019
(212) 415-9309