UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

SHERYL WULTZ, individually, as personal
representative of the Estate of Daniel Wultz,
and as the natural guardian of plaintiff
Abraham Leonard Wultz; YEKUTIEL
WULTZ, individually, as personal
representative of the Estate of Daniel Wultz,
and as the natural guardian of plaintiff
Abraham Leonard Wultz; AMANDA
WULTZ; and ABRAHAM LEONARD
WULTZ, minor, by his next friends and
guardians Sheryl Wultz and Yekutiel Wultz,

          Plaintiffs,

        - against -

BANK OF CHINA LIMITED,

          Defendant.

------------------------------------------------------- X

**OPINION AND ORDER**

**11 Civ. 1266 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/13/14

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      This case arises out of the death of Daniel Wultz and the injuries of

Yekutiel Wultz, suffered in a 2006 suicide bombing in Tel Aviv, Israel.  Four

members of the Wultz family brought suit against Bank of China ("BOC"),

alleging that BOC provided material support and resources to the Palestinian

1

Islamic Jihad ("PIJ") by executing millions of dollars worth of wire transfers to an alleged PIJ leader, Said al-Shurafa ("Shurafa").  Plaintiffs' sole remaining claim against BOC is for acts of international terrorism under the Antiterrorism Act ("ATA").[1]  Plaintiffs allege that BOC had actual knowledge of the connection between the wire transfers and the PIJ because Israeli counter-terrorism officials met with the Chinese government and bank regulators in April 2005 and allegedly warned them that Shurafa's accounts were used to transfer money to terrorist organizations.[2]

On September 28, 2012, BOC subpoenaed Bank Hapoalim ("Hapoalim"), a non-party Israeli bank, requesting documents pertaining to any transactions or wire transfers involving Shurafa.  Hapoalim produced a number of documents, including transaction records for sixteen wire transfers from a single individual to Shurafa's BOC accounts, originated at Hapoalim between August 2004 and November 2007.[3]  On June 30, 2013, BOC served Hapoalim with a second subpoena pursuant to Federal Rule of Civil Procedure ("Rule") 30(b)(6) seeking testimony on a variety of topics, including the sixteen specific Shurafa

---

[1]   *See* 18 U.S.C. § 2333(a).

[2]   *See* First Amended Complaint ¶ 77.

[3]   *See* 8/26/13 Declaration of Elissa J. Glasband, Counsel for BOC, ¶ 3.

transactions, Hapoalim's anti-money laundering and counter-terrorism financing compliance policies and procedures, and communications between Hapoalim and the Israeli government concerning Shurafa specifically and anti-money laundering and counter-terrorism financing generally.[4]

Hapoalim filed a motion to quash or modify the subpoena on August 12, 2013, arguing that the subpoena violates Rule 45's prohibition on compelling an individual to travel more than 100 miles from where that person resides, is employed or regularly transacts business in person in order to be deposed.[5] Further, Hapoalim argued that the subpoena should be quashed on grounds of international comity because complying with the subpoena would require Hapoalim to violate a number of Israel's confidentiality laws and potentially cause Hapoalim to give self-incriminating testimony.[6]  Finally, Hapoalim argued that the subpoena was cumulative, irrelevant and improper.[7]

I referred the dispute to Magistrate Judge Gabriel W. Gorenstein.

---

[4]     A Rule 30(b)(6) deposition notice is proper even though Hapoalim is a non-party.  *See infra* n. 15 and accompanying text.

[5]     *See* 8/12/13 Memorandum of Law in Support of Motion by Non-Party Bank Hapoalim B.M. to Quash or Modify the Subpoena Dated June 20, 2013 ("Hapoalim Mem."), at 6-9.

[6]     *See id*. at 9-24.

[7]     *See id*. at 25-26.

After extensive briefing, Judge Gorenstein issued a written decision on October 15, 2013 in which he granted Hapoalim's motion to quash.[8]  While my ruling on BOC's timely Rule 72(a) objections was pending, BOC amended its subpoena, significantly narrowing the deposition topics.[9]  Further, on December 1, 2013 – while BOC's Rule 72(a) objections were pending but before it revised the subpoena – significant amendments to Rule 45 went into effect.

Because BOC amended its request and the governing rule has changed, it is no longer proper to address this issue as a Rule 72(a) objection.  Rather, I rule on Hapoalim's motion to quash or modify the amended subpoena *de novo*.[10]  Thus, nothing in this Opinion and Order represents a finding with respect to Judge Gorenstein's October 15, 2013 ruling.  Although the subpoena has been significantly modified, the underlying issues of fact and law remain similar to those presented to the Magistrate Judge.  Accordingly, I have considered the record and briefing on the original motion as updated by two teleconferences held on January 7 and 16, 2014 and additional letters submitted by BOC and Hapoalim.

