BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • 7TH FLOOR • NEW YORK, NY 10022 • PH. 212.446.2300 • FAX 212.446.2350

July 9, 2014

**BY ECF AND HAND DELIVERY**

Hon. Gabriel W. Gorenstein
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re: *Wultz v. Bank of China Ltd.*, No. 1:11-cv-01266 (SAS) (GWG)

Dear Judge Gorenstein:

We represent Plaintiffs in the above-captioned action. We write to request that defendant Bank of China Ltd. ("BOC") be ordered to produce certain relevant communications and internal reports that BOC has refused to produce on the basis of U.S. regulations governing the disclosure of Suspicious Activity Reports ("SARs").

BOC asserts that the confidentiality requirements in the U.S. regulations governing the disclosure of SARs (the "SAR privilege")[1] entitle it to withhold in their entirety thousands of documents related to suspicious activity at BOC, and BOC's responses to that activity, even if *none of the documents is a SAR* ("non-SAR documents"). The Court has already recognized multiple times that, at its most expansive, the SAR privilege only entitles BOC to redact portions of non-SAR documents. *See* 1/27/14 Tr. (Gorenstein, J.) (excerpted as Ex. A) at 69:20–23; 4/17/13 Mem. Opinion and Order (Dkt. # 247), at 6–7; April 9, 2013 Opinion & Order (Dkt. # 244), at 41–42. BOC also has suggested that it objects to disclosing some or all of these documents on the grounds that they are irrelevant, even though Your Honor already has explicitly overruled this objection. 1/27/14 Tr. at 56:13–15; 66:24–67:11.

Because BOC's objections to disclosure are inconsistent with the Court's existing orders, and for the additional reasons explained below, BOC should be ordered to produce the non-SAR documents it is withholding pursuant to the SAR privilege. Plaintiffs further request that , for the reasons described below, the Court order BOC to submit a sample of the documents that it has partially redacted (or will partially redact) pursuant to the SAR privilege for *in camera* review, to determine the legitimacy of BOC's redactions.[2]

---

[1] The U.S. regulations relied on by BOC are 12 C.F.R. § 21.11(k)(1) and 31 C.F.R. § 1020.320(e)(1)(i), which provide that "[n]o national bank, and no director, officer, employee, or agent of a national bank, shall disclose a SAR or any information that would reveal the existence of a SAR."

[2] Plaintiffs certify, as required by section 2.A of Your Honor's Individual Practices, that the parties discussed the issues raised in this letter during an in-person meet-and-confer on January 24, 2014, and a telephonic conference on March 27, 2014 (as well as in written correspondence dated October 16, 2013, March 13, 2014, March 25, 2014, and April 2, 2014), and that Plaintiffs informed BOC that they

## I. <u>Background</u>: BOC Has Relied on the SAR Privilege to Withhold in Their Entirety Thousands of Documents that Are Not SARs

### A. <u>BOC refuses to produce a categorical SAR privilege log, representing that the log "would simply say SAR filings"</u>

On December 27, 2013, Plaintiffs asked BOC to supply a categorical privilege log describing the documents that BOC is withholding pursuant to the SAR privilege. Although (as explained further below) the SAR privilege is a narrow privilege designed to protect the confidentiality of a specific filed form—the Suspicious Activity Report—Plaintiffs were concerned that BOC might be relying on the privilege to withhold a wider variety of documents that are not themselves SARs. BOC objected to Plaintiffs' request for a categorical SAR privilege log, claiming that "it is unclear to us how BOC could prepare such a log" (1/3/14 Ltr. from L. Saperstein to S. Froot (Ex. B)). At the ensuing January 27, 2014 conference, Your Honor agreed with Plaintiffs that "it shouldn't be that complicated" for BOC to compile a categorical SAR privilege log, noted that "there shouldn't be any dispute about it," and ordered BOC to produce the log. 1/27/14 Tr. (Gorenstein, J.) (excerpted as Ex. A), at 38:21–24; 40:16–21.

