UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

SHERYL WULTZ, et al.,

                 Plaintiffs,

         - against -

BANK OF CHINA LIMITED,

                 Defendant.

 

------------------------------------------------------ X

RIVKA MARTHA MORIAH, et al.,

                 Intervenors,

------------------------------------------------------ X

THE STATE OF ISRAEL,

                 Movant.

------------------------------------------------------ X

**OPINION AND ORDER**

**11-cv-1266 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/21/14

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

       This suit arises out of the death of Daniel Wultz and the injuries of

Yekutiel Wultz, suffered in a 2006 suicide bombing in Tel Aviv, Israel.  Four

members of the Wultz family brought suit against Bank of China ("BOC"),

alleging acts of international terrorism under the Antiterrorism Act ("ATA"),[1] among other claims.

All of Plaintiffs' non-federal claims against BOC have been dismissed.[2]   In addition, Plaintiffs' attempt to hold BOC liable for aiding and abetting international terrorism under the ATA has been categorically foreclosed by the Second Circuit.[3]   Plaintiffs' only remaining claim against BOC is for acts of international terrorism under the ATA, based on BOC allegedly having provided material support and resources to a terrorist organization.[4]

The general facts and procedural history of this case and Plaintiffs' numerous attempts to obtain discovery from BOC were laid out in previous opinions and familiarity with them is assumed.[5]   Before this Court is a motion filed

---

[1]   *See* 18 U.S.C. § 2333(a).

[2]   *See Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266, 2013 WL 1641179 (S.D.N.Y. Apr. 16, 2013) (dismissing plaintiffs' remaining non-federal claim as time-barred under New York "borrowing statute").

[3]   *See In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 123 (2d Cir. 2013) ("[A] defendant cannot be liable under the ATA on an aiding-and-abetting theory of liability." (citing *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013))).

[4]   *See* First Amended Complaint ¶¶ 106–115.

[5]   The background of the parties' dispute is summarized in *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 551-52 (S.D.N.Y. 2012) ("*Wultz I*") and *Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266, 2013 WL 1832186, at *1-4 (S.D.N.Y. May 1, 2013) ("*Wultz II*").

by nonparty the State of Israel ("Israel") to quash a deposition subpoena served on

Uzi Shaya, a former Israeli national security officer.[6]  Israel argues that the

subpoena should be quashed because it (1) violates Israel's sovereign immunity,

(2) seeks sensitive national security information that constitutes foreign state

secrets, and (3) contravenes Federal Rule of Civil Procedure 45.[7]  For the following

reasons, Israel's motion is GRANTED.

## II.    BACKGROUND

### A.    Uzi Shaya

Shaya is a former Israeli government official, who was involved in

Israeli national security matters between 1984 and 2007.[8]  From 2004 to 2007,

---

[6]      Israel originally filed its motion with the United States Court for the District of Columbia ("D.C. District Court").  On May 30, 2014, that court transferred Israel's motion and all associated briefing to this Court.  *See Wultz v. Bank of China, Ltd*, 13-mc-1282, 2014 WL 2257296, at *8 (D.D.C. May 30, 2014) ("May 30 Order").  In the interest of avoiding wasteful rebriefing, the parties agreed that District of Columbia law would still govern the pending motion.  *See* 6/9/14 Letter from Stuart D. Aaron and John B. Bellinger, III, counsel for Israel, to the Court; 6/10/14 Letter from Lee S. Wolosky, counsel for Plaintiffs, to the Court.

[7]      *See* Memorandum of Law in Support of Israel's Motion to Quash ("Israel Mem.") at 1.

[8]      *See* 10/31/13 Declaration of Major General (Res.) Yaacov Amidror ("Amidror Decl."), Exhibit ("Ex.") B to Israel Mem., ¶ 5.  As of 2009, Shaya declared, "I continue to provide assistance to the Counterterrorism Staff of Israel's National Security Council and to the Israeli government in respect to the matters I dealt with in my former positions."  6/9/09 Declaration of Uzi Shaya, filed in *Licci v. American Express Bank Ltd., et al.*, No. 08 Civ. 7253 (S.D.NY.) ("Shaya

3

Shaya was an official in Israel's National Security Council working with the

Interagency Task Force for Combating Terrorist Financing and Financing of State

Sponsors of Terrorism ("Task Force").[9]  The Task Force worked to prevent

terrorism by preventing the flow of funds to terrorist organizations.[10]  According to

Plaintiffs, the Task Force learned in 2004 of a terrorist financing cell involving

BOC.[11]  The cell was operated by Said al-Shurafa ("Shurafa"), other members of

the Shurafa family in Gaza, senior leaders of the Palestinian Islamic Jihad ("PIJ"),

and Hamas.[12]  From 2003 to 2008, the Shurafas used the BOC bank accounts held

in their names ("Shurafa Accounts") to launder millions of dollars to PIJ and

Hamas operatives in Gaza and the West Bank.[13]

   In 2005, Shaya and other members of the Task Force met with

---

Decl."), Ex. 2 to the Declaration of Lee S. Wolosky ("Wolosky Decl."), ¶ 6.

