# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | |
| | | Docket #11cv1266 |
| WULTZ, et al., | : | 1:11-cv-01266-SAS-GWG |
| Plaintiffs, | : | |
| - against - | : | |
| BANK OF CHINA LIMITED, | : | New York, New York |
| | | July 29, 2014 |
| Defendants. | : | |
| ---------------------------------- | : | |

PROCEEDINGS BEFORE
THE HONORABLE GABRIEL W. GORENSTEIN,
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For the Wultz Plaintiffs: BOIES, SCHILLER & FLEXNER, LLP
BY: STEVEN FROOT, ESQ.
LEE WOLOSKY, ESQ.
JOSEPH DUNN, ESQ.
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

Transcription Service: Carole Ludwig, *Transcription Services*
141 East Third Street #3E
New York, New York 10009
Phone: (212) 420-0771
Fax: (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

Appearances, Cont'd:

For the Defendants:

DORSEY & WHITNEY, LLP
BY: LANIER SAPERSTEIN, ESQ.
GLENN SALVO, ESQ.
MARK SULLIVAN, ESQ.
51 West 52nd Street
New York, New York 10019
(212) 415-9200

SQUIRE PATTON BOGGS
BY: MITCHELL BERGER, ESQ.
2550 M Street, N.W.
Washington, D.C. 20037

# INDEX

## E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

## E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

THE CLERK: Wultz versus Bank of China, docket 11cv1266. Counsels, please state your name for the record.

MR. LEE WOLOSKY: Lee Wolosky, Boies Schiller & Flexner, for the Wultz plaintiffs.

MR. JOSEPH DUNN: Joseph Dunn, Boies Schiller & Flexner, also for the Wultz plaintiffs.

MR. STEVEN FROOT: Steven Froot, Boies Schiller & Flexner, for the Wultz plaintiffs.

MR. LANIER SAPERSTEIN: Good afternoon, Your Honor, Lanier Saperstein of Dorsey & Whitney, LLP, on behalf of Bank of China, Ltd., and sharing argument responsibilities today with Glenn Salvo, who is on my left here.

MR. GLENN SALVO: Good afternoon, Your Honor.

MR. SAPERSTEIN: I'm joined by Mark Sullivan of my firm and Mitch Berger, co-counsel of Squire Patton Boggs, and we're also joined by Mr. Gary Lax of (indiscernible) Scoolman who is the bank's U.S. regulatory counsel.

THE COURT: Okay, welcome, everyone. You can be seated if you're not speaking. We're here based upon letters dated July 9, 24, and 25. I feel a little bit hampered in all of this because all the wonderful cases everyone cited to me, the courts actually had documents

that they were applying whatever rule they were replying to. And they could describe them in a few words generally. Right now things are being argued in generalities. It's certainly not the plaintiff's fault because they haven't seen the documents. I'm not saying it's the defendant's fault either, but it is what it is.

So I think before I figure out what rule of law should be applied, I'd like to know what it is I'm applying it to. So I'm open to any suggestions, but right now things are framed in generalities.

MR. SAPERSTEIN: Your Honor.

THE COURT: Yes.

MR. SAPERSTEIN: Lanier Saperstein on behalf of the bank. We did bring with us today a disk that contains a sample of documents from our privilege log, categorical log, excuse me. We have that with us today. Given the regulations, however, we would just ask for Your Honor to issue an order directing us to turn over the disk to the Court for its in camera review.

THE COURT: Okay, I recognize there's case law that has said rather broadly that a court doesn't have a power to conduct in camera reviews. I think that has to yield to a court's need to determine whether a litigant is complying with the regulation itself; otherwise, a bank

could never be reviewed in its decision-making regarding whether it’s complying with the regulation. Did you want to be heard, Mr. Dunn?

MR. DUNN: Yes, thank you, Your Honor. Plaintiff’s position is that many of the disputes as to particular categories of documents on BOC’s log can be resolved on the basis of the log alone, and while, of course, we welcome in camera review of particular documents if the Court so chooses, we believe that the descriptions in Bank of China’s log are sufficient to conclude that the documents are not protected by the privilege.

THE COURT: You may have a point, but I think I’ll feel more comfortable looking at it. So I’m ordering Mr. Saperstein to hand over the disk.

MR. SAPERSTEIN: Your Honor, it’s password protected, and we put the password on a post-it.

THE COURT: Okay, I hope that this computer (inaudible).

MR. WOLOSKY: Your Honor, Lee Wolosky for the record. We would just like to understand, for the record, how the sample was generated. We did ask Mr. Saperstein to generate a random sample of the documents from the log. Mr. Saperstein confirmed that he did, in fact, generate a random sample of the documents reflected in log for Your

Honor's review. But just for the record and good housekeeping, we'd like to understand how that random sample was generated.

MR. SALVO: I can address that, Your Honor.

THE COURT: Go ahead.

MR. SALVO: We asked one of our --

THE COURT: Could you identify yourself.

MR. SALVO: Sorry, Your Honor, Glenn Salvo.

THE COURT: Go ahead.

MR. SALVO: At our firm Dorsey & Whitney, we asked one of our support staff to create a random selection of documents. We chose three as the number for each category that we presented to you for the disputed categories. The randomization was done as follows:

The documents were all copied into an Excel spreadsheet, a reference number for each of the documents. Those documents were then in Microsoft Excel assigned a random number. The documents were sorted by number, and the first three documents that came up were selected. The only exception to that, one of the disputed categories contains two documents. So in that category we gave you both.

