# BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • 7TH FLOOR • NEW YORK, NY 10022 • PH. 212.446.2300 • FAX 212.446.2350

October 28, 2014

**BY ECF AND HAND DELIVERY**

Hon. Gabriel W. Gorenstein
United States District Court for the
  Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 1620
New York, New York 10007

      Re:    *Wultz v. Bank of China Ltd.*, No. 1:11-cv-01266 (SAS)

Dear Judge Gorenstein:

      Plaintiffs write concerning documents improperly withheld by Defendant Bank of China, Ltd. ("BOC") on the basis of the work product doctrine. On August 11, 2014, Judge Scheindlin ruled that BOC's in-house legal and compliance personnel in China were not attorneys for purposes of U.S. privilege law, and ordered BOC to turn over all documents it was withholding solely on the basis of attorney-client privilege for those individuals. *See* Ex. 1, 8/11/14 Hr'g Tr. (Scheindlin) at 3:14-25. At that time, Judge Scheindlin directed Plaintiffs to bring any challenges to BOC's work product claims to Your Honor (*id.* at 4:3-7), a ruling she reaffirmed at a telephonic conference on August 28, 2014.[1] On October 23, 2014, Your Honor instructed Plaintiff to bring the instant application. *See* 10/23/14 Hr'g Tr. (Gorenstein) at 110:22-112:10.[2]

      BOC has withheld nearly 2,000 documents on work product grounds. Without waiving potential challenges to other work product assertions, Plaintiffs make this application with

---

[1] Due to Judge Scheindlin's travel schedule and the expedited nature of the hearing, the August 28, 2014 telephonic conference was conducted without a court reporter, and there is no transcript of that hearing. Judge Scheindlin subsequently issued an Order addressing only the privilege claims that were the subject of the conference. *See* Dkt. #628.

[2] In accordance with the Court's Individual Rule 2(A), Plaintiffs and BOC engaged in telephonic meet-and-confers regarding the instant dispute and Your Honor's instructions that the parties present a list of undisputed facts regarding BOC's Shurafa-related investigations. These meet and confer sessions occurred on October 1, 2014, for 1-1/2 hours at 2:30pm, and on October 22, 2014, for one hour, at 10:00am, and were attended by Lee Wolosky, Steven Froot, Marilyn Kunstler, and Joseph Dunn of Boies, Schiller & Flexner LLP for Plaintiffs, and by Lanier Saperstein, Shari Aberle, and Dan Goldberger of Dorsey & Whitney LLP, as well as Mitchell Berger of Squire Patton Boggs LLP, for BOC. The parties conferred on a set of undisputed facts, which Plaintiffs sent to counsel for BOC on October 5, 2014 (attached hereto as Ex. 2), before reaching an impasse on the timing of BOC's response to the undisputed fact statement. Your Honor instructed the Plaintiffs to bring this application at oral argument on October 23, 2014. *See* 10/23/14 Hr'g Tr. (Gorenstein) at 110:22-112:10.

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 2 of 20

respect to those withheld documents that relate to BOC's fact investigations into the Shurafa accounts (1) after BOC received Plaintiffs' January 23, 2008 letter (the "Demand Letter") demanding that BOC close the Shurafa accounts (the "Initial Shurafa Investigation"); (2) after the Complaint was filed in this action (the "Second Shurafa Investigation");[3] and (3) during the interregnum between these two investigations (the "Interim Reporting Period"). All of these documents relate to BOC's fact investigations; none was created at the direction of counsel; and none was created in anticipation of litigation.[4] Furthermore, BOC has waived any work product protection by affirmatively using the results of its investigations in this litigation and sharing the results with its regulators.[5] Accordingly, BOC cannot meet its heavy burden of demonstrating that the documents at issue merit work product protection at all.

## I.     Timeline of Undisputed Facts Regarding BOC's Shurafa Investigations

BOC's investigations into the allegations in the Demand Letter, both before and after receiving Plaintiffs' Complaint, have only been revealed in piecemeal fashion. At Your Honor's direction, the parties have conferred on a draft set of undisputed facts regarding this investigation. The following timeline is drawn entirely from the sworn statements and deposition testimony of BOC's witnesses and BOC's privilege logs (*see* Ex. 2 (Statement of Undisputed Facts) ("SOUF")), including the Declaration of BOC employee Geng Wei (*see* Ex. 4 (the "Geng Decl.")).

---

[3] BOC's Head of Compliance, Geng Wei, categorized these as two separate investigations: █████████████████████████████████████████

[4] Schedules of documents the disclosure of which Plaintiffs are seeking because they were improperly withheld based on the work product doctrine are attached hereto as Appendix A (Initial Shurafa Investigation), B (Interim Reporting Period) and C (Second Shurafa Investigation). These appendices are based on entries from BOC's operative privilege logs that appear to fall within the time periods covered by the Initial Shurafa Investigation, the Interim Reporting Period, and Second Shurafa Investigation, respectively.
    Work product protection also is not available for at least 200 documents from these periods that are not related to any investigation and were not prepared at the direction of any U.S. attorney, and attorney-client privilege is likewise not available for documents that do not involve legal advice from a U.S. attorney. Plaintiffs are prepared to meet and confer with BOC on these documents forthwith.

