UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SHERYL WULTZ et al.,                           :

                Plaintiffs,               :   <u>MEMORANDUM DECISION</u>

   -v.-                                             :
                                              11 Civ. 1266 (SAS) (GWG)
BANK OF CHINA LIMITED,                     :

                Defendant.              :
-------------------------------------------------------X
GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

      Following a series of letters from the parties (Docket ## 553, 579, 582, 657, 683, 690), the Court held a hearing on October 23, 2014 at which the parties discussed the production of documents withheld by defendant Bank of China Limited ("BOC") based on regulations governing "Suspicious Activity Reports," commonly known as "SARs." At this hearing, the Court rejected BOC's assertion that the regulations barred production of the documents at issue. <u>See</u> Order, filed Oct. 24, 2014 (Docket # 693). We now provide additional background for our ruling.

      31 U.S.C § 5318(g)(2)(A)(i) provides in pertinent part as follows:

> If a financial institution or any director, officer, employee, or agent of any financial institution, voluntarily or pursuant to this section or any other authority, reports a suspicious transaction to a government agency . . . neither the financial institution, director, officer, employee, or agent of such institution (whether or not any such person is still employed by the institution), nor any other current or former director, officer, or employee of, or contractor for, the financial institution or other reporting person, may notify any person involved in the transaction that the transaction has been reported . . . .

Various banking authorities have issued regulations implementing this statute. BOC has relied on the regulations promulgated by the Office of the Comptroller of the Currency, <u>see</u> Letter from Lanier Saperstein, dated July 24, 2014 (Docket # 579) at 1 n.1, which appear in 12 C.F.R. § 21.11. These regulations go beyond the statute by barring disclosure to anyone, not just a "person involved in the transaction." They provide in relevant part:

> (k) Confidentiality of SARs. A SAR, and any information that would reveal the existence of a SAR, are confidential, and shall not be disclosed except as authorized in this paragraph (k).
>
>     (1) Prohibition on disclosure by national banks. (i) General rule. No national bank, and no director, officer, employee, or agent of a

>national bank, shall disclose a SAR or any information that would reveal the existence of a SAR.

12 C.F.R. § 21.11(k)(1). Additionally, the regulations contain a "rule of construction," which states:

>Provided that no person involved in any reported suspicious transaction is notified that the transaction has been reported, this paragraph (k)(1) shall not be construed as prohibiting . . . [t]he disclosure by a national bank, or any director, officer, employee or agent of a national bank of . . . [t]he underlying facts, transactions, and documents upon which a SAR is based . . . .

12 C.F.R. § 21.11(k)(1)(ii)(A)(2).[1]

As was made clear at the October 23, 2014, hearing and in BOC's submissions, BOC has a written policy that directs what steps BOC employees should take when BOC identifies suspicious or unusual activity. The process involves various portions of BOC's staff, including staff that conducts additional investigation into the facts and circumstances. Ultimately, the information may be presented to a committee within BOC to decide whether a SAR should be filed.

In response to document requests from plaintiffs, BOC gathered more than 10,000 documents that were generated at various points in this process, though it is not clear at this time whether this group includes documents that emanated from the committee ultimately charged with responsibility to decide whether to file a SAR or not. BOC's argument is a simple one: that documents produced at each step of this process are protected by the SAR privilege since they result from the implementation of BOC's policies and procedures for the filing of SARs. Plaintiffs argue the documents are not protected by the SAR privilege because they do not reveal whether or not any SAR was actually filed.

Nothing in the text of the regulations suggests with any clarity that the documents that are part of BOC's investigatory process are covered by the prohibition. The Court's ex parte examination of samples of documents provided by BOC reflects that the documents do not

---

[1] The Financial Crimes Enforcement Network, known as "FinCEN," is the agency with which SARs must be filed. See 31 U.S.C. § 5318; 12 C.F.R. § 21.11(c). FinCEN has issued regulations implementing the SAR confidentiality provisions that mirror OCC's regulations. See 31 C.F.R. § 1020.320(e). The Office of Thrift Supervision has issued similarly worded regulations. See 12 C.F.R. § 563.180(d)(12). The Federal Deposit Insurance Corporation's regulation, 12 C.F.R. § 353.3(g), is similar in content, providing that "[a]ny bank subpoenaed or otherwise requested to disclose a suspicious activity report or the information contained in a suspicious activity report shall decline to produce the suspicious activity report or to provide any information that would disclose that a suspicious activity report has been prepared or filed . . . ." The case law cited herein may rely on any of these regulations.

