UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SHERYL WULTZ et al.,                          :

                     Plaintiffs,          :          <u>OPINION AND ORDER</u>

   -v.-                                            :

                                                  11 Civ. 1266 (SAS) (GWG)
BANK OF CHINA LIMITED,                  :

                   Defendant.          :
-------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiffs Sheryl Wultz, Yekutiel Wultz, Amanda Wultz, and Abraham Leonard Wultz

have brought suit against Bank of China Ltd. ("BOC") for claims arising out of a 2006 suicide

bombing in Tel Aviv, Israel.  They allege that a customer of BOC, Said al-Shurafa ("Shurafa"),

was a senior operative of the terrorist group responsible for the bombing and that BOC assisted

Shurafa by executing dozens of wire transfers on his behalf totaling several million dollars.  See

First Amended Complaint, filed Jan. 13, 2009 (Docket # 12), ¶¶ 69-76.  Plaintiffs now seek to

compel the production of documents relating to investigations conducted by BOC in 2008 into

Shurafa's accounts prompted by a letter sent by plaintiffs' counsel informing BOC of their

intention to file suit.[1]  BOC asserts the documents are protected from disclosure by the

attorney-client privilege and the work product doctrine.  For the reasons stated below, plaintiffs'

---

    [1]  <u>See</u> Letter from Marilyn C. Kunstler, dated Oct. 28, 2014 (Docket # 697) ("Pl. Mem.");
Defendant's Response Memorandum in Opposition to Plaintiff's October 28, 2014 Motion to
Compel Production of Documents Withheld on the Basis of the Attorney-Client Privilege and
the Work Product Doctrine, dated Nov. 14, 2014 (Docket # 722) ("Def. Mem."); Declaration of
Daniel W. Beebe, dated Nov. 14, 2014 (annexed to Docket # 723) ("Beebe Decl."); Letter from
Marilyn C. Kunstler, dated Nov. 19, 2014 (Docket # 729) ("Pl. Reply"); Letter from Marilyn C.
Kunstler, dated Jan. 12, 2015 (Docket # 778); Letter from Lanier Saperstein, dated Jan. 20, 2015
(Docket # 784).

motion is granted.

I.      BACKGROUND

The following facts are undisputed, unless otherwise noted.[2]

On January 23, 2008, Robert Tolchin, an attorney for plaintiffs, sent a letter to BOC's New York Branch ("BOC-NY") stating that he intended to file a lawsuit against BOC because of the assistance it gave to Shurafa.  See Letter from Robert J. Tolchin, dated January 23, 2008 (annexed as Ex. 11 to Beebe Decl.) (the "Demand Letter").  The letter was entitled "Impending Legal Action in United States Courts Against Bank of China" and asserted that BOC "knowingly and intentionally" provided material assistance to terrorist groups that facilitated and caused terrorist attacks.  Id. at 2 (emphasis omitted).  It gave an account number of Shurafa at the BOC branch in Guanzhou and asserted that the account was used to fund terrorist operations.  Id. at 2-3.  Tolchin stated he was preparing a civil action that "will be filed in federal court within the next few weeks."  Id. at 3.  The letter invited BOC to advise Tolchin if it was interested in discussing settlement.  Id. at 5.  The letter concluded: "absent immediate confirmation that BOC is willing to enter into serious settlement negotiations, we will file suit with no further notice."  Id. at 5.  BOC-NY sent a fax to BOC's Head Office in Beijing ("BOC-HO") informing it of the

---

[2]  Both parties have filed statements of proposed undisputed facts and responses admitting or denying such facts.  See Undisputed Facts re Work Product, filed Oct. 28, 2014 (annexed as Ex. 2 to Pl. Mem.); BOC's Response to Plaintiffs' Undisputed Facts re Work Product, filed Nov. 14, 2014 (annexed as Attach. 1 to Def. Mem. at 1-12) ("BOC Resp."); BOC's Statement of Additional Undisputed Facts, filed Nov. 14, 2014 (annexed as Attach. 1 to Def. Mem. at 13-20); Plaintiffs' Response to BOC's Additional Undisputed Facts re: Work Product, filed Nov. 20, 2014 (annexed as Ex. 3 to Pl. Reply) ("Pl. Resp.").  Where a fact has been admitted in one of the parties' submissions, we sometimes cite to the statement and/or admission rather than to the underlying evidence.  In some instances we cite to facts not specifically admitted by a party where the facts are supported by evidence and that party has offered no contradictory evidence.

Demand Letter.  BOC Resp. No. 1; Pl. Resp. No. 1.  In that fax, BOC-NY "offered to recommend external U.S. legal counsel to advise BOC with respect to the Demand Letter."  Declaration of Geng Wei, dated Aug. 27, 2014 (annexed as Ex. 3 to Beebe Decl.) ("Geng Decl."), ¶ 3.

On January 24, 2008, "BOC-HO employee Wang Qi directed BOC-HO employee Geng Wei to conduct an investigation of the allegations in the Demand Letter" and prepare a report and recommendation.  BOC Resp. No. 2; Pl. Resp. No. 4.  At the time, "Wang Qi was the General Manager of BOC's Legal Compliance Department" and "Geng Wei was BOC's Chief Compliance Officer."  BOC Resp. No. 2.  Neither of these individuals is an attorney for purposes of the application of the work product doctrine or attorney-client privilege.[3]

That same day, John Beauchemin, the Chief Compliance officer at BOC-NY "contacted the bank's outside U.S. counsel."  Declaration of John Beauchemin, dated Feb. 20, 2013 (annexed as Ex. 14 to Beebe Decl.) ("Beauchemin Decl."), ¶ 4.  Beauchemin, who is also not an attorney, was responsible for conducting BOC-NY's investigation into the letter's allegations.  BOC Resp. No. 30.  Beauchemin identifies one particular investigatory action — a search of a database — accomplished by BOC-NY's "Legal Department."  Beauchemin Decl. ¶¶ 8-9.  He also states that he broadened the search of that database "at the direction of counsel," id. ¶ 10, though he does not identify who the counsel is or in what context that "direction" occurred.  Beauchemin identifies other investigatory steps taken in February 2008 without reference to the involvement of counsel.  Id. ¶¶ 12-20.  Beauchemin also states that since receiving the Demand

---

[3]  Judge Scheindlin ruled that none of the BOC-HO employees involved in the investigation was a lawyer, see Transcript of Proceedings, dated Aug. 11, 2014 (Docket # 616), at 3 — a question that had previously been disputed between the parties.

Letter, BOC-NY was "in constant contact with its outside U.S. counsel regarding this matter." Id. ¶ 22.  However, he conspicuously omits to give any description of the nature of that content or the specific role of outside counsel in his investigation.  He does not even state that he was communicating with outside counsel in order to obtain legal advice.[4]

On or about January 25, 2008, BOC-NY provided BOC-HO with a preliminary assessment of the allegations in the Demand letter based on information it had collected.  BOC Resp. No. 3.  On January 28, 2014, Geng directed the "Overseas Institutions and AML Section of the BOC-HO Legal and Compliance Department" to send an email to BOC-NY requesting "additional" unspecified information.  Geng Decl. ¶ 8.  At some unspecified date thereafter (but apparently before January 29, 2008),  Geng "directed" BOC-NY to "continue to investigate" the transactions and to "report their findings to the Head Office" so that BOC could assess the allegations in the Demand Letter and "develop BOC's litigation strategy if necessary."  Id. ¶ 9. In other words, Geng suggests that he (not outside counsel in New York) "directed" BOC-NY's investigation and that the investigation's purpose was to apprise the Head Office (through Geng) of any findings.  This is reinforced by Geng's statement that on January 29, 2008, the Legal Department of BOC-NY sent a fax addressed to Wang Qi, Geng's superior, and Geng seeking instruction on how to respond "should the American attorney contact them."  Id. ¶ 10.

_____

    [4] Citing to the Beauchemin Declaration, BOC states that Beauchimin "engaged" its "external U.S. regulatory counsel," apparently, Gary Lax, "[i]mmediately following . . . receipt of the Demand Letter."  Pl. Resp. No. 14.  BOC also states that the purpose of the engagement was "to guide the branch's investigation of, and response to, the allegations made in" the Demand Letter, id. — an assertion repeated in BOC's brief, see Def. Mem. at 7.  The Beauchemin Declaration, however, is devoid of any allegations that outside counsel was "engaged" or that outside counsel "guided" Beauchemin's investigation.  Rather, the paragraph cited by BOC states merely that Beauchemin "contacted" outside counsel and that an investigation began thereafter.  Beauchemin Decl. ¶ 4.

An investigation in China occurred at the same time as the investigation in New York. Geng "led BOC's initial investigation of the allegations in the Demand Letter."  BOC Resp. No. 4.  Geng was assisted by Li Jianyu and Yuan Fang, of the Overseas Institutions and AML Section of the BOC-HO Legal and Compliance Department, as well as several other BOC employees, to whom BOC-HO delegated responsibility for the collection of information.  Id. Geng asserts that in light of the Demand Letter's threat to file a lawsuit within the next few weeks, his "expectation" in collecting information concerning the Demand Letter's allegations was that "external counsel would use and analyze the findings for the purposes of assessing the merits of the allegations in the Demand Letter and developing a litigation strategy if necessary." Geng Decl. ¶ 6.  As already noted, however, there is no evidence that any external U.S. counsel actually directed or was otherwise consulted for legal advice regarding the investigation during this time period.  Indeed, Geng never claims that he received direction from external U.S. counsel.

In the meantime, on January 28, 2008, BOC-HO sent a fax directing BOC's Guangdong Branch ("BOC-GD") to investigate and to report their findings to the Head Office.  Id. ¶ 8.  The investigation in Guangdong was led by Liu Hongbing, Deputy General Manager of BOC-GD's Legal and Compliance Department, and previously a Senior Manager in that department.  BOC Resp. No. 6.  Liu is not a lawyer.  Id.

In January and February, "Liu Hongbing instructed employees of [BOC-GD] with respect to BOC-GD's collection of information related to the allegations in the Demand Letter for BOC-HO."  Id. No. 7.  "Liu Hongbing personally did not speak with BOC's U.S. outside counsel prior to September 2008 . . . ."  Id.  Rather, he "followed instructions from the Head Office to collection information and report back to the Head Office."  Id.  "The Head Office,

under the supervision of Wang Qi and Geng Wei, continued to communicate with BOC-NY and BOC-GD as BOC-NY and BOC-GD gathered additional information concerning the allegations in the Demand Letter."  Pl. Resp. No. 11.

On January 31, 2008, BOC-GD reported the findings of its preliminary investigation to BOC-HO.  BOC Resp. No. 8.  Geng states that BOC-GD "requested legal advice and recommended that BOC retain external U.S. legal counsel."  Geng Decl. ¶ 11.  In other words, BOC-GD did not believe at this time that there was existing U.S. legal counsel who could provide legal advice.  Indeed, on February 3, 2008, BOC-HO sent a fax to BOC-NY asking that BOC-NY propose external legal counsel.  Id. ¶ 12.  Geng states that on February 6, BOC-NY stated that it was "already in contact with BOC's external U.S. regulatory Counsel Gary Lax," although no information is given at all as to the nature of that contact.  Id.  Geng states that BOC-NY proposed that BOC retain Walter Loughlin of the U.S. law firm K&L Gates "for the purposes of assessing the merits of the allegations of the Demand Letter and developing a litigation strategy if necessary."  Id.  For its part, BOC-HO concurred with BOC-GD that it was necessary to retain outside counsel and asked that BOC-GD "decide whether it would like to retain" Loughlin.  Id. ¶ 13.

 "[O]n February 15, 2008, BOC-HO received a report from BOC-GD regarding its ongoing investigation into the allegations in the Demand Letter, requesting additional instructions from BOC-HO, and proposing that BOC's U.S. counsel handle communications with the U.S. regulators."  BOC Resp. No. 9.

On February 18, 2008, as part of BOC-HO's investigation of the allegations in the Demand Letter, "the BOC-HO Legal and Compliance Department sent Li Jianyu and Yuan Fang to Guangzhou to investigate the Shurafa-related accounts and transactions."  BOC Resp. No. 10.

"At Geng Wei's direction, they met with personnel from the BOC-GD Banking Business Department, Personal Banking Department, and Legal and Compliance Department to collect additional information relating to the opening of the Shurafa accounts and the Shurafa transactions."  BOC Resp. No. 10.  "On February 20, 2008, they visited the Zhongshan Balu sub-branch where accounts were opened and interviewed employees, including the tellers, of the sub-branch."  Id.  "On February 21, 2008, at the request of the BOC-HO Legal and Compliance Department, Li Yingyue and Weng Shuping from the BOC-GD Zhongshan Balu sub-branch visited Said Shurafa's place of business at Fuli Business Building . . ., spoke with Said Shurafa, and took photographs."  Geng Decl. ¶ 16.  On March 14, 2008, "BOC employees Li Yingyue and Weng Shuping visited the Shurafa Business Office;" on March 21, 2008, "three BOC employees, Li Yingyue, Li Yongqing, and Huang Dachao, visited the Shurafa Business Office"; and on March 26, 2008, "BOC Employees visited the Shurafa Business Office."  BOC Resp. No. 12.  On March 31, 2008, "BOC employees Li Jingyue and Huang Dachao visited Said Shurafa's storage warehouse."  Id.

On the issue of retaining counsel, on February 22, 2008, "BOC-HO notified BOC-NY that it agreed with BOC-NY's proposal to retain K&L Gates."  Id. No. 11.  BOC gives no information as to when it began communicating with Loughlin or K&L Gates about this matter. It states vaguely that Loughlin "was involved" in the investigation of the Demand Letter, Geng Decl. ¶ 18, but omits the actual dates of his involvement and does not describe the nature of his involvement, including omitting to state whether he directed or claims to have directed any aspect of the investigation.  No affidavit is provided from Loughlin.  For his part, Geng says that BOC "began to provide" information to Loughlin by March 2008 who by that time had "trips planned" to Beijing and Guangzhou to "gather additional facts and provide legal advice."  Id. ¶

19.  He does not say, however, that any of the investigatory actions were done at the direction of Loughlin.[5]

On March 28, 2008, Geng met Loughlin in Beijing, which was the first time they met in person.  BOC Resp. No. 14.  Loughlin, Geng, and others at BOC-HO discussed the allegations in the Demand Letter.  Pl. Resp. No. 25.  Following that meeting, Loughlin traveled with Li Jianyu to Guangzhou to meet with Liao Hai, General Manager of the Legal and Compliance Department, and others from BOC-GD and its sub-branches to discuss the allegations in the Demand Letter.  Id.

On March, 31, 2008, BOC provided a report to the China Banking Regulatory Commission ('CRBC') and the People's Bank of China ('PBOC').  See Report Concerning the Threat of a Lawsuit by an American Attorney against Bank of China, dated Mar. 31, 2008 (annexed as Ex. 7 to Pl. Mem.) ("March 31 Report"); BOC Resp. No. 15.  The March 31, 2008 Report stated that BOC had placed Shurafa in a "high risk" classification and would "monitor his transactions."  See March 31 Report at 3.  The report also stated that BOC had retained U.S. counsel.  BOC Resp. No. 16; March 31 Report at 3.  This report was not created at the direction of U.S. counsel.  BOC Resp. No. 16.

In early April 2008, Loughlin visited BOC-GD.  BOC Resp. No. 17.  On April 10, 2008, Loughlin "provided a nine-page letter to BOC describing his legal advice regarding the

---

[5]  BOC contends that the BOC-HO Legal and Compliance Department "communicated with Mr. Loughhlin through BOC-NY" through February and March, BOC Resp. No. 14, but it provides no evidence to support this contention other than Geng's Declaration.  Geng, however, is vague as to the dates of the communications, and specifically states only that on March 18, 2008, the BOC-HO Legal and Compliance Department wrote to BOC-NY asking it "to inquire of Mr. Loughlin what additional materials he would like to have available for his review in Guangzhou."  Geng Decl. ¶ 19.

allegations in the Demand Letter including a recommended course of action for BOC." Id. No. 18. This advice was "based on the information that we [referring to Geng and presumably other BOC personnel] had collected and provided to him during his visits to Beijing and Guangzhou, and in prior and subsequent communications with the Head Office, BOC-NY, and BOC-GD." Geng Decl. ¶ 22.

On or about May 27, 2008, at the request of the CBRC, BOC provided a report to the Ministry of Foreign Affairs of the People's Republic of China ("MFA"). BOC Resp. No. 20; Report Concerning the Threat of a Lawsuit by an American Attorney Against Bank of China, dated May 27, 2008 (annexed as Ex. 11 to Pl. Mem.) ("MFA Report"), at 1. The May 27, 2008 report to the MFA and the March 31, 2008 report to the PBOC and CBRC are nearly identical. BOC Resp. No. 21. In the MFA Report, "BOC represented to MFA that the allegations in the Demand Letter were baseless and that BOC's counsel suggested that there was no need for BOC to contact the author of the letter, Robert Tolchin, to discuss settlement." Id. No. 22.

"On August 22, 2008, BOC learned that Plaintiffs had filed a complaint" in federal district court. Id. No. 24. "Mr. Loughlin provided his initial legal advice to BOC with respect to the Complaint that same day; he followed that advice with additional written legal advice on August 25, 2008 and thereafter at regular intervals as BOC's counsel of record until he withdrew as BOC's counsel at BOC's request" in 2011. Pl. Resp. No 30, 31. On August 26, 2008, BOC-HO employee Wang Qi met with the PBOC to discuss the complaint. BOC Resp. No. 25. "The meeting minutes show that BOC had 'already formulated and distributed out relevant news-caliber stories, so as to make the facts clear' in the press." Id. On September 3, 2008, Wang and Geng met with PBOC to discuss the complaint. Id. No. 26.

9

II.    DISCUSSION

Plaintiffs seek documents generated as a result of the investigations into the claims made in the Demand Letter, including investigations occurring after the filing of the complaint.  See Pl. Mem. at 1-2; Appendices A, B, and C (annexed to Pl. Mem.).  Plaintiffs seek only documents on BOC's privilege logs that do not reflect communications involving a U.S. lawyer.  See Def. Mem. at 2; Pl. Reply at 2.  BOC asserts that these documents are protected by the attorney-client privilege and the work product doctrine.  We discuss each separately.

A.    Attorney-Client Privilege

In cases such as this where claims are based on federal statutes, the attorney-client privilege is governed by federal common law.  See, e.g., Curto v. Med. World Commc'ns, Inc., 783 F. Supp. 2d 373, 378 (E.D.N.Y. 2011); Crosby v. City of New York, 269 F.R.D. 267, 274 (S.D.N.Y. 2010); Lego v. Stratos Lightwave, Inc., 224 F.R.D. 576, 578 (S.D.N.Y. 2004).  Under federal common law, "[t]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011) (citing In re Cnty. of Erie, 473 F.3d 413, 419 (2d Cir. 2007)); accord United States v. Ghavami, 882 F. Supp. 2d 532, 536 (S.D.N.Y. 2012) (citations omitted).  "The purpose of the privilege is to encourage clients to make full disclosure to their attorneys." United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999) (quotation marks and citation omitted); accord Stryker Corp. v. Intermedics Orthopedics, Inc., 145 F.R.D. 298, 301 (E.D.N.Y. 1992).  Courts acknowledge that "[w]hile the privilege confers important social benefits, it also exacts significant costs [because] [i]t runs counter to the ordinary judicial interest in the disclosure of all relevant evidence." Application of Sarrio, S.A., 119 F.3d 143, 147 (2d Cir. 1997) (citation

10

omitted); accord In re Bairnco Corp. Secs. Litig., 148 F.R.D. 91, 96 (S.D.N.Y. 1993) (noting that

"the attorney-client privilege both advances and impedes the administration of justice.").

Accordingly, courts apply the attorney-client privilege "only where necessary to achieve its

purpose and construe the privilege narrowly because it renders relevant information

undiscoverable." Mejia, 655 F.3d at 132 (quotation marks and citations omitted).

"It is axiomatic that the burden is on a party claiming the protection of a privilege to

establish those facts that are the essential elements of the privileged relationship, . . . a burden

not discharged by mere conclusory or ipse dixit assertions." In re Grand Jury Subpoena Dated

Jan. 4, 1984, 750 F.2d 223, 224-25 (2d Cir. 1984) (quotation marks and citations omitted);

accord Ghavami, 882 F. Supp. 2d at 536 (citations omitted). The party invoking the privilege

also has the burden to show that the privilege has not been waived. Hollis v. O'Driscoll, 2013

WL 2896860, at *1 (S.D.N.Y. June 11, 2013) (citing Denney v. Jenkens & Gilchrist, 362 F.

Supp. 2d 407, 412 (S.D.N.Y. 2004)); accord United States v. Finazzo, 2013 WL 619572, at *6

(E.D.N.Y. Feb. 19, 2013) (citations omitted).

As noted, none of the documents sought by plaintiffs consist of communications between

BOC and one of its attorneys. BOC instead argues that all the log entries identified by plaintiffs

were properly withheld because they "relate to" BOC's investigation of the Demand Letter and

the complaint. Def. Mem. at 24-25. BOC's contention that the investigation into the Demand

Letter is privileged is grounded on the statement of Geng that it conducted the investigation

"with the expectation" that U.S. counsel would use the information to provide legal advice. Id.

at 25 (citing Geng Decl. ¶ 6). However, we are unaware of any case law suggesting that a

person's collection of information is protected merely because the person harbors a plan to

provide the information later to an attorney — particularly where there is no proof that the

11

attorney sought to have the individual collect the information at issue.  Indeed, case law holds

just the opposite.  See, e.g., Egiazaryan v. Zalmayev, 290 F.R.D. 421, 429 (S.D.N.Y. 2013) ("[A]

party cannot create the relationship based on his or her own beliefs or actions.") (quotation

marks and citations omitted).  Nor is it of any importance that this information may have

ultimately been used by Loughlin for the purpose of advising BOC.  See Geng Decl. ¶ 22

(asserting that Loughlin's April 10, 2008, letter was "based on the information that [BOC] had

collected and provided to him").  As the Second Circuit has noted, the attorney-client privilege

"protects communications between a client and an attorney, not communications that prove

important to an attorney's legal advice to a client."  Ackert, 169 F.3d at 139; see also Upjohn Co.

v. United States, 449 U.S. 383, 395 (1981) ("The privilege only protects disclosure of

communications; it does not protect disclosure of the underlying facts by those who

communicated with the attorney . . . .") (citations omitted); In re Six Grand Jury Witnesses, 979

F.2d 939, 944 (2d Cir. 1992) ("[T]he cloak of the privilege simply protects the communication

from discovery, the underlying information contained in the communication is not shielded from

discovery.").

     Neither Geng nor Loughlin ever assert that specific documents sought by plaintiffs here

formed part of a communication between them at the time the documents were created.  Rather,

BOC's argument is that because it made a "request for legal advice" to counsel and because

outside counsel ultimately received this request and "rendered advice in response," the

"communications" at issue are necessarily protected.  Def. Mem. at 26.  But this argument elides

the critical issue: why the specific documents sought by plaintiffs are "communications" that

were made to an attorney given that plaintiffs are not seeking any "communications" with

counsel.[6]

We can imagine a situation where an attorney directs a client to gather information for the purpose of rendering legal advice. We have no doubt that an investigation conducted under these circumstances might well be protected, as was true in Upjohn, 449 U.S. 383. See id. at 390 (attorney-client privilege can extend to "the giving of information to the lawyer to enable him to give sound and informed advice") (citations omitted). Indeed, Judge Scheindlin has already ruled as much when the issue of the BOC-NY investigation was initially presented to her. Wultz v. Bank of China Ltd., 2013 WL 6098484 (S.D.N.Y. Nov. 20, 2013) ("To assert privilege over any documents pertaining to the internal investigation into plaintiffs' demand letter, BOC must show that the communications were made as part of an internal investigation that proceeded at the direction of counsel for the purpose of obtaining legal advice.") (emphasis added); accord Wultz v. Bank of China Ltd., 979 F. Supp. 2d 479, 495-96 (S.D.N.Y. 2013); Wultz v. Bank of China Ltd., 2013 WL 1453258, at *12 (S.D.N.Y. Apr. 9, 2013). BOC, however, provides no evidence — let alone evidence sufficient to meet its burden of proof — that any of the documents at issue in this motion were produced at the "direction" of an attorney in order to allow the attorney to render legal advice. To the extent that BOC is arguing that investigations conducted without the direction of an attorney necessarily form part of an attorney-client communication as long as a corporate employee who received an order to conduct the

---

[6] The same problem exists with respect to Geng's statement that "[i]n the course of Mr. Loughlin's representation of BOC, we would periodically receive requests for additional documents or information from Mr. Loughlin, Mr. Lax, and Patton Boggs (now Squire Patton Boggs), in order to prepare our defense and respond to discovery requests, in response to which we delegated BOC employees to assist in the collection of this information for our external U.S. counsel." Geng Decl. ¶ 23. This statement does not connect the requests to any document sought by plaintiffs.

investigation harbored an "expectation," Geng Decl. ¶ 6, that he would share the information with an attorney at some future date, we reject this argument as unsupported by logic or case law.  In the end, while BOC has made vague claims about the "involvement" of outside counsel in the investigation, see Def. Mem. at 8, it has provided no evidence whatsoever that counsel ever directed that the information reflected in specific documents at issue here be prepared so that he could render legal advice to BOC.  See In re Grand Jury Subpoena, 599 F.2d 504, 511 (2d Cir. 1979) ("Participation of the general counsel does not automatically cloak the investigation with legal garb.") (citation omitted).

BOC's brief is equally unhelpful in connecting the post-complaint documents to any claim of attorney-client privilege.  Once again, the mere fact that some documents were created after the filing of the complaint does not indicate that they were created as part of an effort to seek legal advice from Loughlin.  Thus, while the Court accepts Geng's assertion that Loughlin provided advice to BOC after the complaint was filed and made requests for information from BOC, Geng Decl. ¶ 23, there is no evidence connecting any of the documents on the privilege log sought by plaintiffs to any effort by BOC to obtain advice from Loughlin or any request by Loughlin to BOC in order to give such advice.  More specifically, there is no testimony from Geng, Loughlin, or anyone else that Loughlin directed BOC to generate any of the documents sought by plaintiffs on this motion.

BOC points to case law recognizing that the attorney-client privilege "can arise prior to formal engagement."  Def. Mem. at 26.  But the cases it cites all involve circumstances where there is an actual communication between an individual and an attorney made for the purpose of seeking legal advice.  See Egiazaryan, 290 F.R.D. at 429-30; Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A., 258 F.R.D. 95, 100 (S.D.N.Y. 2009); cf. Diversified Grp., Inc. v.

Daugerdas, 304 F. Supp. 2d 507, 513 (S.D.N.Y. 2003) ("pre-engagement documents" were not privileged where there was no evidence of an intention to retain the attorney "in a legal capacity at the time the communications were made").  The cases merely hold that such communications are protected even though an actual agreement to represent the individual has not yet happened. Here, by contrast, plaintiffs do not seek any documents in which BOC communicated with any of its outside counsel, whether before or after there was any engagement of counsel.  Rather, plaintiffs seek only documents relating to BOC's own investigation of the matter.

BOC relies on Upjohn, 449 U.S. 383, and In re Kellogg Brown & Root Inc., 756 F.3d 754 (D.C. Cir. 2014), but these cases are also not relevant.  In Upjohn, the Court found privileged communications "made by Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel."  449 U.S. at 394 (footnote omitted).  Thus, Upjohn involved corporate employees providing information directly to counsel during interviews as part of an attorney-led investigation undertaken for the purpose of securing legal advice on behalf of the corporation.  Id. at 394-95.  Here, by contrast, no communications with any attorneys are being sought and there is no evidence that any of the documents at issue were created at the direction of an attorney.  In re Kellogg Brown & Root, Inc. found that the attorney-client privilege applied to an internal investigation where "one of the significant purposes of the internal investigation was to obtain or provide legal advice."  Id. at 760.  Again, in contrast to the situation here, the internal investigation at issue was at the direction of counsel.  Id. at 758 ("[T]he investigation . . . was conducted at the direction of the [in-house] attorneys . . . [a]nd communications made by and to non-attorneys serving as agents of attorneys in internal investigations are routinely protected by the attorney-client privilege.")

(citations omitted).[7]

In sum, BOC has not met its burden of proof with respect to the assertion of attorney-client privilege over any of the documents on the privilege log.

B.    Work Product Doctrine

1.    Governing Law

Federal law governs the applicability of the work product doctrine in all actions in federal court.  Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 173 (S.D.N.Y. 2008) (citing Weber v. Paduano, 2003 WL 161340, at *3 (S.D.N.Y. Jan. 22, 2003)).  The work product doctrine is codified in part in Fed. R. Civ. P. 26(b)(3), which provides that a party is not entitled to obtain discovery of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" unless the party shows substantial need and an inability to obtain the substantial equivalent of the documents without undue hardship.  The purpose of the work product rule is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."  United States v. Adlman, 134 F.3d 1194, 1196

---

    [7]  At two points in its brief, BOC asserts that an attorney "directed" the investigations.  See Def. Mem. at 22 ("As K&L Gates began to receive initial information from BOC, it requested more information and provided additional direction and legal advice to BOC."); id. at 24 (referring to "BOC's collection of further information at the direction of its external legal counsel for the purpose of advising BOC in this lawsuit.").  We disregard both these statements because they lack citation to any evidence in the record.  The actual evidence supplied by BOC nowhere refers to an attorney directing that any particular steps be taken by anyone, let alone that particular documents on the privilege log were generated at the direction of counsel.  One possible exception is the statement of Beauchemin that he broadened the search of a database "at the direction of counsel."  Beauchemin Decl. ¶ 10.  It is not necessary to parse further whether this statement is adequate to show the direction of counsel because Judge Scheindlin has previously ruled that Beauchemin's investigation was not protected by the attorney-client or work product privileges.  See Wultz, 2013 WL 1453258, at *12.  Nor has BOC identified any documents on the log that were created at the direction of counsel.

16

(2d Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)); accord United States.
v. Nobles, 422 U.S. 225, 238-39 (1975).  The work product doctrine protects materials prepared
not only by attorneys but also by their agents.  Costabile v. Westchester, N.Y., 254 F.R.D. 160,
164 (S.D.N.Y. 2008) (citing cases).  The party asserting work product protection "bears the
burden of establishing its applicability to the case at hand."  In re Grand Jury Subpoenas Dated
Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d 379, 384 (2d Cir. 2003) (citing cases).  "That party
must show that material it seeks to protect (1) was prepared in anticipation of litigation and (2)
was prepared by or for a party, or by his representative."  Schaeffler v. United States, 22 F. Supp.
3d 319, 334-35 (S.D.N.Y. 2014) (quotation marks and citations omitted).

Because the work product protection arises only for materials "prepared in anticipation of
litigation," the doctrine is not satisfied merely by a showing that the material was prepared at the
behest of a lawyer or was provided to a lawyer.  Rather, the materials must result from the
conduct of "investigative or analytical tasks to aid counsel in preparing for litigation."
Costabile, 254 F.R.D. at 164 (citation omitted).  Additionally, the "in anticipation of litigation"
element requires a showing that "the document can fairly be said to have been prepared or
obtained because of the prospect of litigation."  Adlman, 134 F.3d at 1202 (quotation marks and
citation omitted) (emphasis in original).  Thus, the work product protection does not apply to
"documents that are prepared in the ordinary course of business or that would have been created
in essentially similar form irrespective of the litigation . . . [e]ven if such documents might also
help in preparation for litigation . . . ."  Id.  In determining whether the work product doctrine
applies, a court must ask "not merely whether [the party invoking the privilege] contemplated
litigation when it generated the materials at issue, but rather whether these materials 'would have
been prepared in essentially similar form irrespective of litigation.'"  Allied Irish Banks v. Bank

17

of Am., N.A., 240 F.R.D. 96, 106 (S.D.N.Y. 2007) (quoting Adlman, 134 F.3d at 1204).

Notwithstanding the common description of the doctrine as the "attorney" work product doctrine, as a doctrine "intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy," Adlman, 134 F.3d at 1196, and as applying to "materials prepared by or at the behest of counsel," see, e.g., In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d at 383, it is not in fact necessary that the material be prepared by or at the direction of an attorney.  The text of Fed. R. Civ. P. 26(b)(3)(A) accords the protection to material prepared "by or for [a] party or its representative" — not merely material prepared by or for an attorney.  The Advisory Committee Notes confirm that the intention of the Rule was to protect material prepared by non-attorneys.[8]  Finally, all cases of which the Court is aware that have specifically addressed this question afford protection to materials gathered by non-attorneys even where there was no involvement by an attorney.  See, e.g., Goff v. Harrah's Operating Co., Inc., 240 F.R.D. 659, 660 (D. Nev. 2007) ("It may be surprising to long-time practitioners that a lawyer need not be involved at all for the work product protection to take effect.") (quotation marks and citation omitted); accord Szulik v. State St. Bank & Trust Co., 2014 WL 3942934, at *3 (D. Mass. Aug. 11, 2014) ("[I]t is well-established that the doctrine protects writings made by

---

[8] The 1970 note to Rule 26(b)(3) states:

The courts are divided as to whether the work-product doctrine extends to the preparatory work only of lawyers.  The Hickman case left this issue open since the statements in that case were taken by a lawyer . . . .  Subdivision (b)(3) reflects the trend of the cases by requiring a special showing, not merely as to materials prepared by an attorney, but also as to materials prepared in anticipation of litigation or preparation for trial by or for a party or any representative acting on his behalf.  The subdivision then goes on to protect against disclosure the mental impressions, conclusions, opinions, or legal theories concerning the litigation of an attorney or other representative of a party.

a party, even without any involvement by counsel.") (citations omitted).  The one exception is

Bice v. Robb, 511 F. App'x 108 (2d Cir. 2013), an unpublished decision of the Second Circuit

which ruled otherwise.  Its entire discussion of the issue is contained in a single sentence, in

which it states that the documents at issue were "not protected by the attorney work-product

doctrine, because (though they may have been created because of the prospect of litigation) they

are not the work product of an individual acting as the [creators'] attorney."  Id. at 110 (citations

omitted).  Bice is a summary order, however, and thus lacks precedential effect.  See 2d Cir. R.

32.1.1(a).  The case law cited in support of Bice's ruling contains no holdings regarding the

treatment of non-attorney-generated work product.  Finally, Bice does not address the language

of Rule 26(b)(3)(A), the Advisory Committee notes, or the case law that is directly on point and

contrary to its ruling.  Accordingly, we respectfully decline to follow this aspect of Bice.[9]

       2.    Analysis

Plaintiffs make a number of arguments as to why the documents they seek should not be

accorded work product protection.  Pl. Mem. at 6-17.  It is only necessary to address one,

however, as it is dispositive.

Plaintiffs argue that BOC has not met its burden of showing that the documents would

not have been created in "essentially similar form irrespective of the litigation," Adlman, 134

F.3d at 1202.  See Pl. Mem. at 6, 13.  BOC's response to this argument, Def. Mem. at 12-18,

recognizes the correct legal test but fails in its offer of factual proof to meet that test.

To start off, we accept BOC's contention that BOC's receipt of the Demand Letter

---

[9]  We note that were we required to follow Bice, none of the material sought by plaintiffs would be protected by the doctrine because, for the reasons stated in the previous section, BOC has not shown that any of this material was created at the direction of an attorney.

triggered the investigation and that BOC anticipated the potential for litigation as a result of the threat in the Demand Letter.  BOC goes on to argue that had it not been for the Demand Letter, BOC "would have undertaken no investigation at all."  Id. at 15.  Notably, there is no record citation for this contention.  In any event, it is unclear what BOC means by this assertion.  If BOC means to say merely that the Demand Letter was a "but for" cause of the investigation, this does not address the issue of whether it has shown the materials were prepared "because" of its anticipation of litigation — that is, that the materials would not have been created "in essentially similar form irrespective of the litigation."  Adlman, 134 F.3d at 1202.  The burden is on BOC to make this showing inasmuch as it bears the burden of establishing the applicability of the work product protection.  In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d at 384.

The question is essentially a factual[10] one: would BOC have generated the materials listed on the privilege log in similar form had it not anticipated litigation?  Answering this question "requires us to consider what 'would have' happened had there been no litigation threat—that is, whether [BOC] 'would have' generated these documents if it were acting solely for its" non-litigation purposes.  Allied Irish Banks, 240 F.R.D. at 106.  We note that this hypothetical circumstance does not involve imagining what BOC would have done had no one told it that the Shurafa accounts merited scrutiny.  Rather, we imagine a hypothetical situation where BOC is made aware of all facts contained in the Demand Letter but sees no threat of actual litigation itself — for example, if BOC were to learn of the facts surrounding the Shurafa

---

[10]  We have noted that in fact this "factual" determination is in reality a "counterfactual" determination inasmuch as it requires a court to consider what "would have" happened had some set of factual circumstances existed other than the ones that actually existed.  Schaeffler, 22 F. Supp. 3d at 338.

accounts from its own internal mechanisms for detecting counter-terrorism and anti-money laundering, or from an outside source unlikely to institute litigation such as a foreign law enforcement agency or a newspaper reporter.  In other words, we look at the question as follows: had BOC been presented with the identical facts about Shurafa in circumstances in which it did not foresee litigation, would it have generated essentially the same documents sought by plaintiffs on this motion?

Plaintiffs have come up with various reasons why BOC might have conducted the identical investigation even if litigation had not been threatened — for example, to protect its reputation or to comply with its regulatory obligations.  Pl. Mem. at 11.  But the burden to show what "would have" happened in these circumstances is on BOC, not plaintiffs.  As we have noted in another matter,

> it is not easy for a factfinder to determine what "would have" happened in some hypothetical situation . . . .  Nonetheless, this is the question that the Adlman test requires us to answer and it is an exercise that courts have regularly performed.  See, e.g., DeBeers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc., 2006 WL 357825, at * 1 (S.D.N.Y. Feb.15, 2006) (documents created by management consultant not work product where consultant "would have created" them in similar form "even if the potential for litigation had been remote"); MSF Holding Ltd. v. Fiduciary Trust Co. Int'l, 2005 WL 3046287, at *2 (S.D.N.Y. Nov. 10, 2005) (e-mail not work product where no showing was made that it "would not have been prepared without the threat of litigation"); In re Otal Invs. Ltd. v. Capital Bank Pub. Ltd. Co., 2005 WL 1473925, at *1 (S.D.N.Y. June 22, 2005) (factual statement prepared following collision of boats not work product where "business reasons for obtaining a statement from their captain" would have compelled the report regardless of litigation); Verizon Directories Corp. v. Yellow Book USA, Inc., 2004 WL 4054842, at *2 (E.D.N.Y. July 22, 2004) (e-mail released where no showing was made that it would not have been created in essentially similar form irrespective of the litigation); see also In re Leslie Fay Cos., Inc. Sec. Litig., 161 F.R.D. 274, 281 (S.D.N.Y.1995) (pre-Adlman case finding no work product protection because "had there been no ongoing or anticipated litigation, [the company] would have conducted an investigation anyway").

Allied Irish Banks, 240 F.R.D. at 106-07.

For its part, BOC has provided virtually no evidence on the question of what BOC "would have" done had it learned of the Shurafa allegations under circumstances where the knowledge was not coupled with the threat of litigation.  It has not even made this showing for materials generated after the filing of the complaint.  For this reason alone, BOC has not met its burden of showing that the materials are protectable as work product.  See, e.g., Schulman v. Saloon Beverage, Inc., 2014 WL 3353254, at *11 (D. Vt. July 9, 2014) (denying work product protection where claimants had "not supplied any evidence" or had supplied only "conclusory" evidence that the material at issue "would not have been prepared in essentially similar form" had claimants "not anticipated litigation . . . .  Without any evidence on that issue, Defendants ha[d] not met their burden of proving that [the documents at issue were] prepared in anticipation of litigation.") (quotation marks and citations omitted).

Additionally, while plaintiffs bear no burden of proof, the Court notes that they have supplied evidence affirmatively suggesting that BOC "would have" conducted an essentially similar investigation had the information been brought to BOC's attention other than through the Demand Letter.  Most obviously, BOC presumably would have had to make its own evaluation of whether to close the Shurafa accounts and to make a report to the relevant regulatory agencies.  Accord Def. Mem. at 30 ("The CBRC and PBOC are the banking authorities in China, and BOC reported to them in the course of their regulatory process.").  In its March 31, 2008, report to the PBOC and CBRC, BOC emphasized its efforts to learn the facts about the Shurafa account.  It stated that after it learned of the allegations, it "immediately organized [its] New York Branch and Guangdong Branch to sort and analyze the respective transactions; [it] organized a special team to [its] Guangdong Branch to examine the identity of the customer and to understand the customer business status"; it "check[ed] all of the account opening documents

22

of [Shurafa]"; and it "made ample preparations and t[ook] necessary countermeasures" such as

placing Shurafa in a "high-risk customer classification."  March 31 Report at 2-3.  Furthermore,

BOC took steps to educate its employees: it "briefed the bank on risk, and required the entire

bank to pay close attention to the activities of personal accounts that have frequent cross-border

wire transfer transactions in order to effectively control possible compliance risk" and "[t]o

prevent the recurrence of any similar such events."  Id. at 3.  In the later MFA Report, BOC

made clear that it was concerned about its "anti-money laundering compliance procedure."

MFA Report at 3.  It stated that its U.S. legal counsel was of the opinion that BOC's procedures

were sufficient.  See id.  By the time of the MFA Report, BOC reported that Shurafa had already

"initiated the process for closing two accounts (including the only active account)" and planned

to close the remaining accounts.  Id.  This evidence strongly suggests that BOC had good reason

to investigate the allegations about improprieties in the Shurafa accounts absent the threat of

litigation.  Of course, it is BOC's burden to prove that it would not have undertaken this

investigation and, more specifically, that it would not have generated the documents on the

privilege log had they not anticipated litigation.  As already stated, BOC has provided essentially

no evidence to support this conclusion.

    Accordingly, we find that BOC has failed to carry its burden of proving that the

documents sought by plaintiffs are protected by the work product doctrine.

III.    CONCLUSION

    For the foregoing reasons, plaintiffs' motion to compel (Docket # 697) is granted.

    SO ORDERED.

Dated: January 21, 2015
     New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge