**Squire Patton Boggs (US) LLP**             **Dorsey & Whitney, LLP**
2550 M Street, NW,                                          51 West 52nd Street
Washington, DC  20037                            New York, NY 10019
Tel (202) 457-5601                                              Tel (212) 415-9385

February 23, 2015

Hon. Shira A. Scheindlin
United States District Judge, Southern District of New York
500 Pearl Street, New York, NY 10007

         Re:     *Wultz v. Bank of China Ltd.*, No. 1:11-cv-01266 (SAS)(GWG)
                  *Moriah v. Bank of China Ltd.*, No. 1:12-cv-01594 (SAS)(GWG)

Dear Judge Scheindlin:

In advance of the March 4, 2015 pre-motion conference on summary judgment, Bank of China Ltd. ("BOC") submits this letter to outline, within the Court's space limits,[1] the grounds upon which BOC plans to move for summary judgment in both the *Wultz* and *Moriah* actions through full briefing and a LCvR 56.1 Statement.

**I.**     **THE COURT LACKS PERSONAL JURISDICTION OVER BOC.**

As BOC explained in its previous pre-motion conference letters (Dkt. ##677, 715), the Court cannot exercise general or specific jurisdiction over BOC in these actions:

<u>First</u>, the Second Circuit recently held that BOC is not subject to general jurisdiction in New York under *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). *See Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 135 (2d Cir. 2014). <u>Second</u>, unable to ignore the binding effect of *Gucci*, plaintiffs instead argue that BOC waived its right to object to general jurisdiction by participating in the litigation after the U.S. Supreme Court issued its decision in *Daimler* in January 2014 and the Second Circuit issued its decision in *Gucci* in September 2014. BOC did not waive its objection to general jurisdiction. *See* Dkt. #677 at 2 n.2; #715 at 1-3. Through its motion to dismiss under Rule 12 and in its Answer, BOC took all available steps to preserve its personal jurisdiction objections for summary judgment. *See* Dkt. #715 at 1-3. The right to raise a personal jurisdiction defense on summary judgment after

---

[1] At the January 8, 2015 conference, the Court directed the parties to each submit pre-motion letters of no more than five single-spaced pages or 10 double-spaced pages. *See* Tr. (1/8/15) at 17:18 to 18:3.

discovery would be meaningless if a defendant's participation in discovery and other post-Rule 12 proceedings forfeited its jurisdictional objections. *See Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).

Moreover, BOC could not have waived a general jurisdiction defense that was not available until 2014, when *Daimler* and *Gucci* changed the general jurisdiction test so that New York courts no longer could exercise general jurisdiction over a foreign bank based on the presence of a New York branch. *See* Dkt. #715 at 1-2; *Gucci*, 768 F.3d at 135 ("'[A] party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made.'"). Although the absence of general jurisdiction over BOC became clear and indisputable following *Daimler* and *Gucci*, it would have been futile for BOC to raise a stand-alone challenge to general jurisdiction at that time. As in *Gucci* itself, plaintiffs here would have invoked their alternative and fact-dependent specific jurisdiction theory, and insisted that discovery was required to assess specific jurisdiction. Indeed, that is precisely what plaintiffs did here when the Court inquired about the impact of *Daimler* and *Gucci*. *See* Dkt. #704 at 3; *see also* Tr. (1/8/15) at 16:10-12 (plaintiffs' argument that jurisdictional "facts are so tied up to the merits [plaintiffs] think the whole briefing should be deferred").

After extensive discovery, however, the facts foreclose specific jurisdiction over BOC under "a totality of the circumstances test." *Licci v. Leb. Can. Bank, SAL ("LCB")*, 732 F.3d 161, 170 (2d Cir. 2013). Only a "small fraction of the relevant banking conduct occurred in New York." *Wultz v. Bank of China Ltd.*, 865 F. Supp. 2d 425, 429 (S.D.N.Y. 2012). The "wire transfers to China 'may have incidentally passed through BOC's branch in New York'" but "the bulk of the actual banking services occurred in China." *Id.* (quoting plaintiffs' arguments). Said Al-Shurafa ("Shurafa") did not maintain an account at BOC's New York branch ("BOCNY"). No wire transfers originated at BOCNY. No wire transfers ended at BOCNY. BOCNY only served as an intermediary bank in the

transfer process.  In fact, it only served as a second intermediary bank, meaning that the transfers to Shurafa always passed through another intermediary bank before passing through BOCNY.  The merely "incidental[ ]" role of BOCNY by definition was not "an integral part of the [alleged] wrongful conduct," *Licci*, 732 F.3d at 172 n.7, and thus does not provide a New York nexus sufficient to support specific jurisdiction over BOC.

Also, the transfers that went to Shurafa in China for which BOCNY served as an intermediary bank were not instances in which BOC purposefully availed itself of the opportunity to do business with Shurafa in the United States.  *See* Dkt. #677 at 3; Dkt. #715 at 3.  Rather, BOCNY served only as a second intermediary bank on the Shurafa transfers and only as a result of choices made by the originating banks or antecedent intermediary banks about how to route their customers' U.S. dollar wire-transfer orders to Shurafa's BOC accounts in China.  As in *Amigo Foods Corp. v. Marine Midland Bank*, 402 N.Y.S.2d 406, 408 (1st Dept. 1978), *aff'd* 414 N.Y.S.2d 515 (1979), BOCNY received the Shurafa wire transfers "passively" and due to the "unilateral[ ]" choices of antecedent banks.  *See also Licci*, 732 F.3d at 168 (adopting *Amigo* analysis).  There was no element of "selection and repeated use" or "deliberate" choice of New York by BOC in connection with the Shurafa transactions.  *Id.* at 171.  Other banks' use of their correspondent accounts with BOCNY cannot show that BOC purposefully availed itself of the privilege of banking in New York in order to provide banking services to Shurafa, and BOC thus is not subject to specific jurisdiction.  *Id.* at 168-70.

## II.    PLAINTIFFS' CLAIMS PRESENT NON-JUSTICIABLE POLITICAL QUESTIONS.

Plaintiffs' claims are non-justiciable under the political question doctrine.  That is because discovery has "bump[ed] up against non-cooperation by China [and] Israel," *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 27-28 (D.D.C. 2010) ("*Wultz I*"), with respect to plaintiffs' core allegations.  Before discovery, the transferor D.C. Court held that it was "premature to dismiss this case on the

3

chance that" such evidentiary non-cooperation might occur. *Id.* During discovery, this Court likewise recognized that evidentiary non-cooperation remained a viable justiciability argument, depending on how the Israeli and Chinese governments responded to Hague Requests and other efforts to obtain evidence from them. *See* Tr. (4/4/13) 15:24-17:1. Now, at the close of discovery, it is clear that the governments of Israel and China will not provide evidence concerning plaintiffs' fulcrum "actual knowledge" allegation that Shurafa's BOC accounts were discussed at a meeting of Chinese and Israeli government officials, or plaintiffs' linked allegation that PRC officials in turn notified BOC of Israeli allegations about Shurafa.[2] *See Wultz* 1st Am. Compl. ("FAC"), Dkt. #12 ¶77; *Moriah* Compl., Dkt. #1 ¶38. BOC has no knowledge of any such alleged discussion of Shurafa between the Chinese and Israeli governments. *See infra* at 7 & nn.7-9.

Plaintiffs apparently hoped to prove their "meeting" allegation through Uzi Shaya, but "Israel's valid claim of immunity" made Shaya an unavailable witness, whatever he might have said. *See* Order (8/7/14) at 6; *see also id.* at 3 ("[I]t is Israel that is prohibiting Shaya from testifying, not this Court."); *Wultz v. Bank of China Ltd.*, 2014 U.S. Dist. LEXIS 99846, at *18-19, *26 (S.D.N.Y. July 21, 2014). Israel invoked its "state secrets" privilege and national security concerns as the basis for its assertion of immunity, which the Court accepted as the sole legal cause of Shaya's unavailability. *See Wultz v. Bank of China Ltd.*, Misc. No. 13-1282, Dkt. #1 (D.D.C. Nov. 15, 2013). Accordingly, the absence of Shaya's evidence from this case cannot lead to any inferences adverse to

---

[2] *Compare Wultz* Dkt. #277, *Moriah* Dkt. ##38-2 & 42 (Hague Convention Letters of Request to Israel requesting documents and depositions related to April 2005 meeting), *with Wultz* Dkt. ##587, 629, *Moriah* Dkt. #81-1 (letters from Israel declining to produce documents or facilitate depositions because "the competent Israeli authorities have determined that any substantive response is liable to prejudice Israel's sovereignty and/or security"); *compare Wultz* Dkt. # 301 (Hague Request to the PRC requesting documents relating to any alleged meeting involving PRC officials, Israeli officials, and/or BOC officials), *with Wultz* Dkt. #557, Ex. 2 (email from PRC informing plaintiffs that the Hague Request "could not be executed according to Article 12 Para 1 Subpara 2 [of the Hague Convention]," which permits a country to refuse to execute a Letter of Request when it would prejudice its sovereignty or security).

BOC.[3] The Act of State doctrine forecloses any effort by plaintiffs to portray the national security grounds for the Israeli government's decision as pretextual.[4] Moreover, plaintiffs' claims, which seek a judicial determination that the Chinese government sponsors terrorism through a bank that it regulates, are barred by both the Political Question and Act of State doctrines.[5]

### III.    PLAINTIFFS CANNOT ESTABLISH THEIR ATA CLAIM.

The Antiterrorism Act ("ATA") requires plaintiffs to establish that BOC: (1) committed an act of "international terrorism;" (2) acted with a culpable state of mind; and (3) in fact and proximately caused plaintiffs' injuries. *See* 18 U.S.C. § 2333(a); *Rothstein v. UBS AG*, 708 F.3d 82, 94-95 (2d Cir. 2013); *Wultz I,* 755 F. Supp. 2d at 40-54. The evidence, even construed in plaintiffs'

---

[3] *See* WEINSTEIN'S FEDERAL EVIDENCE §509.46[1] (2013) ("In those proceedings to which the government is not a party, if the government successfully asserts the [state secrets] privilege, the case can continue without the evidence in question. Sanctions are not appropriate, as neither party is responsible for the loss of the evidence."); *Ellsberg v. Mitchell*, 709 F.2d 51, 64 (D.C. Cir. 1983) ("The effect of the government's successful invocation of the state secrets privilege, when the government itself is not a party to the suit in question, is well established: [T]he result is simply that the evidence is unavailable, as though the witness had died, and the case will proceed accordingly, with no consequences save those resulting from the loss of the evidence." (quotation omitted)).

[4] *See Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 145-46 (2d Cir. 2012) (Act of State doctrine prohibits judicial reconsideration of "the detail … or the merits of the result" of a foreign government's action); *see also El-Masri v. United States.*, 479 F.3d 296, 313 (4th Cir. 2007) (under state-secrets privilege, a party's "personal interest in pursuing his civil claim is subordinated to the collective interest in national security"); *cf. Moriah v. Bank of China Ltd.*, 2015 U.S. Dist. LEXIS 18112, at *16-17 (S.D.N.Y. Feb. 13, 2015) (Scheindlin, J.) (precluding the testimony of a foreign government agent—"Ciechanover"—on sovereign immunity grounds where "Plaintiffs wish to depose Ciechanover solely to gain information regarding the Israeli government's actions and decisions—namely, whether China exerted pressure on Israel to withdraw support for Shaya's testimony. … The information … relates solely to 'political acts' that implicate Israel's diplomatic relations with other nations. The effect of this Court issuing a subpoena to elicit this testimony— and then using the testimony in order for this Court to pass judgment on the propriety of Israel's actions—would enforce a rule of law against Israel.").

[5] Plaintiffs contend that the PRC approved and directed BOC to accept wire transfers for Shurafa in order to support terrorist groups that seek to undermine Israel. *See Wultz* FAC ¶¶77, 112, 123. Such a finding would "express[ ] a lack of the respect due to coordinate branches of government," *Baker v. Carr*, 369 U.S. 186, 217 (1962), because it would conflict with the U.S. Executive Branch's determination that the PRC is not a state sponsor of terrorism. *See* U.S. Dep't of State, State Sponsors of Terrorism, http://www.state.gov/j/ct/list/c14151.htm (last visited Feb. 23, 2015). The Act of State doctrine also bars plaintiffs' claims based on these allegations because a judgment holding BOC liable for providing "material support" to terrorism by providing banking services to Shurafa under the approval and direction of the PRC government would call into question the legality of that alleged PRC government approval. *See Konowaloff*, 702 F.3d at 145-46. Although the D.C. Court in *Wultz I* sought to overcome this hurdle by refusing to "consider" plaintiffs' most inflammatory allegations about Chinese government policy, as "extricable" from plaintiffs' claims, 755 F. Supp. 2d at 26-27, plaintiffs' claims remain centered on their allegation that the PRC authorized BOC to provide banking services to Shurafa, or did nothing to stop BOC from doing so despite alleged warnings by Israel to the PRC about Shurafa.

favor, would not permit a rational juror to find that plaintiffs had proved any of those elements.

First, plaintiffs cannot establish that BOC committed an act of "international terrorism" because, *inter alia*, there is no evidence either that (i) Shurafa is an agent of, or affiliated with, any terrorist organization, or (ii) Shurafa ever actually was linked to any act of terrorism. Shurafa never has been designated as a terrorist operative or as someone affiliated with terrorism by any international governmental organization, any country or government agency. No sender or counterparty of any wire transfer to Shurafa's BOC accounts has been designated as affiliated with terrorism by any governmental authority. Given the absence of any evidence whatsoever that Shurafa was affiliated with any terrorist group, plaintiffs cannot establish that BOC's banking services to Shurafa involved "acts dangerous to human life." No rational juror could find that BOC in fact provided banking services to PIJ or any other terrorist group.[6]

Second, plaintiffs cannot establish the ATA's state-of-mind element, which requires proof of "intentional misconduct"—that BOC either (i) had "actual knowledge," or (ii) was "willfully blind" to the "substantial probability," that Shurafa was using BOC accounts to support terrorism. *Wultz I*, 755 F. Supp. 2d at 42; *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070-71 (2011) ("[a] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts"). Constructive

---

[6] Although plaintiffs apparently seek to expand their allegations to include other BOC accountholders with the [Redacted] see *Wultz* Dkt. #779, none of [Redacted] has been designated by any governmental authority as being affiliated with terrorism, nor does any evidence exist linking any of them with terrorism. Relying on unauthenticated documents, plaintiffs focus [Redacted] There is no evidence that BOC ever learned of the [Redac]-related information. It was not publicly available, and there is no evidence that it was brought to BOC's attention before this litigation. The transfers referenced in the [Redacte] involved no terrorist-designated parties, and the transfers were originated and processed without suspicion by other banks before BOC's receipt. The transfers also do not satisfy the causation element because there is no evidence those funds ever left China, let alone were moved to the Middle East to support any terrorist group. Likewise, the detention and release of [Reda] by Israeli authorities cannot prove a culpable state of mind because BOC never learned of those events prior to this litigation. More crucially, [Reda] was released by the Israeli authorities without charges in May 2005, after the supposed Israel-PRC meeting, and he was not detained by Israeli authorities when he subsequently traveled through an Israeli checkpoint on his way to China.

knowledge is not sufficient. *Wultz I*, 755 F. Supp. 2d at 42, 53. Negligence is not enough. *See Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208 (2d Cir. 2014).

BOC lacked "actual knowledge" of any link between Shurafa and terrorism: there is no admissible evidence regarding the substance of any Israel-PRC meeting concerning Shurafa, or that any Israeli accusations or demands about Shurafa were communicated to BOC by the PRC government or otherwise. *See Wultz* FAC ¶77. While the *Wultz* plaintiffs provided self-serving testimony during their depositions of what Uzi Shaya supposedly told them, that is inadmissible hearsay. *See Stern v. Cosby*, 645 F. Supp. 2d 258, 265 n.2 (S.D.N.Y. 2009) ("The law is clear that 'for summary judgment purposes, [a] supporting or opposing affidavit must be made on personal knowledge.'"; a witness's "knowledge of … events" is inadmissible "hearsay" when it is "based on what she has read and what other people told her" (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138 (2d Cir. 2009)).

The record instead reveals that, during all relevant time periods:

- Neither Shurafa, nor any sender or counterparty of any wire transfer sent to his BOC accounts, was ever designated as affiliated with terrorism by any government or agency.
- No BOC officer, employee, or agent was aware of any actual or suspected link between Shurafa and terrorism.
- BOC had no knowledge of any Israeli government concerns regarding Shurafa.[7]
- There is no evidence that the Israeli government had any concerns regarding Shurafa.[8]

---

[7] BOC's LCvR 56.1 Statement will present undisputed evidence showing, *inter alia*, that: (i) BOC was never advised by PRC officials or others that Shurafa was affiliated with terrorism; (ii) BOC had no records or knowledge of any Israel-PRC meeting in which Shurafa was discussed, and BOC never was informed by the PRC government or anyone else that Shurafa had any link to terrorism; and (iii) plaintiffs have never contended that Shaya has direct knowledge that BOC, as opposed to the PRC government, was informed of Israel's alleged views of Shurafa.

[8] BOC's LCvR 56.1 Statement will present undisputed evidence showing, *inter alia*, that: (i) Israel never has pursued criminal charges against Shurafa [Redacted] ; (ii) [Redacted] and (iii) Bank Hapoalim originated wire transfers from Israel to Shurafa's BOC accounts in China, and Israel

7

- BOC has no records or information suggesting that the Israeli government communicated any concerns it had, if indeed it had any, regarding Shurafa to the Chinese government.[9]

Nor is there any triable issue of fact under the willful blindness standard.[10] No rational juror could find that BOC believed there was a substantial probability that Shurafa was engaged in terrorist activities, or that BOC took any type of deliberate action to avoid learning whether Shurafa had terrorist connections. To the contrary, the record demonstrates that, during all relevant time periods:

- BOC complied with the requirements of the international sanctions regimes and its own internal watch list.[11]

---

took no action to warn Hapoalim of Shurafa's alleged terrorism ties or to prevent the wire transfers that Hapoalim originated in Israel. See *Wultz v. Bank of China Ltd.*, 2014 WL 572527, at *5 (S.D.N.Y. Feb. 13, 2014) (holding such evidence would make it "reasonabl[e to] infer that Israel did not provide such a warning to Chinese regulators").

[9] BOC's LCvR 56.1 Statement will present undisputed evidence showing, *inter alia*, that: (i) Redacted and (ii) any April 2005 Israel-PRC meeting would not have been the setting to discuss specific accountholders of a Chinese bank or for Israel to "demand" Chinese government action as it would have been the first bilateral counterterrorism dialogue since a multi-year acrimonious break between the two countries.

[10] Nor can plaintiffs show that BOC possessed the requisite mental state to violate the federal material-support criminal statutes (18 U.S.C. §§ 2339A, 2339B & 2339C) because there is no evidence that BOC knew or "exhibited deliberate indifference" to the fact that it was providing banking services to a person who allegedly supported terrorist activities. See *Weiss*, 768 F.3d at 205, 208. Further, without any evidence establishing a link between Shurafa and terrorism or evidencing a culpable mental state by BOC, there is no basis to impute to BOC the intent of the PIJ or Hamas in carrying out the terrorist acts. See *Wultz I*, 755 F. Supp. 2d at 48-49 (discussing the "appear to be intended" requirement of an act of "international terrorism"). A reasonable person, therefore, would not conclude that BOC's mere provision of banking services to Shurafa "appears to be intended" to intimidate Israeli citizens, influence Israeli government policy, or affect Israeli government conduct.

[11] BOC's LCvR 56.1 Statement will present undisputed evidence showing, *inter alia*, that: (i) BOC screened all transactions that it processed against governmental watch lists, including the U.N. watch list and, in the United States, against the list published by the U.S. Office of Foreign Assets Control; (ii) because neither Shurafa Redacted or counterparties ever appeared on any governmental watch list, the wire transfers to Shurafa did not trigger any hits in the Bank's AML/CTF screening system; (iii) BOC maintained, and screened all of the Shurafa transactions against, an internal "watch list" of high-risk or "actually suspicious" individuals and entities, resulting in no hits; and (iv) even today, Redacted, nor any counterparty on any of their transfers, has appeared on any watch list of any international or governmental authority, more than six years after plaintiffs publicly filed the *Wultz* lawsuit, which openly made allegations that would, if believed, place Shurafa at the top of many nations' counter-terrorism concerns.

- BOC complied with the Chinese AML/CTF requirements.[12]

- Numerous other banks, including major banks in Israel and the U.S., were involved in originating or executing Shurafa's transfers, and none identified those transfers as suspicious or took any action to stop them. This includes Israel's largest bank, Bank Hapoalim, which was an originator on multiple Shurafa transfers, but it was never warned of any Shurafa terrorist-affiliation by the Israeli government. *See supra* at 7 n.8.

- Shurafa's banking activities appeared to correspond to the business activities of a typical clothing merchant in Guangzhou, China.[13]

Third, no rational juror could find that BOC's banking services to Shurafa in China were either the proximate or the "but-for" cause of plaintiffs' injuries in Israel.[14] Without proof that Shurafa was an agent of the PIJ or Hamas (*see supra* at 5-9 & nn.8-11, 13-16), no rational juror could find that BOC's provision of banking services to Shurafa was a proximate cause or cause-in-fact of injuries inflicted by Hamas or PIJ terrorist attacks. BOC could not foresee that, by providing

---



[12] BOC's LCvR 56.1 Statement will present undisputed evidence showing, *inter alia*, that: (i) Redacted; (ii) Redacted; (iii) Redacted; (iv) Redacted; (v) Redacted; and (vi) Redacted.

[13] BOC's LCvR 56.1 Statement will present undisputed evidence showing, *inter alia*, that: (i) Shurafa was in China on a PRC-government issued business visa; (ii) the observable characteristics of Shurafa, his BOC accounts, and his transactions were not unusual relative to what is commonplace among merchants in Guangzhou, China, including making cash withdrawals and cash payments to local businesses; (iii) there is no evidence that Shurafa ever transferred any funds from his BOC accounts to any foreign country, in particular, countries in the Middle East; and (iv) BOC's investigation into Shurafa after receipt of plaintiffs' January 23, 2008 demand letter: (a) confirmed the Bank's belief that Shurafa was a merchant involved in the clothing trading business, and (b) BOC uncovered no evidence that indicated that Shurafa had any apparent connection with terrorist groups.

[14] *See In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi Bank)*, 714 F.3d 118, 123 (2d Cir. 2013) ("by reason of," when used in statutes like the ATA, has a "well understood meaning" which "'require[s] a showing that the defendant's violation not only was a 'but for' cause of [plaintiff's] injury, but was the proximate cause as well'" (citations omitted)); *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013) (holding that a plaintiff cannot recover under an ATA claim "on a showing of less than proximate cause").

9

routine banking services to an accountholder in China with no apparent terrorist ties, injuries from terrorist attacks in Israel would result.[15]  Moreover, even if a rational juror could find that Shurafa was linked with terrorism, "providing routine banking services to organizations and individuals said to be affiliated with [a terrorist entity] … [does not] proximately cause[ ] the attacks or plaintiffs' injuries."  *See Terrorist Attacks*, 714 F.3d at 124.

There is also no evidence that Shurafa "moved" the funds in his BOC accounts to the PIJ or Hamas in the Middle East.  *See Wultz* FAC ¶70; *Wultz v. Bank of China Ltd.*, 865 F. Supp. 2d 425, 426 (S.D.N.Y. 2012).  There is no evidence that Shurafa used any BOC banking channel to transfer any funds to anyone outside of China, let alone to any terrorist entity located in the Middle East.  In the absence of evidence of a connection between BOC's banking services and any alleged receipt of funds by terrorist entities responsible for the relevant attacks, no rational juror could find that BOC proximately or factually caused plaintiffs' injuries.

## IV. *MORIAH* PLAINTIFFS' NON-FEDERAL CLAIMS FAIL AS A MATTER OF LAW.

The non-federal *Moriah* claims for negligence and breach of statutory duty fail as a matter of law pursuant to *Wultz v. Bank of China Ltd.*, 2012 WL 5431013 (S.D.N.Y. Nov. 5, 2012), which dismissed substantively identical non-federal claims after applying Chinese substantive law.[16]

---

[15] *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 567, 572-73 ("Insufficient evidence is adduced to tie the personal bank accounts of individuals who may have been affiliated with Hamas to Hamas itself.  More is required to establish liability of the Bank.").

[16] With respect to the aiding and abetting claim, plaintiffs must establish: (i) that BOC acted with "'a level of intention to advance the principal tortfeasor's tortious ends that exceeds mere knowledge;'" and (ii) "a sufficient connection or contribution exists between the defendant's act and the tortious act."  *Wultz v. Bank of China Ltd.*, 2012 WL 5431013,at *6 (citation omitted).  As shown above, no evidence exists that even suggests BOC intended to aid the PIJ or Hamas in staging their attacks.  Moreover, *Moriah* plaintiffs' non-federal claims are untimely.  The March 5, 2012 *Moriah* complaint seeks relief for injuries suffered in a March 6, 2008 attack.  Under New York's borrowing statute (N.Y. C.P.L.R. § 202), New York's limitations periods apply to the non-federal claims.  The *Moriah* negligence and breach of statutory duty claims are barred by the 3-year limitations period for "an action to recover damages for personal injury."  N.Y. C.P.L.R. § 214(5).  The *Moriah* aiding and abetting claim is barred by the 2-year limitations period for such a claim.  *See Wultz v. Bank of China Ltd.*, 2013 WL 1641179, *2-3 (S.D.N.Y. Apr. 16, 2013).

Respectfully submitted,

/s/ *Mitchell R. Berger*                                                                               /s/ *Lanier Saperstein*

cc: *Wultz* and *Moriah* counsel of record