# BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • NEW YORK, NY 10022 • PH. 212-446-2300 • FAX 212-446-2350

February 28, 2015

**BY EMAIL AND HAND**

Hon. Shira A. Scheindlin, U.S.D.J.
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 1620
New York, New York 10007

    Re:    *Wultz v. Bank of China Ltd.*, No. 1:11-cv-01266 (SAS) (GWG)

Dear Judge Scheindlin:

We represent Plaintiffs in the above-referenced action. We write in response to the February 23, 2015 letter from defendant Bank of China Ltd. ("BOC") (Dkt. # 820) outlining the grounds upon which BOC plans to move for summary judgment. BOC's proffered grounds do not entitle it to summary judgment, as Plaintiffs will establish more fully through briefing in response to BOC's anticipated motion.[1]

## I. BOC Waived Its Personal Jurisdiction Defense, and in Any Event this Court Does Have Jurisdiction Over BOC.

BOC repeats its previous assertions that it is not subject to this Court's general or specific jurisdiction. As set forth in Plaintiffs' October 31, 2014 letter (Dkt. # 704), BOC waived its personal jurisdiction defense both by failing to timely assert it and by participating in litigation before this Court. *See* Dkt. # 704 at 1–2. BOC's contention that it "took all available steps to preserve its personal jurisdiction objections" is belied by the record. In fact, BOC twice expressly confirmed the opposite: that it was subject to personal jurisdiction in this District. Before Judge Lamberth in the District of Columbia in 2009, BOC represented that it "is subject to the general

---

[1] BOC's final argument seeks dismissal of the non-federal claims in the *Moriah* case. For the reasons stated in the *Moriah* plaintiffs' letter, in which the *Wultz* plaintiffs join on this issue, BOC's argument is premature in light of a pending appeal in the New York Court of Appeals. If the Court of Appeals affirms the First Department, the *Wultz* plaintiffs' non-federal claims could be subject to reinstatement. Since those claims would be decided under a negligence standard, they would be even more likely to survive summary judgment than the ATA claims.

February 28, 2015   Hon. Shira A. Scheindlin   Page 2 of 11

jurisdiction of the courts of New York and California, where it has U.S. branches." Mot. to Dismiss First Am. Compl., at 15 (D.D.C. Dkt. # 15). BOC repeated that confirmation to Your Honor when it stated that "[w]e do not argue that the Court lacks jurisdiction." 3/16/11 Hr'g Tr. at 3:9–17.

Even assuming BOC's express confirmation did not constitute voluntary submission to this Court's jurisdiction, BOC was obliged to raise lack of personal jurisdiction promptly after the Supreme Court's June 2011 decision in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, which set forth the "essentially at home" standard for general jurisdiction that was applied in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), and *Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 135 (2d Cir. 2014). *See* Dkt. # 704 at 2. And, even were BOC correct that the personal jurisdiction arguments it asserts now were not available until the Supreme Court decided *Daimler* over a year ago, on January 14, 2014, BOC still has no explanation for why it did not raise those arguments in this case until *ten months later*, which alone constitutes waiver. *See* 9/22/14 Hr'g Tr. at 24:7–19 ("If you thought *Daimler* was the end of the matter, you should have been in here just screaming saying whoa, whoa. Stop everything, Judge.").[2]

Even absent waiver, this Court has specific jurisdiction over BOC because BOC purposefully availed itself of New York to conduct the very transactions at issue here. BOC received millions of dollars *in New York* for its customers, Said al-Shurafa and his relatives, and did so purposefully and knowingly, ███████████████████████████████████

███████████████████████████████████████████████████████████████

The Second Circuit's decision in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013), establishes that even far less meaningful contacts with New York create specific jurisdiction. BOC claims that here it "only served as an intermediary bank in the transfer process"

---

[2] As Plaintiffs have argued previously (*see* Dkt. # 704 at n. 6), if the Court finds that BOC did not waive its personal jurisdiction defense and orders full briefing on the issue, Plaintiffs should be entitled to take jurisdictional discovery of BOC immediately. Such discovery is necessary to show, among other things, that this Court has general jurisdiction over BOC because BOC has consented to jurisdiction in New York. *See Gucci*, 768 F.3d 122 at n.15.

in New York, but that is clearly sufficient to establish specific jurisdiction under *Licci*, where the Second Circuit held that Lebanese Canadian Bank was subject to personal jurisdiction because it executed "dozens of dollar-denominated wire transfers through its AmEx correspondent account in New York." 732 F.3d at 171.  Here, BOC itself (not another bank) cleared suspect dollar-denominated wire transfers through New York.

### II. Plaintiffs' Claims Do Not Present Non-Justiciable Political Questions.

Plaintiffs' claims do not present any non-justiciable political questions for the simple reason that the political question doctrine does not apply.  BOC argues that "evidentiary non-cooperation" by the governments of Israel ("GOI") and China ("PRC") makes the case subject to dismissal, but cites no authority for this proposition.  Judge Lamberth never held that evidentiary issues implicating foreign countries could make this case non-justiciable; he found that the issue was not ripe.  *See Wultz*, 755 F. Supp. 2d 1, 27 (D.D.C. 2010).  Thus BOC cites only *dicta* (4/4/13 Hr'g Tr. at 16:4–5).  Lack of cooperation from the GOI[3] and PRC is no grounds for dismissing this case.  If it were, BOC's theory would turn vast swaths of the federal docket into political question cases.

The political question doctrine permits dismissal of cases that supplant co-equal branches of government or lack "judicially discoverable and manageable standards."  *Baker v. Carr*, 369 U.S. 186, 217 (1962).  Nothing in *Baker* hints that a foreign government's resistance to discovery creates a political question.[4]  To the contrary, "the Second Circuit has made it clear the [political question] doctrine provides no basis for dismissal of the plaintiffs' complaint; civil ATA suits are expressly authorized by Congress." *Gill v. Arab Bank, PLC,* 893 F. Supp. 2d 474, 520 (E.D.N.Y. 2012) (citing *Klinghoffer v. S.N.C. Achille Lauro,* 937 F.2d 44, 49–50 (2d Cir.1991)).  Plaintiffs are not

---

[3] Moreover, the GOI has maintained it will not block Uzi Shaya's voluntary deposition (although the mechanics of that deposition remain in dispute, *see* Dkt ## 816, 821), and has in fact produced relevant documents in response to a Hague Convention request.

[4] Noncooperation from foreign governments is common to ATA cases.  For example, in *Linde v. Arab Bank, PLC* (E.D.N.Y., 04-cv-2799), the court issued Hague Convention requests to Jordan and the Palestinian Authority, both of which were denied by those governments (04-cv-2799, Dkt#. 447).  The case proceeded to trial nonetheless.

seeking to "supplant a foreign policy decision of the political branches . . . but rather seek[ing] relief under several federal statutes authorizing recovery for specific conduct." *Kaplan v. Cent. Bank of Islamic Republic of Iran,* 961 F. Supp. 2d 185, 192 (D.D.C. 2013) (rejecting political question doctrine in ATA action).

**III. Plaintiffs Will Establish Their ATA Claim.**

BOC indicates that it intends to move for summary judgment on Plaintiffs' Antiterrorism Act ("ATA") claim on the bases that (1) there is no evidence that Said al-Shurafa[5] was an agent of any terrorist organization or was linked to terrorism; (2) Plaintiffs cannot establish the ATA's state of mind element; and (3) there is no proximate causation. Each point raises questions of fact.

**A.     State of Mind Standard Under the ATA.**  The Second Circuit has unambiguously held that civil liability under the ATA requires that a defendant act with knowledge or deliberate indifference. *See Weiss v. Nat'l Westminster Bank PLC,* 768 F.3d 202, 205 (2d Cir. 2014) ("Plaintiffs can fulfill [their] burden by demonstrating either that [Defendant] had actual knowledge that [the accountholder] provided material support to Hamas, or that [Defendant] exhibited deliberate indifference to whether [the accountholder] provided material support to Hamas."). In so holding, the *Weiss* Court cited the Seventh Circuit's decision in another ATA case, and stated that "[a] defendant exhibits deliberate indifference if it 'knows there is a substantial probability that [the accountholder] engages in terrorism but . . . does not care.'" *Weiss*, 768 F.3d at 208 (quoting *Boim v. Holy Land Found. for Relief & Dev*., 549 F.3d 685, 693 (7th Cir. 2008)). *Boim*, which has become a touchstone of ATA jurisprudence, explained that this deliberate indifference standard

---

[5] BOC's letter curiously only references one of the Shurafas, even though three were identified in the Amended Complaint and discovery has uncovered the involvement of several other Shurafas with terrorist organizations generally and in the particular terrorist financing scheme at issue here. While BOC has repeatedly asserted that the only facts that are "relevant" to Summary Judgment are those identified in the Amended Complaint, Plaintiffs believe they can use any facts learned through discovery to oppose BOC's motion and prove their claims, and can include in their 56.1 Statement any facts BOC chooses to ignore in its own Statement. If the Court disagrees, then Plaintiffs request leave to further amend their Complaint to add new facts discovered, prior to summary judgment briefing. Plaintiffs also wish to reserve their right to amend the complaint to add a spoliation claim.

February 28, 2015                    Hon. Shira A. Scheindlin                    Page 5 of 11

hinges on a defendant's willingness to ignore known risks of supporting terrorism: "When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Boim,* 549 F.3d at 693.[6]  As described in further detail below, Plaintiffs will present ample evidence that BOC knew of the risk of terrorist funds flowing through the accounts of Said al-Shurafa and his relatives, but did nothing to reduce or eliminate this risk.  Plaintiffs' state-of-mind evidence is sufficient to create a triable issue of fact especially because at summary judgment in ATA cases courts apply a "'lenient' standard . . . for ruling on the sufficiency of evidence of scienter issues."  *Weiss,* 768 F.3d at 211; *see also In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 693 (2d Cir. 2009) ("We are . . . lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences, because such issues are appropriate for resolution by the trier of fact." (internal quotation marks omitted)).

      **B.**    **Plaintiffs Will Prove Actual Knowledge.**  Plaintiffs will offer evidence of BOC's actual knowledge of the connections between Shurafa and terrorism, based on meetings between officials of the GOI and Chinese officials whereby BOC was put on notice that Shurafa was providing material support to terrorist organizations.  Plaintiffs have already established through BOC's own documents that such meetings occurred.[7]  *See* 7/19/13 Hr'g Tr. at 12:3–5.  BOC appears to no longer deny the meetings, instead now claiming no "records or knowledge" of them.

---

[6] The ATA's civil liability provisions do not explicitly include a *scienter* element, but rather import a mental state requirement from the underlying violation of law.  The Second Circuit recognized this in *Weiss*, holding that "in order to establish entitlement to a civil remedy under 18 U.S.C. § 2333(a) predicated on a violation of § 2339B(a)(1), Plaintiffs were obliged to show that [the Defendant] had actual knowledge that, or exhibited deliberate indifference to whether, [the accountholder] provided material support to a terrorist organization."  *Weiss*, 768 F.3d at 206.
BOC largely ignores the Second Circuit's controlling decision in *Weiss*, and attempts to read a more stringent willful blindness standard into the ATA where none exists.  BOC cites the inapposite decision *Global-Tech Appliances, Inc. v. SEB S.A.* (131 S. Ct. 2060, 2070-71 (2011)), a patent case, for the proposition that "[a] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing."  Applying *Global-Tech* to the ATA would disregard the plain language of *Weiss* applying a deliberate indifference standard to an ATA case against a bank.  Plaintiffs are aware of no case applying *Global-Tech* in the context of 18 U.S.C. § 2333, and BOC has cited none.

[7] The existence of meetings between GOI and Chinese officials during the relevant time period was confirmed when BOC disclosed the minutes of a meeting with Chinese government officials regarding this case.  Plaintiffs expect that BOC's investigation documents, which Judge Gorenstein has recently ordered BOC to produce to Plaintiffs (Dkt. #792), will further corroborate the existence and substance of these meetings and BOC's contemporaneous knowledge of them.

February 28, 2015                Hon. Shira A. Scheindlin                Page 6 of 11

*See* 2/23/15 BOC Ltr. at n. 7.  Plaintiffs also expect to offer evidence on the substance of these meetings through declarations and statements of Israeli officials, including Shlomo Matalon, involved with these meetings.  Other documents in the public record corroborate a pattern of meetings between Chinese and foreign government officials by which BOC was alerted directly that it was being used to facilitate illicit financing linked to Iran.

BOC's attacks on the affidavits of the Wultz family are misplaced.  All statements sworn to by the Wultz family are based on their personal knowledge—including their personal communications with Uzi Shaya and senior Israeli officials, such as then-National Security Advisor Yaakov Amidror, who acknowledged that the conduct alleged in this case took place, but claimed that it had stopped.  To the extent the underlying information contained in those statements may be hearsay, Plaintiffs will establish that hearsay exceptions apply making them admissible at trial, because, *inter alia*, BOC caused the unavailability of witnesses.[8]  Documentary evidence will guarantee the trustworthiness of the statements,[9] which are independently confirmed by statements and notes of Nitsana Darshan-Leitner.[10]  Together, this evidence is more than sufficient to raise a triable issue of fact concerning BOC's actual knowledge and thereby defeat a motion for summary judgment.

      C.      **The Record Evidence Shows that BOC Acted with Deliberate Indifference.**

Even if BOC were deemed to lack actual knowledge, the evidence still demonstrates that BOC

---

[8] Plaintiffs' request for discovery into BOC's efforts to render Uzi Shaya unavailable remain outstanding. Plaintiffs have already presented evidence that BOC and its PRC regulators collaborated on diplomatic efforts to deny the PRC-GOI meetings occurred and to maintain a "consistent front" in this regard.  *See* 7/19/13 Hr'g Tr. at 16:8–12.

[9] At summary judgment, the Court "may consider evidence that would not be admissible if it finds that the evidence can be reduced to a form that would be admissible or usable at trial."  *Bray v. Ingersoll-Rand Co.,* 2015 WL 728515, at *4 (D. Conn. Feb. 19, 2015) (citing *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012)).  Hearsay may be considered for the purpose of summary judgment, "if the statement could be reduced to admissible evidence at trial or reduced to admissible form."  *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1293-94 (11th Cir. 2012).

[10] According to court filings, Ms. Darshan-Leitner has personal knowledge of conversations with Uzi Shaya regarding the details of the PRC-GOI meetings in question; was personally involved in GOI efforts to counter the flow of terrorist funds through BOC, including the efforts of the GOI to foster and support the instant law suits; and has personal knowledge of conversations with numerous GOI officials about the pressure applied by the PRC to prevent Uzi Shaya's testimony.  *See Moriah* Pl. Reply Br. (12-cv-1594, Dkt. # 116).

February 28, 2015            Hon. Shira A. Scheindlin            Page 7 of 11

acted with the requisite *scienter* because BOC exhibited "deliberate indifference" to whether the Shurafas were providing material support for terrorism. *Weiss*, 768 F.3d at 206, 208. Deliberate indifference is established by showing that BOC possessed knowledge that there was a "substantial probability" that the Shurafas were providing material support to a terrorist organization, "but . . . [did] not care." *Weiss*, 768 F.3d at 208 (quoting *Boim*, 549 F.3d at 693); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 428-29 (E.D.N.Y. 2013). BOC is not allowed to "ignore the facts" in its possession and "plead ignorance of the risk" when those facts place it "on notice of a risk." *Strauss*, 925 F. Supp. 2d at 428 (*quoting Boim*, 549 F.3d at 693). The evidence of BOC's deliberate indifference is more than sufficient to create genuine issues of material fact as to whether BOC knowingly provided material support to a terrorist organization in violation of the ATA.

      The uncontroverted evidence shows that at least by 2003, the PRC had established anti-money laundering and counter terrorist financing ("AML/CTF") regulations requiring all banks in China to implement comprehensive AML/CTF compliance programs in order to prevent money laundering or terrorist financing—and that BOC in fact did so. The uncontroverted evidence also shows that, in part as a result of its AML/CTF compliance program, BOC was well aware of a substantial probability that the Shurafas were engaged in providing material support to a terrorist organization. For example:



February 28, 2015         Hon. Shira A. Scheindlin         Page 8 of 11

- 

- BOC noted in its own documents that Said al-Shurafa was under surveillance by the police in China for an extended period of time.

- 

BOC understood the substantial probability that the Shurafas were financing terrorism because the indicia of terrorist financing in the Shurafa accounts were pervasive and obvious. For example:

- The Shurafas were from Gaza, a region known as high risk for terrorist financing.

- Funds transferred by wire into the Shurafas' accounts originated from other high risk countries in the Middle East ▮▮▮▮▮, and were remitted from locations—and in patterns—that were inconsistent with the Shurafas' purported business ▮▮▮▮▮



- ▮▮▮▮▮

- ▮▮▮▮▮

---

[11] BOC's attempt to argue that it could not have known the Shurafas were engaged in providing material support to terrorist organizations because the Shurafas did not appear on any watch lists (2/23/15 BOC Ltr. at 8 n.11) is itself yet another example of deliberate indifference. BOC cannot ignore the information it actually knew concerning the nature of the Shurafas' highly suspect financial activity and then plead ignorance of the corresponding risks by claiming the Shurafas did not "trigger any hits in the Bank's AML/CTF screening system." *Id.* For similar reasons, BOC cannot avoid liability by claiming that it had no responsibility for the Shurafas' financial activity beyond checking against governmental watchlists and reporting to the government. *Id.* at 9 n.12. ▮▮▮▮▮

[12] Plaintiffs also expect to offer expert testimony that will further establish that BOC's conduct amounted to deliberate indifference in light of widely recognized AML/CTF standards and practice.

This and other evidence shows that BOC "did not care" whether the Shurafas were engaged in unlawful activity. Even though BOC was aware of the risk created by the Shurafas' financial activity, BOC did nothing to stop it, time and time again. BOC allowed the Shurafas to continue their same financial activity even after receiving Plaintiffs' January 2008 demand letter and starting its own internal investigation in February and March 2008. In fact, BOC did not close the Shurafas' accounts and stop them from using the bank to provide material support to terrorist organizations until knowledge of BOC's involvement was about to become public ███████████████████ ███████████████████████████.

        **D.**       **The Shurafas Were Agents of Palestinian Islamic Jihad ("PIJ") and Hamas.** It is unsurprising that the financial activities of the Shurafas presented so many obvious, objective "red flags" for money laundering and terrorist financing , since at the time the Shurafas were BOC accountholders they were well known to authorities and in the public record as terrorist agents, operators, facilitators and sympathizers. This is established by ample record evidence that further undermines BOC's claims that the Shurafas were unconnected to terrorism. For example, as confirmed by documents produced by Plaintiffs in this case, Said al-Shurafa's brother, Ahmed al-Shurafa (who was also a BOC accountholder), was arrested and confessed to police in 2005 that he "deserve[d] to be punished" for dealing directly with senior PIJ leadership who sent money to Said al-Shurafa in China. Israeli court documents establish that hundreds of thousands of dollars were wired to ███████████ of Mohammed ██ Shurafa ████████████████ at the direction of senior Hamas leadership, for the purpose of then being sent to Hamas terrorists in Gaza (██████ ████████████████████████████). Shipments of goods from Said al-Shurafa to

---

[13] Plaintiffs anticipate that documents BOC will be compelled to produce in response to pending discovery orders, including over 1,670 fact investigation documents that have been withheld as work product, together with additional testimony from witnesses who still remain to be deposed, will provide further irrefutable evidence that BOC was deliberately indifferent to the risk created by the Shurafas' financial activity. As noted here and elsewhere in this letter, there are numerous fact discovery issues remain to be completed, and full summary judgment briefing should not commence until after the close of fact discovery.

Gaza were held by Israeli authorities because they were destined for an arm of PIJ. Moreover, the depositions of Said and Reem al-Shurafa, which are the subject of a pending letter rogatory from this Court and the United States Department of State to the Kingdom of Belgium, will provide additional evidence of the Shurafas' unambiguous use of their BOC accounts to funnel money to PIJ and Hamas.

**E.     The Evidence Establishes Proximate Causation.** The PIJ has publicly stated that it was responsible for the terrorist attack that killed Daniel Wultz and seriously injured Yekutiel Wultz. The record evidence creates at least a genuine issue of material fact as to whether BOC's provision of banking services was a proximate cause of such PIJ terrorist attacks. Moreover, the facts described above demonstrate BOC was providing banking services to people and entities engaged in terrorist financing and whose transactions bear all sorts of indicia of terrorist financing. One of the reasonably foreseeable, natural consequences of providing banking services to terrorist financiers is loss of human life in connection with acts of international terrorism. "But for" causation is not the standard.[14]

Plaintiffs also intend to rely on expert testimony to prove the connections between PIJ and the particular persons and entities and terrorist attack at issue in this case. In several other recent ATA cases in this Circuit, including *Linde et al. v. Arab Bank*, *PLC*, and *Sokolow et al v. Palestine Liberation Organization et al.*, No. 04-cv-00397 (S.D.N.Y.), district courts have relied on expert reports analyzing bank records and linking the terrorist attacks at issue to specific terrorist groups in assessing proximate causation.

---

[14] Although BOC suggests Plaintiffs must demonstrate "but for" causation, the Second Circuit has never held that the ATA requires Plaintiffs to show that defendant's violation of the law was the "but for" cause of Plaintiffs' injuries. Rather, the Second Circuit has repeatedly stopped short of such a requirement, instead holding that Plaintiffs must prove only that defendant's conduct was the "proximate cause" of Plaintiffs' injuries. This is consistent with several decisions in the Second Circuit, *see, e.g.*, *Linde*, 384 F. Supp. 2d 571, 584-585 (E.D.N.Y. Sept. 2, 2005) ("[T]here is no requirement of a finding that the [terrorist] would not, or could not, have acted but for the assistance of [defendant]."), as well as in other circuits, *see, e.g.*, *Boim v. Holy Land Foundation for Relief and Dev.*, 549 F. 3d 685, 693 (7th Cir. 2008) (en banc) (holding "but for" causation is not required in all tort cases, and facts establishing proximate causation are sufficient in ATA cases).

February 28, 2015	Hon. Shira A. Scheindlin	Page 11 of 11

                      Respectfully yours,

                      */s/ Lee Wolosky*

                      Lee Wolosky

cc: All Counsel (via email)