---

[8]      *See Wultz v. Bank of China*, 293 F.R.D. 677, 680-81 (S.D.N.Y. 2013).

[9]      *See* 1/17/14 Letter from Mitchell R. Berger, Counsel for BOC, to the Court, at 1.

[10]      I am addressing this matter in the first instance without remanding it to the Magistrate Judge for reasons of judicial efficiency.

For the following reasons, Hapoalim's motion to quash or modify BOC's amended subpoena is DENIED.

## II.    BACKGROUND

### A.    BOC's Request

BOC's explanation as to why it needs testimony from Hapoalim is as follows:

> Before and after the April 2005 Israeli-PRC meeting, and before and after the April 2006 terrorist bombing at issue here, Hapoalim originated in Israel at least 16 wire transfers to Shurafa's BOC accounts. Those transfers totaled $266,100 and comprised 10% of the approximately 160 wire transfers to Shurafa's BOC accounts. The fact that Shurafa was the beneficiary was clearly indicated on the wire transfer orders that Hapoalim originated. The Israeli government had the jurisdiction, the authority, and the ability to halt any of those Shurafa transfers originated by Hapoalim. BOC seeks Hapoalim's testimony to determine whether the Israeli government made such efforts. Testimony confirming the absence of Israeli government efforts, at home in Israel, to block Hapoalim's origination of transfers to Shurafa would make it unreasonable to infer that the Israeli government at the same time traveled thousands of miles to China in an effort to block Shurafa's receipt of such transfers.[11]

Hapoalim does not contest that this Court has jurisdiction to issue a

---

[11]    8/26/13 Memorandum of Law on Behalf of Bank of China Ltd. in Opposition to Motion of Bank Hapoalim to Quash or Modify Subpoena for Testimony ("BOC Opp."), at 2.

subpoena.[12]  However, Hapoalim maintains that the court must quash the subpoena in light of Rule 45(c)'s geographical limitation on compliance for the following reasons.  *First,* the Shurafa wire transactions "originated in Israel and have no connection to Hapoalim's New York office." *Second*, "there are no employees located in New York with any relevant knowledge of these topics." *Finally,* "it is not reasonable or even practical to 'educate' a New York employee concerning transactions and policies in which they have no knowledge."[13]  Further, Hapoalim argues that even if the subpoena does not violate Rule 45, various Israeli confidentiality and secrecy laws bar "much of the discovery sought in the subpoena" and international comity analysis weighs in favor of quashal.[14]

## III.  APPLICABLE LAW

### A.  Non-Party Subpoenas Under Rules 30(b)(6) and 45

Rule 30(b)(6) provides, in relevant part, that a party's subpoena for deposition testimony

---

[12]     This Court has jurisdiction because Hapoalim does business in New York and has a branch office in New York City.

[13]     Hapoalim Mem. at 6-7.

[14]     *Id*. at 18-24.  In the briefing before Judge Gorenstein, Hapoalim also contended that the subpoena was "overbroad, cumulative, irrelevant and improper."  Now that BOC has substantially narrowed the deposition topics, this is no longer an area of contention.

may name as the deponent a public or private corporation . . . and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. . . . The persons designated must testify about information known or reasonably available to the organization.

A Rule 30(b)(6) request for deposition can be served on a non-party whose attendance can be "compelled by subpoena under Rule 45."[15]  Under Rule 45(c)(1)(A), a "subpoena may command a person to attend a . . . deposition only . . . within 100 miles of where the person resides, is employed, or regularly transacts business in person."[16]  Rule 45(d)(1) further requires that a party issuing a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Rule 45(d)(3)(A) instructs a district court to quash or modify a subpoena that "[1] fails to allow a reasonable time to comply; [2] requires a person to comply beyond the geographical limits specified in Rule 45(c); [3] requires disclosure of privileged or other protected matter, if no exception or waiver applies; or [4] subjects a person to undue burden."

---

[15]     Fed. R. Civ. P. 30(a)(1).

[16]     Rule 45 was significantly amended and renumbered on December 1, 2013.  I use current section numbering, but note that the parties used older numbering because their briefs were submitted prior to the amendment.

7

### B.    Multi-Factor Comity Analysis

In *Société Nationale Industrielle Aérospatiale*, the Supreme Court established that the Hague Convention process does not deprive a District Court of the jurisdiction it would otherwise possess "to order a foreign national party before it to produce evidence physically located within a signatory nation."[17]  The Supreme Court emphasized that "the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states," or "international comity," requires a "particularized analysis of the respective interests of the foreign nation and the requesting nation."[18]

Courts in the Second Circuit consider the following five factors, drawn from the Supreme Court's analysis in *Aérospatiale* when evaluating the propriety of an order directing the production of documents or testimony that may be in contravention of foreign law:

> (1) the importance to the investigation or litigation of the documents or other information requested;
>
> (2) the degree of specificity of the request;
>
> (3) whether the information originated in the United States;

---

[17]    *Société Nationale Industrielle Aérospatiale v. United States Dist. Ct. for the Southern Dist. of Iowa*, 482 U.S. 522, 539–40 (1987).

[18]    *Id.* at 543–44 & n.27.

(4) the availability of alternative means of securing the information; and

(5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.[19]

Courts in the Second Circuit also consider:

(6) the hardship of compliance on the party or witness from whom discovery is sought; and

(7) the good faith of the party resisting discovery.[20]

## C.     Israeli Law

The party objecting to a discovery motion based on foreign law bears the burden "'of demonstrating that such law actually bars the production or testimony at issue.'"[21] "'In order to meet that burden, the party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited

---

[19]     *See Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 438–39 (E.D.N.Y. 2008) (citing *Aérospatiale*, 482 U.S. at 544 n.28; RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 442(1)(c)).

[20]     *See id.* (citing *Minpeco S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987)).

[21]     *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 207 (E.D.N.Y. 2007) (quoting *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993)).

by foreign law.'"[22]  The party must describe, among other things, "'the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case.'"[23]

"'Foreign law, though formerly treated as an issue of fact, is now recognized as an issue of law, to be established by any relevant source, including testimony.'"[24]  Federal Rule of Civil Procedure 44.1 establishes that "[t]he court's determination [of foreign law] must be treated as a ruling on a question of law."

Hapoalim submits two declarations on Israeli confidentiality and privilege laws from Ehud Arzi, an Israeli lawyer with nearly twenty years of experience in banking and regulatory practice.  BOC has not submitted rebuttal declarations or counter-statements of Israeli law.

### 1.    Bank-Client Confidentiality

Israel recognizes

> "the right of a client to the confidentiality of information concerning his accounts and business activities in his relations with [a] banking corporation.  The protection that is given to a bank's client against disclosure of the banking information stems

---

[22]    *Id.* (quoting *Alfadda*, 149 F.R.D. at 34).

[23]    *Id.* (quoting *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 586 (2d Cir. 2005)).

[24]    *Wultz v. Bank of China Ltd.*, 860 F. Supp. 2d 225, 230 (S.D.N.Y. 2012) (quoting *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987)).

> either from the right to privacy that is granted in law or from [fiduciary principles] and [the] general duty of trust that a bank owes its clients."[25]

The bank-client privilege has been recognized by the Supreme Court of Israel,[26] and is considered to be encompassed by the Protection of Privacy Law as well as the "basic right" of privacy "incorporated into Israel's quasi-constitutional Basic Law: Human Dignity and Liberty."[27]  "[T]he bank-client privilege is not an absolute privilege but rather a relative one."[28]  The privilege may "be waived under the circumstances of a specific case," but because Israel strongly disfavors non-party discovery, "prevailing case law holds that the court must protect the confidentiality of accounts belonging to one who is not a party to the dispute, and that any deviation from this rule is permitted only in rare and extraordinary situations."[29]

> "[T]he disclosure of information relating to the bank's clients may . . .

---

[25]    *Agricultural Bank for Israel Ltd. v. Mordechai Dagani*, District Court for the Central Region, T-A (Central) 28621-11-10 (June 2013), quoted in 8/13/13 Declaration of Ehud Arzi ("Arzi Decl.") ¶ 28.

[26]    *See Skoler v. Jerbi*, PD 47(5) 764 (1993).

[27]    5/21/07 Declaration of Ehud Arzi in Connection With *Linde et al. v. Arab Bank, PLC*, No. 04 Civ. 2799 (E.D.N.Y.) ("Arzi *Linde* Decl.") ¶ 25, Exhibit 3 to Arzi Decl.

[28]    Arzi Decl. ¶ 26.

[29]    Arzi *Linde* Decl. ¶¶ 26-27.

constitute a breach of the contractual duty owed by a bank to its client and lead to a civil claim . . . for damages."[30]  Civil damages are also available for violations of the Protection of Privacy Law.[31]  A person who "maliciously infringes the privacy of another" can be subject to the criminal penalties of the Protection of Privacy Laws, which includes up to five years imprisonment.[32]  Arzi's declarations do not list or describe any cases in which a court imposed civil damages or criminal penalties against a bank for violations of client confidentiality.

>    **2.     Banking Ordinance**

Israel's Banking Ordinance governs communications between Israeli banks and the Bank of Israel, the nation's central banking regulatory authority. Section 15A provides that "no person shall reveal any information delivered to him or show any document submitted to him under this Ordinance or under the Banking (Licensing)  Law" and may face criminal penalties of up to one year imprisonment or a fine of 10,000 Israeli pounds for violations.[33]  Interpreting this provision, the Israeli Supreme Court has held that "information received from, or

---

[30]     Arzi Decl. ¶ 34.

[31]     Arzi *Linde* Decl. ¶ 39.

[32]     *Id*.

[33]     *Id*. ¶ 42.

delivered to, the Bank of Israel" is immune from discovery in judicial proceedings.[34]   However, the immunity is "not absolute and a court is entitled to lift [it] in the circumstances of a particular case."[35]  Arzi's declarations do not list or describe any cases in which a court imposed civil or criminal penalties against a bank for violations of Section 15A of the Banking Ordinance.

### 3.    Prohibition on Money Laundering and Prohibition on Terror Financing Laws

The Prohibition on Money Laundering Law "creates an administrative enforcement mechanism by obligating financial service providers to report the activities of their clients [to] a supervisory and audit institution" which analyzes the information and recommends further action to law enforcement, if necessary.[36] The Prohibition on Terror Financing Law sets up the reporting mechanism and data retention policy necessary to carry out the Prohibition on Money Laundering Law.[37]  Section 31A of the Prohibition on Money Laundering Law requires a person to maintain the confidentiality of any information received under the

---

[34]    Arzi Decl. ¶¶ 39-40 (citing *Echo-Tech (Micro Parts) Ltd. v. CreditsCards Company in Israel Ltd.*, 34200-06-11, District Court of Haifa).

[35]    Arzi *Linde* Decl. ¶ 48.

[36]    *Id.* ¶ 52.

[37]    *See id.*  ¶ 60.

13

provisions of these laws, except as required by law or by a court order.[38]  Willful

violations of this law are punishable by up to three years imprisonment and

negligent violations are punishable by up to one year imprisonment.[39]  Arzi's

declarations do not list or describe any cases in which a court imposed civil or

criminal penalties against a bank for violations of Section 31A.

### 4.    Privilege Against Self-Incrimination

Section 47(a) of the Evidence Ordinance establishes the privilege

against self-incrimination.[40]  "[T]he privilege against self-incrimination is not

absolute and courts will balance the damage that may be caused as a result of

revealing a document with the benefit that may result from its disclosure, under the

circumstances of each particular case."[41]  Pursuant to section 37(b) of the Evidence

Ordinance, no incriminating information that is compelled to be disclosed by a

court order can be used against the producing party in a criminal proceeding.[42]

---

[38]      *See id*. ¶ 58.  *Accord* Prohibition on Terror Financing Law § 48(b).

[39]      *See* Arzi *Linde* Decl. ¶ 58.

[40]      *See id*. ¶ 63 ("No person is under obligation to deliver any piece of evidence if it includes the admission of a fact that is one of the elements of an offense of which he stands accused or is liable to be accused.").

[41]      *Id*. ¶ 66.

[42]      *See id.* ¶ 63.

## IV.   DISCUSSION

### A.   Rule 45 Does Not Bar Hapoalim's Testimony

Hapoalim is subject to this Court's subpoena jurisdiction by virtue of having a branch office in New York.  Because Rule 45's geographic restriction applies to Rule 30(b)(6) testimony, the Court cannot compel anyone to travel from Jerusalem to New York to testify at a deposition.  The only issue in question is whether requiring Hapoalim to comply with its affirmative duty to prepare a designee for Rule 30(b)(6) testimony constitutes an undue burden in light of its assertion that all of the individuals with relevant information or knowledge about the Shurafa wire transfers reside or work in Jerusalem.  I conclude that it does not.

"Whether a subpoena imposes an 'undue burden' 'depends on such factors as relevance, the need of the party for the documents, the breadth of the document, the time period covered by it, the particularity with which the documents are described and the burden imposed.'"[43] "'The party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings' [and] the status of a witness as a non-party to the underlying litigation entitles [the witness] to consideration

---

[43]      *Koch v. Pechota*, No. 10 Civ. 9152, 2013 WL 3892827 at *1 (S.D.N.Y. Jul. 25, 2013) (quoting *Night Hawk Ltd. v. Briarpatch Ltd.*, L.P., No. 03 Civ. 1382, 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003)).

regarding expense and inconvenience."[44]

    BOC's amended subpoena has significantly narrowed the deposition topics and described them with sufficient particularity.  Further, BOC has sufficiently established the relevance of the sought testimony to its defense against the ATA claim.  Plaintiffs' theory of actual knowledge is premised on alleged warnings from the Israeli government to Chinese regulators in April 2005 about BOC's Shurafa accounts, approximately one year before the terrorist attack that killed Daniel Wultz and injured Yekutiel Wultz.  There is no dispute that Hapoalim originated sixteen wire transfers to Shurafa's BOC accounts between 2004 and 2007, a time period which includes both the meeting between Israeli and Chinese officials and the terrorist attack.  If BOC can establish through Hapoalim's testimony that the Israeli government did not warn its own bank about Shurafa, a jury could reasonably infer that Israel did not provide such a warning to Chinese regulators.

    Despite its non-party status, Hapoalim has "an affirmative duty to prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources."[45] However, Hapoalim maintains that

---

[44]    *Id*. (quoting *Night Hawk*, 2003 WL 23018833, at *8).

[45]    *Rahman v. Smith & Wollensky Rest. Group, Inc.*, No. 06 Civ. 6198, 2009 WL 773344, at *1 (S.D.N.Y. Mar. 18, 2009) (quotations omitted).

it is "simply not reasonable or practical" to educate an employee in New York

when the "knowledgeable employees are located in Israel," and that requiring

Hapoalim to do so would "encroach[] upon Hapoalim's right to select its own

designee."[46]  In support of this position, Hapoalim cites a recent case from this

Court, which held that there is "no binding authority permitting the court to compel

a corporation deponent to designate a specific person to be its Rule 30(b)(6)

witness."[47]

> Of course the court cannot compel Hapoalim to designate a *specific*

person.  But a court *can* compel Hapoalim to select a designee and educate her in

accordance with its duty under Rule 30(b)(6).  "'The testimony elicited at the Rule

30(b)(6) deposition represents the knowledge of the corporation, not of the

individual deponents.'"[48]  "If the persons designated by the corporation do not

possess personal knowledge of the matters set out in the deposition notice, the

corporation is obligated to prepare the designees so that they may give

---

[46]    9/4/13 Reply Memorandum of Law by Non-Party Bank Hapoalim B.M. to Quash or Modify the Subpoena Dated June 20, 2013 ("Hapoalim Rep."), at 6.

[47]    *Id.* (quoting *MPD Accessories, B.V. v. Urban Outfitters, Inc.*, No. 12 Civ. 6501, 2013 WL 4399199, at *12 (S.D.N.Y. Aug. 13, 2013)).

[48]    *Twentieth Century Fox Film Corp., v. Marvel Enter., Inc.*, No. 01 Civ. 3016, 2002 WL 1835439, at *2 (S.D.N.Y. Aug. 8, 2002) (quoting *United States v. Taylor*, 166 F.R.D. 356, 361-62 (M.D.N.C. 1996)).

knowledgeable and binding answers for the corporation."[49]  "The duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved."[50]

Hapoalim presents no compelling arguments or evidence as to why it should not comply with this duty.  Even if Hapoalim is a non-party witness and all of the documents or knowledgeable persons are in Jerusalem, compliance with the 30(b)(6) subpoena is not an undue burden when weighed against BOC's need for the testimony.  A person in New York can easily be educated by a person in Israel by telephone, email or videoconference and relevant documents can easily be transmitted on a single flash drive or CD-ROM.  Further, in the age of videoconferencing, Hapoalim can avoid the burden of educating a New York employee altogether by agreeing to a deposition by video, to which BOC has consented.[51]

---

[49]     *Id.*

[50]     *Id.*

[51]     *See* Transcript of 1/7/14 Teleconference.  This arrangement is permissible under amended Rule 45, which no longer requires a subpoena to issue from the court for the district where the deposition is taken, but rather, "the court where the action is pending."  Fed. R. Civ. P. 45(a)(2).

B.     **Multi-Factor Comity Analysis**

1.     **Israeli Confidentiality Laws and Privileges**

BOC's amended subpoena seeks testimony on the following topics:

- Topics 1, 2 and 5: information about the sixteen Shurafa wire transfers, including whether those transfers were executed in the ordinary course of business;

- Topics 3, 4, 6, 7 and 13: whether Hapoalim communicated with the Israeli government and its central banking regulators about the Shurafa transfers; whether the government took any steps to block or restrict the Shurafa transfers; whether Hapoalim regularly communicated with the government about anti-money laundering and counter-terrorist financing issues during this time period;

- Topics 8, 9, 10 and 11: whether Hapoalim had anti-money laundering and counter-terrorist financing policies in place at the time of the wire transfers; whether Hapoalim conducted any inquiries, noticed any red flags, or warned its constituent banks in connection with the Shurafa transfers;

- Topic 12: whether Hapoalim provided clearing services for

19

Palestinian banks making wire transfers to Shurafa; and

- Topics 14 and 15: information and clarification about certain public statements made by Hapoalim in 2005 and 2006 pertaining to anti-money laundering and counter-terrorist financing efforts.

Hapoalim does not claim that all of the information sought in the subpoena is protected from disclosure by Israeli law.[52]  For example, none of the stated privileges or laws appear to apply to Topic 12.  Further, because Section 15A of the Banking Ordinance establishes a duty of confidentiality only as to communications with the Bank of Israel, Hapoalim cannot withhold testimony about other communications with the Israeli government based solely on that law.  Similarly, because Section 31A of the Prohibition on Money Laundering Law establishes a duty of confidentiality only as to communications and disclosures made to the regulatory authority established by that law, Hapoalim may invoke the provision only as to those specific communications.

According to Hapoalim, some or most of the remaining testimony is

---

[52]      Hapoalim's briefing responds to the June 30, 2013 subpoena.  The June 30 subpoena was significantly broader in scope but covered many of the same basic topic areas.  In deciding this motion, I evaluated the parties' briefing and arguments, as well as the Arzi declarations, as they apply to the amended subpoena, which renumbered and rephrased certain of the requests.

protected as follows: (1) Israel's bank-client confidentiality laws prevent Hapoalim from disclosing information pertaining to the Shurafa wire transfers (Topics 1-2, 5); (2) Section 15A of Israel's Banking Ordinance forbids it from disclosing any information exchanged with the Bank of Israel, Israel's banking regulatory authority (Topics 3-4, 6, 13) ; (3) Israel's Prohibition on Money Laundering and Prohibition on Terror Financing Laws forbid it from disclosing any information collected and reported to the regulatory agency established by those laws (Topics 1-11, 13); and (4) Israel's privilege against self-incrimination bars Hapoalim from testifying about certain public statements concerning its capacity to block transactions involving terrorist organizations (Topics 14-15).

### 2.    Determining Whether There Is True Conflict

The threshold question in any comity analysis is to determine whether there is a "true conflict" between domestic and foreign law – that is, whether "compliance with the regulatory laws of both countries would be impossible."[53] Israel's self-incrimination privilege does not establish a true conflict with U.S. laws and cannot serve as the basis for denying a motion to compel testimony because the privilege can be waived and "Israeli courts can guarantee that documents as to which the privilege has been waived will not be used against the

---

[53]    *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998) (quoting *In re Maxwell Comm'n Corp.*, 93 F.3d 1036, 1050 (2d Cir. 1996)).

person in any criminal proceeding."[54]

In this case, I also find that there is no true conflict with U.S. law based on Israel's bank-client confidentiality provisions. Hapoalim has already produced various transaction records pertaining to the wire transfers with redacted customer information. Further, plaintiffs, BOC and Hapoalim all know the customer's identity based on other productions and records. The Israeli bank-client privilege pertains to customer information and transaction history. BOC has amended its document request to eliminate specific questions about the originating customer, so there is no risk that further customer information will be revealed. Hapoalim's own document production has already revealed the transaction history. Hapoalim cannot now argue that the bank-client privilege precludes it from answering questions about the allegedly privileged documents it has already produced. Because Hapoalim has already disclosed the transactional information, it may now be questioned about how Hapoalim executed the transfers (Topics 1, 2 and 5).

As to the Banking Ordinance and Prohibition on Money Laundering and Terror Financing Laws, BOC contends that there is no "true conflict" because

---

[54]     *Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 147-48 (E.D.N.Y. 2009). The *Linde* court rejected Hapoalim's assertion that the self-incrimination privilege served as a bar to production or testimony about the same public statements at issue in this case.

the Israeli laws do not preclude "non-event" testimony – that is, testimony that

certain communications or reports *did not* happen.  I disagree, at least as to the

Prohibition on Money Laundering and Terror Financing Laws.  Section 12 of the

Bank of Israel's Order Prohibiting Money Laundering (Identification Obligations,

Reporting and Managing Registries of Banking Corporations) clearly bars the

"disclosure of the fact of the crystallization, *inexistence* or content of [a] report [on

various financial activities performed by a client] . . . as well as the fact of the

existence of a supplementary report."[55]  Further, there is no evidence that

Hapoalim's testimony will, in fact, be "non-event" testimony.  Thus, for reasons of

judicial efficiency, I conclude that there is a true conflict between American

discovery laws and Israel's Banking Ordinance and Prohibition on Money

Laundering and Terror Financing Laws regardless of whether the testimony is

affirmative or negative.

### 3.    Applying International Comity Analysis

Having found a true conflict between the laws, I now apply the

Second Circuit's multi-factor international comity analysis to determine whether

Hapoalim can be compelled to provide deposition testimony in light of conflicting

foreign law.  Hapoalim argues that I should follow a recent decision from the

---

[55]    Arzi Decl. ¶ 47 (emphasis added).

Eastern District of New York, where the court, in similar circumstances, granted a motion to quash a subpoena with respect to information that "fall[s] within the confidentiality provisions of [Israeli] laws."[56]

In *Linde v. Arab Bank, PLC*, Arab Bank sought discovery from Hapoalim about Hapoalim's efforts to identify terrorist organizations and transactions. Arab Bank argued that documents showing Hapoalim's failure to identify certain terrorist organizations or transactions supported Arab Bank's defense that its own failure was in good faith.

> "In other words, if the documents discovered pursuant to the requests relating to customer accounts and transactions and to compliance protocols reveal that Hapoalim performed banking services for terrorist front organizations and employed similar compliance procedures as Arab Bank, they will be useful in refuting the plaintiffs' allegations that Arab Bank exercised insufficient caution in dealing with entities that it should have known were terrorist fronts."[57]

The court concluded that this information was not critical enough to Arab Bank's case to compel disclosure. "The documents sought by Arab Bank here would not be direct evidence of a claim or defense; at best, they would serve as circumstantial evidence of Arab Bank's lack of knowledge."[58] BOC argues that *Linde* is

---

[56]    *Linde*, 262 F.R.D. at 152.

[57]    *Id*. at 150.

[58]    *Id*.

inapposite, because unlike the defendant in *Linde*, "BOC seeks [testimony] from Hapoalim [that] is critically important in testing the veracity and plausibility of plaintiffs' actual knowledge allegation."[59]

In this case, as in *Linde*, several of the international comity factors are easy to resolve. Two of these factors weigh in favor of non-disclosure. *First*, it is undisputed that the information sought originated in Israel. *Second*, BOC concedes that Hapoalim's status as a non-party status may weigh the hardship of compliance factor in its favor.[60] On the other side, the specificity of BOC's amended request weighs in favor of compelling discovery, while the evidence as to Hapoalim's good faith in resisting discovery is, at best, neutral. Although Hapoalim's desire to comply with Israeli confidentiality laws is reasonable, there is no evidence that it tried to balance that desire with its obligation to respond to BOC's subpoena by, for example, seeking consent from its client or from the Israeli government.[61] For the following reasons, I conclude that the remaining three factors weigh in favor of

---

[59]     BOC Opp. at 8.

[60]     *See id.* at 7, 20.

[61]     *See Strauss*, 242 F.R.D. at 226 (finding that a bank asserting French bank secrecy laws as a bar to discovery made "good faith, diligent" efforts to secure discovery by making "at least two efforts to contact [its client] for its consent . . . and at least three efforts to contact the French Ministry of Justice for guidance.").

compelling discovery.

### a.      Importance of the Testimony

BOC cites to my previous opinions in this case, in which I ordered BOC to produce documents that were otherwise protected by Chinese bank secrecy laws because I concluded that "discovery regarding 'the scienter element of plaintiffs' claim' is 'highly important' to the case and 'crucial to establishing whether BOC was put on notice that the Shurafa accounts were being used to fund terrorism (if, in fact, they were).'"[62] Hapoalim responds that my "prior rulings are not relevant to, nor binding on, Hapoalim."[63]  This response misconstrues BOC's argument.  My previous rulings in this case are obviously not binding on Hapoalim, a non-party to this litigation.  But my *analysis* in those rulings, including my conclusion that the issue of BOC's scienter is critical to this case, is highly relevant to determining whether the discovery sought is important to the litigation.

In *Linde*, Arab Bank sought evidence of Hapoalim's anti-money laundering and counter-terrorism financing policies and procedures to show that its own policies and procedures were reasonable and that its failure to identify and

---

[62]      BOC Opp. at 13-14 (quoting *Wultz v. Bank of China*, No. 11 Civ. 1266, 2013 WL1832186, at *8 (S.D.N.Y. May 1. 2013)).

[63]      Hapoalim Rep. at 12.

block transfers to certain terrorist organizations was in good faith.  The *Linde* court concluded that this testimony would only be tangentially relevant to Arab Bank's defense.  But in this case, Hapoalim's documents and testimony are directly relevant to the claims and defenses.  Hapoalim originated sixteen wire transfers to Shurafa's accounts during the time period in question.  The existence of these specific transactions alone is sufficient to distinguish *Linde*.  Further, a key allegation in this case is that Israeli government officials were concerned about Shurafa and warned Chinese regulators about his financial activity.  Hapoalim, an Israeli bank ostensibly in constant communication with its government about anti-money laundering and terrorist financing issues, originated certain transactions with the Shurafa accounts at BOC.  While Hapoalim is certainly not accused of any wrongdoing, its role in the chronology of events is much more relevant to the various fact issues in this case than in *Linde*.

       **b.**      **Availability from Other Sources**

The Israeli government has asserted state privilege in a collateral proceeding and would likely do so in response to any subpoena from BOC.[64]  On January 29, 2014, over seven months after the submission of the parties' Hague Convention request, Israel replied that the request cannot be considered until the

---

[64]     *See State of Israel v. Wultz*, Motion to Quash Subpoena, 13 Misc. 1282 (Dkt. No. 1) (D.D.C. Nov. 15, 2013).

resolution of the collateral proceeding and further indicated that it considers much of the request to be "subject to non-disclosure under Israeli law and under the Hague Convention (Article 12(b)) for reasons relating to prejudice to the 'sovereignty or security' of the State of Israel."[65]  At this time, BOC can only obtain this information from Hapoalim.

### c.   Balance Between U.S. and Israeli Interests

Hapoalim argues that the Banking Ordinance and Prohibition on Money Laundering and Terror Financing Laws protect Israeli interests "in the confidentiality of communications with Israel's central bank and the strict enforcement of anti-money laundering and anti-terror laws, while preventing their abuse in the form of leaked confidential data."[66]  Hapoalim points to the "substantial civil and criminal penalties that attach to violations" of these laws as evidence of Israel's strong interest.[67]  BOC argues that "[s]hielding Hapoalim from discovery would . . . undermine important interests of the United States in fostering full and fair litigation [and] would also undercut important interests of both the United States and Israel in ensuring that their efforts to combat terrorism-financing

---

[65]   1/29/14 Letter from Judge Michael Spitzer, Director of Courts of the State of Israel, to Mitchell Berger, at 2.

[66]   Hapoalim Mem. at 20.

[67]   *Id*.

are aligned."[68]

I find Hapoalim's argument as to Israel's interests not entirely persuasive.  Hapoalim fails to cite even one example of a civil or criminal penalty that was ever actually enforced in connection with these laws.  Further, as per Hapoalim's own expert, Section 15A of the Banking Ordinance and Section 31A of the Prohibition on Money Laundering Law both permit disclosure by court order upon weighing the factors of a case.

At the same time, the "United States has a substantial interest in fully and fairly adjudicating matters before its courts.  When that interest is combined with the United States's goals of combating terrorism, it is elevated to nearly its highest point."[69]  A complete and fair reading of Israel's laws shows that Israel's interest in confidentiality, while significant, can be mitigated by the countervailing factors present in this case.  Courts applying international comity analysis as to other nations' bank secrecy laws have reached the same conclusion and compelled disclosure in similar cases.[70]

---

[68]     BOC Opp. at 20 (quotation omitted).

[69]     *Weiss v. National Westminster Bank, PLC*, 242 F.R.D. 33, 45 (E.D.N.Y 2007) (quotations omitted).

[70]     *Id.* (holding that "the interests of the United States and United Kingdom in combating terrorism outweigh the British interest in preserving bank customer secrecy" and recognizing that "even if comity analysis weighed in favor

## VI.   CONCLUSION

For the foregoing reasons, Hapoalim's motion to quash or modify the subpoena is DENIED.  If the parties agree to conduct the deposition via videoconference, BOC shall "pay the expense (including a reasonable counsel fee) of the attendance of one attorney" for Hapoalim "at the place where the deposition is to be taken."[71] This payment shall be made prior to the examination, pursuant to Local Civil Rule 30.1.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 13, 2014

_____

of" non-disclosure, production would be appropriate "based on an exception to English bank secrecy").

[71]      Local Civil Rule 30.1.

30

**- Appearances -**

**For Plaintiffs:**

David Boies, Esq.
Lee S. Wolosky, Esq.
Steven I. Froot, Esq.
Marilyn C. Kunstler, Esq.
Jaime Sneider, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2350

**For Defendant:**

Mitchell R. Berger, Esq.
Patton Boggs LLP (DC)
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-5601

Lanier Saperstein, Esq.
William G. Primps, Esq.
Neil McDonell, Esq.
Eric Epstein, Esq.
Daniel Goldberger, Esq.
H. Alex Iliff, Esq.
Geoffrey Sant, Esq.
Dorsey & Whitney LLP
51 West 52nd Street
New York, NY 10019
(212) 415-9309

**For Bank Hapoalim:**

Carol M. Goodman, Esq.
Janice I. Goldberg, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016
(212) 592-1400