In its attempts to resist producing a categorical log that would disclose the nature and extent of its SAR privilege claims, BOC represented to the Court at the January 27, 2014 conference that the only documents it was withholding pursuant to the SAR privilege were actual Suspicious Activity Reports—such that, according to BOC, any log of its SAR privilege assertions "would simply say SAR filings." 1/27/14 Tr. (Gorenstein, J.), at 42:22–43:11. BOC stated on six separate occasions that if any document was not itself a SAR, but merely revealed the existence of a SAR, BOC would already have produced that document to Plaintiffs in redacted form. *See, e.g.*, *id.* at 44:18–22 ("To the extent there was a reference in one of those documents where they said we filed a SAR on [a particular person], we would have redacted that sentence, but they would have got the whole document."); *see also* 1/27/14 Tr. (Gorenstein, J.) at 42:22–43:11; 50:2–19; 51:20–52:3; 57:23–58:9; 66:5–12.

### B. <u>The log that BOC was ordered to produce shows that, contrary to its claims, BOC is withholding thousands of relevant non-SAR documents</u>

On February 28, 2014, BOC produced the categorical SAR privilege log that Plaintiffs had requested two months earlier, and which it had been ordered to produce at the January 27,

---

believed the parties to be at an impasse, and would be seeking relief from the Court. The parties' in-person meet-and-confer on January 24, 2014, lasted approximately three hours, and was attended by Lee Wolosky, Steven Froot, Marilyn Kunstler and Joseph Dunn of Boies, Schiller & Flexner LLP for Plaintiffs; and Mark Sullivan, William Primps, Lanier Saperstein and Dan Goldberger of Dorsey & Whitney and Lisa Glasband of Patton Boggs for BOC. The parties' telephonic conference on March 27, 2014, lasted approximately 1.5 hours and was attended by Marilyn Kunstler, Joseph Dunn and Dan Boyle of Boies, Schiller & Flexner for Plaintiffs; and Lanier Saperstein and Glenn Salvo of Dorsey & Whitney and Gary Lax of Luse Gorman Pomerenk & Schick for BOC, among other attorneys for BOC.

2014 conference. The current version of the log is attached to this letter as Exhibit C (BOC's "SAR Log" or "Log").

BOC's SAR Log appears to confirm that, notwithstanding its representations to the Court at the January 27, 2014 conference, BOC has all along been relying on the SAR privilege to withhold in their entirety thousands of documents that are not Suspicious Activity Reports—including hundreds of documents that, according to BOC's Log itself, do not even mention or reveal the existence of any SAR. Indeed, of the 20 categories of documents on the SAR Log that BOC is withholding pursuant to the SAR privilege (Categories 1–20), only *one* consists of "Suspicious Activity Reports" (Category 17), compared to *19* categories that are not SARs. The documents in these 19 non-SAR categories fall into the following two buckets:

**1. Non-SAR documents that BOC claims reveal the existence of specific SARs (Categories 3–6, 9, 10, 12–14, 18, and 20).** According to BOC's own descriptions, 11 of the 19 non-SAR categories on its Log consist of documents that merely "reveal" or "reference" specific SARs—in other words, the very same type of documents that BOC claimed six times at the January 27 conference that it had already produced to Plaintiffs in redacted form but which in fact are being withheld in their entirety. *Compare, e.g.*, SAR Log Category 5 (stating that BOC has withheld in their entirety [redacted] *with* 1/27/14 Tr. (Gorenstein, J.) at 51:20–52:3 ("[I]f a document referenced a specific SAR we redacted it."); SAR Log Category 9 (stating that BOC has withheld in their entirety [redacted] *with* 1/27/14 Tr. (Gorenstein, J.) at 50:2–19 ("We have produced documents, communications about our AML program . . . [t]o the extent that those documents referred to a SAR, yes, what we do is we redact just the specific line.").

**2. Non-SAR documents that BOC does not even claim reveal the existence of any SAR (Categories 1, 2, 7, 8, 11, 15, and 19).** BOC's descriptions of the remaining seven non-SAR categories on its Log do not even assert that the withheld documents "reveal" or "reference" specific SARs. With the exception of Category 11 (lists of suspicious transactions compiled "in connection with" the filing of SARs), these seven categories of documents appear to *have nothing at all to do with Suspicious Activity Reports*, and instead pertain generically to [redacted] BOC's inclusion of these seven categories of documents in its SAR Log was the first time that BOC revealed that it is relying on the SAR privilege to withhold entire documents that are not SARs and do not reveal the existence of any SAR—even though it has been three years since Plaintiffs served their first set of document requests, and Your Honor warned BOC that it may "go down with the ship" because "to the extent that documents have been withheld . . . there has to be a full accounting of what you did." 1/27/14 Tr. (Gorenstein, J.), at 53:5–15.[3]

---

[3] As Judge Scheindlin has already held with respect to BOC's prior failures to timely assert the SAR privilege, "[t]here are better, less dilatory ways of asserting even the most sensitive privileges." 5/1/13 Order (Dkt. # 261), at 37.

**II. The Non-SAR Documents that BOC Has Withheld Are Not Covered by the SAR Privilege.**

BOC should be ordered to produce all of the non-SAR documents listed on its SAR Log that it is withholding pursuant to the SAR privilege. Plaintiffs do not dispute—and have never disputed—that BOC is entitled to withhold SARs themselves (Category 17 on BOC's Log). As explained further below, however, (i) non-SAR documents that BOC claims merely "reveal" or "reference" the existence of a SAR (Categories 3–6, 9, 10, 12–14, 18, and 20 on BOC's Log) are at most only protected in part, and must be produced in redacted form; and (ii) non-SAR documents that, according to BOC's own descriptions, do not even reveal the existence of a SAR (Categories 1, 2, 7, 8, 11, 15, and 19 on BOC's Log) are entirely outside the scope of the SAR privilege, and must be produced in their entirety.

BOC's position, as set forth in its SAR Log—that the SAR privilege should be interpreted to protect any and all documents that pertain to suspicious or potentially suspicious activity and BOC's responses thereto, regardless of whether the documents relate to a Suspicious Activity Report—is inconsistent with the Court's existing rulings on the SAR privilege, unsupported by other case law or regulations governing the scope of this privilege, and irreconcilable with the scope of discovery necessitated by Plaintiffs' claims under the Anti-Terrorism Act.

A. BOC's overbroad application of the SAR privilege is inconsistent with the Court's existing rulings in this case, and finds no support elsewhere in the law.

To resolve the instant application in Plaintiffs' favor, the Court need look no further than the existing rulings in this case, which set forth in detail why the SAR protection is not broad enough to entitle BOC to withhold non-SAR documents in their entirety, or to withhold any portion of documents that do not reveal the existence of any SAR.

The Court first discussed the scope of the SAR privilege in its April 9, 2013 Opinion & Order (Dkt. # 244) (the "April 9, 2013 Order"), which overruled BOC's objection to producing documents related to "BOC's SAR filing practices, the aggregate number of SARs filed during [2003–2008], and the compliance areas to which those SARs relate." 4/9/13 Order at 19, 41–43. Judge Scheindlin recognized that the SAR laws BOC continues to rely on to resist discovery, 12 C.F.R. § 21.11(k)(l), 31 C.F.R. § 1020.320(e)(1)(i), and 31 U.S.C. § 5318(g)(2)(A)(i), create a narrow protection that applies only to Suspicious Activity Reports and information revealing the existence or content of a specific SAR that was actually filed:

> BOC argues that producing this general information would violate federal law prohibiting the disclosure of whether a SAR was filed and what its contents were. However . . . **the OCC's SAR regulations, at their most expansive, prohibit the disclosure of "any information that would reveal the existence of a SAR."** BOC's argument that the production of the general information requested by plaintiffs could indirectly indicate whether a particular SAR was filed is unpersuasive. . . . [T]he OCC's regulations prohibit the disclosure of information

> that would reveal the *existence* of a particular SAR, not the *non*-existence of any SARs.

4/9/13 Order at 41–42 (*citing* 12 C.F.R. §21.11(k)(l)(i)) (emphasis added).

The Court revisited the scope of the SAR privilege a week later, on April 17, 2013, after BOC refused to produce one of the categories of documents that it had been ordered to disclose in the April 9, 2013 Order: an investigative report on Said al-Shurafa that BOC's New York branch prepared in February 2008. Noting the "lack of legal argument" from BOC in support of the theory that "documents fall within the SAR privilege merely by having some relation to a SAR," Judge Scheindlin observed that the investigative report was "not itself a SAR," and held that "even if BOC filed a SAR *based on* the Shurafa report, the report itself would not be privileged — to the extent that it could be produced without revealing the existence of the SAR filing." 4/17/13 Mem. Opinion and Order (Dkt. # 247) (the "April 17, 2013 Order"), at 6–7. BOC subsequently produced the Shurafa report in redacted form.

These rulings establish that (1) the SAR privilege only protects information revealing the existence or content of a specific SAR that was actually filed; and (2) non-SAR documents cannot be withheld pursuant to the SAR privilege, but must instead be produced to the extent possible without revealing the existence or contents of specific SAR filings. Under these principles, BOC should be compelled to produce in their entirety the documents on its SAR Log that BOC itself does not contend would reveal the existence or contents of a specific SAR (Categories 1, 2, 7, 8, 11, 15, and 19 on the Log), and is only entitled to, at most, *redact* the documents that BOC contends "reveal" or "reference" specific SARs (Categories 3–6, 9, 10, 12–14, 18, and 20 on the Log)—like the Shurafa report that BOC was already compelled to produce in redacted form. There is no basis for BOC to withhold any of these thousands of documents in their entirety; as Your Honor noted at the January 27, 2014 conference, "if [BOC] just say[s] well we withheld any document as privileged because it mentions a SAR, you know, I think they're going to lose on that." 1/27/14 Tr. at 69:20–23.

The above-described rulings on the scope of the SAR privilege in this case are consistent with both the SAR regulations cited by BOC and the great weight of case law interpreting those regulations. 12 C.F.R. § 21.11 expressly precludes only the disclosure of the existence and the contents of a SAR, and expressly excludes "underlying facts, transactions, and documents upon which a SAR is based." 12 C.F.R. § 21.11(k)(1)(ii)(A)(2); see also 61 Fed. Reg. 4332, 4336 (Feb. 5, 1996) (OCC guidance providing that "only the SAR and the information on the SAR are confidential under 31 U.S.C. § 5318(g)."). Any document that supports or relates to a SAR, therefore, "remains discoverable . . . provided such documentation does not disclose either the existence or contents of an SAR." *United States v. Holihan*, 248 F. Supp. 2d 179, 187 (W.D.N.Y. 2003). In other words, a document does not become confidential "simply because it has some connection to a SAR" or to suspicious banking activity. *Weil v. L.I. Sav. Bank*, 195 F. Supp. 2d 383, 389 (E.D.N.Y. 2001).

These limitations on the SAR privilege extend to internal investigative materials created by a bank, which, contrary to BOC's claims, do not fall within the SAR privilege merely because they relate to "specific or unusual transactions" (*e.g.*, SAR Log Category 7) or "potentially

suspicious transactions" (*e.g.*, SAR Log Category 2). There is a critical distinction between information revealing the existence of particular Suspicious Activity *Reports*, which is protected, and information revealing the existence of the suspicious activity itself, which is not. *See, e.g.*, *Gregory v. Bank One Corp. Inc.*, 200 F. Supp. 2d 1000, 1002 (S.D. Ind. 2002) (SAR protection "requires confidentiality only of SARs and their contents, not of other reports of suspicious activity"). Because "it is . . . a standard business practice for banks to investigate suspicious activity," documents relating to internal bank investigations do not reveal whether a SAR was filed, and are therefore discoverable even when undertaken "in anticipation of filing a SAR."[4]

B. <u>BOC's overbroad application of the SAR privilege would improperly block discovery necessary to prove "state of mind" under the Anti-Terrorism Act.</u>

BOC's overbroad interpretation of the SAR privilege is contrary not only to all of the case law explained above, but also to the fundamental nature of claims under the Anti-Terrorism Act ("ATA"). As the Second Circuit has recognized, "Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interests through private enforcement." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013). In ATA cases such as this, therefore, there are "important U.S. interests at stake in arming private litigants with the 'weapons available in civil litigation' to deter and punish the support of terrorism." *Id.*

If BOC were correct that the SAR privilege prohibits disclosure in civil litigation of any information related to "potentially suspicious transactions" and "specific suspicious or unusual transactions," regardless of whether that information reveals the existence or contents of a specific SAR (*see* SAR Log at 1–3), it is difficult to see how any plaintiff could make good on the ATA's purpose of subjecting banks that deal with terrorists to "private enforcement." Any bank document identifying potential terrorist financing or recording that the bank was aware of specific terrorist financing transactions would be barred from disclosure, denying ATA plaintiffs an important source of evidence to prove state of mind under the ATA. This is clearly not what the Congress intended.

In this case there are obvious examples, based on existing evidence, of how adopting BOC's incorrect view of the SAR privilege would improperly foreclose discovery of evidence of BOC's knowledge of, or deliberate indifference to, the terrorist financing scheme that Said al-Shurafa and his family members were operating by means of their BOC accounts.

---

[4] *Freedman & Gersten, LLP v. Bank of Am., N.A.*, 2010 WL 5139874, at *2 (D.N.J. Dec. 8, 2010) (compelling production of "any memoranda or documents drafted in response to the suspicious activity at issue," which the Court noted were—as here—"relevant for purposes of Plaintiff discovering and/or assessing the precise facts [at issue] . . . and whether [the defendant bank] acted properly in responding to the facts at issue in this case"). *See also In re Whitley*, 2011 WL 6202895, at *4 (Bankr. M.D.N.C. Dec. 13, 2011) (noting that because it is "a standard business practice for banks to investigate suspicious banking activity," "the internal bank reports or memorandum generated by the bank regarding such an investigation are not protected by SAR privilege"; and denying a motion to quash as to internal bank documents related to "suspicious and/or unusual, irregular or improper account activity"—including "computer generated reports" identifying such activity, "all documents relating to any investigation or inquiry by the bank" into such activity, and "[a]ll documents which would evidence any response to the investigation").

- The Shurafas' support for Palestinian Islamic Jihad and Hamas has been documented in Israeli court and police records dating back to 2005, and is apparent from the patterns of transactions the Shurafas were executing through their BOC accounts (including in dollar wire transfers that were processed by BOC's U.S.-based personnel). Red flags such as these should have prompted internal discussion at BOC regarding closing the Shurafa accounts, blocking Shurafa transfers, and reporting the Shurafas' activities at BOC to U.S. law enforcement authorities. But BOC has confirmed to Plaintiffs during the parties' meet-and-confer calls that, under its view of the SAR privilege, BOC has withheld in their entirety internal communications concerning suspicious activity at BOC, including at BOC's New York branch, *even if those discussions concluded with a decision **not** to file any Suspicious Activity Report*. Internal communications concerning suspicious banking activity in which BOC decides to conceal that activity from the U.S. government by *not* filing a SAR are core evidence of state of mind under the ATA, and are not protected in any way by the SAR privilege. *See* 4/9/13 Order at 41–42 ("[T]he OCC's regulations prohibit the disclosure of information that would reveal the *existence* of a particular SAR, not the *non*-existence of any SARs.").

- [redacted] Ala'a Deraneiah, a Jordanian money launderer who wired hundreds of thousands of dollars from Jordan to the Shurafas' accounts at BOC. Israeli court documents from 2005 confirm that at least $400,000 in wire transfers from Deraneiah to the account of Mohammed al-Shurafa (Said al-Shurafa's first cousin) were made at the request of senior Hamas leadership in Syria; [redacted] But the law is clear that "internal bank reports or memorand[a] generated by the bank regarding such an investigation are not protected by SAR privilege." *In re Whitley*, 2011 WL 6202895, at *4. Even if BOC did file a SAR on Deraneiah, Plaintiffs would still be entitled to full discovery [redacted] knowledge that Deraneiah and the Shurafas were laundering money for terrorists, but which do not bear on the separate issue of whether BOC also filed a SAR.

## III. The Withheld Documents Are Relevant.

Apart from its improper SAR privilege assertions, BOC has refused to produce the non-SAR documents described on its SAR Log on the basis that some or all of the documents are

irrelevant under Federal Rule of Civil Procedure 26.[5] But Your Honor has already correctly ruled that the SAR-related documents on BOC's SAR Log are relevant, and there is no reason to depart from that ruling now.

At the January 27, 2014 conference, BOC objected to producing any log of the documents that it is withholding pursuant to the SAR privilege on the basis that if a SAR-related document "doesn't relate to a Sh[u]rafa," it is not "even relevant to [Plaintiffs'] claims." 1/27/14 Tr. at 42:16–21. Your Honor considered BOC's relevance objection and overruled it, reasoning that "documents that talk about . . . whether [SARs] should be filed or not be filed and that sort of thing" are relevant because Plaintiffs "are entitled to understand how this bank dealt with SARs." *Id.* at 56:13–15; 66:24–67:11 ("THE COURT: Okay, I'm overruling your relevance objection because they're entitled to understand how this bank dealt with SARs.").

BOC's only explanation for why it is entitled to maintain its relevance objection in the face of the Court's clear ruling at the January 27, 2014 conference is its claim that the ruling at the January 27 conference was limited to the scope of "what information BOC should log, not what information BOC was required to produce." 3/25/14 Ltr. from L. Saperstein to L. Wolosky, at 6. The logical implication of BOC's position is that the Court ordered it to log irrelevant documents, and that position finds no support in the record. The Court nowhere limited its ruling "overruling [BOC's] relevance objection" to BOC's SAR Log, and even specified that the ruling resolved all relevance disputes with respect to BOC's SAR-related documents: "THE COURT: Well I've overruled the relevance claim. . . . So now it just becomes a privilege issue." 1/27/14 Tr. at 70:3–6. BOC did not present any objection to Your Honor's ruling overruling its relevance objection to Judge Scheindlin after the January 27 conference, and it should not be permitted to challenge that ruling or maintain its already-overruled objection now.

In any event, the Court correctly decided the parties' relevance dispute at the January 27 conference when it held that Plaintiffs are entitled to discovery of SAR-related documents to "understand how this bank dealt with SARs." 1/27/14 Tr. 66:24–67:11. Judge Scheindlin had previously ruled, in her April 9, 2013 Order, that Plaintiffs are entitled to discovery related to "BOC's SAR filing practices, the aggregate number of SARs filed during the relevant years [2003–2008], and the compliance areas to which those SARs relate." 4/9/13 Order at 19. It remains the case that documents related to BOC's SAR filing practices in the 2003–2008 period—which, as the descriptions on BOC's SAR Log confirm, pertain to illicit financial activity at BOC and BOC's policies and practices for responding to that activity—are relevant to show that BOC was deliberately indifferent towards terrorist financing during that period. *See* 12/26/12 Tr. (Scheindlin, J.) at 24:14–25 ("[T]he higher the standard of proof with respect to state of mind of the conduct, the more you will need to discover whether there are deficiencies in the practices of the bank.").

---

[5] BOC has not articulated the precise scope of its relevance objection, instead asserting that "[b]y logging any particular category of documents, BOC does not concede that the information is relevant." 3/25/14 Ltr. from L. Saperstein to L. Wolosky (Ex. E), at 6.

The documents at issue here are also relevant to show that BOC was aware that Said al-Shurafa, his family members, and the people and entities that sent money to his BOC accounts in China were actually or possibly laundering money for terrorists. As described above, under the ATA standard for state of mind, production of the non-SAR documents described on BOC's SAR Log is necessary to determine the full extent to which BOC was aware of "potentially suspicious transactions" or "specific suspicious or unusual transactions" involving the Shurafas and the sources of funds to the Shurafas' accounts.

For the foregoing reasons, Plaintiffs respectfully request that BOC be ordered to produce all of the documents listed on BOC's SAR Log that are not themselves SARs, but which BOC is withholding pursuant to the SAR privilege. Plaintiffs further request that BOC be ordered to produce the documents that fall within Categories 1, 2, 7, 8, 11, 15, and 19 on BOC's Log (which BOC does not even claim "reference" or "reveal" any SAR) without any redactions; and that BOC be ordered to produce the documents that fall within Categories 3–6, 9, 10, 12–14, 18, and 20 on BOC's Log with only those redactions necessary to conceal information that would reveal the existence of a specific SAR that was actually filed by BOC. Finally, in light of BOC's misrepresentations regarding its application of the SAR privilege at the January 27, 2014 conference and its ongoing avoidance of the Court's existing orders on the scope of this privilege, Plaintiffs respectfully request that the Court order BOC to submit a sample of the documents that it has produced (or will subsequently produce) with redactions for *in camera* review to assess the legitimacy of BOC's redactions.

Respectfully yours,

Joseph W. Dunn

cc: All Counsel (via email)
Exhibits