  [9]  *See* Shaya Decl. ¶ 5.  There is a slight discrepancy in the record
regarding the dates of Shaya's service.  Shaya states that he "retired from active
service" in 2008, but Amidror declared that Shaya was employed by Israel until
2007.

  [10]  *See, e.g.*, 2/18/05 U.S. Diplomatic Cable, Ex. 15 to Wolosky Decl.

  [11]  *See* 5/16/09 Declaration of Shlomo Matalon, former Department Head
at the Israeli Prime Minister's Office, filed in *Wultz v. Islamic Republic of Iran, et
al.*, No. 08 Civ. 1460 (D.D.C.), Ex. 1 to the Wolosky Decl., ¶ 4.

  [12]  *See id.* ¶¶ 4-7.

  [13]  *See id.*

representatives of the People's Bank of China — BOC's chief regulator — to

inform them that the Shurafa Accounts were being used to finance PIJ and

Hamas.[14]  The Task Force asked the Chinese representatives to close the Shurafa

Accounts.[15]  The Chinese representatives declined to do so.[16]  One year later, on

April 17, 2006, PIJ operatives executed a suicide bombing that killed Daniel Wultz

and seriously injured Yekutiel Wultz.

In 2009, Plaintiffs filed their Amended Complaint in the D.C. District

Court.[17]  In October 2012, Plaintiffs and their counsel met with Shaya to determine

whether he was willing to testify on Plaintiffs' behalf.[18]  On March 20, 2013,

Shaya sent Plaintiffs' counsel a letter stating,

> I have been contacted on behalf of plaintiffs . . . to voluntarily
> testify . . . . Due to my previous employment and involvement in
> matters relating to Israel state security, I would like to underscore,
> that should I decide to testify, although I would testify as a private
> citizen [] in classified matters and matters relating to the security
> of the State of Israel and certain individuals, I am bound to the
> provisions of the Israeli law and to the subsequent guidance of the
> relevant authorities in Israel.

14    *See id.* ¶ 8.

15    *See id.*

16    *See id.* ¶ 9.

17    *See* First Amended Complaint ("Amended Compl.").

18    *See* Declaration of Yekutiel Wultz ("Y. Wultz Decl."), Ex. 7 to
Wolosky Decl., ¶¶ 20-21.

> Should I decide to provide such testimony, it would be based upon knowledge I accrued . . . as a member of the Counterterrotism Staff of Israel's National Security Council, which naturally includes certain classified matters.[19]

Shaya then set forth "specific prerequisites" to any potential voluntary deposition.[20] For example, he requested that the parties conduct the deposition in Israel, prohibit photography, excuse him from answering questions that implicate Israeli security, and allow him to consult with both an Israeli government legal advisor and security information officer during the deposition.[21]

On August 29, 2013, Shaya wrote again to Plaintiffs' counsel to explain that he is "inclined to give a deposition."[22]  However, he warned, "[U]ntil I receive express written permission [from Israel] to provide information that came to me in my official capacity as a state employee and information about the activities that I engaged in while employed by the State, I am prohibited from doing so."[23]  Shaya also reported that Israeli Penal Law 5737-1977 forbids him

---

[19]    3/20/13 Letter from Shaya to Wolosky, Ex. 10 to Wolosky Decl., at 1.

[20]    *Id.* at 1-2.

[21]    *See id.*

[22]    8/29/13 Letter from Shaya to Wolosky, Ex. 11 to Wolosky Decl., at 1.

[23]    *Id.*

from providing such testimony without authorization.[24]  As such, he asked

Plaintiffs to postpone scheduling the deposition for three months so that he could

"secure and finalize such permission" from Israel.[25]  He would "consider [whether]

to provide [] testimony concerning this matter at that time."[26]

On September 18, 2013, Plaintiffs served a subpoena on Shaya, who

was visiting Washington D.C.[27]  The subpoena compelled him to attend a

deposition at Plaintiffs' counsels' office in Washington D.C. on November 25,

2013.[28]  On September 27, 2013, this Court wrote to Israel to notify it about the

deposition and ask whether it objected to Shaya's participation.[29]  After discussion

with the parties, I agreed to supervise Shaya's deposition in my courtroom on

November 25, 2013.[30]

###    B.    Post-Subpoena Briefing

---

[24]    *See id.*

[25]    *Id.*

[26]    *Id.*

[27]    *See* 9/18/13 Subpoena Addressed to Shaya, Ex. A to Israel Mem.

[28]    *See id.*

[29]    *See* 9/27/13 Letter from Court to Ayelet Levi, First Deputy to the
State Attorney General of Israel, Ex. 32 to the Wolosky Decl., at 1.

[30]    *See* 11/15/13 Order, Doc. No. 394.

On November 4, 2013, Intervenors — Plaintiffs in *Moriah v. Bank of China*, a related suit — filed a motion in the D.C. District Court to intervene "regarding the enforcement [of the] subpoena served . . . on Uzi Shaya."[31]  On November 15, 2013, Israel filed its motion to quash the subpoena in the D.C. District Court.[32]  On November 19, 2013, Judge Reggie B. Walton of the D.C. District Court entered an Order staying Shaya's deposition pending resolution of Israel's motion to quash and setting a briefing schedule.[33]  On November 26, 2013, after Plaintiffs and Israel consented, Judge Walton granted Intervenors' motion to intervene.[34]  Plaintiffs and Intervenors then filed briefs in opposition to Israel's motion.[35]

On December 2, 2013, Intervenors moved to strike or transfer the proceeding to this Court.[36]  Israel filed papers in opposition.[37]  On May 30, 2014,

---

[31]     Memorandum in Support of Proposed Intervenors' Motion to Intervene at 8.  On January 3, 2013, I entered an Order coordinating discovery in the *Wultz* and *Moriah* cases.

[32]     *See* May 30 Order at 4.

[33]     *See* 11/19/13 Order, Doc. No. 5 ("November 19 Order") at 1.

[34]     *See* May 30 Order at 4.

[35]     *See id.* at 1.

[36]     *See id.* at 4.

[37]     *See id.* at 4-5.

8

Judge Walton denied with prejudice Intervenors' request to transfer the physical location of Shaya's deposition to this Court.[38]  However, Judge Walton granted Intervenors' motion to transfer Israel's motion to quash.[39]  As a result, Israel's motion to quash, and all associated briefing were transferred to this Court.

## III.   APPLICABLE LAW

### A.   Non–Party Subpoenas Under Rule 45

In general, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."[40] Nevertheless, a district court has discretion to circumscribe discovery even of relevant evidence by issuing "an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."[41]  Rule 45 affords additional protection for non-parties subject to a subpoena by requiring parties to "avoid imposing undue burden or expense on a person subject to the subpoena."[42] Specifically, the court "must quash or modify any subpoena" that

---

[38]    Judge Walton noted that under Rule 45, Shaya may be deposed in New York only if he consents. *See id.* at 16 n.7.

[39]    *See id.* at 17.

[40]    Fed. R. Civ. P. 26(b)(1).

[41]    Fed. R. Civ. P. 26(c)(1).

[42]    Fed. R. Civ. P. 45(d)(1).

> (I) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond [100 miles of where the person resides, is employed, or regularly transacts business in person . . .]; (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden.[43]

In addition, amendments to Rule 45 have "enlarge[d] the protections afforded persons who are required to assist the court by giving information or evidence."[44]

### B.    Foreign Official Immunity

In *Samantar v. Yousuf*, the United States Supreme Court clarified that the Foreign Sovereign Immunities Act ("FSIA") governs determinations of sovereign immunity for foreign states, but not for foreign officials.[45] The Court explained that when Congress enacted the FSIA, it did not intend to "eliminate[ ] the State Department's role in determinations regarding individual official immunity," a procedure that developed as a matter of common law.[46] In addition, "from the time of the FSIA's enactment [the State Department has] understood the

---

[43]     Fed. R. Civ. P. 45(d)(3)(A).

[44]     Advisory Committee Note to the 1991 Amendment to Fed. R. Civ. P. 45. *Accord* Advisory Committee Note to the 2013 Amendment to Fed. R. Civ. P. 45 (stating that the Rule was amended, in part, to "protect local nonparties").

[45]     *See* 560 U.S. 305, 320 (2010).

[46]     *Id.* at 323.

Act to leave intact the Department's role in official immunity cases."[47]  Therefore,

"[e]ven if a suit [against a foreign official] is not governed by the Act, it may still

be barred by foreign sovereign immunity under the common law."[48]

Courts apply a "two-step procedure" to assess common-law claims of

foreign sovereign immunity.[49]  "Under that procedure, the diplomatic

representative of the sovereign could request a 'suggestion of immunity' from the

State Department."[50]  If the State Department grants the request, "the district court

surrender[s] its jurisdiction."[51]  But if the State Department declines the request or

provides no response, "a district court ha[s] authority to decide for itself whether

all the requisites for such immunity exist[]."[52]  When deciding for itself, "a district

court inquire[s] whether the ground of immunity is one which it is the established

policy of the State Department to recognize."[53]

---

[47]     *Id.* at 323 n.19.

[48]     *Id.* at 324.

[49]     *Id.* at 312.

[50]     *Id.* at 311 (quoting *Ex parte Peru*, 318 U.S. 578, 581 (1943)).

[51]     *Id.*

[52]     *Id.* (citing *Ex parte Peru*, 318 U.S. at 587).

[53]     *Id.* at 312 (citing *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945)).

Case law involving immunity of nonparty foreign officials is scarce. But a D.C. District Court recently held — and the D.C. Circuit unanimously affirmed — that nonparty, Alvaro Uribe, a former president of Colombia, could not be deposed even though he was served with a subpoena while visiting the District of Columbia.[54] In that case, the State Department granted a Suggestion of Immunity that "former President Uribe enjoys residual immunity from this Court's jurisdiction insofar as Plaintiffs seek information (i) relating to acts taken in his official capacity as a government official; or (ii) obtained in his official capacity as a government official."[55] The court agreed that Uribe could not be compelled to testify about "information he received and acts he took in his official capacity as a government official."[56]

The Supreme Court has similarly observed that it "may be correct as a matter of common-law principles" that "foreign sovereign immunity extends to an

---

[54]    *See Giraldo v. Drummond Co., Inc.*, 808 F. Supp. 2d 247, 249 (D.D.C. 2011), *aff'd*, 493 Fed. App'x 106 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 1637 (2013).

[55]    *Id.* (citing Statement of Interest and Suggestion of Immunity of the United States, *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247 (D.D.C. 2011) (No. 10-mc-764) ("*Giraldo* SOI"), at 1-2).

[56]    *Id.*

12

individual official 'for acts committed in his official capacity.'"[57] As the court in *Giraldo v. Drummond* recognized, this immunity protects non-parties from compelled testimony because "sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits."[58] Moreover, "[t]he common law of foreign sovereign immunity made no distinction between the time of the commission of official acts and the time of suit."[59] Thus, unlike head-of-state immunity, which is based on status, "immunity based on acts . . . does not depend on tenure in office" and is available to officials even after leaving office.[60]

---

[57]   *Samantar*, 560 U.S. at 322 n.17 (quoting *Chuidian v. Philippine Nat. Bank*, 912 F.2d 1095, 1103 (9th Cir. 1990)). *Accord Rosenberg v. Lashkar-e-Taiba*, 980 F. Supp. 2d 336, 342 (E.D.N.Y. 2013) (deferring to the State Department determination that "former [officials of the Government of Pakistan] are entitled to foreign sovereign immunity under the common law as foreign officials who were sued in their official capacity for acts conducted in their official capacity").

[58]   *Giraldo*, 808 F. Supp. 2d at 250-51 (citing *Foremost–McKesson, Inc. v. Islamic Repub. of Iran*, 905 F.2d 438, 443 (D.C. Cir.1990)).

[59]   *Belhas v. Ya'alon*, 515 F.3d 1279, 1285 (D.C. Cir. 2008). *Accord Yousuf v. Samantar*, 699 F.3d 763, 769 (4th Cir. 2012) (stating that foreign official immunity is "conduct-based immunity that applies to current and former foreign official"); *Giraldo*, 808 F. Supp. 2d at 249 (holding that "*former* President Uribe enjoys *residual* immunity as to information relating to acts taken or obtained in his official capacity as a government official") (emphasis added).

[60]   *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009).

## IV.   DISCUSSION

### A.   Israel Has Standing to Challenge the Subpoena

Both Plaintiffs and Intervenors contend that Israel lacks standing to challenge the subpoena because Shaya — the subpoenaed party — has not objected.[61]  However, "[t]he basis for recognizing [foreign official immunity] is that 'the acts of [] official representatives of the state are those of the state itself, when exercised within the scope of their delineated powers.'"[62]  And as the State Department has asserted, the "immunity protecting foreign officials for their official acts ultimately belongs to the sovereign rather than the official."[63]  As such,

---

[61]   *See* Plaintiffs' Corrected Memorandum of Law in Opposition to Israel's Motion to Quash ("Pl. Opp.") at 20-22; Intervenors' Memorandum of Law in Support of Motion to Strike Israel's Motion to Quash ("Intervenors' Strike Mem.") at 6.

[62]   Brief for the United States as Amicus Curiae Supporting Affirmance, *Samantar v. Yousef*, 560 U.S. 305 (2013), 2010 WL 342031, at *12 (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)).  *Accord Herbage v. Meese*, 747 F. Supp. 60, 66 (D.D.C. 1990), *aff'd*, 946 F.2d 1564 (D.C. Cir. 1991) (recognizing that a foreign sovereign "does not act but through its agents").

[63]   Statement of Interest of the United States, *Yousef v. Samantar*, 04 Civ. 1360 (E.D. Va. Feb. 14, 2011) ("*Samantar* SOI"), ¶ 10.  *Accord In re Doe*, 860 F.2d 40, 45 (2d Cir. 1988) ("Because it is the state that gives the power to lead and the ensuing trappings of power — including immunity — the state may therefore take back that which it bestowed upon its erstwhile leaders.").

14

regardless of whether Shaya is willing to testify,[64] Israel has standing to protect its rights and interests.[65]

Moreover, Israel has standing to prevent disclosure of sensitive information that implicates its national security. Under Rule 45, any person or entity — even those not subject to the subpoena — may move to quash a subpoena that "requires disclosure of privileged or other protected matter . . . ."[66] Here,

---

[64] Although Plaintiffs insist that Shaya is willing to testify, his own statements suggest otherwise. *See* 3/20/13 Letter from Shaya to Wolosky at 1 (requesting certain conditions "*should* [he] decide to testify") (emphasis added); 8/29/13 Letter from Shaya to Wolosky at 1 (stating that he would "consider [whether] to provide [] testimony" after he attempts to secure Israel's permission).

[65] *See Albany Molecular Research, Inc. v. Schloemer*, 274 F.R.D. 22, 25 (D.D.C. 2011) (rejecting the argument that "the only party that has standing to quash a Rule 45 subpoena . . . is the party subpoenaed" where "the subpoena directly implicates [another's] privilege or rights"); *Novak v. Capital Mgmt. & Dev. Corp.*, 241 F.R.D. 389, 394 (D.D.C. 2007) ("[A] party may challenge a subpoena when enforcement of it may disclose information that party can claim is privileged at common law or by statute or rule."); *In re Investigation of World Arrangements with Relation to Prod., Transp., Ref. & Distribution of Petroleum*, 13 F.R.D. 280, 286 (D.D.C 1952) (Because "the privilege belongs solely to the foreign sovereign[,] [it] must be asserted by the foreign sovereign and it cannot be claimed by a party for his own benefit.").

[66] Fed. R. Civ. P. 45(d)(3)(A)(iii). *Accord Estate of Ungar v. Palestinian Author.*, 332 Fed. App'x 643, 645 (2d Cir. 2009) (holding that non-party had standing to object to subpoenas directed to his attorney); *Pleasant Gardens Realty Corp. v. H. Kohnstamm & Co., Inc.*, No. 09 Civ. 5582, 2009 WL 2982632, at *4 (D.N.J. Sept. 10, 2009) ("The fact that a non-party has standing to challenge a subpoena directed to someone else in a situation where the non-party seeks to protect its property right or privilege, is not surprising or novel.").

Israel's National Security Advisor, Yaacov Amidror, declared that the subpoena requires disclosure of "sensitive and classified information" that Shaya learned in his official capacity.[67]  In addition, "[a]ny disclosure of such information would implicate the methods and activities used by the State of Israel to prevent terrorism, would harm Israel's national security, would compromise Israel's ability to protect the lives of its citizens, residents, and tourists from terrorism . . . ."[68]

Plaintiffs insist that the subpoena does not "infringe on [Israel's] national security interests."[69]  But the D.C. Circuit has "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."[70]  Accordingly, I will not second-guess the assessment of the National Security Advisor.[71]

---

[67]     Amidror Decl. ¶ 5.

[68]     *Id.* ¶ 7.

[69]     Pl. Opp. at 22.

[70]     *Center for Nat. Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003) (citing *King v. United States Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987)).

[71]     Intervenors — but not Plaintiffs — further contend that Israel must intervene in the underlying lawsuits before moving to quash. *See* Intervenors' Strike Mem., at 4-6; Intervenors' Memorandum in Opposition to Israel's Motion to Quash ("Intervenors' Opp. Mem."), at 10-11.  But Rule 45 imposes no such requirement on nonparties. *See Estate of Ungar*, 332 Fed. App'x at 645) (holding that nonparty that claims privilege has standing to challenge subpoena served on law firm that represented it); *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*,

16

## B.   Shaya Is Immune from Testifying

On June 12, 2014, Israel requested a Suggestion of Immunity from the State Department.[72]  Because the State Department has yet to respond, this Court "ha[s] authority to decide for itself whether all the requisites for such immunity exist[]."[73]  In doing so, I must determine "whether the ground of immunity is one which it is the established policy of the State Department to recognize."[74]

The State Department recently defined the contours of immunity for foreign officials in *Giraldo*.  There, the plaintiffs, legal representatives of terror victims, served a subpoena on former Colombian President Alvaro Uribe, a nonparty.[75]  Plaintiffs sought to depose Uribe regarding information about terrorist activity in Colombia.[76]  The State Department granted a Suggestion of Immunity that "former President Uribe enjoys residual immunity from this Court's

---

12-mc-0275, 2013 WL 238176, at *1 (S.D.N.Y. Jan. 18, 2013) ("Because [nonparty] asserts a claim of privilege in the documents sought by [plaintiff], it appears that [nonparty] has standing to challenge the subpoena on those grounds.").

[72]   6/23/14 Email from John B. Bellinger, III, counsel for Israel, to the Court.

[73]   *Samantar*, 560 U.S. at 311 (citing *Ex parte Peru*, 318 U.S. at 587).

[74]   *Id.* at 312 (citing *Hoffman*, 324 U.S. at 36).

[75]   *See Giraldo*, 808 F. Supp. 2d at 249.

[76]   *See id.* at 248.

17

jurisdiction insofar as Plaintiffs seek information (I) relating to acts taken in his official capacity as a government official; or (ii) obtained in his official capacity as a government official."[77] The district court adopted the State Department's Suggestion of Immunity, agreeing that Uribe could not be compelled to testify about "information he received and acts he took in his official capacity as a government official."[78] The D.C. Circuit unanimously affirmed.[79]

Plaintiffs argue that *Giraldo* is distinguishable.[80] *First*, they contend that because Uribe was a former head of state, he was entitled to "far greater immunity than other officials, such as Shaya."[81] But head-of-state immunity was unavailable to Uribe — a *former* president — because it only applies to sitting heads of state.[82] Instead, the court recognized Uribe's immunity as a former

---

[77]   *Id.* at 249 (citing *Giraldo* SOI at 1).

[78]   *Id.*

[79]   *See Giraldo*, 493 Fed. App'x at 106.

[80]   *See* Pl. Opp. at 23-25.

[81]   *Id.* at 25.

[82]   *See Manoharan v. Rajapaksa*, 711 F.3d 178, 179 (D.C. Cir. 2013) (adopting State Department Suggestion of Immunity that "President Rajapaksa, as the sitting head of a foreign state, enjoys head of state immunity from the jurisdiction of U.S. courts in light of his *current* status.") (emphasis added).

"foreign official."[83]  Unlike head-of-state immunity, foreign official immunity

"does not depend on tenure in office" and extends to former officials, like Uribe

and Shaya.[84]

   *Second*, Plaintiffs argue that the *Giraldo* plaintiffs sought to depose

Uribe in order to "challenge the actions of the [Colombian] government."[85] By

contrast, their subpoena would not "call into question" the actions of Israel or

Shaya.[86]  But official immunity operates not only as shield from accusations or

claims of wrongdoing.  It also offers broad protection from a domestic court's

jurisdiction.[87] As the D.C. Circuit has explained, "sovereign immunity is an

immunity from trial *and the attendant burdens of litigation*, and not just a defense

to liability on the merits."[88]  As such, in *Giraldo*, the court found Uribe to be

---

[83] *Giraldo*, 808 F. Supp. 2d at 249.

[84] *Matar*, 563 F.3d at 14.

[85] Pl. Opp. at 25.

[86] *Id.* at 23.

[87] *See The Schooner Exch. v. McFaddon*, 11 U.S. 116, 137 (1812) ("One sovereign being in no respect amenable to another; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another . . . .").

[88] *Belhas*, 515 F.3d at 1293 (citing *Foremost–McKesson, Inc.*, 905 F.2d at 443. *Accord Giraldo*, 808 F. Supp. 2d at 150-51 (same as to foreign official immunity).

immune from compelled testimony even though neither he nor

Colombia faced any claim of wrongdoing.[89]

      *Third*, Plaintiffs argue that *Giraldo* is distinguishable because Uribe

"failed to appear at his deposition and opposed the plaintiff's motion to compel."[90]

This is a distinction without a difference because foreign official immunity

"ultimately belongs to the sovereign rather than the official."[91] Thus, in *Giraldo*, it

was the Colombian Government's "formal[] request[]" for immunity that prompted

the State Department to issue its Suggestion of Immunity for Uribe.[92]

---

[89]    *See* Petition for Certiorari, *Giraldo v. Drummond Co. Inc.*, 2013 WL 266620, at *5 (Jan. 22, 2013). Plaintiffs also rely on the Court's statement in *Samantar* that "The Restatement provides that the 'immunity of a foreign state . . . extends to . . . any other public minister, official, or agent of the state with respect to acts performed in his official capacity *if the effect of exercising jurisdiction would be to enforce a rule of law against the state.*'" *Samantar*, 560 U.S. at 321 (2010) (quoting Restatement (Second) of Foreign Relationship Law § 66). Although the Court cited this provision in dicta to demonstrate a potential difference between state and official immunity, it disavowed any "view on whether Restatement § 66 correctly sets out the scope of the common law immunity applicable to current or former foreign officials." *Id.* at 321 n.15. Notably, the *Giraldo* court did not consider whether the subpoena "enforce[d] a rule of law against the state," and the Restatement (Third) includes no such limitation. Thus, I cannot conclude that Shaya's immunity depends on whether the subpoena calls his conduct "into question." Pl. Opp. at 23.

[90]    Pl. Opp. at 25.

[91]    *Samantar* SOI ¶ 10. *Accord In re Doe*, 860 F.2d at 45.

[92]    *Giraldo* SOI at 5 (considering the concerns expressed by the Colombian Government).

## C.   Israel Has Not Waived Immunity

Next, Plaintiffs and Intervenors argue that Israel waived immunity by encouraging Plaintiffs to bring the underlying lawsuits. In the D.C. Circuit, "[e]xplicit waivers of sovereign immunity are narrowly construed 'in favor of the sovereign.'"[93] "[A] foreign sovereign will not be found to have waived its immunity unless it has clearly and unambiguously done so."[94] Furthermore, "[t]he theory of implied waiver contains an intentionality requirement, and that a finding of 'an implied waiver depends upon the foreign government's having at some point indicated its amenability to suit.'"[95]

For obvious reasons, sovereigns that wish to waive an official's immunity tend to do so expressly.[96] Here, Plaintiffs cannot — and do not —

---

[93]     *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (quoting *Library of Cong. v. Shaw*, 478 U.S. 310, 318 (1986)).

[94]     *Gutch v. Federal Republic of Germany*, 255 Fed. App'x 524, 525 (D.C. Cir. 2007).

[95]     *Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 24 (D.D.C. 2013) (quoting *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994)).

[96]     *See, e.g., In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108, 1110 (4th Cir. 1987) ("[The Republic of the Philippines] issued a diplomatic note purporting to waive any residual head-of-state or diplomatic immunity enjoyed by [the former president and his wife.]").

21

contend that Israel expressly waived immunity.  At most, Plaintiffs suggest that

Israel "commit[ted]" to make Shaya available to testify.[97]  Intervenors similarly

complain that Israel "initially agreed to provide [] access to [] Shaya."[98]  But no

evidence suggests that Israel *intended* to waive Shaya's immunity with respect to

this Court's jurisdiction.[99]  Because I find that Shaya is immune as to information

regarding acts taken or knowledge obtained in his official capacity as a government

official, I need not determine whether Shaya's testimony is also protected as a

---

[97]     Pl. Opp. at 14, 16.  Moreover, as evidence of these "commitments,"
Plaintiffs cite only to statements from their own affidavits.  *See* Y. Wultz Decl. ¶¶
8, 10; 12/16/13 Declaration of Sheryl Cantor Wultz ("S.C. Wultz Decl."), Ex. 8 to
Wolosky Decl., ¶¶ 7, 9.  They present no evidence of any written communication
from Israel — contemporaneous or otherwise.

[98]     Intervenors' Opp. at 19.  This claim is similarly unsupported.

[99]     *See Foremost-McKesson, Inc.,* 905 F.2d at 444 ("[C]ourts rarely find
that a nation has waived its sovereign immunity . . . without strong evidence that
this is what the foreign state intended").  Plaintiffs further argue Shaya will testify
about information that has already been disclosed in their public filings.  *See* Pl.
Opp. at 11-12; 36-39.  Even if this is true, Shaya remains immune.  In *Giraldo,* the
Court recognized Uribe's immunity even though "[m]any of the details regarding
the links between the [terrorist organization] and Mr. Uribe became public as a
result of the Uribe Government's justice and peace process."  Reply Brief of
Plaintiffs in Support of Motion to Compel, *Giraldo v. Drummond Co.,* (D.D.C.
2011) (No. 10-mc-764), at 5.  *See Smith v. Cromer,* 159 F.3d 875, 880 (4th
Cir.1998), *cert. denied,* 528 U.S. 826 (1999) ("[D]isclosure of factual information
does not effect a waiver of sovereign immunity as to other related matters.").

foreign state secret.[100]

Finally, Plaintiffs seek to depose Shaya on information he acquired after leaving office — namely, "his personal knowledge" about Israel's efforts to commence the underlying litigation and BOC's efforts to "prevent him from testifying."[101] Assuming, arguendo, that this information is relevant, the question remains whether Shaya learned this information in his official or personal capacity.[102] In any event, to compel Shaya to testify in the United States would

---

[100]    Finally, Plaintiffs contend that if the Court denies Israel's motion, "[Israel] would simply preclude enforcement of Plaintiffs' valid subpoena to [] Shaya by detaining (or incarcerating) him in Israel." Plaintiffs' Supplemental Memorandum of Law in Opposition to Israel's Motion to Quash ("Pl. Supp. Mem.") at 8. Under "the doctrine of disentitlement," a court should decline to hear an application for relief where relief would be futile because the applicant "will respond to a judgment only if it is favorable." *Id.* at 6 (citing *Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 282 (2d Cir. 1997)). But this doctrine applies where "the party seeking relief is a fugitive while the matter is pending." *Degen v. United States*, 517 U.S. 820, 824 (1996). Because Israel has not defied or fled to avoid a court order, the doctrine is inapplicable here. In fact, if anyone defied a court order it was Plaintiffs, who covertly wrote to Shaya on April 18, 2014 to request a "voluntary deposition" despite Judge Walton's November 19, 2013 Order that stayed Shaya's deposition pending resolution of Israel's motion. 4/18/13 Letter from Wolosky to Shaya, Ex. 3 to Pl. Supp. Mem., at 1.

[101]    Pl. Mem. at 22.

[102]    *See* Shaya Decl. ¶ 5 ("I continue to provide assistance to the Counterterrorism Staff of Israel's National Security Council and to the Israeli government in respect to the matters I dealt with in my former positions.").

violate Rule 45's 100-mile restriction.[103]  Shaya is an Israeli citizen and resident.[104]

Holding the deposition in the United States would burden both Shaya and the

representatives from the Israeli Government, who would necessarily accompany

him.[105]

   To the extent that Shaya wishes to testify voluntarily as to information

unrelated to acts taken or knowledge obtained in his official capacity, the

deposition is permitted.  If it is held in the United States, the deposition will be

carefully supervised by myself or Judge Gorenstein.  The courtroom will be closed

for the entirety of the deposition and courtroom access will be restricted to counsel

of record, court personnel, and other authorized persons.  A representative from

Israel is invited to attend to raise any objections.  If a deposition is held in Israel,

similar arrangements will be made.

## V.  CONCLUSION

---

[103] *See* Fed. R. Civ. P. 45(c)(1)(A)("A subpoena may command a person to attend a trial, hearing, or deposition only . . . within 100 miles of where the person resides, is employed, or regularly transacts business in person.").

[104] I cannot credit Plaintiffs' unsupported assertion that Shaya "regularly transact[] business" in Washington, D.C., simply because he was served there.  Pl. Mem. at 44.

[105] *See* 3/20/13 Letter from Shaya to Wolosky at 1-2 (requesting that the deposition be held in Israel and that a representative from the Israeli government be present).

For the foregoing reasons, Israel's motion is GRANTED.[106]

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    July 21, 2014
          New York, New York

---

[106]    Because the motion and related filings were never formally transferred
by the D.C. District Court, Israel's motion does not appear on this Court's docket.

## - Appearances -

**For Plaintiffs:**

David Boies, Esq.
Mary Boies, Esq.
Lee S. Wolosky, Esq.
Steven I. Froot, Esq.
Marilyn C. Kunstler, Esq.
Joseph W. Dunn, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2350

**For Intervenors:**

Robert Joseph Tolchin, Esq.
Aalok J. Karambelkar, Esq.
The Berkman Law Office, LLC
111 Livingston Street, Suite 1928
Brooklyn, NY 11201
(718) 855-3627

**For Defendant:**

Mitchell R. Berger, Esq.
Patton Boggs LLP (DC)
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-5601

Lanier Saperstein, Esq.
William G. Primps, Esq.
Neil McDonell, Esq.
Eric Epstein, Esq.
Daniel Goldberger, Esq.
H. Alex Iliff, Esq.
Geoffrey Sant, Esq.
Dorsey & Whitney LLP
51 West 52nd Street
New York, NY 10019
(212) 415-9309

**For the State of Israel**

Stewart D. Aaron, Esq.
John B. Bellinger, III, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022
(212) 715-1399