There's one other thing, Your Honor. In the course of reviewing the sample that we created, we noticed

that one of the documents that was selected for the sample should probably not have been in the log because, in fact, we had already produced that document in response to the April 9 order in redacted form. So the plaintiffs already have that. They received it back in November. It should not have been on our log. It's one of the documents for category 13.

I have the produced copy here if Your Honor would like to compare he redacted and non-redacted versions. I brought copies for Your Honor and for the plaintiff's counsel as well.

THE COURT: Well, I don't need it because it's in here, right?

MR. SALVO: The unredacted version, yes. We have the redacted version here if you'd like to see our redactions.

THE COURT: Sure. All right, I'm still – I was just looking through the first document which is what I suspect it would look like. It's an activity review checklist.

(pause in proceeding)

THE COURT: I don't know how easy it's going to be to do this on the spot.

MR. SALVO: Your Honor, if it would be helpful,

we can come back and give you some time to work with the documents. I do think --

THE COURT: I don't mean today.

MR. SALVO: Whenever it's convenient for you, obviously, Your Honor. I do think there are a couple --

THE COURT: I think there's some things we might be able to accomplish today. I'm not saying we all go home. Maybe we should try to talk generically about these. I mean I think I have to make some broad decisions, and I'm sort of tentatively prepared to do that. My problem is that the case law is just all over the place.

MR. DUNN: Your Honor, if I may.

THE COURT: Yes. Is there something about my having said all over the place that made you jump up?

MR. DUNN: Yes.

THE COURT: Or you just want to start arguing? We can do it that way if you want. Go ahead.

MR. DUNN: Well, we would like to be heard on the general law to be applied here, and we recognize that the case law does differ court to court. However, as stated in our letters, we believe that this dispute can be resolved on the basis of Judge Scheindlin's orders in this case.

THE COURT: Stop right there. I don't think there's anything in Judge Scheindlin's orders that tells me

what to do here. I've thought about that, so I don't even want to talk about it. Do you want to talk about the case law or the log or anything like that, that's fine. I don't think Judge Scheindlin has called upon to deal with what I'm doing here and anything that says otherwise is dictum, I don't think she would want to be bound by it without having considered the actual issue.

MR. DUNN: Well, we're not suggesting that the Court has already ruled on the particular documents at issue here, but we believe that the Court's April 17, 2013 order considered a document that falls into the same category as the materials that are being withheld currently by Bank of China and that are now at issue.

THE COURT: I read the order though I admit I can't recall specifically the documents.

MR. DUNN: So the document at issue --

THE COURT: You know what, let's make life simpler. I'm going to call up the order.

MR. DUNN: This is docket number 247.

THE COURT: Hold on, hold on.

(pause in proceeding)

THE COURT: The number?

MR. DUNN: 247, 2-4-7.

(pause in proceeding)

THE COURT: Go ahead.

MR. DUNN: So the discussion of the application of the privilege in this order begin on page 5, and the document at issue here was an investigative report that Bank of China's New York branch prepared on Sahid Al-Sharafa (phonetic) and various counterparties to Sahid Al-Sharafa, individuals who sent wires to or from Sahid Al-Sharafa. The report consisted of the investigations of the compliance department of BOC's New York branch into the nature of these transactions, in particular, indicia that these transactions were terrorist financing or otherwise suspicious. And that report is not distinguishable from various items on BOC's log without materials.

For example, entry 15 on Bank of China's star log, this is exhibit C to plaintiff's July 9 letter --

THE COURT: Your position is that, based upon this order – and the big question here I assume is going to be two types of things. One is materials that relate to a specific customer's transactions where the bank says, you know, you've seen these transactions, it's suspicious, maybe it's money-laundering, maybe it's this or that, and at some point down the line, they did or did not file a SAR, and you say none of that's protected. They say that's all protected. That's one type. The other type is the

general policies, procedures about what's suspicious, not related to any specific person.

So for you this fits within category one.

MR. DUNN: That's correct, Your Honor.

THE COURT: Right. And it's just been produced, okay. And then we have the case law that addresses that and it goes both ways as far as I'm concerned. So your view is this thing, this order from Judge Scheindlin essentially comes within the case law that says it's not SAR protected.

MR. DUNN: That's right. In --

THE COURT: It's produced. All right, Mr. Saperstein.

MR. SALVO: Your Honor --

THE COURT: Just on – whoever's speaking. Just on the issue of Judge Scheindlin's April order.

MR. SALVO: What would you like me to address, Your Honor?

THE COURT: Whether she essentially ruled on this leading question.

MR. SALVO: She did not.

THE COURT: Because?

MR. SALVO: Because the key question here is what is the meaning of the words that are in the regulation

revealing the existence of a SAR. She quotes the regulation, she states the regulation revealing these are (indiscernible) SAR, but she nowhere interprets revealing the existence of a SAR. The Sharafa report was not presented as part of the bank's SAR decisional process to the --

(interposing)

THE COURT: Maybe that's really the issue, what was this report, was it something contemporaneous with what was going on with Sharafa, was it generated after, what was it?

MR. SAPERSTEIN: It was generated after the bank received the plaintiff's demand letter.

THE COURT: Ah, okay. All right, well, to me that's very helpful to know because that, you know, again, as I go through this case law, the hard question, what I call the first category, is all the things that lead up to the decision to or to not file the SAR, the investigation and so forth, is that protected by this statute? So if she's dealing with a report that was long after any SAR would or would not have been filed, and it's sort of an analysis of what they did or didn't do wrong, and to me that's of a very different character.

Now, maybe there are things on this log that fit

within that category, and I sort of haven't gotten to that point yet, and we can certainly talk about that, but I don’t see how this decision in the April 17 decision addresses the problem I’m trying to grapple with right now. So – go ahead.

MR. DUNN: Well, Your Honor, the specific question at issue in the April 17 decision was the extent to which the SAR prohibition protected this report. And there was no question of work product, there was no question of what the timing of the production of the report was, and that hasn’t been a consideration that other courts have taken into account when deciding whether to apply this privilege, to my knowledge.

The question here was --

THE COURT: Well, I think you’re wrong on timing. I think that is something that the courts, or do maybe explicitly – I think certainly implicitly talk about. They talk about, you know, the institution’s process for complying – I’m just quoting from various cases – with federal reporting requirements. That’s from Union Bank.

MR. DUNN: A key issue that courts have --

THE COURT: Let me finish my sentence. Here’s from Whitney, “documents preliminary, preparatory” – I admit he does say follow-up – “or related communications.”

So I think there is – I think there is a sense they're concerned about protecting this process that leads up to the decision to file or not to file or this is somehow subsumed in the regulation.

And let's just look at the Federal Register explanation from the Agency. Yeah, here it is, "prepared by the National Bank as part of its process to detect or report suspicious activity regardless of whether a SAR ultimate was filed or not." All that to me talks about a pre-SAR or pre-decision-making on SAR process.

MR. DUNN: Your Honor, a couple of points in response to that. First, with respect to the guidance from FinCEN in the Federal Register that was, this portion of the Federal Register was quoted by BOC although not a particular paragraph is illuminating here. FinCEN's guidance as to the application of its SAR regulations contains this language --

THE COURT: Before we do this though, I'd like to stay on topic. I'm happy to get to the merits of this divide in the case law. The top I'm trying to get at is why you think the April 17 ruling is law of the case or somehow defines what's going on here. I mean if you need to reference the FinCEN ruling, go ahead.

MR. WOLOSKY: It's Lee Wolosky for the record.

Let me just say one thing that is clear from that order, and that is that regardless of the circumstances under which Judge Scheindlin was applying the SAR privilege, and that's the only privilege she was applying in that order. What is clear is that she set forth a process for this case, and that was redactions and production. What Bank of China is doing here, among other things, is they are withholding documents in their entirety based on the SAR privilege. At a minimum, we believe they must concede that that order sets forth a process for dealing with material that reveals the existence of the SAR, and that is redaction and production.

THE COURT: Well, I have to do this my way, and I started out by asking a question about the division of the case law for me to deal with this issue, which route I'm going to follow without the preliminary investigative material. And before I can get anything out of my mouth, your co-counsel said, oh, don't worry about that, look at Judge Scheindlin's order, she addresses that legal question. Now you're telling me to look at it for another purpose, and if you want to give up your chance to argue the legal question, that's fine, but I want to do this in the way I want to do it because I view this as a different problem.

MR. WOLOSKY: Sure. We're prepared to argue that; we're prepared to argue the regulations or the case law, as Your Honor may wish.

THE COURT: So let's get back to the division in the case law. Again, I start out – I go back to where I was when I started out, which was I didn't think there was anything I read from Judge Scheindlin where she considered this division in case law, considered how it applied to a situation like this. We'll deal with that issue.

MR. WOLOSKY: I think the key point is that the document that was at issue in the April 17, 2013 order is of the same type as the documents that are at issue now. And --

THE COURT: Well, if it's a decision – if it's a sort of a look-back at, you know, what did we find out, what did we know and when did we know it, what should it have alerted us to anything or were we properly alerted to anything, I think it would be the right thing. I didn't think that there were documents like that in this list. If there are, you should talk about that. You couldn't tell that from the categories.

MR. WOLOSKY: Bank of China does take the position, and I believe this is stated in the Bank's July 25 letter, that documents even that post-date the filing of

a SAR could be protected under the privilege. But returning to the Sharafa investigative report that was at issue in this April 2013 order, the nature of that report was not entirely retrospective, and there were materials in that report that indicated an ongoing investigation by Bank of China's compliance department in New York of the same type that Bank of China says was undertaken and is reflected in the documents that it's withholding now.

For example, that Sharafa investigative report contains suspicious activity review checklists, internal account activity review checklists of the same type that appear to be described as number one on Bank of China's SAR log. It contains documents that Bank of China pulled out of its files from times prior to 2008 that reflect contemporaneous investigations of counterparties at issue in this case from prior to 2008, from 2007.

THE COURT: The checklist part of I understood. Tell me the next part.

MR. WOLOSKY: The report does not consist entirely of documents that were created at the time of the investigation that is the main subject of the report.

THE COURT: Wait, wait, and you said checklist, I understand that. What was the next thing you said?

MR. WOLOSKY: Correct. The report contains

documents that appear to have been, based on their dates, the dates of those documents, pulled out of existing files that Bank of China had as of 2008. So the point is that the contents of the report are not things that were entirely created in 2008 post-dating activity that the report discusses. There are also contemporaneous materials included in that document.

THE COURT: Okay, and, therefore, what?

MR. WOLOSKY: And, therefore, the document that was at issue in this April 2013 order seems not to be distinguishable in any way from the materials that appear on BOC's log.

THE COURT: Well, it depends what it is they talk about. We can talk about what they attach, and I understand the checklist point. But are you saying that they attached documents contemporaneous with the Sharafa transactions that discuss their suspiciousness and what should be done about it and that sort of thing, is that what you're getting at?

MR. WOLOSKY: That is what I'm getting at, Your Honor. There are historical documents from prior 2008 included in this report.

THE COURT: Okay, and you're not bringing this up to point out inconsistency, which would be one thing, bring

it up to show that this shows that Judge Scheindlin considered this issue that I'm talking about?

MR. WOLOSKY: That's correct, Your Honor.

THE COURT: I can't – I think we're wasting our time the way we're doing this, it's already been decided by Judge Scheindlin, because I just don't believe that. And I don't think parsing out pieces of the Sharafa document is going to do it. So let's move on and let's talk about the case law if you wish and where that leads us.

MR. WOLOSKY: So in a discussion of the case law, we would start, take a step back and start first with the regulation itself. And there are two regulations that Bank of China cites in support of its --

THE COURT: If it's just the regulation, then I think that you guys have the better of the argument. I think it's the interpretation of the regulation.

MR. WOLOSKY: So on that front, refer the Court to the portion of the Federal Register that I mentioned earlier. This is FinCEN guidance on how to interpret the regulation at issue.

THE COURT: Is this something that was supplied to me? Because I'm not sure I saw it.

MR. WOLOSKY: I'm actually not certain, Your Honor. It was cited --

THE COURT: It was supplied to the other side at least?

MR. WOLOSKY: It was cited by Bank of China in its letter on this issue.

THE COURT: Okay.

MR. SALVO: Your Honor, I have the parallel OCC Federal Register here if that would be helpful.

THE COURT: Is it the identical language?

MR. SALVO: It is not identical, Your Honor. They're two different agencies, but they're very similar.

MR. WOLOSKY: We may have a copy.

THE COURT: But you want to cite FinCEN not – I have 75 – I copied some portions, just ring with me, of 75, Federal Register 75576-01. Is that --

MR. SALVO: Yes, Your Honor, that's the OCC --

THE COURT: Hold on, I'm talking to this gentleman. Is that not going to be sufficient to hear your argument or do I have to look at this other one?

MR. WOLOSKY: I'm actually not certain of the language that's contained in that portion of the Federal Register. I'm looking at Volume 75, Number 232, at page 75595.

THE COURT: Let me see if I can roll that up somehow.

MR. WOLOSKY: Your Honor, we do have a clean copy here.

THE COURT: Okay, sure.

MR. WOLOSKY: May I hand this up?

THE COURT: Yeah. Okay, what am I looking at?

MR. WOLOSKY: So we are looking at the second full paragraph that is in the second column of page 755 --

THE COURT: The more difficult situation?

MR. WOLOSKY: Yes. And this paragraph pertains to the carveout in the regulation that states explicitly that the regulation does not create a confidentiality requirement for the underlying facts, transactions, and documents upon which a SAR is based.

THE COURT: Okay. Do you folks have this, by the way?

MR. SALVO: Yes, Your Honor.

THE COURT: So the more difficult situation, is that what I'm reading?

MR. WOLOSKY: Correct.

THE COURT: All right, hold on. Do I need to look at the footnotes too?

MR. WOLOSKY: The footnotes are instructive but not essential. The footnotes --

THE COURT: All right, well, I'll look at them,

it's fine.

(pause in proceeding)

MR. WOLOSKY: In particular footnote --

THE COURT: Hold on.

(pause in proceeding)

THE COURT: Okay, so I'm now just comparing it to the other one, and it leaves out the paragraph with the in appropriate circumstances language. Is that your point or something else?

MR. WOLOSKY: Our point is simply that FinCEN has endorsed in this guidance a position that a document that merely relates to suspicious activity but does not reveal whether a SAR exists is not protected.

THE COURT: I know, but if you look at the character of the things they're talking about, like a transaction, account statement, cash deposit, that's not the kind of thing I think is, I assume is going to be an issue in this case, which is the (indiscernible) investigatory function that the bank may be undertaking of suspicious activity. So that doesn't help me a whole lot.

MR. WOLOSKY: On this point --

THE COURT: Go ahead.

MR. WOLOSKY: On this point that the case law does contain a key point that we believe applies here, and

that is that banks investigate suspicious activity for a variety of reasons connected to the filing of SARS or not. Bank of China's own policies, at least in the U.S. claim that Bank of China does not deal with terrorists, claim that Bank of China has a practice of investigating suspicious activity generically without reference to whether the purpose of those investigations are to file SARS or not. And, therefore, simple disclosure of documents related to an investigation at BOC does not indicate whether a SAR was or was not filed and may, in fact, not pertain to any procedures at Bank of China that relate to the filing of a SAR or even a debate internal to the bank about whether to file a SAR. And referring back to --

THE COURT: Well, I mean this is the argument that they made in some of the cases that it should be treated like the work product doctrine, which is you figure out what they would do in the ordinary course of business, and if they would do this, then you don't protect it because it doesn't reflect consideration about whether a SAR is filed. Is that --

MR. WOLOSKY: It's an analogous argument, Your Honor, yes.

THE COURT: Well, I'm not sure – it was an

interesting argument. I wasn't sure — you know, this is not work product. I'm not sure why that concept of ordinary course of business should be (inaudible) into it. The reason you gave was that, well, if they're doing it anyway, then people won't necessarily associate this investigation as SAR. I think my problem with that is if this is – if the point of this rule, it's sort of a prophylactic rule, that encompasses more than just figuring out whether a SAR has been filed but the way the agency has described it as sort of cordoning off this whole area of information about suspicious activities sort of to protect banks from claims by the customers that they're being improperly targeted.

I don't know that the concept of the ordinary course of business makes sense in this context. And another problem I have is that this is such an overriding important requirement for banks, that I don't know that we should be looking back to the pre-1990 whatever practice to see if this is the sort of thing they would have done then because I'm not sure it's really practical to think about it in those terms. So see if you (inaudible) those points.

MR. WOLOSKY: Looking to more recent guidance from FinCEN itself, there was an October 2, 2012 letter sent to plaintiff's counsel in this case in which --

THE COURT: This the one that's attached to your --

MR. WOLOSKY: That's correct.

THE COURT: Yeah, go ahead.

MR. WOLOSKY: It's exhibit A to the bank's July 24 letter. And it is true FinCEN recognizes in this letter the interest that Your Honor just spoke about. This is on page 2 of FinCEN's letter. However, the position of FinCEN in this letter, as clearly stated in the first paragraph, is that the scope of the protection at issue here covers any suspicious activity reports or information that may reveal that a SAR has or has not been filed. And so the fundamental question is whether the disclosure here will reveal that a SAR has been filed.

And with respect to documents that relate generically to suspicious activity at Bank of China, the answer has to be that those simply do not reveal whether a SAR has been filed.

THE COURT: Well, you know, I'm not sure this is getting us anywhere. If I recognize or accept they have the ability to make this sort of prophylactic rule and it's their vision that any time you talk about ingredients that go into the decision-making process for whether a SAR is or is not to be filed, that that is something that must be

protected to not take any chance that someone's going to use that to try to connect the dots to figure out whether a SAR did or didn't get filed, I think we're back to my same problem. I don't think his letter adds anything.

MR. WOLOSKY: Your Honor, it's Lee Wolosky for the record. Just one further point on this, which is that the only regulatory guidance that BOC relies on here, which Your Honor has already quoted, is the in appropriate circumstances language. And our concern would be that, frankly, we don't know what that term means --

THE COURT: I agree.

MR. WOLOSKY: However, it's clear from FinCEN's letter that FinCEN does not believe these circumstances to be the appropriate circumstances. We believe, you know --

THE COURT: These circumstances meaning what?

MR. WOLOSKY: Well, I'm just saying, Your Honor, that the --

THE COURT: This letter does not apply to – does not – they didn't review any documents that say they do or don't apply. This is I assume a form letter they send to everybody, right?

MR. WOLOSKY: I'm sure that that's right. I mean certainly with respect to the current proceedings, Your Honor, FinCEN and OCC are on notice of these proceedings,

and I believe that further argument for Your Honor to consider is that we don't know what appropriate circumstances are, but FinCEN certainly knows a fair amount about this case and this dispute.

THE COURT: All right, I want to hear from the other side.

MR. SALVO: On the FinCEN letter and limited to that, unless you'd like me to expand --

THE COURT: No, no, I assume you were done on the, you know, the issue of the case law and the regulation, or at least I've heard (inaudible). So you're free – you argue anything on the other side.

MR. SALVO: Your Honor, I'd like to begin by echoing your remark that this is a very important question to the Bank of China, to the banking industry, whether it be SARs and the related documents are protected as to banks, assume that they are, so that we can have frank and full disclosure and communication with regulators. You mentioned that there are cases on both sides, and I think we can shortcut that full discussion here. There were cases on both sides.

In 2011 the regulation was amended, and BOC, FinCEN and the OTS issued formal interpretations which you have before you of the regulations. The key question here,

looking at the regulation, whether the information would reveal the existence of a SAR, that language wasn't even in the regulation before 2011. The exception for the transactional documents in the ordinary course of business was not in the regulation before 2011. So the old cases that the plaintiffs cite are completely out. Your Honor, the cases that we cite would be out too, except that they were expressly adopted by these agencies as the right away to do this in the --

THE COURT: And what is the language that got added, remind me, in the reg? I'm going to put the reg in front of me.

MR. SALVO: Certainly. The language that was added is information that would reveal the existence of a SAR.

THE COURT: Or any information that would reveal the existence of a SAR.

MR. WOLOSKY: Your Honor, I'm sorry – Lee Wolosky – just to be clear, we're not seeking that category of information.

THE COURT: Well, I would expect you to answer that question that way, but that's not the hard question. The hard question is whether this information on this list is information that would reveal the existence of a SAR.

MR. SALVO: Your Honor, the agencies say that it is. Why do we care what the agencies say? Because this is a question of interpreting the agency's own regulation. The OCC, they're interpreting their own regulation, and that is entitled to Seminole Rock deference which is one of the strongest, most compelling forms of deference we have --

THE COURT: Tell me, just so I know what I'm referring to, how is that an investigation of bank deposit X, transfer Y, and withdrawal Z of a particular account, how does that – and that's maybe described in an email from someone, and, again, I don't have this in the documents which is part of my problem. How does that reveal the existence of a SAR?

MR. SALVO: May I point you to the location in the OCC regulation where they discuss that, Your Honor?

THE COURT: No, I think you should answer it for me. Why could they legitimately find that this sort of investigation reveals the existence of a SAR?

MR. SALVO: Certainly, and it's the language that you mentioned yourself before, Your Honor. The agency says that there's a strong public policy that underlies the SAR system as a whole, namely, the creation of an environment that encourages a national bank to report suspicious

activities without fear of reprisal, which leans heavily in favor of applying SAR confidentiality, not only to the SAR itself, but also in appropriate circumstances to material prepared by the national bank as part of its process to detect and report suspicious --

THE COURT: You've now restated my question but you haven't answered it. Tell me – you're not answering my question. Why is it that that sort of information reveals the existence of a SAR? I know they say it does, but why is my question. Why could they legitimately conclude that?

MR. SALVO: Well, it's the agency's interpretation, and that interpretation is based on the fact that if you look at it from the perspective of the person who this information relates to who did the transaction, if that person were reviewing this information, could they tell that the person was talking about them? That's the appropriate test here. And we have to --

THE COURT: Well, I think it shouldn't be whether it was talking about them, but would someone looking at this investigation might they be able to infer from it that a SAR got filed? I assume that would be the answer. Maybe not.

MR. SALVO: Yes, Your Honor. They did assume

that there was a consideration with respect to whether to file a SAR if they could – that a SAR was filed or was not filed, which are both covered.

THE COURT: I mean it sweeps a lot – the agency's interpretation, as interpreted by these other courts, sweeps a lot in, relies on inferences about what people are capable of doing based upon information --

(interposing)

THE COURT: Let me finish my sentences.

MR. SALVO: Sorry, Your Honor.

THE COURT: Based upon information churned up in an investigation assumes that I think grave powers that are possessed by people outside the transaction might see this investigatory report, looking back, and assumes that they, in all instances, would be able to divine from the investigation information about whether a SAR was or was not filed. I think it's broad. I think the question for me is it too broad. Is the inference that's being relied on by the agency to make this kind of broad sweeping rule to say, well, this is going to reveal the existence of a SAR, whether that's going too far.

MR. SALVO: Well, the OCC has the expertise, Your Honor, with respect to what's typically contained in these reports. We're talking here about the work product that

goes into considering whether to file a SAR on someone. So everything in these documents is part of the internal deliberations with respect to whether to file a SAR, and I think that's why the agency is saying this whole consideration of whether to file a SAR, this discussion reveals the existence of a SAR that was a prepared and/or filed.

Now, it's not plainly erroneous even if some different people would reach a different result under the deference test, Your Honor. It's not plainly erroneous and it's not inconsistent with the language of the regulation. In fact, the plaintiffs in the reply made no response to this entire deference argument.

THE COURT: Anything you folks want to add to this?

MR. WOLOSKY: Your Honor, we would just agree that agencies defer deference, deserve deference. In this case the agency is saying that documents that may identify suspicious activity are not protected, and then that's the general rule of interpretation, we believe, in the guidance. Then the next paragraph, as we've now said three or four times, says that in appropriate circumstances certain materials that are part of the process to detect and report suspicious activity may be also entitled to

protection, may be entitled to protection under the SAR privilege.

THE COURT: Okay, so let's talk about what their, the first half of that sentence, which is what causes them to say that an appropriate circumstance is the material prepared as part of its process (indiscernible) would be protected. And the policy it identifies is the creation of an environment that encourages a bank to report suspicious activity without fear of reprisal. So do you not need to make the case that putting this sort of information out there to the customer or maybe some larger group would not dissuade banks from reporting suspicious activity. I assume that's the case you need to make, or do you think you don't need to make that case?

MR. WOLOSKY: Well, I mean we think that it's clear that this rule applies only in certain circumstances to the documents that are identified. And what I am objecting to in a certain sense is the manner in which the defendants are cloaking themselves around the agency, which, frankly, has defendants' privilege log in this case.

THE COURT: I've totally lost you. Can you answer my question? Should I repeat my question or you're getting to it?

MR. WOLOSKY: Please repeat your question, Your

Honor. I apologize.

THE COURT: So you point to, properly you point to this sort of qualifying in appropriate circumstances language, and as a reader of this statement, I feel I need to figure out what are the appropriate circumstances to protect material prepared by a national bank as part of its process to detect and report suspicious activity.

So the way I figured that out I think is by reading this whole sentence which tells me the answer to that question. The answer to that question is to vindicate the strong public policy that they identify in the first half of the sentence. That's when there would be the appropriate circumstances.

So it's a two-party question. First, am I correct that that's the right way to read the sentence, and, second, if I am correct, do we now not need to look at that policy and see if it's vindicated by, or not, by protecting what it is the bank here is claiming needs to be protected.

MR. WOLOSKY: Right. No, I think that's the correct analysis.

THE COURT: Okay, so question one I'm correct. So now go to question two.

MR. WOLOSKY: Well, I think question two devolves to whether disclosure of certain information which we,

frankly, you know, we haven't seen it, would threaten the public policy architecture of the SAR reporting system, and this is disclosure under protective order in a litigation with --

THE COURT: Well, Your Honor, you know, I thought about that. Is that really relevant?

MR. WOLOSKY: I believe it is because the architecture – if you look at the enabling statute that enables the Secretary of the Treasury to promulgate these regulations, the enabling statute makes clear that the fundamental concern is revealing the suspicious concerns of the bank to the customer. And I can provide the cite to Your Honor in which the enabling statute lays that out. That is the basis for promulgating the entirety of the regulations we're arguing over.

THE COURT: I agree with you, and I guess it's a new argument, and I'm saying it's inappropriate to make it now, but it certainly is new, and it essentially is the concept that I couldn't order this if Sharafa were suing Bank of China, but I could order it if someone else is.

MR. WOLOSKY: That's exactly right. If you're starting to analyze the system as a whole, which is the language here, I think it's appropriate to look back at the enabling statute under which this regulation was

promulgated.

THE COURT: I'm not sure I can accept this concept though, that this privilege that's characterized as absolute, seemingly to be determined on the face of its language, is to be applied differently depending upon who happens to be getting the documents. Sure, there's a protective order, but part of the reasons they have – they could have had a regulation that said, you know, anything that is reduced must be reduced under strict protective order. They didn't want to take any chances. So as far as they're concerned, even documents produced under a protective order could go to some bad people.

So I don't think I can accept the concept that – I have a different view --

MR. WOLOSKY: But, Your Honor, I somewhat disagree because right now we're in the realm of a somewhat discretionary interpretation of what the appropriate circumstances --

THE COURT: And my discretion is to be informed by who's asking for the interpretation?

MR. WOLOSKY: Your Honor, your discretion, we believe, should be informed by what this guidance says, which is whether or not disclosure in these circumstances would threaten the SAR reporting system as a whole.

THE COURT: Yeah, I just – I can’t believe that appropriate circumstances they were thinking of who’s asking for it as opposed to the type of document involved. I just can’t accept that. So let’s try another argument on this point, if you want.

MR. WOLOSKY: No, I think we’ll rest on this point, Your Honor. We wouldn't also disagree with it, it is the type of argument in addition to the context.

THE COURT: Say it again, I couldn't understand it.

MR. WOLOSKY: We wouldn't disagree with Your Honor’s observation that the determinative rule should also rest on what type of document it is, not just whether or not the context as a whole would threaten the SAR reporting system. You know, I think it’s clear that it would have to be both of those things to determine “appropriate circumstances.”

THE COURT: All right, let me – I’m not sure what we’re solving today. We may solve some things, but just wanted to talk about the legal issue first.

I think if I was analyzing the language of the rule itself, I think I might be hard-pressed to say that sort of investigatory documents about suspicious transactions were covered by the rule. But I can’t ignore

the case law that requires me to defer the agency’s interpretation, which I think is sort of broad and prophylactic, but I think that’s the sort of thing that I’m obligated to defer to. I can’t ignore the fact that they’re citing cases that are very – you know, they use the word in appropriate circumstances, but the cases they cite talk about communications, you know, preparatory and preliminary to it, and cite with approval cases that say that that’s the sort of thing that’s covered by the regulation.

I’m now quoting from Union Bank of California, which they quote from, “Internal memorandum prepared as part of a financial institution’s process for complying with federal reporting requirements.” So I’ve got that, and I’ve got two appellate court case, state appellate court cases, Norton and Union Bank, which I guess I already just cited. And a district court case, Whitney. Cotton’s a little bit ambiguous, so I’m not quite sure where that leaves us. That are giving me discomfort in saying that this is the sort of thing that’s to be produced under the terms of the regulation.

I’m starting out by saying that, but I have to apply this to particular documents or types of documents, so this is not over, and we have to figure out what kind of

documents are at issue here because I don't know that any possible document that talks about money-laundering comes within this. I think it certainly doesn't. I think as an initial matter we have to be talking about documents that relate to individuals or individual transactions. If there's some document that talks about what the bank does to combat money-laundering, I don't think that's going to come within this. I don't think that's barred by the regulation.

I'm not sure, are you taking that position? I assume you're taking the position that we have to be talking about individual transactions, right?

MR. SAPERSTEIN: Your Honor, the bank has produced its BSA manuals which includes its policies and procedures with respect to volume and size.

THE COURT: Okay, so let's just start talking about your categories. So if we talk about – let's go through all the categories and see if we can make headway. To the extent I need to look at a sample of documents, I'll do it.

So when you have these internal checklists, these four internal checklists, are those relating to particular accounts or are they checklists generally about what the bank does to review for transactions?

MR. SALVO: Your Honor, these checklists relate to specific individuals, and (indiscernible) process to determine whether or not to file a SAR.

THE COURT: Okay, so you just happen to have four.

MR. SALVO: We just happen to have four.

THE COURT: Okay. Is there a problem – let me just look. Do they have the checklists without sort of the answer with respect to the individuals or don’t you know?

MR. SALVO: Just the blank form, Your Honor?

THE COURT: Yeah.

MR. SALVO: I don’t know the answer to that.

MR. SAPERSTEIN: It’s Lanier Saperstein here. I don’t know the answer either. I’d have to look at the BSA manual. There may be one in there; there may not be.

THE COURT: Okay, well, would I be correct that you would have an objection to redacting all the clients’ specific information from one or more of these forms?

MR. SAPERSTEIN: We would have no objection to redacting one of the documents and providing it to the plaintiffs.

THE COURT: So what we have here is, just for the plaintiff’s information, is this checklist with a list of things on the left about what they’re checking for and with

a yes, no, or not applicable box, and for this one I guess it's a particular individual, some X's are checked and some aren't. Your plan was to do what, was if you got the actual individuals to follow to see what happened with that individual or – just curious. Are you losing much by not getting the actual X's in these four checklists?

MR. WOLOSKY: Your Honor, yes, we are losing that much.

THE COURT: Yeah, well, I think that's my ruling anyway. So I guess you can't just redact the X's; it'll show where the X's are. So you can redact the columns.

MR. WOLOSKY: I'm sorry, Your Honor, we're having a hard time following because we don't know what the document looks like.

THE COURT: Right.

MR. WOLOSKY: If Your Honor's ruling that the name will be redacted and that's it or is it something other than that?

THE COURT: You know, it's funny, I don't even see a name in this. Oh, yes, there is a name. There's name in the top line. And it's got some specific information – you can redact any client specific information in the columns with the X's. I mean I'm accepting, you know, this – I'm accepting a premise here

which you need to verify for me on the record, and if you can't tell me. But the premise here is that this is being used to decide whether to submit a SAR or not, this checklist. If you're not a hundred percent sure of that, don't answer it; get back to me.

MR. SAPERSTEIN: We will get back to you. My understanding is it is --

THE COURT: You need to put in writing when you give it to these people, if you're redacting anything, that this is used by the bank in order to determine whether to file a SAR. And if you can't do that, then you should give it to them unredacted. Okay?

MR. SAPERSTEIN: I understand, Your Honor. I just want to clarify, we are going to be producing to them one, two, or three of the documents in redacted form?

THE COURT: It's completely pointless to do unless – if the checklists are otherwise identical, you don't have to produce them four times, that would be foolish. But if there's changes, maybe year by year they changed, then you need to produce any different versions. There's only four of them.

MR. SAPERSTEIN: Understood, Your Honor. And if there's some way – if we confirm that we have produced the form in its original format, can we just direct the --

THE COURT: All versions of it that I see here, then you can point them to the Bates stamp.

MR. WOLOSKY: Your Honor, I apologize for perhaps going back, but can we understand for the record the legal basis for the redaction of the name on the form?

THE COURT: Well, my ruling is that when this bank is having a process, an investigation, to determine whether to file a SAR, that they can redact those documents. They don't have to produce those documents at all. It's not that you get to know the names of the people for whom they had this process. Okay.

Now, this document is being represented, subject to the written confirmation, as part of that process. I could have just said to them don't give it to them at all, but it seemed to me there was a piece of this that could tell you generically about the process without giving you any information as to whether Mr. John Doe had a SAR filed against him or not that would help you. So I thought I would just give you that. If it muddies the water by my having them do that, I'm happy to tell them to keep the whole thing and then you can do it, you know --

MR. WOLOSKY: No, no, we're happy to take the redacted form. I just wanted to understand if it was, you know, the SAR privilege, if it was, you know, there are

separate rules relating to customer privacy, things of that sort.

THE COURT: No, no, this is just – from my point of view it's SAR.

MR. WOLOSKY: Are these people – and will the defendant be able to tell us if these people are, in fact, customers of the bank or is that irrelevant to Your Honor's ruling?

THE COURT: It didn't occur to me that it could possibly not be customers. How could they not be customers? Could they not be customers?

MR. SALVO: They could not be customers. I don't believe that's a relative distinction, Your Honor. If a gentleman walks into the bank, a stranger to the bank and tries to cash a check for $10,000 and that sets off red flags, that could generate a SAR even though he's not customer of the bank.

THE COURT: But normally it's a customer, right?

MR. SALVO: I can't speak for normally, Your Honor.

THE COURT: I mean the one I happened to look at is a customer obviously. Why are you bringing up the customer issue? Which do you care about this?

MR. WOLOSKY: It goes to the basis for the

redaction. You know, again, we don't know what we're talking about --

THE COURT: Maybe I'm confusing you by having them redact it. I could've just said it's part of this preparatory investigative process leading to deciding whether to file a SAR or not on this individual, and I could have said you don't get it.

MR. WOLOSKY: Okay, thank you, Your Honor.

THE COURT: That would have ended it. And if it's simpler for you, I'm happy to say that.

MR. WOLOSKY: No. Thank you, Your Honor.

THE COURT: All right. Okay. Why don't I get an oral description of what category two is.

MR. SALVO: Your Honor, category two is the OC demand questionnaires investigating potentially suspicious transactions.

THE COURT: Once again, I'm asking the same question. Is this used to make a decision as to whether to generate a SAR for this individual, for the individuals involved? And if you can give me the same answer for each, then you can tell me that now. If you want the chance to confirm in writing.

MR. SALVO: Your Honor, may I confer with the bank's regulatory counsel?

THE COURT: Sure.

MR. WOLOSKY: Your Honor, this is --

THE COURT: Hold on. Just wait until he confers.

(pause in proceeding)

MR. SALVO: Your Honor, out of an abundance of caution, we should probably confirm, we'd like to go back and confirm all of these and let you know.

THE COURT: Okay, I won't ask you again, but everything I say now, a ruling is on the assumption that you're able to confirm as to each document, and you can do it by category if you want, but in the end, as to each document, that it's used as part of the process with the bank as to whether to file a SAR.

MR. SALVO: I understand. Your Honor, there's one clarification to that. Some of the categories were not part of the process in creating a SAR. They're lists of SAR transactions after the fact.

THE COURT: Okay. That's fine. Mr. Dunn.

MR. DUNN: Your Honor, I was just going to make a suggestion in response to your comments just now, and that is that it might be productive for the parties to confer with the benefit of the guidance that you provided at today's conference and discuss each of these categories and the extent to which the documents in each of these

categories are part of Bank of China's process for preparing SAR's. For example --

THE COURT: For preparing or deciding whether to file a SAR.

MR. DUNN: I don't know that this log was prepared with that question in mind, for example, and there have been fairly extensive disclosures in this case already about what types of documents are part of Bank of China's SAR filing practices. And so I think it would benefit both of the parties if we had a chance to consult those documents, confer, and --

THE COURT: Rather than my going through all this right now.

MR. DUNN: Correct, Your Honor.

THE COURT: Okay, that's fine with me. Do you folks have any problem with that?

MR. SALVO: No objection, Your Honor. We're willing to meet and confer with the plaintiffs on this.

THE COURT: So is there anything else we should do today?

MR. SAPERSTEIN: Not on our end.

THE COURT: Should we just stop this now and you'll come back to me when you re-up this process?

MR. DUNN: That's acceptable to plaintiffs, Your

Honor.

THE COURT: Okay. I think I want to give back this disk, so hold on a second. By the way, if we do this again, the password has to be entered for the document each separate one each time I call it up. So if you find a shorter password next time, that'll be easier.

MR. SALVO: If there is a shorter way, I apologize, Your Honor.

THE COURT: All right, thank you, everyone.

(Whereupon the matter is adjourned.)

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, Wultz, et al. v. Bank of China Limited, Docket #11cv1266, was prepared using PC-based transcription software and is a true and accurate record of the proceedings.

Signature______________________________

Date: July 31, 2014