[5] Although BOC has claimed, in boilerplate fashion, that almost all of these documents are also protected by the attorney-client privilege, the attorney-client privilege does not apply to documents located in China or the U.S. where there is no involvement by U.S. lawyers and for the additional reasons discussed in Section VI, *infra*.

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 3 of 20

### A. *The Initial Shurafa Investigation and Reports to Regulators (January-March 2008)*

BOC's New York Office ("BOC-NY") received Plaintiffs' Demand Letter on January 24, 2008, and subsequently faxed it to BOC's Head Office ("BOC-HO").[6] SOUF ¶ 1. The following day, January 25, 2008, BOC-NY provided BOC-HO with a preliminary assessment of the allegations of the Demand Letter, based on the information it had collected. *Id.* ¶ 3.



. *Id.* ¶ 2. Geng conducted this investigation assisted by, among others, BOC-HO employees Li Jianyu and Yuan Fang. *Id.* ¶ 4. None of these BOC-HO employees is a lawyer.[7] No written litigation hold was issued at this time.[8]



Concurrent with this internal investigation by BOC management in China, BOC-HO directed compliance personnel at BOC-NY to investigate the allegations in the Demand Letter and report back to BOC-HO. *Id.* ¶ 29. The aspects of the Initial Shurafa Investigation conducted at BOC-NY were overseen by John Beauchemin, BOC-NY's Head of Compliance at that time, who also is not a lawyer. *Id.* ¶¶ 30, 32. As part of this investigation, Beauchemin contacted

---

[6] Plaintiffs do not suggest that January 24, 2008 was the first point at which BOC became aware that the Shurafa accounts were being used to finance terrorism. Plaintiffs maintain, and BOC disputes, that BOC was on notice regarding the illicit use of the Shurafa Accounts from at least 2005, having been notified as the result of meetings with Israeli counterterrorism officials. *See* Ex. 5 (5/16/09 Declaration of Shlomo Matalon).

[7] At the time of this investigation, none of these employees was a lawyer entitled to invoke the attorney-client privilege, as defined by Judge Scheindlin's 8/11/14 ruling. BOC employee Li Jianyu subsequently completed U.S. legal education and was later admitted to the bar, but was not an attorney during the pertinent periods.

[8] BOC conceded this fact in conference before Judge Scheindlin on October 21, 2014, after Plaintiffs had already served BOC with their draft statement of undisputed facts. *See* Ex. 6, 10/21/14 Hr'g Tr. (Scheindlin) at 63:21-23 (MR. SAPERSTEIN: "We think the first formal written litigation hold was issued once the complaint was filed. . . . So it was late August, early September 2008.").

BOC-NY's U.S. regulatory counsel, Gary Lax, Esq., but as Judge Scheindlin has previously determined (*see* April 9, 2013 Order at 40 & n. 114) (Dkt. # 244) (the "April 9 Order"), Lax did not direct the Initial Shurafa Investigation. SOUF ¶ 30. Also in February of 2008, BOC-NY provided files related to the Initial Shurafa Investigation to BOC-NY's regulator, the Office of the Comptroller of the Currency ("OCC"). *Id.* ¶ 33. No written litigation hold was issued at BOC-NY at this time.



No written litigation hold was issued at either BOC-HO or BOC-GD at this time.

### B. BOC's Engagement of Outside Litigation Counsel

On February 6, 2008, BOC-NY recommended that BOC retain K&L Gates as litigation counsel concerning the allegations in the Demand Letter. SOUF ¶ 11. Two weeks later, on February 22, 2008, BOC-HO notified BOC-NY of its agreement with BOC-NY's suggestion. *Id.* One month later, on Friday, March 28, 2008, Geng Wei first met with Walter Loughlin of K&L Gates, in Beijing. *Id.* ¶14. At the time of this first meeting, the BOC-GD investigation was already substantially complete. *Id.* ¶ 14. Mr. Loughlin subsequently visited BOC-GD.[9] SOUF ¶ 17. No written litigation hold was issued at this time.

### C. The Interim Reporting Period (April-July 2008)

After BOC completed its Initial Shurafa Investigation in March 2008 and disclosed its findings to its regulators, BOC's sworn statements and entries on its privilege logs suggest that

---

[9] Geng testified that Loughlin's visit to BOC-GD "); *see also* Ex. 4 (Geng Decl.) ¶ 21 ("following [the March 28, 2008] meeting, Mr. Loughlin and Li Jianyu travelled together to Guangzhou").

BOC did not conduct significant additional investigation activities for several months. *See* Geng. Decl. ¶ 21-23; SOUF ¶ 23.



No written litigation hold was issued at this time.

### D. *The Second Shurafa Investigation (August-September 2008)*

On August 22, 2008, BOC learned that Plaintiffs had filed a complaint based on the allegations in the Demand Letter. *Id.* ¶ 24.



## II. Work Product Protection in the Second Circuit

The work product doctrine applies to "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant . . . or agent."). FED. R. CIV. P. 26(b)(3)(A). The doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir.1998) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

---

10 

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 6 of 20

In evaluating a work product claim, the party asserting work product protection "bears the burden of establishing its applicability to the case at hand." *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002,* 318 F.3d 379, 384 (2d Cir. 2003). The "threshold issue" requires "an inquiry into the primary motivational purpose behind the creation of the document." *Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP,* 03 CIV. 5560 (RMB) (HBP), 2008 WL 4452134, at *10 (S.D.N.Y. Oct. 2, 2008) (quotation marks omitted); *see also In re Grand Jury Proceedings,* M-11-189, 2001 WL 1167497, at *14 (S.D.N.Y. Oct. 3, 2001) ("It is not enough that a document is created after the threat of litigation becomes real, but it is also necessary that the motivation for creating that document be the litigation."). If a document was created in the ordinary course of business, or would have been created in the same form regardless whether litigation was expected, it is not subject to work product protection. *See Allied Irish Banks v. Bank of Am., N.A.,* 240 F.R.D. 96, 106 (S.D.N.Y. 2007) (Gorenstein, M.J.).

While work product protection may in some cases attach to documents not created at the direction of an attorney, counsel's involvement or lack thereof provides insight into the party's "primary motivational purpose" – that is, whether a document was created in anticipation of litigation or for some other purpose. *See Am. Ins. Co. v. Elgot Sales Corp.,* 97 CIV. 1327 (RLC), 1998 WL 647206, at *2 (S.D.N.Y. Sept. 21, 1998) (denying work product assertion as to investigation report; finding it "significant that there is no evidence in the record to support a conclusion that any of the reports were prepared at the request of an attorney or with any attorney involvement").

Finally, Plaintiffs note that none of the investigation documents sought are entitled to the "special protection" afforded to "core" work product that reflects an attorney's analysis of an anticipated litigation. *Adlman,* 134 F.3d at 1197. Because Judge Scheindlin has ruled that the BOC personnel in China listed on its privilege logs as having created the investigation documents are not attorneys (*see* Ex. 1, 8/11/14 Hr'g Tr. (Scheindlin) at 3:14-25), none of the documents at issue discloses attorney opinion. The investigation documents also cannot be cloaked retroactively with the attorney-client privilege simply by subsequently sharing them with an attorney. *See* Section VI, *infra.*

### III. BOC's Initial Shurafa Investigation Is Not Subject to Work Product Protection.

BOC cannot meet its heavy burden of proving that Initial Shurafa Investigation documents merit work product protection. As described further below, not only was no outside law firm retained to conduct the investigation, but it was completed before BOC's outside litigation counsel had any meaningful involvement. The Initial Shurafa Investigation was, instead, driven by fears of damage to BOC's reputation and a desire to convince its regulators that the Demand Letter allegations would not cast the Chinese financial industry in a negative light. ████████████████████████████████████. Moreover, even if work product protection were appropriate for these investigation documents, which it is not, BOC's disclosure of this information to its regulators, as well as to the MFA, and its use of that

BOIES, SCHILLER & FLEXNER LLP

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 7 of 20

disclosure in this litigation have waived any protections and warrant disclosure of these documents.

### A. BOC's Initial Shurafa Investigation Was Not Conducted at the Direction of Counsel.

Judge Scheindlin has already ruled that a portion of BOC-NY's Initial Shurafa Investigation files were not protected by the work product doctrine because BOC "[did] not show that any attorneys were involved in the preparation of the Shurafa Files, nor that the Files contain attorney work-product. . . ." 4/9/13 Order, at 40 (Dkt. #244).[11] Judge Scheindlin stated that "after Beauchemin received plaintiffs' demand letter, he called outside counsel [Gary Lax, Esq.], then set about performing the investigation within the Compliance Department — without the involvement of any counsel, and not for the purpose of obtaining legal assistance." *Id.* Judge Scheindlin found that the purpose of BOC-NY's investigation into the Shurafa allegations was to provide a report to BOC-NY's regulator, the OCC. *Id.* at n.114.[12]

With respect to those aspects of the Initial Shurafa Investigation conducted in China, the investigation followed the same pattern as in New York: The investigation began shortly after receipt of the Demand Letter, was led by compliance personnel, and the investigation's findings were disclosed to third parties, in this case, BOC's PRC regulators, the PBOC and the CBRC.

From BOC-HO, Geng Wei, BOC's head of compliance, directed the Initial Shurafa Investigation overall, dispatching employees to Guangdong to assist in the investigation efforts (SOUF ¶¶ 4, 10), and receiving reports from BOC-GD and BOC-NY (*id.* ¶¶ 3, 8, 9

---

[11] Judge Scheindlin did not rule on the entirety of BOC's work product claims in that Order, and left open the question of work product protection for documents related to the "Shurafa Files," but not collected by Beauchemin. *See* May 23, 2013 Order, at 4 (Dkt. #271).

[12] The declaration of Geng Wei confirms that the "outside counsel" whom Beauchemin had contacted following receipt of the demand letter was "BOC's U.S. *regulatory* counsel Gary Lax of the U.S. law firm Luse Gorman Pomerenk & Schick P.C." *See* Ex. 4 (Geng Decl.) ¶ 12 (emphasis added); *see also id.* ¶ 14 (BOC's Guangdong office proposed that "U.S. counsel handle communications with the U.S. regulators").

[13]

BOIES, SCHILLER & FLEXNER LLP

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 8 of 20

    Geng and Liu are in agreement that BOC's outside litigation counsel at K&L Gates was not involved in, much less directed, any investigation until after the Initial Shurafa Investigation was complete.



    Geng Wei's recent declaration confirms that Loughlin did not provide his first written analysis of the allegations in the Demand Letter until nearly two weeks after BOC had reported its investigation findings to its regulators. *See* Ex. 4 (Geng Decl.), at ¶ 22. The undisputed facts thus support a finding that BOC's outside litigation counsel was not involved in the Initial Shurafa Investigation until it was substantially complete, and had been disclosed to BOC's regulator. Only after the investigation was complete and submitted to the PRC regulators did BOC's outside counsel provide any input regarding the findings (SOUF ¶¶ 15, 16, 18), a legal analysis which BOC subsequently disclosed to its regulators and used in this litigation. *See* Sections III.D and VI, *infra*.

    After Judge Scheindlin foreclosed the attorney-client privilege for BOC's Chinese in-house legal and compliance personnel, BOC submitted a declaration from Geng Wei prepared for the purpose of defending BOC's expansive work product (and, presumably, attorney-client privilege) claims in this case. The Geng Declaration does not controvert any of the above evidence that no outside litigation counsel directed the Initial Shurafa Investigation. While Geng recites that "from [his] first review" of the Demand Letter, he "recognized that BOC would require legal representation from external US Counsel," (Ex. 4 (Geng Decl.), at ¶ 4), Geng's declaration confirms that by the time he first met with outside counsel on March 28, 2008, the

BOIES, SCHILLER & FLEXNER LLP

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 9 of 20

Initial Shurafa Investigation was substantially complete.[14]  SOUF ¶ 14; *see also* Ex. 3 ▮
▮ By then, BOC had already produced its January 31, 2008 preliminary findings on the Shurafa Investigation (SOUF ¶ 8), produced a second report in mid-February (*id.* ¶ 9), and conducted overt and covert interviews of Shurafa and visits to his business. *Id.* ¶¶ 10, 12; Ex. 4 (Geng. Decl.) ¶¶ 16, 20.

### B. BOC Did Not Anticipate Litigation When It Investigated the Allegations in the Demand Letter, and Took No Steps Typically Associated with Preparing for Litigation.

A valid work product assertion requires proof that a document was created in anticipation of litigation. BOC's actions and statements here show that neither the Initial Shurafa Investigation, nor any other activities in China during that period, were undertaken in anticipation of litigation.

The most obvious proof that BOC did not anticipate litigation while conducting the Initial Shurafa Investigation is the absence of any evidence that BOC issued any litigation hold to preserve documents at that time. *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."). After receiving the Demand Letter, and for the entire period it was ▮

▮ BOC admitted before Judge Scheindlin that it did not issue any formal litigation hold until after receipt of the Complaint in late August 2008. *See* Ex. 6, 10/21/14 Hr'g Tr. (Scheindlin) at 63:21-23. BOC now asserts that it issued *oral* instructions to preserve documents earlier than that time, but there is no documentary record supporting this assertion, including in

---

[14] No documents directly to or from Loughlin or any attorney at K&L Gates and any BOC personnel in China appear on BOC's privilege logs until an entry dated March 13, 2008. ▮

▮ There are no communications *from* K&L Gates *to* BOC regarding the investigation before BOC reported its findings to the PBOC. *See* Ex. 12 (compilation of entries from BOC 11/7/13 Amended Priv. Logs). It is also not clear when K&L Gates was formally retained by BOC. ▮

[15] Even before Loughlin and Geng met in Beijing, BOC had apparently begun sending drafts of its report to the PBOC, ▮

BOIES, SCHILLER & FLEXNER LLP

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 10 of 20

BOC's privilege logs.[16] In any event, Geng Wei testified  BOC asserts that prior meetings occurred at which employees were told to look for documents, but those discussions did not concern BOC's preservation obligations. *Id.*

BOC's assertion that it anticipated litigation from the day it received the Demand Letter lacks credibility without an explanation as to why it did not issue any formal instruction to preserve documents at that time. *See Mastr Adjustable Rate Mortg. Trust 2006-OA2 v. UBS Real Estate Sec. Inc.,* 295 F.R.D. 77, 82 (S.D.N.Y. 2013) (requirement that a party begin preserving records "arises when a party reasonably anticipates litigation"), *aff'd*, 2013 WL 6840282 (S.D.N.Y. Dec. 27, 2013); *see also* Ex. 6, 10/21/14 Hr'g Tr. (Scheindlin) at 86:9-17 (THE COURT: "That's the obligation, the obligation to preserve. There's lots of questions as to when it's triggered. . . . a lot of folks think as soon as you claim work product that's when you began to have the duty to preserve."). The answer is simple: BOC did not anticipate any litigation arising from the Demand Letter, and the early investigations it undertook were primarily for the purpose of making reports to its regulators.

BOC affirmatively represented to the PRC government that it did not foresee litigation arising from the Demand Letter. As late as May 2008, BOC told its regulator

---

[16] For example, the head of BOC's investigation in Guangdong testified BOC has not disclosed which employees received these instructions, how widely the instructions might have been disseminated, what categories of documents were covered by such instructions, or how these purported instructions might have been monitored or enforced.

[17] BOC has also admitted that it did not suspend its deletion of security videos after receiving either the Demand letter or the Complaint—including surveillance at those locations where the Shurafas continued banking. *See* Ex. 15 (9/24/14 Ltr. from L. Saperstein to M. Kunstler) at 2.

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 11 of 20

Ex. 11, at 3. BOC considered the Demand Letter legally frivolous, and informed its regulator that ▮

Accordingly, it is clear that BOC did not anticipate litigation and conducted the Initial Shurafa Investigation to placate its regulators and protect its reputation, without any concern for litigation. *See Allied Irish Banks,* 240 F.R.D. at 106 (work product protection "turns on whether the material 'would have been prepared irrespective of the expected litigation'") (citation omitted).

### C. BOC's Initial Investigation Was Motivated by Concern for Its Reputation and Regulatory Pressure.

The record shows that the primary purpose of the Initial Shurafa Investigation (and the documents generated by it) was not the threat of litigation, but rather fear of damage to BOC's reputation and a desire to appease BOC's regulators. Months after receiving the Demand Letter, when BOC sent its report to the MFA, BOC's overriding concern was avoiding damage to its good name, not the risk of a negative litigation outcome. In its report to the MFA, BOC dismissed the legal merits of the Demand Letter as frivolous (and even sanctionable) ▮

BOC's Head of Legal & Compliance, Wang Qi, confirmed that BOC's reputation was its primary concern.[18] BOC's motivation for the Initial Shurafa Investigation was to convince its regulator that these allegations were baseless, not to prepare for a litigation it considered so unlikely that it saw no need to respond to Plaintiffs' Demand Letter. Where a litigant created documents based on concerns for reputation or negative publicity, the requirements of work product protection are not satisfied. *See, e.g., Martin v. Valley Nat. Bank of Arizona,* 140 F.R.D. 291, 306 (S.D.N.Y. 1991) (memorandum was not work product where its purpose was to alert Secretary of Labor to possibility of negative publicity).

### D. Any Protection for the Initial Shurafa Investigation Was Waived By BOC's Disclosure of that Work Product to BOC's Regulators and this Court.

Even if BOC's Initial Shurafa Investigation was motivated in part by fear of litigation, BOC has waived any work product protection by disclosing its findings and conclusions (as well

---

18 ▮

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 12 of 20

as accompanying advice of counsel) to various PRC government agencies, and also by using the investigation's ultimate findings and conclusions affirmatively in this case. *See* Ex. 11 (███████████████).[19]

BOC first disclosed a summary of the Initial Shurafa Investigation, including the findings and conclusions of the investigation, in a report to the MFA and other PRC governmental agencies. *Id.* This report explained ███████████████████████████████████████████████████████████████████████████████████████████████████████████. BOC was under scrutiny from its regulator, and ordered to report to the MFA. ███ BOC's affirmative use of the investigation's findings and conclusions is thus sufficient to find waiver. *See Bank of Am., N.A. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 170 (S.D.N.Y. 2002) (Gorenstein, M.J.) ("[W]aiver will be found if the governmental agency was an adversary, a potential adversary or even just stood in an adversarial position with respect to the disclosing party.") (quotation marks omitted).

Subsequently, BOC disclosed the same report to Plaintiffs and the Court in this action, using the same document affirmatively in a letter to the Court in support of its work product assertions. *See* Ltr. from L. Saperstein to Hon. G. Gorenstein, at 3 n.5 (Dkt. #568). BOC's attempt to selectively inject the carefully crafted conclusions of its investigation into this action when it thinks it will bolster its case, while invoking work product protection to deny Plaintiffs the documents underlying the report – including the documents informing its conclusion that ███████████████████████████████████████████████████████████ but nevertheless were not ███████████████████████████████████████ is further grounds to find waiver. *See Complex Sys., Inc. v. ABN AMRO Bank N.V.*, 279 F.R.D. 140, 147 (S.D.N.Y. 2011) (waiver of protection occurs when a party puts work product "in issue through some affirmative act intended to inure to that party's benefit or where the party makes selective use of the privileged materials"); *see also In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987) ("[T]estimony as to part of a privileged communication, in fairness, requires production of the remainder."). BOC having affirmatively used those portions of its investigation's conclusions that it thinks will assist its defense in this litigation, fairness requires that BOC be ordered to disclose all Initial Shurafa Investigation reports made to BOC-HO, and also the related documents and source materials underlying those investigative reports.[20]

---

[19] BOC also disclosed in the report it submitted to the MFA that ███████████████████████████████████████████████████████████████████████████████████████████████

[20] Plaintiffs are *not* arguing for a subject matter waiver for all Shurafa-related or investigation-related documents BOC has withheld, but rather seek only those documents which, in fairness, are required to evaluate the material BOC has placed in issue, specifically, its investigation findings and conclusions of

### IV. BOC's Second Shurafa Investigation and the Interim Reporting Period Are Not Subject to Work Product Protection.

BOC also cannot meet its burden of proving that documents relating to the Second Shurafa Investigation and Interim Reporting Period merit work product protection. Although BOC's outside counsel became involved at some point by September 2008 (*see* Section III.A., *supra*), when BOC faced actual litigation, the Second Shurafa Investigation was again driven primarily by fears of damage to BOC's reputation and a desire to convince its regulators that the allegations of the Complaint would not expose the Chinese financial industry to negative publicity. *See In re Grand Jury Proceedings*, 2001 WL 1167497, at *14 ("It is not enough that a document is created after the threat of litigation becomes real, but it is also necessary that the motivation for creating that document be the litigation."). Work performed during the Interim Reporting Period likewise had the same fundamental purpose.

The minutes of BOC's August 26, 2008 meeting with employees of PBOC demonstrate that even after it received Plaintiffs' Complaint, BOC's primary concern remained avoiding negative publicity and appeasing PRC regulators.  Thus, while BOC had only begun to consider a legal response, it had already undertaken to ▓▓▓ Even where litigation is threatened, work product protection does not attach to material prepared primarily for public relations purposes:

---

counsel as expressed to governmental authorities. *See* n.1, *supra*. BOC's disclosure and use of the May 2008 MFA Report requires that Plaintiffs have access to the documents underlying it, specifically, those documents from the Initial Shurafa Investigation predating the MFA report. *See In re Kidder Peabody Sec. Litig.,* 168 F.R.D. 459, 473 (S.D.N.Y. 1996) (disclosure of internal investigation report to government and use in litigation triggers waiver of the work product protection for underlying interview documents); *Gruss v. Zwirn*, 2013 WL 3481350, at *12 (S.D.N.Y. July 10, 2013) ("As a general matter, when a party selectively discloses attorney-client communications to an adverse government entity, the privilege is waived not only as to the materials provided, but also as to the underlying source materials."); *see also In re Martin Marietta Corp.,* 856 F.2d 619, 623 (4th Cir.1988) (incorporation of investigators' interviews into position paper provided to U.S. Attorney waived attorney-client and work product protections as to attorneys' notes of interviews).

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 14 of 20

> Doe Corp. was greatly concerned about the legality of certain transactions for public relations reasons. Not only did Doe Corp. want to help safeguard consumer transactions, but it also wanted to avoid vilification in the press for facilitating illegal or fraudulent activity. While these are worthy business motivations, *they do not warrant work-product protection.*

*In re Grand Jury Proceedings*, 2001 WL 1167497, at *17 (emphasis added). What little internal memoranda BOC has disclosed on this question do not mention the risks of a negative judgment or formulation of a legal strategy, but rather the risks of negative media scrutiny and formulation of a media strategy. BOC cannot establish that the Second Shurafa Investigation was primarily motivated by concerns about litigation.[21]

## V. Plaintiffs Have a Substantial Need for Factual Documents Underlying BOC's Initial and Second Shurafa Investigations, As Well as the Interim Reporting Period.

Even if the Court concludes that BOC's documents are protected work product, and that BOC has not waived any protection by disclosure to the PRC government and use in this litigation, Plaintiffs request in the alternative disclosure of the documents on the ground that Plaintiffs have a substantial need for the factual information in BOC's investigative reports concerning the Shurafa accounts. *See* Fed. R. Civ. P. 26(b)(3)(A)(ii) (work product may be discoverable where a party has shown "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.").

A substantial need exists where the protected material is "'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issue." *Nat'l Cong. for Puerto Rican Rights v. City of N.Y.*, 194 F.R.D. 105, 110 (S.D.N.Y. 2000). While materials containing an attorney's mental impressions, conclusions, opinions, or legal theories (so-called "opinion" work product) receive special protection and require a "highly persuasive" showing of need, only an ordinary showing of substantial need is required where, as here, the materials were obtained through independent factual investigation (*i.e.*, "factual" work product). *In re Terrorist Attacks on September 11, 2001,* 293 F.R.D. 539, 543 (S.D.N.Y. 2013); *see also Nat'l Cong. for Puerto Rican Rights*,194 F.R.D. at 109-10 ("[E]ven if the documents in issue could be considered work product, they consist of purely factual information and are therefore entitled to only the most minimal protection.").

---

[21] In addition, the Second Shurafa Investigation, at least up to the end of September 2008, was based largely on the Initial Shurafa Investigation. Because any protection of the materials underlying the Initial Shurafa Investigation was waived, the mere fact that the same information was later re-used at a later time is insufficient to undo the prior waiver.

BOIES, SCHILLER & FLEXNER LLP

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 15 of 20

As Your Honor recognized in a previous conference, "substantial need is you can't get it in some other way, and it's very fact based." Ex. 19, 7/17/14 Hr'g Tr. (Gorenstein) at 63:5-6. BOC's internal investigations are possibly the only contemporaneous source for factual information on the Shurafa transfers and BOC's response to them, including its conclusions that the transactions were suspicious but not related to terrorism, and Plaintiffs have now exhausted all other avenues for discovery into the Shurafa transfers and BOC's investigation of them:

- The PRC government has refused, on the ground that its sovereignty or security would be prejudiced thereby, to execute the Court's Hague Convention request for documents related to meetings between the PRC government and BOC regarding the Shurafa accounts, the allegations the Demand Letter, and BOC's reports to its regulators on the investigation. *See* Ltr. from L. Wolosky to Hon. S. Scheindlin, July 14, 2014 (Dkt. #557).[22]

- The Israeli Government has refused to produce the vast majority of discovery requested by the parties' joint Hague Request (Dkt. #629), and succeeded in quashing Plaintiffs' subpoena of Uzi Shaya, the Israeli intelligence officer with first-hand knowledge of the meetings alleged in the Complaint. *See* Dkt. #572.

- The BOC officers ultimately responsible for the decision to close the Shurafa accounts, BOC's former Chairman, Xiao Gang, and former President, Li Lihui, have left BOC. *See* Ex. 20, 9/22/14 Hr'g Tr. (Scheindlin) at 4:7-12. BOC has stated that it has no responsive documents from these high-level decision makers, other than documents that have been collected from other sources within BOC, because BOC failed to preserve their files. *See* Ex. 21, 10/14/14 Ltr. from S. Aberle to L. Wolosky ("BOC similarly does not have electronic records for Messrs. Li or Xiao, both of whom took their respective computers with them when they left their positions.").

- Key BOC witnesses, Wang Qi and Geng Wei, were unable to remember basic facts about the investigation, including, among other things:



---

[22] When BOC sought documents and testimony from non-party Bank Hapoalim, Judge Scheindlin cited the Israeli government's refusal to execute a Hague Convention request (for reasons similar to those offered by the government of the PRC) as a factor in allowing the discovery to go forward, concluding that "[a]t this time, BOC can only obtain this information from Hapoalim." *See* February 13, 2014 Order, at 27-28 (Dkt. #443).

BOIES, SCHILLER & FLEXNER LLP

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 16 of 20



- Wang Qi testified that ▬▬▬▬▬▬▬▬▬

     Particularly where, as here, one party has claimed work product protection over factual information involving a foreign government, and the opposing party has been denied that information, substantial need may be found. *Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 68 (E.D.N.Y. 2007). With no cooperation from the PRC government, withdrawal of assistance by the Israeli government (reportedly due to intense diplomatic pressure from the PRC), and BOC's refusal to disclose any details of the PRC law enforcement investigation and surveillance of Shurafa, the most viable remaining avenue for Plaintiffs to obtain any information on Shurafa's operations in China is the fact investigation conducted in 2008 by BOC itself.

---

[23] The extensive and fundamental gaps in the memories of BOC's senior officers distinguish this case from decisions such as *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 80 (S.D.N.Y. 2010), where the party claiming substantial need could still obtain the information requested through deposition testimony. BOC's officers are either unwilling or unable to remember basic facts about this investigation, leaving documentary evidence as the only source for this information. Even with depositions remaining, Plaintiffs have now deposed, or been denied the depositions of, the senior executives responsible for BOC's decisions based on the Shurafa Investigations. Future depositions of lower-level employees are unlikely to fill these gaps in the factual record.

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 17 of 20

In short, Plaintiffs are seeking documents arising from a fact investigation, conducted by non-attorneys, not operating at the direction of counsel, that was aimed at reporting the results to regulators and responding to negative publicity. There is no risk of exposing the mental processes of BOC's counsel in investigation documents created by non-lawyers without counsel's involvement. As such, these documents are entitled to only the "most minimal protection," as recognized in *Nat'l Cong. for Puerto Rican Rights.* 194 F.R.D. at 110.

## VI. BOC's Accompanying Attorney-Client Privilege Claims Should Be Rejected Because the Investigations Were Not Conducted at the Direction of Counsel Or for the Purpose of Seeking Legal Advice and Any Such Claims Were Waived.

Although Plaintiffs focus this application on BOC's improper work product claims, BOC's accompanying invocations of attorney-client privilege should be rejected as well.

Despite Judge Scheindlin's unambiguous ruling that BOC's in-house legal and compliance personnel in China are not entitled to invoke the attorney-client privilege, BOC continues to assert the privilege over thousands of investigation-related documents that do not involve or even mention BOC's outside counsel.[24] In so doing, BOC introduces a new theory, not reflected on its privilege logs, to avoid disclosing its investigation-related documents – BOC appears now to assert attorney-client privilege based on the purported involvement of BOC's U.S. outside litigation counsel in the investigations, rather than BOC's in-house legal and compliance personnel in China. Citing *In re Kellogg Brown & Root, Inc.*, 756 F.3d 764 (D.C. Cir. 2014), which is not binding on this Court, BOC takes the position that any communication by any BOC employee involved in the investigation was necessarily made as an agent of BOC's *outside* counsel, and thus BOC may invoke the privilege to withhold every investigation-related document, even those not reflecting the direction or advice of BOC's outside litigation counsel. *See e.g.,* 8/26/14 Ltr. from L. Saperstein to Hon. S. Scheindlin, at 3 (citing and quoting *Kellogg* to defend BOC's withholding of investigation documents) (Dkt. #626).

BOC's arguments should be rejected for at last two reasons. First, *Kellogg* has no application to this case because the investigations were not conducted at the direction of attorneys. As the Supreme Court made clear in *Upjohn Co. v. United States*, the attorney-client privilege protects "the giving of information to the lawyer to enable him to give sound and informed advice." 449 U.S. 383, 390 (1981). Providing a lawyer with factual material is a privileged communication only insofar as it is intended to inform the attorney's legal advice, not where a client is acting for business, policy, or reputational ends. *See Fox News Network, LLC v. U.S. Dep't of Treasury*, 911 F. Supp. 2d 261, 271 (S.D.N.Y. 2012) ("[A]dvice about 'risks or costs in terms of expense, politics, insurance, commerce, morals, and appearances' typically is

---

[24] None of the documents Plaintiffs request in this application are to or from BOC's outside counsel, or reference the advice of any outside counsel. The documents requested by Plaintiffs here are strictly internal BOC documents, or documents disclosed by BOC to its PRC regulators.

BOIES, SCHILLER & FLEXNER LLP

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 18 of 20

not legal advice.") (quoting *In re County of Erie*, 473 F.3d 413, 420 (2d Cir.2007)). In *Upjohn*, the results of the interviews were sent directly to the lawyers conducting the investigation for the purpose of allowing them to render legal advice. Likewise, in *Kellogg*, the investigation "was conducted at the direction of the attorneys" and "under the auspices of KBR's in-house legal department, acting in its legal capacity." 756 F.3d at 757-58.

Here, as described in detail above, BOC's investigation was conducted without the direction or involvement of outside U.S. counsel, outside the presence of U.S. counsel, with no concern for U.S. litigation, and primarily for reputational purposes. The employee who headed up BOC's investigations in China testified that outside litigation counsel was not even involved in the Initial Shurafa Investigation or the resulting report, and BOC's subsequent report to the MFA establishes that BOC's investigation was not in preparation for any U.S. legal proceeding. BOC has offered no support for the questionable proposition that its investigations were conducted for the purpose of providing information to its outside litigation counsel, rather than saving face with, or as required by, its regulators.[25] That BOC ultimately provided some of this factual material to outside counsel after it had reported to its regulators does not bring the entirety of BOC's investigation within the scope of *Upjohn*. If that were the case, any internal investigation, for any purpose, could become cloaked by the privilege simply by the act of forwarding its findings to outside counsel after the fact. Indeed, at least one court has rejected that very proposition where a defendant had similarly prepared a report without involving outside counsel. *See United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 129-32 (D.D.C. 2012).[26]

---

[25] BOC's sole support for its new argument that the purpose of the Initial Shurafa Investigation was to inform outside counsel appears in the August 2014 Geng Declaration, after Judge Scheindlin's rulings removing the protection of the attorney-client privilege from the documents at issue. *See* Ex. 4 (Geng Decl.) ¶18-19. ("[Mr. Loughlin was involved in the investigation of the allegations in the Demand Letter with the *expectation* that he would use and analyze the findings for the purposes of assessing the merits of the allegations in the Demand Letter and developing a litigation strategy if necessary. [BOC] continued to collect additional information, which we began to provide to Mr. Loughlin. . . ") (emphasis supplied). This post-hoc rationale offered in the declaration is unaccompanied by any specifics regarding any involvement by outside litigation counsel in directing or conducting the investigation, and the record shows that BOC informed outside counsel of the results of its investigation only after the fact. Unlike in *Gucci America, Inc.*, where the non-attorney investigator was "deputized" by U.S. counsel "to gather information from [defendant's] employees to assist in the litigation," 271 F.R.D. at 71, here Geng testified that *he* led the investigation, on Wang Qi's orders. SOUF ¶¶ 4, 10; Ex. 3 (Geng Dep.) at 188:4-9 ("Q. You were in charge of the investigation? A. Yes. Q. Who directed you to do the investigation? A. General manager Wang Qi.").

[26] That court summarized the privilege claimant's argument as follows:

> "At bottom, the respondent's claim to privilege appears to be premised on a gimmick: exclude counsel from conducting the internal investigation but retain them in a watered-down capacity to "consult" on the investigation in order to cloak the investigation with

*Second*, even if such a broad invocation of the attorney-client privilege were appropriate, BOC waived the privilege when it self-servingly disclosed what it claimed was the advice and legal analysis of its outside litigation counsel both to the MFA, and to the Court and Plaintiffs here. BOC's report to the MFA states:

> Already, our bank has brought U.S. legal counsel to the Guangdong Branch to undertake an investigation and has provided legal analysis and legal advice of responding to the letter . . . . The counsel is of the opinion that the Bank of China has a comprehensive anti-money laundering compliance procedure and that during the process of managing business activities, Guangdong Branch has complied with the requirements of relevant laws and regulations as well as banking requirements regarding 'know your customer' and the monitoring of suspicious transactions; that the customer's account activities were consistent with the purpose of his business, and that Guangdong Branch [REDACTED] based on the characteristics of the customer's cash transactions. In short, our bank has committed no wrongdoing.

*See* Ex. 11 at 3. BOC cannot disclose the analysis and conclusions of its outside counsel to gain an advantage vis-à-vis its regulators, the Court and the parties in this litigation, but then invoke privilege to shield those same communications from scrutiny. *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."). BOC waived the attorney-client privilege when it sought to use its outside counsel's advice to defend itself before its regulators. Plaintiffs are now entitled to see what that purported legal opinion was based on, if anything at all. *See* Section III.D, *supra*.

*Finally*, BOC's attorney-client privilege assertions under *Kellogg* must fail for the same reasons BOC's work product claims fail. A finding by this Court that any of BOC's investigation documents were not created at the direction of outside counsel, or that their purpose was not related to the litigation, necessarily means that BOC fails the *Kellogg* test. As noted above, in *Kellogg* the court recognized that "[the] investigation here was conducted at the direction of the attorneys," and "under the auspices of KBR's in-house legal department, acting in its legal capacity." 756 F.3d at 757-58. BOC's Chinese in-house counsel are not lawyers, and its outside counsel did not direct the investigations at issue.

---

> privilege. Unfortunately for the respondent, this sort of "consultation lite" does not qualify the Audit Report for the protections of the attorney-client privilege."

*Id.* at 129-30.

BOIES, SCHILLER & FLEXNER LLP

Hon. Gabriel W. Gorenstein
October 28, 2014
Page 20 of 20

      For the above reasons, Plaintiffs respectfully request that the Court overrule BOC's work product and attorney client privilege assertions and order immediate production of the documents listed in Appendices A, B, and C.

                                                          Respectfully yours,

                                                          Marilyn C. Kunstler

Attachments

cc:      All Counsel of Record (via ECF)