themselves indicate whether a SAR was actually filed or not.  Instead, the documents contain references to banking transactions without any specific discussion of SAR requirements.  Certainly, a person with knowledge of SARs might deduce that certain banking activity would (or would not) result in the filing of a SAR.  But the same is true of a knowledgeable person who examined any original records of banking transactions.  Thus, a knowledgeable person who saw a bank statement with dozens of sequential cash deposits of $9,999 would deduce that the bank would file a SAR for that customer.  But if we were to conclude that a document's potential to engender such a deduction brought the document within the regulatory prohibition, it would negate the plain language of 12 C.F.R. § 21.11(k)(1)(ii)(A)(2), which makes clear that there is no bar to revealing "[t]he underlying facts, transactions, and documents upon which a SAR is based."

      BOC makes much of the following interpretive text that accompanied the promulgation of the final regulations — in particular, the underscored text at the end of this paragraph:

> Documents that may identify suspicious activity, but that do not reveal whether a SAR exists (e.g., a document memorializing a customer transaction such as an account statement indicating a cash deposit or a record of a funds transfer), should be considered as falling within the underlying facts, transactions, and documents upon which a SAR is based, and need not be afforded confidentiality.  This distinction is set forth in the final rule's second rule of construction discussed in this Section-by-Section Analysis and reflects relevant case law.  However, the strong public policy that underlies the SAR system as a whole — namely, the creation of an environment that encourages a national bank to report suspicious activity without fear of reprisal — leans heavily in favor of applying SAR confidentiality not only to a SAR itself, but <u>also in appropriate circumstances to material prepared by the national bank as part of its process to detect and report suspicious activity, regardless of whether a SAR ultimately was filed or not.</u>

75 Fed. Reg. 75576-01, 75579 (Dec. 3, 2010).  We recognize that in some circumstances, a court must defer to an agency's interpretation of its own regulations.  See, e.g., Auer v. Robbins, 519 U.S. 452 (1997).  But even accepting arguendo that such deference is due here (a decision that requires us to find that the regulatory language is ambiguous and that the interpretation is not inconsistent with the regulation), we find the underscored language to be unhelpful in resolving the current dispute.  Had the regulation or perhaps even the interpretation outright barred production of documents prepared by a bank as part of its process to investigate suspicious activity, the materials at issue here would be properly withheld.  But neither the regulation nor the interpretive language contains any such bar.  Additionally, the interpretative language is couched in tentativeness: it refers to how policy behind the SAR requirement "leans heavily in favor" of withholding investigatory material, not that such withholding is required.  More significantly, it states that withholding of such material, if it is even to occur, need not occur in all circumstances but only in "appropriate" circumstances, without stating what those circumstances are or even what characterizes them.   We thus find that the underscored language

3

is lacking in semantic content and offers the Court no guidance as to how the investigatory documents in this case should be treated.[2]

  While there is case law arguably supportive of defendant's position, and this Court originally took a different position at the conference with the parties on July 29, 2014, the Court finds the case law supporting plaintiffs' position to be more persuasive.  Thus, in First American Title Insurance Co. v. Westbury Bank, 2014 WL 4267450 (E.D. Wis. Aug. 29, 2014), the court found that documents generated as part of a bank's standard business practice, such as investigating potential fraud or other irregularities, remained discoverable even when the "fraud investigation parallels the process of preparing a SAR." Id. at *3.  It cogently noted that "[t]he relevant regulation bars only disclosure of information that 'would' reveal the existence of an SAR; it does not prohibit disclosure of information that 'could' or 'might' reveal the existence." Id. at *2.  Here, as might be expected, there was no evidence of any process for investigating suspicious activity other than the process that might ultimately lead to a presentation to the SAR committee to decide whether to file a SAR.  But any bank, including BOC, has its own reasons for investigating suspicious activity other than the statutory obligation to file a SAR — including to protect itself from fraud and to make sure it does not violate or abet the violation of other banking regulations and statutes, such as money laundering statutes.  Thus, investigatory documents do not by themselves reveal the existence of a SAR.  This was made plain in Freedman & Gersten, LLP v. Bank of America, N.A., 2010 WL 5139874 (D.N.J. Dec. 8, 2010), in which the court noted that although the bank in that case "may have undertaken an internal investigation in anticipation of filing a SAR, . . . it is also a standard business practice for banks to investigate suspicious activity . . . . " Id. at *3.  Freedman & Gersten, LLP ordered production of "any memoranda or documents drafted in response to the suspicious activity at issue in this case, " id., notwithstanding the fact that the bank's "entire investigation was undertaken in anticipation of the potential filing of an SAR," id. at *3 n.3.

  Similarly, in In Re Whitley, 2011 WL 6202895 (Bankr. M.D.N.C. Dec. 13, 2011), plaintiffs sought discovery of documents relating to the identification of an individual's bank account as "an account which was experiencing unusual, suspicious and potentially illegal activity." Id. at *1-2.  The court compelled the disclosure of any documents or notes obtained by the bank from any source, relating to "any investigation or inquiry by the bank or its agents into any account of" the individual at issue, including where the individual was identified as having "suspicious and/or unusual, irregular or improper account activity." See id. at *4.  See also United States v. Holihan, 248 F. Supp. 2d 179, 187 (W.D.N.Y. 2003) ("Any supporting documentation which would not reveal either the fact that an SAR was filed or its contents cannot be shielded from otherwise appropriate discovery based solely on its connection to an SAR."); Weil v. Long Island Sav. Bank, 195 F. Supp. 2d 383, 389-90 (E.D.N.Y. 2001)

---

  [2]  The agency goes on to state that "[t]his interpretation also reflects relevant case law." 75 Fed. Reg. at 75579.  But we do not believe that we can generate a rule from the cited cases that would allow us to add content to the language used in the main body of the text.  Moreover, the agency states that the cited cases merely support the interpretive language, not that they engraft onto it additional substance.

(compelling the production of any "supporting documentation" that did not reveal the existence of a SAR or reveal its contents).

As was explained at the October 23, 2014, hearing, there may be documents generated at the decisionmaking stage that contain a discussion of SAR requirements and reflect BOC's decisionmaking process specifically as to whether to file a SAR. We have invited BOC to point out any such documents and indicated that they may be withheld if they reveal the existence of a SAR. This is consistent with the decision in Wiand v. Wells Fargo Bank, N.A., 981 F. Supp. 2d 1214 (M.D. Fla. 2013), in which the court compelled the production of "a report generated by the bank in the ordinary course of business in monitoring unusual activity" and other internal emails but not reports of "an evaluative nature intended to comply with federal reporting requirements." Id. at 1217-19.

The Court acknowledges that cases exist to support a more expansive construction of the regulations. See, e.g., Norton v. U.S. Bank Nat. Ass'n,, 324 P.3d 693 (Wash. App. Div. Feb. 18, 2014); Union Bank of Cal., N.A. v. Superior Court, 29 Cal. Rptr. 3d 894 (2005). However, the Court is unable to reconcile such cases with the cases cited above and does not find them as persuasive. More importantly, we are faced with the regulatory language itself, which bars production of only those documents that "would reveal the existence of a SAR." We do not see how the investigatory documents at issue differ in character from the "underlying . . . documents upon which a SAR is based" — records that the regulations themselves explicitly exclude from the SAR prohibition. In no instance have we been shown documents that would "reveal the existence of a SAR."

For the reasons stated above and on the record at the hearing held on October 23, 2014, BOC's invocation of the SAR prohibition is rejected as to investigatory documents. If BOC can point to evaluative documents, presumably generated by or for the committee involved in the final SAR decisionmaking process, that reference the SAR requirements specifically as to the particular customer or transactions involved, such documents would likely be protected. If there are such documents, BOC should provide them (or samples if they are numerous) to the Court forthwith for in camera review.

SO ORDERED.

Dated: November 5, 2014
      New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge